# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN RE TYCO INTERNATIONAL, LTD., SECURITIES LITIGATION | ) MDL Docket No. 02-1335-B ) This Document Relates To: ) Securities Action, ) C.02-266-B, Williams, et al. v. ) Tyco International, et al. |

### CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, on behalf of themselves and the class they seek to represent, for their Consolidated Class Action Complaint (the ΑComplaint≅), make the following allegations against defendants Tyco International, Ltd. (ΑTyco≅ or the ΑCompany≅), L. Dennis Kozlowski, Mark H. Swartz, Mark A. Belnick, Frank E. Walsh, Jr., Michael A. Ashcroft (the ΑIndividual Defendants≅) (Tyco and the Individual Defendants are collectively referred to as the ΑTyco Defendants≅), and PricewaterhouseCoopers LLP (ΑPwC≅) (Tyco Defendants and PwC are collectively referred to as Αdefendants≅), upon information and belief (except as to allegations specifically pertaining to plaintiffs and their counsel, which are based on personal knowledge) based upon the thorough investigation conducted by and under the supervision of plaintiffs= counsel, which included reviewing and analyzing information and financial data relating to the relevant time period concerning Tyco and obtained from numerous public and proprietary sources (such as LEXIS-NEXIS, Dow Jones and Bloomberg), including, among other things, filings with the Securities and Exchange Commission (the ΑSEC≅), publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead plaintiffs= claims with particularity. Plaintiffs= investigation also included interviewing or consulting with numerous individuals,

including former Tyco employees who worked at the Company during the "Class Period" (December 13, 1999 through June 7, 2002), and are knowledgeable about Tyco=s business and operations and/or the industry and markets in which Tyco operates.  Except as alleged herein, the underlying information relating to defendants= misconduct and the particulars thereof are not available to plaintiffs and the public and lie exclusively within the possession and control of defendants and other insiders, thus preventing plaintiffs from further detailing defendants= misconduct.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Sections 1331 and 1337, Section 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. ' 77v], and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. ' 78aa].

2.      The claims asserted herein arise under Sections 11, 12(a) and 15 of the Securities Act [15 U.S.C. '' 77k, 77l(2) and 77o], Sections 10(b), 14, 20(a) and 20A of the Exchange Act [15 U.S.C. ' 78j(b), 78t(a), and 78t-1], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. ' 240.10b-5].

3.      In its Transfer Order dated August 14, 2002, the Judicial Panel on Multidistrict Litigation transferred this action to this District for coordinated or consolidated pretrial proceedings.

4.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including the mail, the internet, telephone communications and the facilities of national securities exchanges.

2

# PARTIES

## A.    PLAINTIFFS

5.    *Lead Plaintiffs.*  Lead Plaintiffs Plumbers and Pipefitters National Pension Fund,

United Association General Officers Pension Plan, United Association Office Employees Pension Plan

and United Association Local Union Officers & Employees Pension Fund, Teachers Retirement System

of Louisiana, Louisiana State Employees Retirement System, and Voyageur Asset Management

purchased the securities of Tyco at artificially inflated prices during the Class Period, as set forth in the

certifications that are attached hereto in Exhibit A, and were damaged thereby.  The Court has

previously designated these entities to serve as Lead Plaintiffs pursuant to an Order dated November

20, 2002.

6.    *Additional Plaintiffs.*  Numerous additional plaintiffs purchased Tyco securities in the

open market during the Class Period and were damaged thereby.  Certain of these plaintiffs have signed

appropriate certifications under the PSLRA (see Exhibit A), and, if needed, are willing and able to serve

as class representatives.

## B.    TYCO DEFENDANTS

7.    Defendant Tyco is a Bermuda corporation and holds itself out as a diversified

manufacturing and services company.

8.    Defendant L. Dennis Kozlowski was Tyco≈s Chairman and Chief Executive Officer

throughout the Class Period until June 3, 2002.

9.    Defendant Mark H. Swartz was Tyco≈s Executive Vice-President and Chief Financial

Officer during the Class Period.  Before his appointment as CFO, Swartz was Tyco≈s Director of

Mergers and Acquisitions.  Swartz became a Tyco Board member in 2001 and ranked as the highest paid CFO in the United States that year.  According to research firm Equillar Inc., Swartz earned nearly $47 million in compensation in 2001, or nearly $15 million more than the next highest paid CFO, Richard Bressler of Viacom.

10.    Defendant Mark A. Belnick was Tyco=s Executive Vice-President and Chief Corporate Counsel throughout the Class Period until June 12, 2002.

11.    Defendant Frank E. Walsh, Jr. was a director of Tyco throughout the Class Period until February 2002, when he did not stand for re-election to the Board.

12.    Defendant Michael A. Ashcroft was at all relevant times a Tyco director.  Ashcroft became a director of Tyco through Tyco=s acquisition of ADT, a security business purchased by Tyco for $6 billion in 1997.

13.    The Individual Defendants were at all relevant times during the Class Period controlling persons of Tyco within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.  Because of the Individual Defendants= positions with the Company, they had access to undisclosed adverse information about its business, operations, balance sheets, accounting policies, operational trends, financial condition, and present and future business prospects through, among other ways, access to internal corporate documents (including the Company=s operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the board and committees thereof, and through reports and other information provided to them in connection therewith.

4

14.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company=s public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Individual Defendants identified above.  Each of the Individual Defendants, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest level and was privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances and financial condition as alleged herein.  These defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein (including SEC filings, press releases and other publications), were aware of or recklessly disregarded that materially false or misleading statements were being issued regarding the Company, and nonetheless approved or ratified these statements in violation of the federal securities laws.

15.     As officers, directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC, traded on the New York Stock Exchange (ANYSE@), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company=s financial condition and performance, growth, operations, financial statements, business, earnings, management, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company=s publicly-traded securities would be based upon truthful and accurate information.  The Individual

Defendants= misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications concerning Tyco that are complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and the omissions therefrom, and were aware of their materially false and misleading nature. Because of their positions with Tyco, each of the Individual Defendants had access to adverse undisclosed information about Tyco=s business prospects and financial condition and performance as particularized herein, and knew (or recklessly disregarded) that these adverse facts rendered the statements complained of herein materially false and misleading.

17.     The Individual Defendants, because of their positions of control and authority as officers and controlling persons of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports, releases and statements detailed herein and is therefore primarily liable for the representations contained therein.

**The Individual Defendants' Guidance To Securities Analysts**

18.     The Individual Defendants also provided guidance to securities analysts and used analysts as a conduit (particularly through analyst conference calls) to provide materially false and

6

misleading information to the securities markets.  Tyco was followed by securities analysts employed by brokerage firms that throughout the Class Period reported information provided to them by the Individual Defendants and made recommendations concerning the Company=s securities based on the information provided by the Individual Defendants.  Among the securities firms that followed the Company during the Class Period were J.P. Morgan, Deutsche Bank, Alex Brown and UBS Warburg. In writing their reports, analysts reflected information provided by the Individual Defendants and the Individual Defendants' confirmation that information in the analysts= reports did not materially vary from the Individual Defendants= internal knowledge of the Company=s current operations and future prospects.

19.    Prior to and during the Class Period, it was the Company=s frequent practice to have its top officers and key members of its management team, including the Individual Defendants, communicate regularly with securities analysts at the firms identified above (among others) on a regular basis to discuss, among other things, the Company=s financial results, and to provide detailed guidance to these analysts with respect to the Company=s business.  These communications included, but were not limited to, conference calls, meetings, analyst briefings and investor conferences where the Individual Defendants discussed relevant aspects of the Company=s operations and financial prospects on, among others, the following dates: January 18, 2000, April 18, 2000, June 28, 2000, July 19, 2000, October 24, 2000, November 14, 2000, January 17, 2001, March 13, 2001, April 18, 2001, May 30, 2001, July 18, 2001, August 3, 2001, September 11, 2001, October 18, 2001, November 15, 2001, January 15, 2002, January 22, 2002, February 6, 2002, February 13, 2002, February 26, 2002, March 5, 2002, March 12, 2002, March 19, 2002, April, 2, 2002, April 25, 2002, April 30, 2002,

May 16, 2002, and June 7, 2002.  The Individual Defendants knew that by participating in these regular and direct communications with analysts, the Company disseminated information to the investing community, and that investors relied and acted on such information by purchasing and selling the Company=s securities.

20.     Many of the analyst reports issued during the Class Period were remarkably similar or reported substantially the same facts after meetings with the Company.  This confirms that the information contained in analyst reports came from Tyco and the Individual Defendants.

21.     The Individual Defendants engaged in the above-referenced communications with analysts to cause or encourage them to issue favorable reports concerning Tyco, and used these communications to present the operations and prospects of Tyco to the marketplace in a falsely favorable light to artificially inflate the market price of Tyco securities.  Tyco also endorsed the reports of analysts, adopted them as its own, and placed its imprimatur on them as well as on the projections, forecasts, and statements contained therein, as set forth in more detail below.  Despite their duty to do so, the Individual Defendants failed to correct these statements during the Class Period.

22.     The investment community, and in turn investors, relied and acted on the information communicated in these written reports that recommended that investors purchase Tyco securities.  The Individual Defendants manipulated and inflated the market price of Tyco securities by falsely presenting to analysts, through regular meetings, and during both telephonic and written communications, the prospects of the Company, as well as by failing to disclose the true adverse information about the Company that was known only to them.

8

23.     Each of the Individual Defendants is liable as a participant in the fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Tyco securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

C.     **DEFENDANT PRICEWATERHOUSECOOPERS**

24.     Defendant PwC, which is headquartered in New York City, acted as the Company=s purportedly independent outside auditor at all relevant times during the Class Period.  PwC audited Tyco=s materially false and misleading financial statements during the Class Period and issued materially false and misleading opinions on those financial statements.  Additionally, PwC consented to the use of its unqualified opinions on Tyco=s financial statements and in Tyco=s reports and Registration Statements and Prospectuses filed with the SEC and otherwise disseminated to the investing public.

## DEFENDANTS= WRONGFUL COURSE OF CONDUCT

25.     Throughout the Class Period, defendants failed to disclose and falsely denied the falsification of Tyco=s financial reporting, reported acquisition costs, and the purported success of its acquisition strategy.  Defendants also failed to disclose the looting of the Company by its senior executives who were conducting Tyco as a criminal enterprise.  Tyco has admitted that during the Class Period it, among other things:

> (1) failed to disclose that it was engaged in Aa pattern of aggressive accounting which . . . was intended to increase reported earnings above what they would have been if more conservative accounting had been employed@ (Section A below);
> (2) misrepresented that growth was Aorganic,@ and failed to disclose that it engineered financial results through a wide variety of improper accounting procedures, including the widespread use of undocumented journal entries (Section A.1 below);

(3) failed to disclose that senior management Aexerted pressure@ on and Aprovided incentives@ to employees to artificially inflate reported earnings (Sections A.1.b, B.1, B.2, B.3 and B.4 below);

(4) failed to disclose that it paid off executives at companies to be acquired by Tyco to incentivize them to manipulate their financial reporting before the acquisition to create the false appearance of superior earnings for Tyco after the acquisition (Sections A.1.b, below);

(5) failed to disclose Aa number of accounting entries that were incorrect and required correction@ (Section A.1.a below);

(6) failed to disclose a number of material related party transactions, including 1. Aabuse of [Tyco=s] employee relocation loan program@; 2. Aunapproved bonuses@; 3. Acompensation arrangements@; 4. Aperquisites@; and 5. Aself-dealing transactions@ (Sections A.1.b, B below);

(7) failed to disclose that it artificially inflated the Company=s earnings by engaging in AFinancial Engineering@ and the improper manipulation of accounting reserves (Section A.1.d below);

(8) failed to disclose that Tyco=s earnings were inflated as a result of the failure to timely recognize expenses, including an impairment in the value of reported goodwill (Section A.1.e below);

(9) failed to disclose that it improperly included excess Areimbursements@ received by its hiome security business (ADT) in the Company=s earnings rather than recognizing such payments over the life of the contract; Tyco has now admitted that the cumulative effect of the Areimbursements@ recorded in years prior to fiscal 2002 in excess of costs incurred, net of the effect of the appropriate recognition of such payments, totaled approximately $186 million (Section A.1.f below);

(10) failed to disclose contingent liabilities and significant risks and uncertainties (Section A.1.g below);

(11) failed to disclose the effects of Tyco=s numerous (approximately 700) undisclosed acquisitions (Section A.2 below); and

1. failed to disclose that it improperly withheld incriminating responsive documents from the SEC during that agency=s 1999-2000 inquiry into Tyco=s accounting practices (Section A.1.3 below).

A.     **Material Omitted Information Concerning the Falsification of Tyco's Financial Reporting, Reported Acquisition Costs, and the Purported Success of its Acquisition Strategy**

26.     Throughout the Class Period, the Tyco Defendants touted Tyco's financial success, falsely stating that it arose Aorganically@ out of Asynergies@ created by the management strategies that Tyco applied to the companies it acquired.  In fact, Tyco's financial reporting was falsified in myriad ways to create the appearance of financial success through an intentional and undisclosed scheme to inflate financial results, as Tyco has now admitted after the close of the Class Period.  The nature of this scheme was never disclosed to investors during the Class Period.  To the contrary, the Tyco Defendants falsely and repeatedly represented that there was no accounting manipulation at Tyco.  As a result, throughout the Class Period, all of Tyco's periodic reports of earnings and revenues and its financial projections given to investors and securities analysts were materially false and misleading and omitted material information.

27.     As the Company has recently admitted in its Form 8-K filed on December 30, 2002 (the ADecember Report@), during at least the five years preceding defendant Kozlowski=s resignation in June 2002, Tyco pursued a Apattern of aggressive accounting@ that was Aintended@ to Aincrease current earnings above what they would have been if a more conservative accounting approach had been followed.@  The Company has also admitted that there were instances when senior management Aexerted pressure and provided incentives which had the purpose and effect of encouraging unit and segment officers to achieve higher earnings, including in some cases by their choice of accounting treatments.@

28.     The admissions in the December Report were largely based on the findings of Boies

Schiller & Flexner (the "Boies firm"), a law firm retained by Tyco to conduct an internal investigation.

As described in the December Report, the investigation by the Boies firm was limited.  Thus, the

material admissions that Tyco <u>has</u> made in the wake of the investigation represent the proverbial "tip of

the iceberg."  The December Report states that the investigation was principally restricted to "the

integrity of the company's financials and the possible existence of systemic or significant fraud, or other

improper accounting that would materially adversely affect the Company's reported earnings or cash

flow from operations *in 2003 or thereafter*" (emphasis added).  Thus, the Company's past financial

statements were not examined to see whether they were false, and indeed the adjustments that did result

from the investigation were largely recorded in fiscal year 2002, which ended on September 30, 2002.

As Tyco admits: "the Company has not sought to go back and identify every accounting decision and

every corporate act over a multi-year period that was wrong or questionable, or whether there was a

preferable accounting treatment among the alternative accounting treatments available under generally

accepted accounting principles (GAAP)."  Such an examination was deemed "impossible" in the

December Report, which stresses that "documentation was not always available; the documentation that

was available was often dispersed."

29.     The investigation was also limited because of the "Company's past failure to document

many decisions contemporaneously."  Journal entries[1] were apparently used to engineer desired financial

---

[1] Journal entries are records made to change numerical account balances in a company's
accounting system.  Standard internal control practices and procedures require that journal entries
include:  (1) an explanation as to why account balances are being changed; (2) the date of the journal
entry; (3) the identification the preparer of the journal entry; and (4) the identification of  management

results and in many cases to lack any documentation, without any description of the entry, who made it, prepared it, or approved it.

30.     In addition, according to the December Report:

the accounting for fifteen large transactions, the selection of which was made after consultation with the SEC staff, has been reviewed in detail. Of the fifteen, three of the transactions (AMP, Surgical, and Keystone) were accounted for under the pooling of interests method. The remaining twelve (Sherwood, Mallinckrodt, Carlisle Plastics, Thomas & Betts, SSI, Raychem, Central Sprinkler, AFC Cable, Scott Tech, Simplex, Sensormatic, and Wells Fargo) were accounted for under the purchase accounting method.

Although it states that A[d]uring the period 1999-2002, Tyco completed more than 700 acquisitions,@ the December Report considered only 15 of those deals Awhere there was sufficient documentation on the nature of the reserve to reach a conclusion.@

31.     Moreover, at least with respect to the Company=s purchase accounting, the December Report concludes that there was Aa notable lack of documentation supporting the establishment and utilization of reserves and a pattern of aggressive purchase accounting.@

32.     Even as to this circumscribed subset of transactions for which Asufficient documentation@ was available to permit examination, virtually all of the conclusions in the December Report are phrased as follows:  AOn the basis of *information currently available*, the Company *with the concurrence of its auditors* has concluded that the accounting treatment . . .  should not be revised.@ Or:  A*there is not now* sufficient evidence to warrant changing@ the accounting treatment previously given (emphasis added).

_____

who approved the recording of the journal entry.

33.     Indeed, the December Report acknowledges that Athe Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ.@ The December Report also acknowledges that Tyco=s Form 8-K filed on September 17, 2002 (the ASeptember Report@) contained admissions of Aevidence of intentional fraud.@

34.     The December Report admits the existence of pay-offs to executives at companies to be acquired by Tyco, and that the financial reporting of the to-be-acquired companies was manipulated by Tyco in advance of the acquisitions to create the false appearance of superior earnings and management by Tyco after the acquisitions.  Moreover, the December Report concludes that there were Ainstances@ where Tyco=s prior management paid off executives at acquired companies Ato influence the management of an acquisition target into adopting accounting treatments that >over-accrued= expenses prior to an acquisition=s consummation or otherwise exceeded what was permitted by GAAP.@

35.     Despite their limitations, the September and December Reports amply document numerous instances of a previously undisclosed pattern of company-wide accounting fraud.  For example, the December Report states that:

14

in 1999 a controller for one of [Tyco=s] Fire & Security business units prepared and gave a presentation to the subsidiary=s operating managers relating to what was entitled AAcquisition Balance Sheet Opportunities.@ [The controller] urged [the managers] to **Abe aggressive in determining exposures; determine reserves with worst case scenario; have a strong story to tell regarding each reserve; book the reserves on the acquired company=s financial system; use the owner for ideas; improve on your estimates**.@ [The controller] also told [the] audience to **Abe aggressive in determining the reductions of the asset,@** and **Acreate stories to back the reductions**.@ [Emphasis added.]

36.     The December Report also states that one version of the presentation (which has not yet been made available to the public) has a marginal notation adjacent to this comment as follows: **ABe Careful!! B I wouldn=t want this to get out**.@ (emphasis added).  In addition, opposite the comment ASeverance B if immaterial, our existing business B include fringe at high rate,@ there is a handwritten notation that states, **AI would strongly recommend <u>Never</u> to put this in writing**!!@ (Emphasis added).

37.     With respect to Atransitioning the acquired company@ by creating reserves to cover one-time costs, the presentation stated, **Abeing aggressive in our estimates will allow us to be aggressive in the cost we apply**.@ (Emphasis added).  It also stated, **Akeep the reserve descriptions within the accounting rules but stretch the expenditures that go in**.@ (Emphasis added).

38.     A similar document cited in the December Report summarizes a September 18, 1998 Tyco presentation on the US Surgical merger (which document has not yet been made available to the public) that closed on October 1, 1998.  In a section called ASynergies Summary,@ the presentation indicated that with AFinancial Engineering,@ Tyco could recognize $72 million in 1999, $52 million in 2001 and $52 million in 2002.

15

39.     An August 17, 1998 memorandum cited in the December Report (which document has not yet been made available to the public) identified similar means to achieve EBIT (AEarnings Before Interest and Taxes@) goals for US Surgical in the first year after the merger.  The memo lists numerous cost-savings measures, and reaches a Atotal savings before financial engineering@ of $145.4 million.  The memo also suggests $64.6 million in Afinancial engineering@ categories, including plans to Aover-accrue expenses in Q3 before closing,@ and to Aaccrue in advance rebates.@

40.     Another document that has not yet been made available to the public, dated September 10, 1996, discusses ACarlisle Plastics B Financial Engineering and Purchase Accounting.@ The memo and attachments define Afinancial engineering@ as Apre-merger entries@ and Apurchase accounting@ items as Apost-merger entries.@ A ADiscussion Items@ attachment states, Awe=ll book additional >Financial Engineering= reserves in July with the objective of having a break even month.  This way we won=t raise any flags with the Lender reporting.  The balance of the reserves will be booked in August.@ According to the December Report, the equity balance sheet attachment for the Carlisle acquisition contemplates $26,440,000 in Afinancial engineering,@ thereby reducing pre-merger earnings by that amount.  The detailed schedule demonstrates that the overwhelming portion of the financial engineering was to be in the month just before the consummation of the merger.

41.     The December Report also admits:

Tyco=s aggressive accounting in the past was not neutral as to the timing of the recognition of revenues and expenses. The Company, for example, devoted considerably less attention to identifying appropriate accounting adjustments that would reduce reported earnings in the period immediately after an acquisition than it devoted to identifying appropriate accounting adjustments that would increase reported earnings after an acquisition.

16

42.     Moreover, the December Report admits that:

there were instances where prior management appeared to influence the management of an acquisition target into adopting accounting treatments that Aover-accrued@ expenses prior to an acquisition=s consummation or otherwise exceeded what was permitted by GAAP. For example, in the month before the merger, US Surgical accrued $18.7 million for potential legal fees related to on-going patent defenses and other items. The Company later reduced this amount by $18.2 million, in the same period, as a result of discussions with the Company=s external auditors [defendant PwC], because it concluded that the initial accrual did not represent a reasonable estimate of legal fees. As set forth below, in a number of instances the accounting treatment applied to certain transactions in the Company=s reported financials was erroneous.

43.     The Tyco Defendants= scheme to manipulate Tyco=s financial results is confirmed by the Company=s recent announcement that first quarter profit fell 32% in fiscal 2003.  This is in stark contrast to the manipulated financial results released by the Company throughout the Class Period.

44.     Indeed, the Tyco Defendants continue to manipulate Tyco=s income statement. According to a January 21, 2003 article in THE WALL STREET JOURNAL, Tyco Adelayed paying many annual bonuses that were due to be awarded in its fiscal first quarter ended Dec. 31, a move that likely boosted its cash flow in the quarter by a significant sum.@  In fact, Tyco confirmed that $200 million in employee bonuses typically paid in the first quarter were in fact delayed, such that they were not recorded in the first fiscal quarter.

### 1.   Tyco=s Materially False And Misleading
### Financial Statements and Financial Disclosures

45.     During the Class Period, Tyco represented that each of the financial statements it issued to investors was prepared in accordance with GAAP and the rules and regulations of the SEC.  These representations were materially false and misleading because, as Tyco has now admitted, the Tyco Defendants knowingly or recklessly employed numerous deceptive accounting practices over an extended period of time that were intended to artificially increase reported current earnings.

46.     Despite this admission, Tyco baselessly contends that the Tyco Defendants= deliberate and long-standing attempts to inflate the Company=s operating results did not result in a Asignificant or systematic fraud affecting Tyco=s prior financial statements.@  This conclusion is flatly inconsistent with Tyco=s recognition of the following in the December Report and the Company=s fiscal 2002 Form 10-K:  (1) Aa number of *accounting entries that were incorrect and required@* (2) the A*aggressive accounting pursued by prior senior management@* (3) A*breakdowns of internal control* which occurred during fiscal 2002@; (4) A*abuse of our employee relocation loan programs@* (5) A*unapproved bonuses@* (6) A*undisclosed compensation arrangements@* (7) A*unreported perquisites@* (8) A*self-dealing transactions@* (9) A*a lack of* a stated and demonstrable commitment by former senior management to set *appropriate standards of ethics, integrity, accounting, and corporate governance@* and (10) Aother *misuses of corporate trust.@*  (Emphasis added).

47.     In addition to the foregoing, Tyco has also admitted:  (1) instances in which *senior management* Aexerted pressure@ and Aprovided incentives@ to report higher earnings; (2) the recording and manipulation of A*Financial Engineering@ reserves*; (3) instances in which Tyco=s management

18

pressured the management of an acquisition target into adopting accounting treatments that violated

GAAP; and (4) *a "pattern" of "aggressive" accounting over a period of years.*  [Emphasis added].

48.     Plaintiffs= securities litigation against Tyco, as well as media coverage of the Tyco

scandal, have in turn prompted: (1) *investigations by the U.S. Attorney, the SEC, the District*

*Attorney for New York County, and the State of New Hampshire Bureau of Securities*

*Regulation*; (2) the replacement of Tyco=s *entire* Board of Directors; (3) the termination and

*criminal indictment of Tyco=s former Chief Executive Officer, Chief Financial Officer, and*

*Chief Corporate Counsel*; and (4) *the guilty plea of one of Tyco=s former outside directors in*

*New York County in connection with accepting an improper $20 million payment*.  *See*

December Report; 2002 Form 10-K.

49.     The undisputed facts that constitute a pattern of acts of corporate misconduct at the

Company belie Tyco=s current representation that there Awas no significant or systemic fraud affecting

Tyco=s prior financial statements.@

### a.     Tyco=s Admission That It Issued Materially False and Misleading Financial Statements During The Class Period

50.     At all relevant times during the Class Period, each of Tyco=s financial statements was

represented to have been prepared in accordance with GAAP.[2]  These representations were materially

false and misleading because *Tyco=s financial statements artificially and improperly inflated the*

*Company=s operating results and failed to disclose numerous acts of self-dealing, which are*

*currently being prosecuted as violations of U.S. and state criminal laws*.

---

[2] GAAP are those principles recognized by the accounting profession as the conventions, rules

51.     By failing to file financial statements with the SEC that conformed to GAAP (and the rules and regulations of the SEC), the Tyco Defendants repeatedly disseminated financial statements that are Apresumed to be misleading or inaccurate.@[3]  In fact, Tyco=s actual financial performance was materially distorted and its Class Period financial statements were materially false and misleading, as defendants knew or recklessly ignored.

52.     In an apparent attempt to shield itself and defendant PwC from liability, Tyco has also now concluded that:

> *[t]he incorrect accounting entries and treatments are not <u>individually</u> or in the aggregate material to the overall financial statements of Tyco.*  [Emphasis added.]

53.     Contrary to this assertion, the Aincorrect accounting entries and treatment@ are indeed material.  First, Tyco=s restatements have been limited by a lack of documentation and by an internal investigation into the Company=s accounting matters that was Aselected@ in scope.  By the Company=s own admission, these factors Alimited the conclusions that could be drawn concerning individual accounting treatments in any event.@  Second, Tyco=s restatements of its interim 2002 financial statements are admissions, in and of themselves, that those financial statements were materially misstated.  GAAP provides that the retroactive restatement of previously-issued financial statements is appropriate only when those statements were materially misstated when issued.[4]

---

and procedures necessary to define accepted accounting practice at a particular time.

[3] Regulation S-X (17 C.F.R. ' 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

[4] *See generally* Accounting Principles Board (AAPB@) Opinion No. 20, **&&** 13, 38.

54.     In fact, Tyco has admitted that ***during the quarter ended December 31, 2001, Tyco=s pre-tax income was overstated by more than 21%. During the quarter ended March 31, 2002, Tyco understated its reported loss by more 71%***, and ***for the quarter ended June 30, 2002, Tyco=s reported pre-tax <u>income</u> of $150.6 million was restated to a <u>loss</u> of $236.1 million***.

55.     For example, Tyco=s actual net loss for the quarter ended March 31, 2002 was $3.22 per diluted common share, not $0.96 as originally reported.  Accordingly, Tyco=s March 31, 2002 Form 10-Q filed with the SEC, which represented that Ain the opinion of management, such financial statements include all adjustments, consisting only of normal recurring adjustments, necessary to summarize fairly the Company=s financial position and results of operations,@ was materially false and misleading.

56.     Concerning the false financial statements that Tyco issued before fiscal 2002, Tyco=s 2002 Form 10-K disclosed:

> As a result of the Phase 2 Review, the Company identified certain adjustments relating to years preceding fiscal 2002.  Such adjustments were recorded in the first quarter of fiscal 2002, and are discussed further below.
>
> CHARGES RELATING TO PRIOR YEARS RECORDED IN FISCAL 2002--
>
> During the fourth quarter of fiscal 2002, the Company identified various adjustments relating to prior year financial statements.  ***Management concluded <u>the effects of these adjustments</u>, as well as any unrecorded proposed audit adjustments, <u>were not material individually or in the aggregate</u> to the current year or any prior year.  Accordingly, prior year financial statements have not been restated.***  Instead, these adjustments, which aggregate $261.6 million on a pre-tax income basis or $199.7 million on an after-tax income basis, have been recorded effective October 1, 2001.  The nature and amounts of these adjustments are principally as follows: The Company determined the amounts reimbursed from dealers under ADT=s authorized

21

dealer program exceeded the costs actually incurred.  The *cumulative* effect of reimbursements recorded in years prior to fiscal 2002 in excess of costs incurred, net of the effect of the deferred credit, which would have been amortized as described further in Note 1, is $185.9 million.  [Emphasis added.]

57.    Tyco=s conclusion B that the effects of the adjustments in question were not material individually or in the aggregate B is untrue.  For example, $98.8 million of the $185.9 million Aadjustment@ for ADT reimbursements related to fiscal 2001.[5]  During fiscal 2001, Tyco reported that the operating income of its Fire and Security Services segment, after restructuring and other charges, totaled $1,207.7 million.[6]  Accordingly, the operating income of Tyco=s Fire and Security Services segment for fiscal 2001 was overstated by approximately 9%.[7]

58.    An approximately nine percent overstatement of a company=s reported segment=s operating income is, at least individually, a material overstatement.  Nonetheless, Tyco, in violation of GAAP, failed to restate its fiscal 2001 financial statements because its management concluded such overstatement is A*not material __individually__ or in the aggregate* to the current year or any prior year@ (emphasis added).

59.    As the SEC=s Staff Accounting Bulletin (ASAB@) No. 99[8] provides:

---

[5] Tyco=s Fire and Security Services segment includes the results of ADT.

[6] Tyco=s 2002 Form 10-K indicates the reported $1,289.2 million in operating income for its Fire and Security Services Segment excludes restructuring, other unusual, and impairment charges of $81.5 million.  Reducing Tyco=s reported $1,289.2 million in operating income for its Fire and Security Services Segment by the excluded charges yields $1,207.7 million.

[7] The Fire and Security Services segment=s purported operating income for 2001 of $1,207.7 million less the admitted overstatement of $98.8 million totals $1,108.9 million.  $98.8 million divided by $1,108.9 million equals an overstatement of approximately 9%.

[8] 17 C.F.R. Part 211.

Evaluation of materiality requires a registrant and its auditor to consider *all* the relevant circumstances, and the staff believes that there are numerous circumstances in which *misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material*; as stated in the auditing literature:

> As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor≤s attention could have a material effect on the financial statements. Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are -

> $    Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate.

> $    *Whether the misstatement masks a change in earnings or other trends.*

> $    *Whether the misstatement hides a failure to meet analysts≤consensus expectations for the enterprise.*

> $    *Whether the misstatement changes a loss into income or vice versa.*

> $    *Whether the misstatement concerns a segment or other portion of the registrant≤s business that has been identified as playing a significant role in the registrant≤s operations or profitability.*

> $    Whether the misstatement affects the registrant≤s compliance with regulatory requirements.

> $    Whether the misstatement affects the registrant≤s compliance with loan covenants or other contractual requirements.

> $    Whether the misstatement has the effect of increasing management≤s compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.

> $    *Whether the misstatement involves concealment of an unlawful transaction.*

> This is not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement.

[Footnotes deleted, bolded italics added.]

60.     If management=s conduct demonstrates a lack of integrity or candor, that lack of integrity or candor is relevant to an investor and thus material, even if the conduct itself was not financially significant to the company.[9]  Accordingly, the nine percent overstatement of operating income for Tyco=s Fire and Security Services segment is material.

61.     Indeed, **_Tyco has admitted that the Tyco Defendants engaged in numerous Afinancial engineering@ practices that were Aundertaken with the purpose and effect of increasing reported results.@_** In addition, the December Report concluded that A>[d]uring **_at least_** the five years preceding Kozlowski=s resignation, **_Tyco pursued a pattern of aggressive accounting_** that was intended, within the range of accounting permitted by GAAP, to increase current earnings above what they would have been if a more conservative accounting approach had been followed@ (emphasis added).

62.     All these facts belie Tyco=s denials that it engaged in fraud or materially misstated its Class Period financial statements.  Tyco=s position in the December Report that Aaggressive accounting is not necessarily improper accounting@ B  that certain of its accounting practices may have been Aaggressive@ but not improper B is untrue.

---

[9] _See, e.g., SEC v. Jos. Schlitz Brewing Co._, 452 F. Supp. 824, 830 (E.D. Wis. 1978).

63.    Because it urgently needed financing in the face of an imminent cash crunch, Tyco was strongly motivated to minimize reporting of its improper accounting practices prior to and during the Class Period.  According to a November 15, 2002 report on *The Street.com*:

> Tyco (TYC:NYSE) will be glad to bid farewell to this year.  But believe it or not, ***2003 could be even worse for the troubled conglomerate.***
>
> Next year, ***Ed Breen***, the ex-Motorola (MOT:NYSE) executive who recently replaced the disgraced Dennis Kozlowski as CEO, ***must find a way to pay back nearly $12 billion in debt and other obligations that fall due.  If the size of the debt mountain weren≠t problem enough, Breen≠s task is made more arduous by a strict legal provision that could complicate any efforts by Tyco to pledge assets to secure loans from risk-averse lenders.***
> This potential legal thicket is important, because it≠s no exaggeration to say that ***Tyco≠s future now lies in the hands of its banks and bond creditors***.  Tyco≠s cash crunch was eased after it sold its commercial lender CIT (CIT:NYSE) for $4.4 billion in July, and the company has $6.5 billion of cash on its balance sheet.
> Yet even with that cash on hand, the company≠s maturity schedule looks daunting.
>
> \*   \*   \*
>
> But a look at the company≠s demanding debt-repayment schedule suggests Tyco≠s next bout of trouble may come quite a bit sooner.  ***The company must repay nearly $3.9 billion of bank debt that comes due in February [2003], the same month that investors have the right to demand that Tyco repay $2.3 billion of convertible bonds*** Β an obligation Tyco can meet in stock or cash.
>
> ***There could be as much as $1.85 billion of bond debt coming due in the second and third quarters of 2003***, though the actual sum may have been reduced by debt repurchases.  Then, in the fourth quarter, holders of another convertible issue have the right to redeem their securities for $3.6 billion in cash.
>
> At the same time, cash from operations looks anemic.  All those obligations add up to $11.7 billion.  In fiscal 2003 ending next September, Tyco expects $2.5 billion to $3 billion of free cash flow, which is a company-devised measure of cash flow that factors in capital spending but excludes other types of cash outflows.  The company hasn≠t updated its guidance for the last quarter of calendar 2003, though in an August regulatory filing Tyco indicated it expected to bring in cash flow of around $700 million

for that period.  Previous cash flow guidance provided by Tyco has proved to be generous, however.

If Tyco were to pay its February convertible back in stock, its cash obligations would be $9.4 billion, which more or less matches cash flow plus cash in hand.

**Lemon Fresh**

Clearly, that=s too close for comfort.  ***No surprise, then, that Tyco is talking to its banks to gain some financial breathing room.  On a third-quarter earnings conference call in October, Tyco=s Breen said that dealing with the financing issue Acontinues to be our top priority,@and added that he hopes to have a deal with the banks Awell in advance of our February maturities.@***

The market is eager to see details of a bank deal.  AThe clock is ticking, as far as I am concerned,@says Cynthia Werneth, the analyst at the Standard & Poor=s rating agency who covers Tyco.  AI would hope we see something soon.@

*   *   *

***The other important factors in the bank negotiations are the status and findings of the SEC and Manhattan DA investigations of Tyco.***  These may not be completed before February.  If they=re not, ***<u>the threat that the probes will turn up evidence of accounting fraud after February is one more argument for why the banks will be ultracautious when deciding whether to roll over their loans.</u>***

***The company*** has itself appointed experts and lawyers to ***conduct its own internal accounting investigation, <u>and it is probably hoping that if it finds no serious fraud, the banks will be placated</u>.***  However, the banks might doubt the thoroughness of the probe after the third-quarter conference call, when David Boies, the outside lawyer overseeing the probe, said Awe=re obviously not reauditing the company and going through every single accounting issue.@

[Emphasis added].

64.     Whatever Tyco=s motivation for minimizing its Class Period restatements, Tyco=s pattern

of Aaggressive@accounting did in fact violate GAAP.  For example, the Company=s December Report

disclosed that ATyco=s aggressive accounting in the past was not neutral as to the timing of the

recognition of revenues and expenses.@  Indeed, as set forth above, the December Report

26

acknowledges that Athe Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ.@

65.     Tyco has also admitted (in the December Report) that it is unable to make judgments about the appropriateness of accounting treatments because of Athe Company=s past failure to document many decisions contemporaneously,@ and because documentation supporting its transactions is Anot always available@ and is Aoften dispersed.@  These failures of documentation violate the mandate of Section 13 of the Securities Exchange Act of 1934.[10]

66.     Moreover, *the December Report admits the existence of pay-offs to executives at companies to be acquired by Tyco, and that the financial reporting of the to-be-acquired companies was manipulated by Tyco in advance of the acquisition to create the false appearance of superior earnings and management by Tyco after the acquisition.*

---

[10] Section 13 of the Securities Exchange Act of 1934 and the rules thereunder require SEC registrants to make and keep books, records and accounts that accurately and fairly reflect its transactions.

67.    Indeed, in Concepts Statement No. 2, GAAP provides that accounting information is not useful if it is unreliable, and that *reliable accounting information must be verifiable and neutral*.  In addition, in Concepts Statement No. 2, GAAP provides that the convention of conservatism B meaning prudence B is to be applied in financial accounting and reporting.  Similarly, FASB=s Concepts Statement No. 1 states that the role of Afinancial reporting requires it to provide evenhanded, neutral, or unbiased information.@

68.    In addition, GAAP provides that:

a.    financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, & 34);

b.    financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, & 40);

c.    financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, & 50);

d.    financial reporting should provide information about an enterprise=s financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect

investors= expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, **&** 42);

      e.      financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, **&&** 58-59);

      f.      financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, **&** 79); and

      g.      financial reporting should be conservative and ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, **&&** 95, 97).

      69.      Accordingly, Tyco=s Apattern@ of Aaggressive@ accounting and its employment of numerous Afinancial engineering@ practices Aundertaken with the purpose and effect of increasing reported results@ caused Tyco to issue Class Period financial statements that were neither useful, complete, neutral, conservative, nor unbiased.  Accordingly, Tyco has admitted, albeit backhandedly, that it violated fundamental precepts of GAAP,[11] and that its Aaggressive@ accounting practices rendered its Class Period financial statements materially false and misleading.

---

[11] In Concepts Statement No. 2, GAAP defines neutrality as the Aabsence in reported information of bias intended to attain a predetermined result or to induce a particular mode of behavior.  Neutrality is a necessary and important characteristic of accounting information.  FASB=s Statement of Financial Accounting Standards (ASFAS@) No. 141.

29

**b.      Tyco=s Improper Failure To Disclose
Material Related Party Transactions**

70.      In FASB=s SFAS No. 57, GAAP provides guidance on disclosures of transactions

between related parties.[12]  SFAS No. 57 states that an Aenterprise=s financial statements may not be

complete without additional explanations of and information about related party transactions and thus

may not be reliable.@  Accordingly, *SFAS No. 57 requires that financial statements identify*

*material related party transactions and disclose (a) the nature of the relationship(s), (b) a*

*description of the transaction, (c) the dollar amount of transactions for each period for which*

*an income statement is presented, and (d) the amounts due from or to the related parties as of*

*the date of each balance sheet.*[13]

(Emphasis added).

71.      In addition, as noted in the SEC=s SAB Topic 4E, GAAP provides that

in some cases, the significance of an amount may be independent of the amount
involved.  For example, *amounts due to and from officers and directors, because*
*of their special nature and origin, ought generally to be set forth separately [in*
*financial statements] even though the dollar amounts involved are relatively*
*small.*

---

[12] Pursuant to SFAS No. 57, related party transactions include transactions between an
enterprise and its Directors of the Board, CEO, COO, Vice Presidents in charge of principal business
functions, and other persons who perform similar policy-making functions.

[13] Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the
ordinary course is necessary for users to understand financial statements.

72.     As Tyco has now admitted, before and during the Class Period, it engaged in numerous material related party and self-dealing transactions that were not disclosed in its financial statements in violation of GAAP, including at least the following (during the Class Period):

### i.     Undisclosed Extraordinary Related Party Compensation

73.     On June 17, 2002, Tyco filed a complaint in the United States District Court for the Southern District of New York alleging that ***defendant Kozlowski approved a $20 million Afee@ that was paid to Frank Walsh***, who served as a member of Tyco=s Board of Directors from 1997 through February 2002.  This fee, $10 million of which went to Walsh with the balance to a charity of which he was a trustee, purportedly compensated Walsh in connection with Tyco=s acquisition of CIT.

74.     In September 2000, ***defendant Kozlowski caused Tyco to pay Aspecial@ bonuses*** purportedly related to the successful completion of the TyCom initial public offering.  These bonuses ***approximated $96 million***, of which defendants Kozlowski and Swartz received approximately $33 million and $17 million respectively.  In addition, defendant Belnick received $1 million as a special bonus, purportedly relating to the TyCom deal.

75.     In connection with the above arrangement, a Tyco Vice President of Finance prepared a memorandum signed by defendant Swartz that explained:

> The sale of 14% of TyCom generated a one-time gain of approximately $1.76 billion on the books of Tyco. We have decided to award special bonuses to various Tyco employees for their efforts over the past few years in enhancing the value of TyCom and thereby contributing to this gain.  Selected employees will receive their bonus in the form of cash, forgiveness of relocation loans, and/or Tyco Common shares under Tyco=s restricted stock program.

76.     As a result of this accounting treatment, Tyco=s September Report admitted: A[T]his *extraordinary $100 million charge* was allocated to several different accounts and appears in the general ledger and financial statements@ (emphasis added).

77.     In addition, according to the September Report, Tyco purchased a cooperative apartment in New York City in 1998 for approximately $5.5 million and thereafter made improvements to the apartment.  In May 2000, *defendant Kozlowski purchased the property from Tyco at its depreciated book value of approximately $7 million*, rather than its then current market value.

78.     In July 2000, *Tyco purchased a Rye, New Hampshire property* worth $1.5 million from *defendant Kozlowski for approximately $4.5 million.  In addition, defendant Kozlowski also used millions of dollars of Company funds to pay for, among other things*:  (1) a $700,000 investment; (2) an Aextravagant@ $1 million birthday celebration for his wife in Sardinia; (3) over $1 million in undocumented business expenses; and (4) *at least $43 million in personal donations or for his personal benefit.*

### ii.     Undisclosed Related Party Loans

79.     The Tyco Defendants also violated GAAP by failing to disclose in the Company=s financial statements a number of related party loans.  As set forth below in Sections B.1 and B.4, these loans were either repaid by the Individual Defendants without interest, repaid through unauthorized Aforgiveness,@ or simply reclassified to other loan accounts that the Individual Defendants had with the Company.

80.     For example, in violation of the terms of Tyco=s relocation loan program, *defendant Kozlowski Aborrowed@ approximately $29.7 million from the Company to purchase land and*

32

*construct a home in Boca Raton, Florida* during the years 1997 to 2000.  In addition, ***defendant***

***Kozlowski improperly Aborrowed@approximately $7 million to purchase a cooperative***

***apartment in New York City*** in 2000.

81.     Similarly, ***defendant Swartz Aborrowed@approximately $20.1 million from Tyco***

in violation of the Company=s relocation loan program purportedly to purchase property in Boca Raton,

Florida during the period 1997-2000.

82.     Defendant ***Belnick Aborrowed@approximately $4.2 million from Tyco*** during the

period September 1998 through May 2001 for the purchase and improvement of a cooperative

apartment in New York City.  From 2001 through March 2002, ***defendant Belnick Aborrowed@an***

***additional $10.4 million from Tyco to purchase land and build a home in Park City, Utah.***

Defendant Belnick then charged Tyco $1,600 per month for his home office located in that house.

83.     In 1997, the ***President of Tyco=s Fire and Security Services division Aborrowed@***

***a total of $5 million from Tyco*** to purchase property in Boca Raton, Florida.  ***The former***

***President of Tyco Engineered Products and Services and, later, the Plastics division,***

***Aborrowed@$1,750,000 from Tyco, and a former President and Chief Executive Officer of***

***TyCom borrowed $5,000,000 from Tyco in 2000.***

84.     In apparent violation of the terms of Tyco=s Key Employee Loan (AKEL@) Program,

***defendant Kozlowski Aborrowed@over $55.9 million from Tyco in 1999.***  As of June 30, 2002,

defendant Kozlowski owed Tyco approximately $43.8 million, plus accrued interest, for amounts

borrowed under Tyco=s KEL Program.

85. Similarly, *defendant Swartz=s total principal outstanding balance under the KEL program as of July 18, 2002 was approximately $2.8 million, plus accrued interest.* In addition, *defendant Belnick Aborrowed@a total of $8.6 million under the KEL program, and other Tyco Executive Officers Aborrowed@more than $6 million* under the KEL program.

86. The Tyco Defendants knew that, in gross violation of GAAP, these material related party transactions (to which the Company has now admitted) were not disclosed in Tyco=s financial statements during the Class Period. The Tyco Defendants also knew that, by failing to do so, the Company=s financial statements during the Class Period violated GAAP and were materially false and misleading.

**c. Tyco=s Improper Accounting For
Uncollected Related Party Receivables**

87. In furtherance of its scheme to misrepresent the Company's operating results, Tyco has compounded its false and misleading accounting and reporting of its related party receivables.

88. GAAP requires that financial statements account for existing uncertainties as to probable losses. Such loss contingencies should be recognized and reported as a charge to income when: information existing at the date of the financial statements indicates that it is probable (*e.g.*, a likely chance) that an asset has been impaired; and the amount of such loss can be reasonably estimated. SFAS No. 5, **&** 8.

89. As noted herein, *Tyco's receivables from, at least, defendants Kozlowski, Belnick and Swartz total in excess of $65 million.* These defendants are now the subjects of numerous criminal and civil actions. Accordingly, it is "probable," as contemplated under GAAP, that Tyco's

34

receivables from, at least, such defendants will go uncollected.  Nonetheless, Tyco has not reported a

charge for such uncollectible receivables pursuant to GAAP.  In this way, Tyco continues to manipulate

its accounting reserves (see below) and its reported operating results remain materially inflated.

90.    Moreover, GAAP, in the SEC's SAB Topic 4G requires that notes and receivables

from a company's affiliates should be reported as a reduction of stockholders' equity.  In further

violation of GAAP and the SEC's accounting rules and regulations, Tyco has not reported its

"receivables" from its affiliates as a reduction of the Company's stockholder's equity.

        **d.**      **Tyco's False and Misleading Accounting for Acquired
Companies and Improper Manipulation of Accounting Reserves**

91.    As noted above, the Tyco Defendants knew or recklessly ignored that they caused

certain of the companies acquired by Tyco to engage in deceptive accounting practices before the

closing of an acquisition so that the financial performance of these companies would compare favorably

after the acquisition.  Among other things, these acquired entities overstated accounting reserves to

show more favorable financial metrics in quarters after Tyco's acquisition.

92.    For example, on March 13, 2001, Tyco announced that it had entered into a definitive

agreement to acquire CIT.  According to a senior economist that worked for CIT, at or around that

time, the Company sent Brad McGee, who was Executive Vice President and Chief Strategy Officer at

Tyco, as well as defendant Kozlowski=s Aright hand man,@ to CIT=s offices in Livingston, New Jersey to,

according to Kozlowski, Adevelop synergies@ and help Aboost business.@  In reality, according to the

CIT senior economist, McGee was there to Aprepare for the acquisition.@

35

93.     According to the witness, although Mr. McGee (with the assistance of another Tyco employee) was supposed to assist with the transition and report to Al Gumper (CIT=s CEO), McGee began dictating important business decisions for CIT.  In fact, according to the witness, what had previously been a mild-tempered and quiet executive staff, quickly changed upon McGee=s arrival. Screaming matches between McGee and CIT=s executives were common.  According to the CIT senior economist, A[t]here were some acrimonious issues there.  Lots of shouting and screaming.  A lot of screaming at each other, and it was tense and bad on executive row.  McGee was de facto dictating and running the company.@

94.     On January 7, 2002, THE WALL STREET JOURNAL=s AHeard On The Street@ column reported that some investors were critical of  Aa series of charges by@ CIT immediately before the acquisition that Adepressed CIT=s earnings but didn=t show up on Tyco=s books.@ As a result, the JOURNAL reported, ACIT=s results surged in the first month after Tyco took control.@ Specifically, THE WALL STREET JOURNAL reported that during April and May of 2001 CIT posted a $148 million provision for credit loss resulting in a net loss of $78.8 million.  In June 2001, after being absorbed by Tyco, CIT posted net profits of $71.2 million, which added 1.5 cents per share to Tyco's third quarter results, and substantially contributed to Tyco=s beating analysts= expectations by $0.03 per share.

95.     Albert J. Meyer, an analyst working for David W. Tice & Associates, explained the highly suspicious nature of the Tyco Defendants= accounting treatment with respect to CIT in an interview on February 25, 2002 with *BusinessWeek Online* (ABehind Tyco=s Accounting Alchemy: The CIT acquisition offers new insight into how the company produced huge pop up profits@):

36

*A*This is one of the most startling examples of financial engineering you can hope to find@ . . .  Several things look fishy about that $150 million turnabout, Tice=s Meyer maintains.  **To start with, in that April-May [2001] period, CIT took a massive $148.1 million A**provision for credit losses.@ **That was well over twice the $68.3 million provision CIT took in the entire first quarter.**

[Emphasis added].

96.    The same article reported that:

At the same time [that CIT appeared to achieve a $150 million swing in profit after the merger], CIT booked a $54 million charge for acquisition-related costs. . . .  Jack Ciesielski, publisher of the <u>Accounting Observer</u>, notes that CIT also adopted Aa new basis of accounting@ on June 2 [2001], allowing Tyco to Apush down@ deal costs to CIT.  AThat [shifts] some of Tyco=s closing transactions into the CIT financials, making them appear as if they were CIT=s own,@ he says.

\*   \*   \*

*[T]he bottom-line impact is indisputable: The huge surge in charges taken by CIT just before the deal closed B combined with the drop in A*other revenue@ *B helped produce a noticeable jump in CIT earnings just after the deal closed. Indeed, CIT was the major reason Tyco reported a 34% increase in per-share earnings for the quarter ending September 30 [2001]* . . . .

[Emphasis added].

97.    The February 25, 2002 *BusinessWeek Online* article quoted Mr. McGee=s admission that ACIT made downward >adjustments= to income totaling $221.6 million last May, just before the [CIT] deal closed.@  The article also stated that AMcGee concedes [that] the provision for credit losses and the acquisition charge caused a $143.5 million spike in CIT=s costs in April and May [2001].@

98.    Furthermore, the *BusinessWeek Online* article reported that Tyco=s financial statements for fiscal 2001 revealed that, in CIT=s first four months under Tyco=s umbrella B from June 2 to September 30, 2001 B CIT generated $252.5 million in net income, <u>more than triple</u> the $81.3 million

37

CIT earned in the last four months as an independent public company (from January 1, 2002 to June 1, 2002).

99.     Similarly, on June 12, 2002 THE NEW YORK DAILY NEWS reported that the SEC was again looking into Tyco's accounting for acquisitions:

100.    The original inquiry got its start in 1999 after a Dallas investment manager began warning clients that cash flow from Tyco acquisitions appeared inflated.

101.    One theory was that Tyco was aggressively undervaluing the assets of acquisition targets before the new companies joined Tyco's balance sheet.

102.    The practice, detractors said, allowed Tyco to build a pool of assets from which it could then unlock value at a later point.

> Though the SEC gave Tyco a clean bill of health two years ago, ***at least one New York businessman with close ties to Simplex Time Recorder, a December 2000 Tyco acquisition, told the Daily News he witnessed such dealings first-hand.***
>
> ***"I think it's fair and accurate to say they made [Simplex] writedowns on the value of their receivables to a level that, if it didn't break the law, certainly bordered on breaking the law," the businessman said.***

[Emphasis added].

103.    Tyco has now admitted that the Tyco Defendants engaged in the above-noted accounting manipulations throughout the Class Period so that the Company could report favorable pre- to post-acquisition comparisons and mislead investors about Tyco management's ability to generate better returns from acquired entities than the previous management of such entities.

104.    For example, Tyco has now admitted in its December Report:

1)  [A] June 19, 1998 letter from the Sigma Chief Financial Officer was identified in which *the Sigma CFO indicated that he was Aprepared to delay shipment of certain product until early July@as requested by Tyco and, as a result of which, Sigma would not achieve its anticipated revenue minimum* established in the June 1, 1998 Merger Agreement.  *The Sigma CFO asked Tyco to confirm that the resulting failure of Sigma to meet the quarterly revenue minimum established in the Merger Agreement was Aacceptable to Tyco* and within the spirit of the Definitive Agreement.@ The Sigma CFO=s June 19 letter was faxed to Tyco the same day and, later that day, faxed from the recipient to others within Tyco.  [Emphasis added.]

2)  Similarly, Tyco=s acquisition of Raychem was announced May 19, 1999 and consummated August 12, 1999.  *Internal Tyco documents raise issues whether actions taken by Raychem, even if consistent with GAAP, artificially reduced revenue or increased expenses in the quarter immediately prior to the consummation of the acquisition, and artificially inflated earnings and cash flow in subsequent quarters.*  These actions included *directions* from Raychem management *to hold back shipments and pay all bills received whether due or not, prior to the consummation of the acquisition. These documents fit the pattern discussed above of the Company=s aggressive use of numerous accounting opportunities where available to enhance earnings in the first few quarters after companies were acquired, compared to the period just before acquisition.*  [Emphasis added.]

105.  Indeed, on September 30, 2002, THE WALL STREET JOURNAL reported that the SEC and the Manhattan District Attorney's Office were investigating whether a secret $40 million payment made by Tyco to settle a 2000 lawsuit represented a pay-off to hide incriminating documents that detailed the ways Tyco would help U.S. Surgical slow its growth after Tyco agreed to acquire that company in the months before the purchase was completed.

106.  Moreover, Tyco has also admitted in the December Report that "*there were instances where prior management appeared to influence the management of an acquisition target into adopting accounting treatments that* >over-accrued= expenses prior to an acquisition=s

39

consummation or otherwise *exceeded what was permitted by GAAP.@* In fact, among other things, Tyco caused acquired entities to record significant accounting reserves for:  (1) litigation and other accruals recorded in purchase accounting, some of which were subsequently reversed; (2) exit costs, which included amounts that did not qualify as exit costs; and (3) *matters not reserved previously by the acquired entity* (including warranty, environmental accruals).

107.    For example, Tyco has admitted in its December Report:

1)      AWith respect to the purchase accounting and pooling transactions examined, *there were instances in which the pre-acquisition earnings of an acquired entity for the period immediately preceding the consummation of its acquisition by Tyco were significantly lower than the entity=s earnings in prior periods. The decrease in reported earnings in the period immediately preceding the consummation of an acquisition*, which decreases were for the most part due to non-recurring charges, *raise the issue as to whether the acquired entity=s pre-merger financials had been improperly manipulated in order to increase reported earnings subsequent to the consummation of the acquisition*.@ [Emphasis added.]

2)      AFor example, in the month before the merger, US Surgical accrued $18.7 million for potential legal fees related to on-going patent defenses and other items. The Company later reduced this amount by $18.2 million, in the same period, as a result of discussions with the Company=s external auditors, because it concluded that *the initial accrual did not represent a reasonable estimate of legal fees.@* [Emphasis added.]

3)      AAnother document dated September 10, 1996 discusses >Carlisle Plastics B Financial Engineering and Purchase Accounting.= **The memo and attachments define >financial engineering= as >pre-merger entries=@** and >purchase accounting= items as >post-merger entries.= A >Discussion Items= attachment states *>we=ll book additional >Financial Engineering= reserves in July with the objective of having a break even month. This way we won=t raise any flags with the Lender reporting.  The balance of the reserves will be booked in August.=  The equity balance sheet attachment for the Carlisle acquisition contemplates $26,440,000 in financial engineering, thereby reducing pre-merger earnings by that amount.* The detailed schedule demonstrates that the overwhelming portion of the financial

engineering will be in the month just prior to the consummation of the merger.@ [Emphasis added].

4)      AA September 9, 1998 memo stated that *a manager >started putting pressure=on Surgical's former CFO and presented a >plan= for increasing earnings*. [Emphasis added].

5)      AA similar document summarizes a September 18, 1998 Tyco presentation on the US Surgical (>Surgical=) merger which closed October 1, 1998.  The presentation in its >Synergies Summary,= indicated that *Tyco could recognize $72 million from >Financial Engineering= in 1999 and $52 million in the each of the following two years.*@  [Emphasis added].

6)      AAn August 17, 1998 memorandum similarly identified means to achieve EBIT goals for Surgical in the first year after the merger. The memo lists numerous cost-savings measures, and reaches a >total savings before financial engineering= of $145.4 million. The memo also suggests *$64.6 million in >financial engineering= categories, including plans to >over-accrue expenses in Q3 before closing= and >accrue in advance rebates.=*@ [Emphasis added].

108.    The manipulation of accounting reserves employed by the Tyco Defendants in accounting for acquisitions is one that the SEC specifically has identified as improper.  For example, the SEC's SAB No. 100, issued in 1999, addresses asset reserves and liabilities associated with acquisitions.   SAB No. 100 provides:

. . . the staff believes that purchase price adjustments necessary to record liabilities and loss accruals at fair value typically are required, while *merely adding an additional "cushion" of 10 or 20 or 30 percent to such account balances is not appropriate*.  [Emphasis added.]

109.    In fact, Tyco has now admitted in its Form 10-K for fiscal 2002 that it has "identified several adjustments" that defendant PwC proposed to make during its year-end audits but which Tyco never recorded.  For example, prior to fiscal 2000, PwC identified and proposed adjustments to Tyco's financial statements for improper "adjustments" to Tyco's acquisition reserves that overstated Tyco's

reported income by a net amount of $22.7 million.  In fiscal 2001, PwC identified and proposed adjustments to Tyco's financial statements for improper "adjustments" to Tyco's acquisition reserves that overstated Tyco's reported income by a  net amount of $26.4 million.

110.    In addition to Tyco's improper manipulation of reserves when accounting for acquired entities, Tyco otherwise manipulated accounting reserves in order to inflate its reported operating results.

111.    For example, on September 30, 2002, THE WALL STREET JOURNAL reported:

Typically, accounting experts say, employee bonuses are accounted for as part of general and administrative expenses.  But Tyco's [report on its internal investigation filed with the SEC] says the TyCom bonus was booked in three different accounts totaling $97.4 million B a slightly larger figure than the bonus payments, which Tyco didn't explain.  About $44.6 million of the total was booked as part of the TyCom offering expense, which some accounting experts said was incorrect but at least resulted in a similar bottom-line effect as the proper accounting treatment.

The other $52.8 million, however, doesn't appear to have been counted as an expense at all, according to three accounting experts who reviewed Tyco's filing.  ***Instead, Tyco seems to have hidden the sum in two different reserve accounts that had been previously established on the balance sheet for unrelated purposes.***  The majority of the money, $41 million, was booked against "Accrued Federal Income Tax," the filing says, in effect reducing sums that Tyco had put aside to pay its federal corporate taxes.

***"This looks like blatant misstatement of both the income statement and the balance sheet," said Charles Mulford, an accounting professor at Georgia Institute of Technology in Atlanta, who reviewed the Tyco report but isn't involved in the case.  Based on the filing, Mr. Mulford said the maneuver appears to have improperly inflated Tyco's pretax income by $52.8 million in the period, the fourth quarter of fiscal 2000.***  For that quarter, Tyco reported net income of $1.1 billion before the TyCom gain.

***Mr. Mulford called dipping into the income-tax kitty particularly "egregious,"*** and said "it would be very surprising if it wasn't picked up by the auditors."

[Emphasis added].

112.     Indeed, GAAP expressly prohibits the manipulation of accounting reserves described herein.  Tyco has admitted in the December Report the existence of accounting reserve reversals that were ***"timed on a number of occasions for the purpose of making EBIT targets."***

113.     In SFAS No. 5, GAAP provides that companies may establish reserves for identifiable, probable and estimable risks, and precludes the use of reserves for general or unknown business risks, including excess reserves, because they do not meet the accrual requirements of SFAS No. 5.  Any reserves that do not meet the accrual requirements of SFAS No. 5, when identified, should be immediately released into income.  A systematic or timed release of excess reserves into income violates GAAP.  *See e.g., In re Rush*, SEC Exchange Act of 1934 Release No. 44501 (July 2, 2001); *SEC v Dunlap*, No. 01-8437-Civ, SEC Litig. Release No. 17710 (Sept. 4, 2002); *Xerox Settles SEC Enforcement Action*, SEC Press Release No. 2002-52 (Apr. 11, 2002).

114.     Moreover, Tyco has stated in the December Report that the above-noted admissions have been circumscribed by a lack of documentation.

115.     During the Class Period, the Tyco Defendants also falsely stated that the Company had and would continue to acquire other companies that would be immediately accretive to the Company=s free cash flow (the net amount of cash generated from operating activities, less capital expenditures, less dividends paid) and earnings and, consequently, that the Company=s healthy cash flow position would not require it to tap into its high-interest emergency credit facilities.  This disclosure was materially false and misleading as Tyco failed to disclose that its reported cash flow was manipulated because it required companies about to be acquired to accelerate payments on outstanding obligations prior to the

43

acquisition, as noted herein in detail.  This undisclosed practice had the effect of increasing Tyco's

reported cash flow after the acquisition.

116.    In fact, Tyco has now admitted that it "encouraged" companies it was acquiring to

accelerate vendor payments, which increased Tyco's operating cash flow after the acquisition.  For

example, on February 28, 2002, THE NEW YORK TIMES reported:

> **Tyco International said yesterday that it had <u>encouraged</u> Raychem, an
> electronic components maker that it bought in 1999, to prepay some expenses
> before the acquisition was completed.**
>
> The disclosure about Raychem came in response to questions about a letter sent by a
> former Raychem employee to the Securities and Exchange Commission.  The letter
> outlined payments that Raychem made at Tyco's behest before the acquisition closed.
> [Emphasis added].

117.    In furtherance of its scheme to mislead investors, the Tyco Defendants actually told

investors to focus on its misleading reporting of cash flow in measuring the Company's financial

performance.  For example, on March 5, 2002, THE WALL STREET JOURNAL reported that:

> Tyco repeatedly has pointed to what it characterizes as its strong Afree cash flow@. . . .
> Tyco considers the [free cash flow] measure so critical that its **chief financial officer,
> Mark Swartz, told investors last month to Aforget reported earnings@and
> instead focus on cash-flow generation as a percentage of net income, to "show
> that our quality of earnings is good."** [Emphasis added].

118.    Thus, in furtherance of their scheme to defraud unsuspecting investors while shamelessly

enriching themselves, and in a gross violation of GAAP, the Individual Defendants engaged throughout

the Class Period in a practice of manipulating the accounting for its acquisitions and accounting reserves

in a deliberate attempt to materially overstate Tyco's operating results and misrepresent the

performance, ability and integrity of Tyco's management.

**e.    Tyco=s Improper Failure To Timely Record Impaired Goodwill**

119.    Tyco=s Class Period financial statements were also materially false and misleading

because the Company failed to timely record a loss due to an impairment in the value of its CIT

subsidiary, as it has now admitted.  Thus, in yet another way, Tyco=s Class Period financial statements

were not presented in conformity with GAAP, the rules and regulations of the SEC, and deceived

investors about the Company=s true financial condition and operating performance.

120.    As noted in Tyco=s financial statements for the year ended September 30, 2002:

> During the quarter ended March 31, 2002, Tyco experienced disruptions to its business
> surrounding its announced break-up plan, a downgrade in its credit ratings, and a
> significant decline in its market capitalization.  During this same time period, CIT also
> experienced credit downgrades and a disruption to its historical funding base.  Further,
> market-based information used in connection with the Company=s preliminary
> consideration of the proposed IPO of CIT indicated that CIT=s book value exceeded its
> estimated fair value as of March 31, 2002.  As a result, ***the Company performed a
> SFAS 142 first step*** *impairment analysis as of March 31, 2002 and concluded
> that an impairment charge was warranted at that time.*  [Emphasis added.]

121.    In furtherance of its on-going scheme to inflate it operating results, Tyco improperly

failed to record such impairment in conformity with GAAP.  *In fact, when Tyco filed its financial*

*statements for the quarter ended March 31, 2002 with the SEC on Form 10-Q on or about*

*May 15, 2002, such financial statements did* **not** *recognize an impairment in the value of*

*CIT=s goodwill.*  To the contrary, Tyco=s March 31, 2002 Form 10-Q disclosed:

> The Company periodically reviews and evaluates its goodwill and other intangible assets
> for potential impairment. Effective October 1, 2001, the beginning of Tyco=s fiscal year
> 2002, the Company adopted SFAS No. 142, AGoodwill and Other Intangible Assets,@
> under which goodwill is no longer amortized but instead is assessed for impairment at
> least annually.  Under the transition provisions of SFAS No. 142, there was no goodwill
> impairment at October 1, 2001.  ***Updated valuations were completed as of March***

> **31, 2002 for our Tyco Telecommunications (formerly TyCom) reporting unit and Tyco Capital,[14] which resulted in no impairment of goodwill at that date.**

[Emphasis and footnote added].

122.    Tyco=s March 31, 2002 financial statements further disclosed:

> However, during the quarter ended March 31, 2002, circumstances developed that could potentially impair the value of goodwill with respect to our Tyco Telecommunications reporting unit and Tyco Capital.  Updated valuations were completed as of March 31, 2002, which resulted in no impairment of goodwill at that date.

123.    Shortly after defendant Kozlowski resigned, however, Tyco filed an amendment to its March 31, 2002 Form 10-Q that included its restated financial statements for the quarter then ended.

124.    Tyco=s restated March 31, 2002 financial statements filed with the SEC on or about June 12, 2002 reported a *$4.5 BILLION* impairment in the value of CIT=s goodwill.  *The effect of this charge eliminated almost 40% of the retained earnings Tyco accumulated __since its inception__*.  In its originally filed financial statements for the quarter ended March 31, 2002, Tyco reported *accumulated earnings* of $11.8 billion.  This amount, which *generally represents the total net income, less dividends, over the life of a corporation* was inflated, as Tyco has admitted, by $4.5 billion, or approximately 38%.

125.    In addition, Tyco has now admitted that it improperly failed to timely record an impairment in the value of goodwill at Tyco Telecommunications and Tyco Infrastructure Services during the quarter ended June 30, 2002.  As a result, *Tyco=s reported pre-tax earnings of*

---

[14] Tyco Capital includes CIT and all of its subsidiaries.

***approximately $151 million during the quarter ended June 30, 2002 were overstated by***

***approximately $387 million.***

126.     Here again, Tyco has admitted that its previously issued Class Period financial

statements were materially false and misleading to the detriment of unsuspecting investors when they

were issued.

> **f.     Tyco=s Improper Recognition Of Excess
>         Reimbursements From Independent Dealers**

127.     Tyco=s ADT subsidiary routinely purchases residential security monitoring contracts

from external independent dealers who operate under the umbrella of ADT=s authorized dealer network.

ADT incurs costs for performing due diligence associated with the purchase of such contracts and for

maintaining and operating the authorized dealer network.

128.     The independent dealers operating within the network reimburse ADT for certain of the

costs noted above.  Tyco has now disclosed that the amounts reimbursed to ADT by the independent

dealers materially exceed the actual costs incurred by ADT.[15]  Prior to fiscal 2002, Tyco improperly

recognized into earnings the amount by which the independent dealer reimbursements exceeded the

amount actually incurred by ADT.

129.     In 1999, the SEC issued SAB No. 101, which includes a series of hypothetical

questions and interpretive responses intended to provide guidance to SEC registrants associated with

the recognition of revenue.  Question 6 of SAB No. 101 provides:

---

[15] It is uncertain why costs Areimbursed@ to ADT should exceed the actual amount of costs
incurred.

**Facts:** Company A provides its customers with activity tracking or similar services (*e.g.*, tracking of property tax payment activity, sending delinquency letters on overdue accounts, etc.) for a ten-year period.  Company A requires customers to prepay for all the services for the term specified in the arrangement. ***The on-going services to be provided are generally automated after the initial customer set-up.  At the outset of the arrangement, Company A performs set-up procedures to facilitate delivery of its on-going services to the customers.***  Such procedures consist primarily of establishing the necessary records and files in Company A=s pre-existing computer systems in order to provide the services. Once the initial customer set-up activities are complete, Company A provides its services in accordance with the arrangement. Company A is not required to refund any portion of the fee if the customer terminates the services or does not utilize all of the services to which it is entitled. However, Company A is required to provide a refund if Company A terminates the arrangement early.  Assume Company A=s activities are not within the scope of SFAS No. 91.

**Question:** When should Company A recognize the service revenue?

**Interpretive Response:** The staff believes that, provided all other revenue recognition criteria are met, ***service revenue should be recognized*** on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, ***over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer.***  In this case, the customer contracted for the on-going activity tracking service, not for the set-up activities. ***The staff notes that the customer could not, and would not, separately purchase the set-up services without the on-going services.***  The services specified in the arrangement are performed continuously over the contractual term of the arrangement (and any subsequent renewals). Therefore, the staff believes that Company A should recognize revenue on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer.

In this situation, the staff would object to Company A recognizing revenue in proportion to the costs incurred because the set-up costs incurred bear no direct relationship to the performance of services specified in the arrangement. The staff also believes that it is inappropriate to recognize the entire amount of the prepayment as revenue at the outset of the arrangement by accruing the remaining costs because the services required by the contract have not been performed.

[Emphasis added].

130.    In violation of the requirements of SAB No. 101, Tyco improperly included the excess Areimbursements@ received by ADT in the Company=s earnings rather than recognizing such payments over the life of the contract, as the Tyco Defendants knew or recklessly ignored.

131.    Tyco has now admitted that the cumulative effect of the Areimbursements@ recorded in years prior to fiscal 2002 in excess of costs incurred, net of the effect of the appropriate recognition of such payments, totaled approximately $186 million and materially inflated, at least, the reported operating results of Tyco= Fire and Security Services segments, as noted above.

132.    The Tyco Defendants knew or recklessly ignored that GAAP, in SAB No. 101, required Tyco to recognize such fee income over the life of the dealer contract.  In order to accelerate the recognition of such fee income, Tyco improperly accounted for the fees charged to dealers as an immediate reduction in its reported expenses.  In so doing, Tyco improperly inflated its reported financial performance during the Class Period.

133.    Moreover, GAAP, in Accounting Principles Board (AAPB@) Opinion No. 22, & 7, provides that *the usefulness of financial statements in making economic decisions depends significantly upon the user=s understanding of the accounting policies followed by a company*.  In fact, GAAP states that *information about the accounting policies* adopted by a reporting company *is* A*essential*@ for financial statement users.  (APB Opinion No. 22, & 8).  Accordingly, GAAP, in & 12 of APB Opinion No. 22 provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:

a.     A selection from existing acceptable alternatives;

b.     Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;

c.     Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

134.     Tyco=s Class Period financial statements were thus also false and misleading and failed to comply with GAAP because they improperly failed to identify and describe important judgments associated with its recognition of excess Areimbursements@ received by ADT.  Accordingly, investors were unable to assess the appropriateness of, or the risks associated with, Tyco=s accounting of excess payments received by ADT or even, for that matter, the bona-fides of such Areimbursements@ that Tyco has admitted materially exceeded the actual cost it incurred.

### g.     Tyco=s Improper Failure To Disclose Contingent Liabilities And Significant Risks And Uncertainties

135.     The Tyco Defendants= attempt to deceive investors during the Class Period is also evidenced by the failure of Tyco=s financial statement to disclose its contingent liabilities in conformity with GAAP.

136.     GAAP requires that financial statements disclose contingencies when it is at least reasonably possible (*i.e.*, a greater than slight chance) that a loss may have been incurred.  SFAS No. 5, **&** 10.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made.  *Id*.

50

137.    The SEC considers the disclosure of loss contingencies to be so important to an

informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. ' 210.10-01],

which provides that disclosures in interim period financial statements may be abbreviated and need not

duplicate the disclosure contained in the most recent audited financial statements, **except that** Awhere

material contingencies exist, disclosure of such matters shall be provided even though a significant

change since year end may not have occurred.@

138.    In addition, GAAP requires that financial statements disclose significant risks and

uncertainties associated with an entity=s business.  American Institute of Certified Public Accountant=s

Statement of Position No. 94-6.

139.    In violation of GAAP, Tyco=s Class Period financial statements improperly failed to

disclose that it engaged in certain practices that violated U.S. income tax laws.  For example, certain of

the businesses that provide services to Tyco=s customers are contractually required to rebate monies to

Tyco upon the attainment of certain milestones B that is, companies are obligated to give Tyco volume

discounts based on the level of business Tyco may give to a particular company.

140.    In an apparent attempt to evade U.S. income tax on such rebates, Tyco directed

companies to remit periodic rebate checks to Tyco entities domiciled outside the U.S. even though the

companies billed and transacted with U.S. Tyco entities domiciled in the U.S.  In this way, U.S. Tyco

entities were able to realize the benefits of the tax deductions without offsetting such deductions by the

amount of volume rebates due them.

141.    For example, one witness associated with a provider of transportation services to Tyco

told plaintiffs= counsel that his employer and other companies in the transportation industry with whom

Tyco does business were instructed by Steve Huntley B Tyco=s Director of Global Transportation B that his transportation company should send refund checks for volume discounts to a different company, called World Services Inc.  In addition, the witness stated that, even though his company provided transportation services for only a small fraction of Tyco=s overall business, his company paid rebates in the millions of dollars to non U.S. Tyco entities, including World Services, Inc.

142.    Nonetheless, Tyco=s financial statements, in violation of GAAP, failed to disclose the existence of this practice or the potential adverse consequences ensuing from such practice.  In fact, the Company recently conceded in its Form 10-K for fiscal 2002 that:

> Tyco and its subsidiaries' income tax returns are routinely examined by various regulatory tax authorities. In connection with such examinations, tax authorities, including the Internal Revenue Service, have raised issues and proposed tax deficiencies. We are reviewing the issues raised by the tax authorities and are contesting such proposed deficiencies. Amounts related to these tax deficiencies and other tax contingencies that management has assessed as probable and estimable have been accrued through the income tax provision. We believe but cannot assure you that ultimate resolution of these tax deficiencies and contingencies will not have a material adverse effect on our results of operations, financial position or cash flows.

Thus, the Company has admitted in the December Report that it is under investigation by the Internal Revenue Service for tax evasion and has refused to quantify its resulting liabilities.

143.    Moreover, according to a December 23, 2002 article in *BusinessWeek*, entitled AThe Rise and Fall of Dennis Kozlowski,@ Tyco was saving Aover $600 million a year in income taxes thanks to one of the most aggressive efforts ever by a multinational to avoid paying U.S. taxes.@  The *BusinessWeek* article explains AHow Kozlowski Did It@:

> B MOVED OFFSHORE to the tax haven of Bermuda through a reverse merger with ADT Ltd. in 1997. This put all non-U.S. income beyond the reach of the Internal Revenue Service.

**B** SET UP A FINANCE SUBSIDIARY in Luxembourg known as Tyco International Group (TIG). TIG helped finance Tyco=s debt by borrowing billions and reloaning the money to Tyco units in the U.S. and other high-tax jurisdictions. The interest that Tyco=s U.S. units pay on these loans is not taxed in Luxembourg and is tax-deductible in the U.S. **B** thus cutting Tyco=s U.S. tax liabilities. By 2001, Tyco had $16.7 billion in such intracompany loans outstanding.

**B** SET UP OVER 100 SUBSIDIARIES with names like ADriftwood@ and ABunga Berabu@ in such tax havens as the Cayman Islands, Barbados, and Jersey. They are perfect vehicles for shielding interest, dividends, royalties, and other forms of passive income from tax, says Samuel C. Thompson Jr., a professor at the University of Miami School of Law. The subs may be part of the reason Tyco was able to report in 2001 that while 65% of its revenues came from the U.S., only 29% of its income did.

Now that Kozlowski is gone, Tyco is scaling back its use of these tax tricks. On Sept. 25, Kozlowski=s replacement as CEO, Edward Breen, said a reexamination of its financials had caused him to raise Tyco=s estimate of its effective tax rate for the year ending September, 2002, to 22%, from 18.5%. Later, he said it would climb into the high 20s in 2003. Some observers believe Tyco may be forced to move back to the U.S. as part of the drive to leave its problems behind.

144.    In addition, Tyco=s financial statements failed to disclose the significant risks and

contingent liability ensuing from its improper withholding of documents from the SEC during its 1999-

2000 inquiry as noted below.  In this way, Tyco=s financial statements also fail to comply with GAAP.

### h.    Violations of SEC Regulations

145.    Item 7 of Form 10-K and Item 2 of Form 10-Q, Management=s Discussion and

Analysis of Financial Condition and Results of Operations (AMD&A@) require the issuer to furnish

information required by Item 303 of Regulation S-K [17 C.F.R. 229.303].  In discussing results of

operations, Item 303 of Regulation S-K requires the registrant to:

[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results. . .

146.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the registrant=s financial condition or results of operations.

147.    Nonetheless, Tyco=s Class Period Forms 10-K and 10-Q failed to disclose that the Company=s internal control system deficiencies, Apattern@ of aggressive accounting for the purpose of inflating Tyco=s operating results, related party transactions, accounting reserves manipulation, including the employment of Afinancial engineering@ reserves, each of which were all reasonably likely to have a material adverse effect on Tyco=s operating results, which was necessary for a proper understanding and evaluation of the Company=s operating performance and an informed investment decision.

### 2.    The Tyco Defendants= Failure to Disclose Numerous Acquisitions During the Class Period

148.    In addition to engaging in manipulative accounting, Tyco failed to disclose the sheer number of companies it was acquiring, and the amount it was paying for each.  According to a February 4, 2002 report in THE WALL STREET JOURNAL (ATyco Made $8 Billion of Acquisitions Over 3 Years but Didn=t Disclose Them@), defendant Swartz admitted that Tyco had spent about $8 billion over the

three previous fiscal years on more than **700 acquisitions that were never announced to the public**. In fiscal 2001 alone, ΑTyco paid $4.19 billion in cash for [350] unannounced deals . . . , or about 37% of the $11.3 billion in cash it spent on all deals.@ Moreover, according to the report, Swartz admitted that it would be impossible for an investor to discern the amounts it spent on the unannounced deals because Tyco failed to disclose the amount of cash on the balance sheets of the companies it acquired. Tyco subtracted that amount from its total acquisition spending to get the Αnet@ figure, according to the report, but calculating the unannounced deals requires it to be added back. ΑYou could fault me for that,@ Mr. Swartz is quoted as saying.

### 3. The Tyco Defendants= Withholding of Documents From The SEC During Its 1999-2000 Inquiry

149.    The Tyco Defendants also withheld a substantial number of documents from the SEC, causing the SEC to reach a false conclusion in its investigation.  Moreover, as set forth below, the Tyco Defendants made false statements to investors concerning the merits of the SEC investigation and the Company=s purported Αcooperation.@

150.    In 1999 and 2000, the SEC conducted a Matter Under Inquiry (MUI) concerning the Company=s acquisition accounting.  At the beginning of the inquiry, the SEC requested that Tyco produce various categories of documents.

151.    In July 2000, the SEC closed its informal inquiry.  However, the Company has recently admitted in its December Report that Α[a] large quantity of documents collected by Tyco and its counsel in connection with the SEC=s document request had not been produced to the SEC at the time the SEC closed its inquiry.@

152.    An article in the December 27, 2002 edition of THE WALL STREET JOURNAL also shows that Tyco=s outside counsel knew in early 2000 that the Company had serious accounting problems and that corporate funds were being misused by the Company=s senior executives, including the Individual Defendants.  The article states:

> Newly discovered e-mails written by attorneys at Tyco International Ltd.=s former outside law firm reveal that they knew about personal use of corporate funds by former Tyco Chairman L. Dennis Kozlowski and a host of accounting problems at the company in early 2000.

> The e-mails B written by Wilmer, Cutler & Pickering partners Lewis Liman and William McLucas B have been obtained by the Manhattan district attorney=s office and the Securities and Exchange Commission in their continuing investigation into Tyco and some of its former top executives, according to people familiar with the matter. Part of the SEC=s probe involves whether the conglomerate and Wilmer Cutler withheld relevant information that would have helped the SEC in an informal inquiry it launched in 1999 into Tyco=s accounting practices . . . .

153.    The December 27th article in THE WALL STREET JOURNAL quotes two of the emails:

> March 23, 2000 e-mail from Lewis Liman (Wilmer Cutler partner) to Mark Belnick, former Tyco General Counsel: AThere are payments to a woman whom the folks in finance describe to be Dennis=s girlfriend. I do not know Dennis=s situation, but this is an embarrassing fact.@ (This refers to payments from the key Employee Loan Account in 1997 to Karen Mayo, now Karen Kozlowski.)

> May 25, 2000 e-mail from William McLucas of Wilmer Cutler to Belnick: AWe have found issues that will likely interest the SEC. . . creativeness is employed in hitting the forecasts. . .@ AThere is also a bad letter from the Sigma people just before the acquisition confirming that they were asked to hold product shipment just before the closing. . .@ The same e-mail also said that the company=s financial reports suggest Asomething funny which is likely apparent if any decent accountant looks at this.@

154.    As a result of the Company=s failure to cooperate with the investigation, the SEC reached a false conclusion concerning Tyco=s accounting practices and investors remained in the dark concerning the Tyco Defendants= fraudulent scheme.

### 4.      Breakdown of Internal Controls

155.      Although the Tyco Defendants claimed throughout the Class Period that there was no accounting fraud at Tyco and that it had been vindicated by the conclusion of an investigation commenced by the SEC, in fact, however, the Company was suffering from a chronic and systematic breakdown of its internal controls and procedures such that its internal financial reporting was inherently corrupted, subject to manipulation, and unreliable, resulting in materially false and misleading financial statements.  Indeed, according to the December Report: (found in 10-K)

> We learned of instances of breakdowns of certain internal controls during fiscal 2002. This began in January 2002 when our Board of Directors learned of an unauthorized payment to our former Lead Director, Frank E. Walsh, and eventually led to the Board replacing our senior management team. These instances included abuse of our employee relocation loan programs, unapproved bonuses, attempted unauthorized credits to employee loans, undisclosed compensation arrangements, unreported perquisites, self-dealing transactions and other misuses of corporate trust, and have been widely reported in the press. We believe the publicity resulting from such instances negatively impacted our results of operations and cash flow in fiscal 2002. In addition, such publicity contributed to a deterioration in our financial condition as we lost access to the commercial paper market and credit ratings on our term debt declined during fiscal 2002 from ratings as of the end of fiscal 2001.

156.      In addition, the December Report concluded that, during the Class Period:

> the company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ.

157.     Moreover, Tyco≈s former Chief Executive Officer (Kozlowski) resigned on June 3, 2002, its former Chief Corporate Counsel (Belnick) was dismissed on June 10, 2002 and its former Chief Financial Officer (Swartz) resigned on August 1, 2002.  In addition, these members of former senior management have each been indicted by the State of New York for violations of criminal law. On September 12, 2002, Kozlowski and Swartz were charged with 39 violations of New York state criminal law, including enterprise corruption and obtaining monies by theft and fraud, and Belnick was charged with falsifying business records in violation of New York state criminal law.

158.     Despite its stated limitations, the December Report nevertheless concluded, among other things, that: (found in 10-K)

$     AThere were a number of accounting entries and treatments that were incorrect and required correction@; and

$     Tyco≈s Aprior senior management engaged in a pattern of aggressive accounting which . . . was intended to increase reported earnings above what they would have been if more conservative accounting had been employed.@

159.     In addition, the Company≈s Form 10-K for fiscal 2002 (dated December 30, 2002) stated that the Company≈s new senior management team (in conjunction with its Board of Directors) reviewed overall company policies and procedures in areas that were viewed as important.  Specific areas of focus included acquisition accounting, restructuring, financial and legal controls, reserve utilization, incentive compensation and a number of other areas relevant to Tyco≈s financial statements. The Company≈s new senior management determined that Tyco≈s existing policies and standards of approval needed Asubstantial improvement@ and found that there were instances in which documentation of important financial reporting matters was substandard; there had been limited review of bonuses and

incentive compensation across Tyco; and the manner in which former senior management managed Tyco reflected neither a commitment to sound corporate governance nor the processes required to ensure the highest standards of financial integrity and accounting rigor.

160.    According to Tyco=s fiscal 2002 Form 10-K, prior senior management=s Aprimary focus@ was on earnings-per-share accretive acquisitions that resulted in Tyco=s growing considerably over the past several years, including the acquisition of approximately 700 companies of varying size and in varying businesses around the world, Abut which also strained the internal control environment and limited [the Company=s] investment in these areas.@

161.    In addition, the fiscal 2002 Form 10-K states that Tyco now believes that prior senior management during the past three years placed Aundue reliance on non-recurring charges and pro forma financial information.@  According to Tyco=s new senior management, Athe rapid pace of acquisitions and attendant restructurings made it difficult to ascertain the level of [the Company=s] organic growth.@

162.    PwC recently placed a full page advertisement in the LOS ANGELES TIMES (January 15, 2003) stating its view concerning the importance of effective internal controls:[16]

Today=s topic for conversation: Internal control, *i.e.*, the ability of a company to monitor itself

It is sobering to see how many of last year=s corporate scandals were apparently a result of lax controls or management=s override of internal control processes. A better system of internal

---

[16] A January 1, 2003 article in THE NEW YORK TIMES concerning PwC=s recent advertisements, entitled APricewaterhouse Taking a Stand, And a Big Risk,@ states that PwC Afaces a significant challenge from continuing public scrutiny of its past work. For instance, it approved of financial disclosures at Tyco International despite the company=s use of Aaggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used.@

checks and balances would have caught many of these problems before they became headlines, before they hurt investors.

The Sarbanes-Oxley Act has responded to this situation by putting the accountability of internal financial control squarely on the shoulders of both company management and, ultimately, in our opinion, its board of directors.

Sarbanes-Oxley is also requiring external auditors to attest to management=s assertions regarding the effectiveness of the company=s internal control and procedures for financial reporting.

These changes are good, but no one should think the goal here is just a good report card. The opportunity exists to create a higher level of monitoring and control, which, coupled with a spirit of transparency, will create better communications to the marketplace and, ultimately, rebuild investor confidence.

But that is going to require looking at internal control not as a checklist, as many do, but as a dynamic process.

The daily challenges a business faces B new staff, less staff, more demands and an even greater opportunity for conflict B should not be allowed to create opportunities for fraud, confusion or even innocent human error.

163.    Tyco=s lack of adequate internal controls increased the opportunity for the Tyco

Defendants to commit the fraud alleged above, and rendered the Company=s Class Period financial

statements inherently unreliable and non-compliant with GAAP.  Nonetheless, throughout the Class

Period, the Company consistently issued materially false and misleading financial statements without ever

disclosing the existence of the significant and material deficiencies in its internal accounting controls.

164.    Although these materially adverse factors, trends and facts were apparent to

defendants, including defendant PwC, at all material times defendants failed to timely and adequately

disclose them during the Class Period.  Instead, as detailed below, PwC continued to knowingly or

recklessly issue Aclean@ audit opinions on the Company=s fraudulent financial statements throughout the

relevant period, and the Tyco Defendants continued to portray the Company in positive terms, and any

partial disclosures that they may have made of certain of these problems were materially incomplete and

calculated to deceive or mislead investors as to the true nature and extent of the problems and material

liabilities facing the Company.

### 5.    PwC≈s Participation in the Fraud and its Scienter

165.    Tyco has been a long time and significant client of PwC and a major source of income

for PwC's Boston office.  In fact, *during fiscal 2001 alone, the fees paid by Tyco to PwC*

*exceeded $51 million.  Indeed 75% of this amount was <u>non</u>-audit fees, including fees for*

*consulting and other services rendered to Tyco by PwC.[17]*

166.    As noted in the SEC's 2001 Revision of the Commission's Auditor Independence

Requirements:[18]

> In a June 2000 study, Brand Finance plc surveyed analysts and representatives of
> companies listed on the London Stock Exchange. Brand Finance reported, Analysts are
> concerned that the acceptance of non-audit fees by auditors is likely to result in the
> independence of the audit being compromised. *94% of analysts stating an opinion*
> *believe that significant non-audit fees are likely to compromise audit*
> *independence. 76% of companies stating an opinion felt that auditor*
> *independence is likely to be compromised where significant non-audit fees are*
> *received from audit clients.*

---

[17] In July of 2000, the SEC proposed changes to its auditor independence rules.  Such proposal
required SEC registrants to disclose in their proxy statements the amount and types of fees paid to their
auditors.  Although Tyco and PwC were aware of such proposal, Tyco's fiscal 2001 proxy statement,
filed with the SEC on or about January 29, 2001, did not contain such disclosure.  One week later, the
SEC's proposed rule requiring the disclosure of audit fees became final on February 5, 2001.

[18] 17 CFR Parts 210 and 240,  Release Nos. 33-7919; 34-43602; 35-27279; IC-24744; IA-
1911; FR-56.

Brand Finance also found that "83% of analysts who expressed an opinion believe objectivity is threatened even when the non-audit fee is less than the audit fee."

In another recent survey, the Association for Investment Management and Research ("AIMR") surveyed its members and certified financial analyst candidates regarding auditor independence issues. ***AIMR reported that "[p]otential threats to auditor independence, resulting from audit firms providing non-audit services to their audit clients [were] troublesome to many . . . respondents."***

A recent poll was conducted by Public Opinion Strategies to determine, among other things, how the investing public views our proposed rules. The results showed that ***eighty percent of investors surveyed favor (forty-nine percent strongly favor; thirty-two percent somewhat favor) an SEC rule that generally would require restrictions on the types of consulting services accounting firms can provide their audit clients***, and fifty-one percent thought the new rule was "very important" to protecting individual stock market investors. As summarized by James C. Stadler of Duquesne University, "The results of our national poll indicate that average American investors, in fact, overwhelmingly support the need for some new rulemaking in this area." He further stated, ***"The survey results confirm what most practitioners have felt for decades - that large consulting engagements for audit clients can raise serious concerns regarding audit independence."***

(Emphasis added and footnotes deleted).

167.    As a result of its longstanding relationship with Tyco and the nature of the auditing and

consulting services rendered to the Company, PwC's personnel were regularly present at Tyco's

corporate headquarters throughout the year and had continual access to, and knowledge of, Tyco's

internal accounting records and confidential corporate financial and business information through

conversations with employees of Tyco and through review of Tyco's non-public documents.

168.    In fact, according to the Company=s 2001 Proxy Statement, the Tyco Audit Committee

was asked to:

1)    Determine whether based on the ***review and discussion of the audited financial statements with*** management and ***independent accountants***, if the Committee should recommend to the Board that

the audited financial statements be included in the Company's Annual Report on Form 10-K for the last fiscal year for filing with the Securities and Exchange Commission;

2)    Meet with management and the *external auditors to discuss the results of the annual audit, including any significant changes in accounting principles and any serious difficulties or disputes with management encountered during the audit*;

3)    Review with management and the *external auditors the interim financial statements prior to filing*. . . ;

4)    *Periodically consult with independent accountants,* without the presence of management, *about internal controls and the fullness and accuracy of the Company's financial statements*;

5)    *Review the Company's financial reporting process*, both internal and external, *in consultation with the independent accountants*;

6)    Consider *the independent accountants' judgments about the quality and appropriateness of the Company's accounting principles applied,* including management's handling of *proposed audit adjustments identified by external auditors*;

7)    *Consider suggestions made by independent accountants*, management, or internal audit, *regarding the Company's accounting principles and practices*.

8)    Establish regular and separate systems of reporting to the Committee by management, *independent accountants* and internal audit *regarding any significant judgments made in management's preparation of the financial statements and the view of each as to the appropriateness of such judgments*;

9)    Review with management, *independent accountants* and internal audit *difficulties encountered during the course of the annual audit, including any restrictions on the scope of work or access to required information and any other significant disagreements in connection with preparing the financial statements*; and

10)    Discuss with management, ***independent accountants*** and internal audit ***the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented***;

[Emphasis added].

169.    Given the nature of the auditing and consulting services rendered to the Company, and the fact that PwC's personnel were regularly present at Tyco and had intimate knowledge of Tyco's financial reporting practices based on its access to internal accounting records and Tyco employees, PwC knew of or recklessly disregarded the following adverse facts concerning the Company's improper financial reporting (detailed at length above) during the Class Period, including the Company's 1999, 2000 and 2001 year-end financial statements and PwC's unqualified audit opinions thereon. Nonetheless, PwC knowingly, or recklessly, issued false unqualified audit opinions during the Class Period.

170.    PwC issued its audit opinion, dated October 21, 1999, except as to "Revision" in Note 1, which is as of June 12, 2000, on Tyco's 1999 year end financial statements.  PwC's opinion falsely stated that such Tyco financial statements were presented in conformity with GAAP and that PwC's audit was performed in accordance with GAAS:

In our opinion, based upon our audits and the reports of other auditors, the accompanying consolidated balance sheets and the related consolidated statements of operations, shareholders' equity and cash flows present fairly, in all material respects, the financial position of Tyco International Ltd. and its subsidiaries at September 30, 1999 and 1998, and the results of their operations and their cash flows for the years ended September 30, 1999 and 1998, and the nine months ended September 30, 1997, in conformity with accounting principles generally accepted in the United States. In addition, in our opinion, the accompanying financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.  These consolidated financial statements and financial statement schedule are the responsibility of the Company's

64

management; our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits. We did not audit the financial statements of AMP Incorporated, a wholly owned subsidiary, at September 30, 1998, and for the year ended September 30, 1998 and the nine months ended September 30, 1997, which statements reflect total assets constituting 20.1% of consolidated total assets as of September 30, 1998, and net sales constituting 29.0% and 33.6% of consolidated net sales for the year ended September 30, 1998 and the nine months ended September 30 1997, respectively. We did not audit the financial statements of United States Surgical Corporation, a wholly owned subsidiary, for the nine months ended September 30, 1997, which statements reflect net sales constituting 6.8% of consolidated net sales for the nine months ended September 30, 1997. Those statements were audited by other auditors whose reports thereon have been furnished to us, and our opinion expressed herein, insofar as it relates to the amounts included for AMP Incorporated and United States Surgical Corporation, as of and for the periods described above, is based solely on the reports of the other auditors. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits and the reports of other auditors provide a reasonable basis for the opinion expressed above.

As discussed under the heading "Revision" in Note 1, the accompanying consolidated financial statements for the fiscal year ended September 30, 1999 have been revised to adjust merger, restructuring and other non-recurring charges and charges for the impairment of long-lived assets for the timing and classification of certain charges.

171. PwC issued its audit opinion, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), on Tyco's 2000 and 1999 financial statements. PwC's opinion stated that such Tyco financial statements were presented in conformity with GAAP and that PwC's audit was performed in accordance with GAAS:

In our opinion, based upon our audits and the report of other auditors, the accompanying consolidated balance sheets and the related consolidated statements of operations, shareholders' equity and cash flows present fairly, in all material respects, the financial position of Tyco International Ltd. and its subsidiaries at September 30,

65

2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2000, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the accompanying financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We did not audit the financial statements of AMP Incorporated, a wholly owned subsidiary, as of September 30, 1998, and for the year ended September 30, 1998, which statements reflect total assets of 20.1% of the related consolidated total assets as of September 30, 1998, and net sales of 29.0% of the related consolidated total sales for the year ended September 30, 1998. Those statements were audited by other auditors whose report thereon has been furnished to us, and our opinion expressed herein, insofar as it relates to the amounts included for AMP Incorporated, as of and for the period described above, is based solely on the report of the other auditors. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits and the report of other auditors provide a reasonable basis for our opinion.

172.    PwC issued its audit opinion, dated October 18, 2001 (except as to Note 31, which is

as of December 18, 2001), on Tyco's 2001 and 2000 financial statements, which it stated were

presented in conformity with GAAP and that PwC's audit was performed in accordance with GAAS:

In our opinion, based upon our audits, the accompanying consolidated balance sheets and the related consolidated statements of operations, of shareholders' equity and of cash flows present fairly, in all material respects, the financial position of Tyco International Ltd. and its subsidiaries at September 30, 2001 and 2000, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2001, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the accompanying financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the

66

Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion. As described in Note 18, the Company changed its method of revenue recognition and changed its method of accounting for derivative instruments and hedging activities.

173.    PwC also issued a number of Consent Letters during the Class Period that permitted Tyco to incorporate by reference PwC=s materially false and misleading reports in the Company=s Registration Statements.  These Consent Letters are discussed below.

174.    In issuing such audit opinions, PwC turned a blind eye to Tyco's myriad improper accounting practices as described above and issued unqualified audit opinions on Tyco's 2001, 2000 and 1999 financial statements, even though PwC knew or recklessly disregarded that: (a) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of Tyco and its subsidiaries as of September 30, 2001, 2000 and 1999, and the results of their operations and cash flow for the periods ended September 30, 2001, 2000 and 1999; and (b) PwC had not audited Tyco's 2001, 2000, 1999 financial statements in accordance with GAAS.

175.    Among other things as set forth in detail in Section A.1 above, PwC knew or recklessly disregarded that Tyco's 2001, 2000, and 1999 year end financial statements violated numerous

provisions of GAAP and were materially false and misleading.  Tyco's violations of GAAP during the

Class Period include, among other things:

      1.      the improper accounting for acquisitions;

      2.      the manipulation of accounting reserves for the purpose of inflating the

Company's reported operating results;

      3.      the failure to timely recognize expenses, including impairments in the value of the

Company's assets;

      4.      the failure to disclose material related party transactions;

      5.      engaging in "aggressive" accounting for the purpose of inflating the Company's

reported results;

      6.      the failure to appropriately restate previously issued and materially misstated

financial statements;

      7.      the improper recognition of "reimbursements" from independent dealers;

      8.      the failure to disclose accounting policies in accordance with GAAP; and

      9.      the failure to disclose material contingent liabilities and significant risks and

uncertainties.

176.      In certifying Tyco's 2001, 2000 and 1999 year end financial statements, PwC also

falsely represented that its examination was made in accordance with GAAS.  These statements were

materially false and misleading because the audits conducted by PwC were knowingly or recklessly not

performed in accordance with GAAS in the following respects:

68

a.      PwC violated GAAS Standard of Reporting No. 1 that requires the audit report

to state whether the financial statements are presented in accordance with GAAP.  PwC's

opinion falsely represented that Tyco's 2001, 2000 and 1999 financial statements were

presented in conformity with GAAP when they were not for the myriad reasons herein alleged.

b.      PwC violated GAAS Standard of Reporting No. 4 that requires that, when an

opinion on the financial statements as a whole cannot be expressed, the reasons therefore must

be stated.  PwC should have stated that no opinion could be issued by it on Tyco's 2001, 2000

or 1999 financial statements or issued an adverse opinion stating that the 2001, 2000 and 1999

financial statements were not fairly presented.

c.      PwC violated GAAS General Standard No.2 that requires that an

independence in mental attitude is to be maintained by the auditor in all matters related to the

assignment.

d.      PwC violated SAS No. 82 in that it failed to adequately consider the risk that

the audit financial statements of Tyco were free from material misstatement, whether caused by

errors or fraud.  PwC knew or recklessly ignored numerous events and conditions that occurred

or existed at Tyco during the Class period, which events and conditions are specifically

identified in SAS No. 82 as being "risk factors relating to misstatements arising from fraudulent

financial reporting."  These risk factors include, but are not limited to:

$      An excessive interest by management in maintaining or increasing the entity's
        stock price or earnings trend through the use of unusually aggressive accounting
        practices;

$  A failure by management to display and communicate an appropriate attitude regarding internal control and the financial reporting process;

$  Management displaying a significant disregard for regulatory authorities;

$  Management continuing to employ an ineffective accounting, information technology, or internal auditing staff;

$  Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm; and

$  Significant bank accounts or subsidiary or branch operations in tax-haven jurisdictions for which there appears to be no clear business justification.

e.  PwC violated SAS No. 54 in that PwC failed to perform the audit procedures required in response to possible improper acts by Tyco in connection with its audit of Tyco's 2001, 2000 and 1999 year end financial statements.  PwC knew or recklessly disregarded that Tyco engaged in numerous improper acts.  In fact, on September 30, 2002, THE WALL STREET JOURNAL reported:

> **New York prosecutors are investigating whether** Tyco International Ltd.'s outside auditor, **PricewaterhouseCoopers LLP, knew about secret bonuses paid to former Tyco executives as well as accounting practices that regulators have charged were used to hide the payments**, according to people with knowledge of the matter.

> *   *   *

> Prosecutors' level of interest in PricewaterhouseCoopers suggest they now may be attempting to make a criminal case against the nation's largest accounting firm, which so far hasn't been ensnared in the widening Tyco scandal.  **One focus of the probe is whether PricewaterhouseCoopers uncovered the secret bonuses in the course of its audit work**, the people with knowledge of the matter said.  These people said **prosecutors also are seeking to determine whether PricewaterhouseCoopers was aware of the improper**

> ***accounting techniques that the Securities and Exchange
> Commission alleges Tyco used to "bury" the bonus payments***.

[Emphasis added].

Moreover, ***Tyco has now admitted that it engaged in "a pattern of using
aggressive accounting that, even when not erroneous, was undertaken with the
purpose and effect of increasing reported results," and that it put "pressure on," and
gave "inducements to, segment and unit managers to increase current earnings,
including by decisions as to what accounting treatment to employ."*** [Emphasis added].

    f.    PwC violated GAAS and the standards set forth in SAS No. 1 and SAS No.
53 by, among other things, failing to adequately plan its audit and properly supervise the work
of assistants and to establish and carry out procedures reasonably designed to search for and
detect the existence of errors and irregularities that would have a material effect upon the
financial statements.  PwC knew, or recklessly ignored, that it failed to adequately plan its audits
or supervise its staff in a manner designed to reasonably identify Tyco≈s manipulation of
accounting reserves, prematurely recognized fees on dealer contracts and unreported reported
related party transactions.

    g.    PwC violated GAAS General Standard No. 3 that requires that due
professional care must be exercised by the auditor in the performance of the audit and the
preparation of the report.

    h.    PwC violated GAAS Standard of Field Work No. 2, which requires the auditor
to make a proper study of existing internal controls, including accounting, financial and

managerial controls, to determine whether reliance thereon was justified, and if such controls are

not reliable, to expand the nature and scope of the auditing procedures to be applied.  The

standard provides that a sufficient understanding of an entity's internal control structure be

obtained to adequately plan the audit and to determine the nature, timing and extent of tests to

be performed.  AU ' 150.02.  In all audits, the auditor should perform procedures to obtain a

sufficient understanding of three elements of an entity's internal control structure:  the control

environment, the accounting system, and control procedures.  AU ' 319.02.  The control

environment, which includes management's integrity and ethical values, is the foundation of

internal control and provides discipline, structure and sets the tone of an organization.  After

obtaining an understanding of an entity's internal control structure, the auditor assesses the

entity's control risk.  AU ' 319.02.  Control risk is the risk that a material misstatement in an

assertion by management contained in a company's financial statements will not be prevented or

detected on a timely basis by an entity's internal control structure policies or procedures.  AU '

319.29.  The ultimate purpose of assessing control risk is to aid the auditor in evaluating the risk

that material misstatements exist in the financial statements.  AU ' 319.61.

        In the course of auditing Tyco's 2001, 2000 and 1999 financial statements,

PwC either knew or recklessly disregarded facts that evidenced that it either failed to sufficiently

understand Tyco's internal control structure and/or it disregarded weaknesses and deficiencies

in Tyco's internal control structure.  ***These deficiencies, each of which Tyco has now***

***admitted, include***: (a) "***the failure to document decisions contemporaneously***", (b)

***documentation that was "not always available" or "dispersed***," (c) "***poor***"

*documentation*, (d) "*inadequate policies and procedures to prevent misconduct of senior executives*," (e) "*inadequate approval procedures and documentation*," (f) "*a lack of oversight by senior management*," (g) "*serious abuses of trust and self-dealing by the highest officers of Tyco*," and (h) "*a lack of a stated and demonstrable commitment by former senior corporate management to set appropriate standards of ethics, integrity, accounting, and corporate governance*."  [Emphasis added].

      i.     PwC violated Standard of Field Work No. 3, which requires sufficient competent evidential matter to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  PwC knew or recklessly disregarded that it did obtain sufficient competent evidential matter concerning the myriad of material transactions Tyco admittedly has improperly recorded.

      j.     PwC also violated AU ' 334, which requires auditors to identify, examine and determine that financial statements disclose related party transactions.  As stated above, Tyco's financial statements failed to provide the disclosure required by GAAP concerning the transactions between it and its officers and directors.

      *In fact, defendant Belnick, in his Memorandum of Law in Support of Omnibus Retrial Motion filed in the Supreme Court of the State of New York on or about October 18, 2002, asserts that, as early as August 25, 1999, he "fully disclosed" to and "personally confirmed" with PwC the loans that plaintiffs now allege that Tyco's financial statements, in violation of GAAP, improperly failed to disclose.*

177.     As a result of its failure to accurately report on Tyco's 2001, 2000 and 1999 financial

statements, PwC utterly failed in its role as an auditor as defined by the SEC.  SEC Accounting Series

Release No. 296, *Relationships Between Registrants and Independent Accountants*, Securities Act

Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the
> confidence of investors in financial reporting.  An investor's willingness to commit his
> capital to an impersonal market is dependent on the availability of accurate, material and
> timely information regarding the corporations in which he has invested or proposes to
> invest.  The quality of information disseminated in the securities markets and the
> continuing conviction of individual investors that such information is reliable are thus key
> to the formation and effective allocation of capital.  **Accordingly, the audit function
> must be meaningfully performed and the accountants' independence not
> compromised**.  The auditor must be free to decide questions against his client's
> interests if his independent professional judgment compels that result.  [Emphasis
> added.]

178.     In addition, PwC violated the requirements of Section 10A of the Securities Exchange

Act, which requires auditors of public companies to design procedures to provide reasonable assurance

of detecting illegal acts and to identify material related party transactions.    Section 10A of the

Securities Exchange Act requires an auditor to notify the SEC if he or she becomes aware of

information indicating that an illegal act has, or may have occurred, if management or the Board of the

company fails to take appropriate remedial actions with respect to the illegal acts.  PwC knew or

recklessly ignored that it violated Section 10A of the Securities Exchange Act in the performance its

"audits" of Tyco's 2001, 2000 and 1999 year end financial statements.

179.     In fact, ***Charles Mulford, an accounting professor at Georgia Institute of***

***Technology in Atlanta,*** when asked of certain of the accounting reserve manipulations noted herein

74

stated, in a September 30, 2002 THE WALL STREET JOURNAL article, that ***"it would be very surprising if it wasn't picked up by the auditors."***  [Emphasis added].

180.    In the addition, the same THE WALL STREET JOURNAL article reported:

> ***Lynn Turner, a former chief accountant at the Securities and Exchange Commission*** who also reviewed [Tyco's September Report], went even further, saying ***"this is called fraud."  As for the auditors, he asked: "How the hell do you do that and not have PricewaterhouseCoopers find it?***"

[Emphasis added].

181.    PwC's opinions, which represented that Tyco's 2001, 2000 and 1999 year end financial statements were presented in conformity with GAAP, were materially false and misleading because PwC knew or was reckless in not knowing that Tyco's 2001, 2000 and 1999 year end financial statements violated the principles of fair reporting and GAAP.  In the course of rendering its unqualified audit certification on Tyco's 2001, 2000, and 1999 year end financial statements, PwC knew it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP.  PwC, in issuing its unqualified opinions, knew or recklessly disregarded that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

182.    PwC knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Tyco's 2001, 2000 and 1999 year end financial statements; or (b) withdrawn, corrected or modified its opinion for the years ended September 30, 2001, 2000 and 1999 to recognize Tyco's improper accounting and financial reporting stated above.

**B.     Material Omitted Information Concerning Looting of the Company by its Senior Executives Who Were Conducting Tyco as a Criminal Enterprise**

183.     The Tyco Defendants and other executives at Tyco were motivated to engage in the financial misreporting and manipulation of Tyco's financial results by engaging in wide-scale looting of Tyco.  Similarly, the previously undisclosed abuse and improper accounting of Tyco=s executive compensation and loan programs for the benefit of other Tyco executives and employees was intended by the Tyco Defendants to incentivize Tyco=s management to participate in the scheme, including the falsification of Tyco=s financial reporting.

184.     The Tyco Defendants did not disclose their looting to investors during the Class Period. Rather, the Tyco Defendants vehemently denied what they falsely described as unfounded "rumors" and falsely represented that Tyco's management and its practices were of the highest integrity.  Accordingly, all of the Tyco Defendants' Class Period statements concerning the integrity of its executives and management team, Tyco=s financial reporting, and the compensation received by its executives were materially false and misleading and omitted to state this material information.

185.     According to the Company=s September Report, Aduring at least the five years prior to June 3, 2002, Tyco=s three top corporate officers B its CEO [defendant Kozlowski], its CFO [defendant Swartz], and its Chief Corporate Counsel [defendant Belnick] B engaged in a pattern of improper and illegal conduct@ by which they looted hundreds of millions of dollars from Tyco.  In fact, the Company has recently admitted in its December Report that senior management=s stewardship of Tyco, both prior to and during the Class Period, Awas characterized by serious abuses of trust and self-dealing by the highest officers of Tyco.@

186.     The Tyco Defendants were obligated to disclose this information to investors.  For

example, Regulation S-K sets forth instructions for filing forms under the 1933 and 1934 Acts.  One of

these rules, Item 402, relates to the disclosure of information concerning AExecutive Compensation.@

Item 402 provides:

> (2)     *All compensation covered*.  This item requires clear, concise and understandable
> disclosure of all plan and non-plan compensation awarded to, earned by, or paid to the named
> executive officers designated under paragraph (a)(3) of this item, and directors covered by
> paragraph (g) of this item by any person for all services rendered in all capacities to the
> registrant and its subsidiaries, unless otherwise specified in this item.
>
> (3)     *Persons covered*.  Disclosure shall be provided pursuant to this item for each of the
> following (the Anamed executive officers@):
>
>> (i)      All individuals serving as the registrant=s chief executive officer or acting in a
>> similar capacity during the last completed fiscal year (ACEO@), regardless of
>> compensation level;
>>
>> (ii)     The registrant=s four most highly compensated executive officers other than the
>> CEO who were serving as executive officers at the end of the last completed fiscal year;
>>
>> (iii)    Up to two additional individuals for whom disclosure would have been provided
>> pursuant to paragraph (a)(3)(ii) of this item but for the fact that the individual was not
>> serving as an executive officer of the registrant at the end of the last completed fiscal
>> year.
>
> *Instructions to Item 402(a)(3)*.  1.  *Determination of Most Highly Compensated
> Executive Officers*.  The determination as to which executive officers are most highly
> compensated shall be made by reference to total annual salary and bonus for the last completed
> fiscal year . . . .

187.     Similarly, Item 404 requires disclosure of ACertain Relationships and Related

Transactions@:

> (a)     *Transactions With Management and Others*.  Describe briefly any transaction, or
> series of similar transactions, since the beginning of the registrant=s last fiscal year, or any
> currently proposed transaction, or series of similar transactions, to which the registrant or any of

its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000, and in which any of the following persons had, or will have, a direct or indirect material interest, naming such person and indicating the person≡s relationship to the registrant, the nature of such person≡s interest in the transaction(s), the amount of such transaction(s) and, where practicable, the amount of such person≡s interest in the transaction(s):

> (1)    Any director or executive officer of the registrant;

> (2)    Any nominee for election as a director;

> (3)    Any security holder who is known to the registrant to own of record or beneficially more than five percent of any class of the registrant≡s voting securities; and

> (4)    Any member of the immediate family of any of the foregoing persons.

*Instructions to Paragraph (a) of Item 404.*

> 1.    The materiality of any interest is to be determined on the basis of the significance of the information to investors in light of all the circumstances of the particular case.  The importance of the interest to the person having the interest, the relationship of the parties to the transaction with each other and the amount involved in the transactions are among the factors to be considered in determining the significance of the information to investors.

*    *    *

(c)    *Indebtedness of Management*.  If any of the following persons has been indebted to the registrant or its subsidiaries at any time since the beginning of the registrant≡s last fiscal year in an amount in excess of $60,000, indicate the name of such person, the nature of the person≡s relationship by reason of which such person≡s indebtedness is required to be described, the largest aggregate amount of indebtedness outstanding at any time during such period, the nature of the indebtedness and of the transaction in which it was incurred, the amount thereof outstanding as of the latest practicable date and the rate of interest paid or charged thereon:

> (1)    Any director or executive officer of the registrant;

> (2)    Any nominee for election as a director;

> (3)    Any member of the immediate family of the persons specified in paragraph (c)(1) or (2);

(4)     Any corporation or organization (other than the registrant or a majority-owned subsidiary of the registrant) of which any of the persons specified in paragraph (c)(1) or (2) is an executive officer or partner or is, directly or indirectly, the beneficial owner of ten percent or more of any class of equity securities; and

(5)     Any trust or other estate in which any of the persons specified in paragraphs (c)(1) or (2) has a substantial beneficial interest or as to which such person serves as a trustee or in a similar capacity.

188.    As set forth below, the Tyco Defendants failed to comply with these disclosure requirements.

### 1.     Relocation Programs

189.    The September Report admits that the Individual Defendants Aused the relocation program to receive non-qualifying loans and unauthorized benefits that were not generally available to all salaried employees affected by relocations, or were not related to any Tyco relocation.@ This provided the Individual Defendants with an additional method to steal from the Company.

### a.     L. Dennis Kozlowski

190.    According to the September Report, defendant Kozlowski Aimproperly borrowed approximately $29,756,000 in non-qualifying relocation loans to purchase land and construct a home in Boca Raton, Florida during the years 1997 to 2000, and improperly borrowed approximately $7,012,000 in non-qualifying relocation loans to purchase a cooperative apartment in New York City in 2000.@

191.    The table attached hereto as Exhibit B is from the September Report and sets forth undisclosed interest-free Arelocation loans@ improperly taken by defendant Kozlowski since the

inception of his relocation program account, including loans and charges reflected in the Company=s

records for Kozlowski=s relocation account.

192.    In sum, the September Report concludes that:

$    A$7,011,669 in interest free loans was charged by Mr. Kozlowski for
purported New York relocations that did not qualify under the New York
Relocation Program.@

$    A$29,756,110 in interest free loans was charged by Mr. Kozlowski for the
acquisition of property under an unauthorized Florida relocation program and@

$    A$24,922,849 in interest free loans was borrowed by Mr. Kozlowski for the
acquisitions of other properties that were not authorized by any relocation
program.@

193.    Of defendant Kozlowski=s $61,690,628 of unauthorized interest free relocation loans,

the September Report concludes that:

$    A$21,697,303 were actually repaid by him, but without interest@;

$    A$19,439,392 were repaid through unauthorized forgiveness, discussed in the
next section, that he bestowed upon himself and@

$    A$20,553,933 were reclassified to other Mr. Kozlowski loan accounts that he
maintained with the Company.@

### b.    Mark H. Swartz

194.    As set forth above, defendant Swartz was Tyco=s CFO from 1995 through August

2002, and a Tyco director from February 2001 through August 2002.  The table attached hereto as

Exhibit C is from the September Report and sets forth undisclosed interest-free Arelocation loans@

improperly taken by defendant Swartz since the inception of his relocation program account, including

loans and charges reflected in the Company=s records for defendant Swartz=s relocation account.

195.    In sum, the September Report concludes that:

$       A$7,668,750 in interest free loans were taken by Mr. Swartz for property acquisitions in New York and New Hampshire under the unauthorized New York Relocation Program@;

$       A$20,992,000 in interest free loans were taken by Mr. Swartz under an unauthorized Florida relocation program and@

$       A$4,437,175 was borrowed, interest-free, for the acquisition of other properties that were not authorized by any relocation program and@

196.    Of defendant Swartz=s $33,097,925 of unauthorized interest-free relocation loans, the

September Report concludes that:

$       A$10,786,977 was repaid by him, but without interest@;

$       A$9,792,000 was repaid through forgiveness that Mr. Kozlowski was not authorized to bestow and@

$       A$12,518,948 was reclassified to other Mr. Swartz loan accounts that he maintained with the Company.@

        c.      **Mark A. Belnick**

197.    As set forth above, defendant Belnick served as Tyco=s Executive Vice President and

Chief Corporate Counsel from September 1998 until June 10, 2002.  According to the September

Report, defendant Belnick improperly Aused the unauthorized version of the New York relocation

program to borrow approximately $4,217,000 from September 1998 through May 2001 for the

purchase and improvement of a cooperative apartment in New York City.@  The September Report

also admits that defendant Belnick improperly Aused the relocation program to pay his rent for several

months while his new apartment was being renovated.@

81

198.     From 2001 through March 2002, the September Report also states that defendant

Belnick wrongly Aborrowed an additional $10,418,599 to purchase land and build a home@ in Park

City, Utah.  The report states that defendant Belnick Athen charged Tyco $1600 per month for his home

office located in that house,@ even though the Company Amaintains no corporate offices in Utah, and

Mr. Belnick was not requested to relocate to Utah.@

199.     In sum, the September Report concludes that defendant Belnick=s indebtedness Awas

not incurred through an authorized employee relocation plan available generally to all salaried

employees, and as such was not exempt from disclosure in the Company=s proxies.@

### d.     Other Executive Officers

200.     The September Report also describes the relocation loan activity of Tyco=s executive

officers as defined by Section 16 of the Securities Exchange Act of 1934 and identified in Tyco=s proxy

statements during the Class Period.  Many (if not all) of these loans were given as pay-offs for

participating in the Tyco Defendants= fraudulent scheme to manipulate the Company=s financial results.

For example, almost $12 million was loaned to senior executives to incentivize them to participate in the

Tyco Defendants= fraudulent scheme to manipulate Tyco=s financial results:

$     **Jerry R. Boggess**. Mr. Boggess is currently President of Tyco=s Fire and
        Security Services division. Mr. Boggess borrowed a total of $5,000,000 in
        relocation loans to purchase property in Boca Raton in 1997. This loan was
        forgiven and grossed-up as part of the TyCom Bonus in September 2000
        discussed in the next section, which also had not been approved by the
        Compensation Committee. Mr. Boggess also borrowed an additional amount
        which was purportedly forgiven by defendant Kozlowski in January 2002.

$     **Neil R. Garvey**. Mr. Garvey served as President and Chief Executive Officer
        of TyCom Ltd., a Tyco subsidiary, until July 19, 2002. Mr. Garvey borrowed
        $5,000,000 in relocation loans related to his relocation to New Hampshire in

2000. Mr. Garvey=s loan exceeded approved program guidelines by $472,703. As of September 2002, Mr. Garvey=s entire $5,000,000 loan was outstanding, and the Company was seeking repayment of the balance.

201.    In addition, and as set forth in the December Report, Arelocation loans outstanding at the segment level units [rather than the corporate level] reviewed as of June 30, 2002, totaled $3.8 million,@ and Aof the total $3.8 million loans outstanding, about $3.2 million appear not to have conformed to applicable policies and guidelines, although some had legitimate business justification.@

### 2.    The ATyCom Bonus@ Misappropriation

202.    The September Report also admits that in September 2000, defendant Kozlowski Acaused Tyco to pay a special, unapproved bonus to 51 employees who had relocation loans with the Company.@ (The list is set forth as an exhibit to Tyco's civil complaint against defendant Kozlowski.) According to the report, A[t]he bonus was calculated to forgive the relocation loans of all 51 employees, at a total cost of $56,415,037, and to pay compensation sufficient to discharge all of the tax liability due as a result of the forgiveness of those loans.@ The September Report explains that A[t]his action was purportedly related to the successful completion of the TyCom Initial Public Offering.@ The September Report concludes that the Atotal gross wages paid by the Company in this loan forgiveness program were $95,962,000, of which amount Mr. Kozlowski received $32,976,000 and Mr. Swartz $16,611,000.@

203.    Listed below are key managers of Tyco B other than defendants Kozlowski and Swartz B who received unauthorized loan forgiveness and Agross-up@ bonuses pursuant to the September 2000 program that, according to the September Report, was Aconceived and implemented by Mr. Kozlowski@:

| NAME | LOAN BALANCES FORGIVEN | GROSSED UP |
|------|---:|---:|
| Jerry Boggess | $        5,000,000 | $        8,481,764 |
| Irving Gutin | $        3,109,971 | $        5,275,608 |
| Jeffrey Mattfolk | $          825,000 | 1,399,491 |
| Brad McGee | $        1,942,026 | 3,294,361 |
| Patricia Prue | $          748,309 | 1,269,396 |
| Michael Robinson | $        1,063,355 | 1,803,826 |
| Scott Stevenson | $          845,869 | 1,434,893 |
| **Total** | $      13,534,523 | 22,959,338 |

204.     In sum, the September Report concludes that:

the program was discriminatory in scope, terms or operation in favor of executive officers.  First, forgiveness was offered to some people who never moved, some people at the operating division level who were never part of the corporate relocation to Florida and people who did not even have a Tyco mortgage.  Second, forgiveness was never offered to those who were originally eligible for relocation, yet declined to move. In short, forgiveness was never part of the Florida relocation program, but rather was an extra-program benefit.  Regardless of advice that may have been offered relating to the disclosure requirements for nondiscriminatory relocation benefits, the forgiveness benefit was not applied in a nondiscriminatory fashion as part of a nondiscriminatory program and, therefore, should not have qualified for nondisclosure.

205.     All of the forgiveness benefits were individually reported on separate W-2s, yet Tyco admits in its September Report that Anone of the income associated with the forgiveness benefits was reported in the Company=s proxies for [defendants Kozlowski and Swartz] in the year 2000.@

## 3.        The AADT Automotive Bonus@Misappropriations

84

206.    The September Report also states that defendant Kozlowski introduced a second bonus program only a few weeks after the unauthorized forgiveness and gross-up of Florida relocation loan liability.  According to the September Report, AMr. Kozlowski sent a letter to 16 of the Company=s executive officers and key managers [on November 13, 2000] thanking them for their many contributions towards the successful divestiture of Tyco=s ADT Automotive business and enclosing bonuses and >relocation= payments.@  The report states that A[e]ach of the intended recipients of the purported relocation benefits had already recovered all of the grossed-up costs associated with their recent relocations as part of the near-$100 million unauthorized forgiveness program just completed.@  The report also states that A[t]he total of the additional ADT Automotive cash bonus and >relocation= benefits were $3,979,000 and $32,009,641, respectively.@

207.    According to the September Report, defendant Kozlowski=s letter Anoted that information regarding the vested shares had already been previously communicated and that the amounts listed were reviewed and approved by the Chairman of Tyco=s Compensation Committee.@  The report states that A[t]he total number of shares awarded was 261,500 with a then market value of $14,804,038.@

208.    Thus, the September Report concludes that Athe total benefits awarded at the time of the ADT Automotive divestiture were, and total cost [to] the Company was, approximately $55,954,455.@  The distribution of this benefit is summarized in the Company=s September Report as follows:

| EMPLOYEES | CASH BONUS | VALUE OF  ARELOCATION@ | TOTAL |
|---|---|---|---|

|  |  | RESTRICTED SHARES | BENEFITS |  |
|---|---|---|---|---|
| Kozlowski | $700,000.00 | $8,378,576.00 | $16,488,034.00 | $25,566,610.00 |
| Swartz | $350,000.00 | $4,189,288.00 | $8,305,344.00 | $12,844,632.00 |
| Foley | $100,000.00 | $113,224.00 | $422,180.00 | $635,404.00 |
| Gutin | $500,000.00 |  | $2,637,804.00 | $3,137,804.00 |
| Mattfolk | $312,500.00 | $424,590.00 | $699,746.00 | $1,436,836.00 |
| McGee | $500,000.00 | $424,590.00 | $1,647,181.00 | $2,572,771.00 |
| Prue | $312,500.00 | $424,590.00 |  | $737,090.00 |
| Robinson | $312,500.00 | $424,590.00 | $901,913.00 | $1,639,003.00 |
| Stevenson | $312,500.00 | $424,590.00 | $717,447.00 | $1,454,537.00 |
| Other Employees | $579,000.00 | $424,590.00 | $189,992.00 | $768,992.00 |
| Total | $3,979,000.00 | $14,804,038.00 | $32,009,641.00 | $50,792,679.00 |

209.    In sum, the Company has admitted in its September Report that Ain November 2000, Mr. Kozlowski authorized Tyco to pay cash, award property and restricted shares of Tyco common stock, and purportedly forgive the same relocation loans (and make related tax payments) to those Tyco officers and employees B notwithstanding that the relocation loans of each of these persons had already been paid in full as a result of the September 2000 misappropriation described above.@

### 4.    Key Employee Loan Program

210.    Tyco=s Key Employee Loan Program (KEL program) was intended to encourage ownership of Tyco common shares by executive officers and other key employees.  The KEL program was intended to provide loans (KEL loans) on favorable terms to these officers to enable them to pay

taxes due upon the vesting of shares granted under Tyco=s restricted share ownership plan without having to sell the shares at the time of vesting to pay the resultant tax liability.

211.    According to the September Report, during the fiscal years from 1997 to 2002, Acertain executive officers used KEL loans for purposes other than the payment of taxes due upon the vesting of restricted shares, borrowed more than the limits allowed under the program=s terms, or both.@

### a.    L. Dennis Kozlowski

212.    According to the Company=s September Report, throughout the Class Period defendant Kozlowski improperly Aborrowed funds for purposes other than those stated in the KEL program and used the KEL program like an unlimited line of credit.  In addition to taking non-program loans, Kozlowski borrowed in excess of the KEL program=s limits.@

213.    According to the September Report, defendant Kozlowski=s Anon-program KEL borrowing principally occurred in 1999 and afterwards.@  The September Report stated:

> As of August 1998, Mr. Kozlowski=s total KEL account balance was $132,310.  By
> August 1999, Mr. Kozlowski=s outstanding balance had increased to over $55.9
> million.  By the end of 2001, Mr. Kozlowski had taken over 200 KEL loans B some for
> millions of dollars, and some as small as $100.  Mr. Kozlowski used these loans to
> purchase, develop and speculate in real estate; to fund investments in various business
> ventures and partnerships (including private ventures in which both he and Mr. Swartz
> used Tyco KEL loans to invest); and for miscellaneous personal uses having nothing to
> do with any taxes due on the vesting of his shares of Tyco stock.

214.    According to Tyco records cited in the September Report, Aapproximately 90% of Mr. Kozlowski=s KEL loans were non-program loans, which he used to fund his personal lifestyle, including speculating in real estate, acquisition of antiques and furnishings for his properties (including properties purchased with unauthorized >relocation loans=), and the purchase and maintenance of his yacht.@

87

215.    The September Report sets forth some of defendant Kozlowski=s KEL loans, including the journal entries used to describe the purpose for which the money was used and the resulting total loan balance (including both authorized program uses and non-authorized non-program loans). Balances after the date of August 31, 1999 reflect the effect of a $25 million unauthorized credit that has been reversed by Tyco and all balances thereafter should be adjusted accordingly.  *See* Exhibit D.

216.    The September Report also concludes that defendant Kozlowski Agenerally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested (or shortly thereafter C thus violating both the spirit and the letter of the KEL program).@

217.    Defendant Kozlowski was indicted on September 12, 2002 for using the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco.  The September Report states that defendant Kozlowski=s Atotal principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of June 30, 2002, was approximately $43,841,000, plus accrued interest.@

### b.    Mark H. Swartz

218.    As Tyco=s Chief Financial Officer, defendant Swartz was responsible for approving and monitoring the KEL loans of senior management, including defendant Kozlowski=s KEL loans.  As such, the September Report admits that Ahe was aware of the nature and extent of Mr. Kozlowski=s loans.@ As a Tyco director, the report states that defendant Swartz was also Aresponsible for reporting any issues relating to those loans to the Compensation Committee.@

219.    The Company admitted in its September Report that:

Mr. Swartz, like Mr. Kozlowski, borrowed millions in non-program loans.  Like Mr. Kozlowski, Mr. Swartz used those unauthorized loans to purchase, develop and speculate in real estate; to fund investments in various business ventures and partnerships (including private ventures in which both he and Mr. Kozlowski used Tyco KEL loans to invest); and for miscellaneous personal uses having nothing to do with the ownership of Tyco stock.

220.    The Company=s September Report sets forth some of defendant Swartz=s KEL loans, including the journal entries used to describe the purpose for which the money was used and the resulting total loan balance (including both authorized program uses and non-authorized non-program loans).  Balances after the date of August 31, 1999, reflect the effect of a $12.5 million unauthorized credit that has been reversed by Tyco and all balances thereafter should be adjusted accordingly.  *See* Exhibit E.

221.    The September Report concludes that, like Kozlowski, AMr. Swartz also generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested or shortly thereafter B thus violating both the spirit and the letter of the KEL program.@  As explained above, defendant Swartz was indicted on September 12, 2002 for conspiring with defendant Kozlowski to use the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco. The September Report states that defendant Swartz=s Atotal principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of July 18, 2002, was approximately $2,853,025, plus accrued interest.@

### c.   Other Executive Officers

222.   The September Report also provides a summary of KEL borrowing by other executive

officers.

$   **Mark A. Belnick**.  Defendant Belnick borrowed a total of $8,603,218 under
the KEL program prior to and during the Class Period.

$   **Jerry R. Boggess**. Mr. Boggess borrowed a total of $4,461,645 under the
KEL program prior to and during the Class Period.

$   **Neil R. Garvey**. Mr. Garvey borrowed a total of $1,342,572 under the KEL
program prior to and during the Class Period.

### 5.   Attempted Unauthorized Credits to Key Employee Loan Accounts

223.   The September Report admits that in August 1999, at the direction of defendants

Kozlowski and Swartz, Aentries were made in Tyco=s KEL records that purported to reduce

$25,000,000 of Mr. Kozlowski=s outstanding KEL indebtedness, $12,500,000 of Mr. Swartz=s KEL

indebtedness, and $1,000,000 of the KEL indebtedness of another employee.@ According to the

Company, A[t]his was done without the knowledge or approval of the Compensation Committee.@

224.   As set forth in the September Report, AMr. Kozlowski, through his attorneys, has

acknowledged to Tyco that he sought no approvals for these credits and that, if they were entered as a

credit to his KEL account, it was done so improperly.@ The September Report also states that AMr.

Swartz was advised that the credit was unauthorized and has also agreed to repay his forgiven

indebtedness with interest.@ Thus, Tyco has stated that it has Areversed these unauthorized entries, after

notice to investigating authorities.@

### 6.   Belnick=s Undisclosed Executive Compensation

90

225.     According to the September Report, defendants Kozlowski and Belnick Asecretly

agreed@ to additional terms that tied Belnick=s compensation to Kozlowski=s, Athereby giving Mr.

Belnick an undisclosed incentive to aid and facilitate Mr. Kozlowski=s improper diversion of Company

funds to Mr. Kozlowski=s personal benefit.@ The September Report states that the undisclosed terms of

defendants Kozlowski=s and Belnick=s agreement were incorporated in an August 19, 1998 letter signed

by defendant Kozlowski B which Kozlowski did not disclose to the Tyco Board, the Board=s

Compensation Committee, the Tyco Human Resources department, or investors.  The undisclosed

version of Belnick=s agreement with defendant Kozlowski provided, among other things, that Belnick=s

bonus would not be less than 1/3 of Kozlowski=s bonus.

226.     In April 2000, defendant Kozlowski awarded defendant Belnick 100,000 restricted

shares of stock, with 50,000 shares vesting on September 30, 2000 and 50,000 shares vesting on

September 30, 2001.  In July 2000, Kozlowski awarded Belnick an additional cash bonus of $2

million, separate from and in addition to his agreed upon bonus (which defendant Belnick now claimed

was $2 million); along with an additional grant of 200,000 shares of restricted stock B all vesting one

year later.

227.     Adding the $4 million in bonuses to defendant Belnick=s base compensation made

Belnick one of Tyco=s four highest paid executive officers other than the chief executive officer.  In fact,

adding just the $2 million guaranteed bonus to defendant Belnick=s other compensation would have put

him in that category.

228.     As set forth below, Tyco=s proxy statement for fiscal 2000 did not disclose defendant

Belnick=s compensation.  In order to avoid disclosing his compensation, defendant Belnick caused $1

million of the $2 million guaranteed bonus to be falsely characterized as a special bonus, purportedly

relating to a transaction with TyCom.  As a result of this improper reclassification, $3 million of

Belnick=s bonuses was excluded from the computation of Tyco=s four highest paid executives, dropping

Belnick out of that category.

229.    According to the Company=s September Report, defendant Belnick=s actual

compensation in 1999, 2000 and 2001 was as follows:

1999:    $700,000 base salary; $1,500,000 guaranteed bonus; $179,990 in loan interest
forgiveness; $3,388,258 in restricted stock vesting; and $1,906,799 in proceeds from
the exercise of stock options (of a total of 1,000,000 options granted); total
compensation (after adjustments for deferred compensation and other matters, but
excluding unexercised stock options): $6,916,004

2000:    $750,000 base salary; $2,000,000 guaranteed bonus (though $1,000,000 was
re-classified as a Aspecial bonus@); $2,000,000 in another Aspecial bonus@, $231,445 in
loan interest forgiveness; $197,485 in gross-up payments to compensate for taxes on
the imputed income from his loan interest forgiveness; $6,035,803 in restricted stock
vesting, and new options to purchase 200,000 shares of stock; total compensation
(after adjustments for deferred compensation and other matters, but excluding
unexercised stock options): $10,442,331

2001:    $762,500 base salary; $50,000 in an undefined Aspecial bonus@; $300,010 in loan
interest forgiveness; $255,420 in gross-up payments to compensate for taxes on the
imputed income from his loan interest forgiveness; $15,592,042 in restricted stock
vesting; and more options to purchase 200,000 shares of stock; total compensation
(after adjustments for deferred compensation and other matters, but excluding
unexercised options): $16,973,344

230.    In view of this conduct, on June 17, 2002, Tyco filed a civil action against Belnick in the

United States District Court for the Southern District of New York, *Tyco International Ltd. v.*

*Belnick*, No. 02-CV-4644 (SWK).  Tyco alleges that:

a.	**Belnick Took $35 Million in Compensation That Was Not Approved by Tyco=s Board or its Compensation Committee**.  Belnick solicited and accepted large cash and restricted stock bonuses (valued at approximately $20 million in calendar year 2000 alone) from Kozlowski, without the approval or knowledge of the Board or its Compensation Committee.  The Belnick Complaint states that Belnick made over $35 million, including over $25 million on sales of Tyco stock given to him under agreements that were not approved by the Board or its Compensation Committee.  The complaint states that although the original and subsequent grants of stock and options to Belnick were to enable him to build significant equity in Tyco, ΑBelnick regularly abandoned his investment in the Company and sold his shares (or converted options and sold the underlying shares) within days after they vested, earning him millions of dollars≅; ΑFrom the inception of his employment, Belnick failed in his responsibilities and betrayed the Board=s trust, choosing instead to conspire with Kozlowski to evade the Board=s policies regarding compensation and conceal the extent of Belnick=s compensation and benefits, as secretly agreed to by Belnick and Kozlowski, from the Company and the Board.≅

b.	**Belnick Impermissibly Borrowed $14 Million, Interest-Free, under the Company=s Relocation Program**.  This program was authorized by the Compensation Committee in 1995 to assist employees who were then relocating from Tyco=s headquarters in New Hampshire to its then-new offices in New York.  According to the Belnick Complaint, when Belnick began work at Tyco in September 1998, his previous law firm was only a short walk from Tyco=s New York offices.  In addition, he already lived in a suburb of New York City.  Thus, Belnick did not qualify for Tyco=s New York relocation program.  Nevertheless,

Belnick, in clear violation of the policies of the loan program, solicited and accepted a

Arelocation loan,@ and used that loan, plus another Company loan, to pay $2.75 million for an

apartment on Central Park West.  Belnick=s total improper borrowing for his New York

residence now exceeds $4 million, all of which he still owes Tyco.  Belnick also used $10

million in interest-free loans from Tyco to finance a new resort home in Utah. Tyco never

adopted a relocation program to Utah, and Tyco has no corporate offices in Utah to which

Belnick could be said to be relocating.

        c.        **Belnick Manipulated SEC Disclosures to Hide His and Kozlowski=s**

**Wrongful Conduct**.  To accomplish his improper activity while keeping it concealed from

investors, Belnick drafted and executed a new ARetention Agreement@ for himself that provided

him with a further payment of approximately $20 million (in addition to all of his other

compensation and stock, and his existing options) by October 1, 2003.  This additional

payment was structured to assure him of $10.6 million in after-tax income.  The agreement

purported to pay him this additional compensation even if he was terminated for violating his

duties to the Company.  According to the Belnick Complaint, Belnick failed to seek prior Board

or Compensation Committee approval for the agreement; failed to disclose his compensation in

required SEC filings; and fabricated documents after-the-fact to re-characterize certain

components of his compensation so that he could later argue that he was not one of the four

highest-paid officers other than the Company=s CEO, each of whose compensation is required

to be disclosed in proxy statements by SEC Regulation S-K Item 402.

d.   **Belnick Failed to Advise the Board of Various Improper Acts**.  Belnick

failed to inform the Board that $20 million was paid to defendant Frank Walsh, without Board

approval, in connection with his role in the Company=s acquisition of CIT, and that the

Company had a right to recover those payments.  The Belnick Complaint further charges

Belnick with failing to advise the Board of the improper conduct of Kozlowski of which Belnick

was aware, and failing to take any action to remedy or even stop the continuation of such

conduct, thereby facilitating, aiding and abetting Kozlowski=s breach of his own duties to Tyco.

e.   **Belnick Failed to Report Kozlowski=s Subpoena by the Manhattan**

**District Attorney to the Tyco Board**.  The Belnick Complaint also charges Belnick with

failing to advise the Board that the Company had received a subpoena on May 3, 2002 in

connection with a criminal investigation of CEO Kozlowski and concealing from the Board the

fact of the investigation until the evening of May 31, 2002, when Kozlowski himself began

informing the Board.  As alleged in the Belnick Complaint: AAs the nature of Belnick=s

relationship with Kozlowksi, and his own lack of disclosures regarding his compensation

indicate, Belnick chose to conceal the criminal investigation of Tyco=s CEO from the Board for

weeks, and until he had no choice but to do so, because Belnick was seeking to protect

Kozlowski, and Belnick=s own position with the company, rather than acting in good faith with

regard to Tyco=s interests.@

f.   **Belnick Blocked an Internal Tyco Investigation**.  The Belnick Complaint

also details Belnick=s refusal to cooperate with the Company=s outside counsel in the internal

investigation ordered by the Board related to Kozlowski=s conduct, in spite of repeated

95

instructions to cooperate, as well as his actions in obstructing the investigation.  Further, the

Belnick Complaint states that early in the morning of Monday, June 10, ABelnick entered the

New York offices of Tyco and directed Tyco and other personnel to commence packing boxes

with numerous files maintained in the vicinity of his office.@  The Belnick Complaint notes:

ABelnick also deleted folders, files and numerous documents from his computer relating to his

compensation and employment matters, memoranda to Kozlowski, and other confidential Tyco

documents.@  This occurred immediately before Belnick=s termination as Tyco=s chief legal

officer.

> g.    **Belnick Attempted to Remove Paper Files Belonging to Tyco on the Day He Was Terminated, and Ordered the Destruction of Tyco Records Related to Multiple Investigations**.  On June 12, 2002,  Belnick=s legal counsel demanded that Tyco=s

counsel Adelete the Quicken program and all of Belnick=s financial data on the computer in his

office.@  The Belnick Complaint states that at the time of this demand, Belnick and his counsel

knew that authorities were conducting inquiries and had issued subpoenas demanding

documents from Tyco.  AThe Chief Corporate Counsel must be the principal protector of the

Board and the Company against the kind of misconduct engaged in by the Company=s former

Chief Executive Officer.@ According to Tyco, A[f]or a lawyer of Belnick=s position and

reputation to facilitate and conceal such conduct, and to engage in such conduct himself for

personal gain, is inexplicable and inexcusable.@

In sum, the Belnick Complaint characterizes Belnick=s behavior at Tyco as Ainexcusable@ and states that

Belnick Afailed in his duties to the Board and to the Company.@

### 7.   Other Undisclosed Perquisites to Kozlowski and Swartz

231.   The Company admitted in the September Report that prior to and during the Class

Period, "both Mr. Kozlowski and Mr. Swartz each received auto and aircraft perquisites from Tyco

that, in the aggregate, exceeded $50,000 per year." In addition, the Company admitted in its

September Report that "Mr. Kozlowski caused Tyco to make available to him various properties that

the Company owned for his purported business use," and that the value of these personal uses "was

also not reported."

### 8.   Self-Dealing Transactions and Other Misuses of Corporate Trust

232.   The Company has also admitted to numerous other examples of self-dealing and

flagrant abuses of corporate trust.  These include, but are not limited to, the following:

### a.   Kozlowski Evidence Tampering

233.   The September Report admits that from at least 1997 through the time of his departure

in 2002, "Mr. Kozlowski has systematically abused his position and caused Tyco to expend funds for

his personal benefit." For example, the September Report states that "after his violation of the sales tax

rules led to the service of a subpoena on the Company, [Kozlowski] caused Tyco not to comply with a

subpoena.  Concerned only with protecting his wrongdoing from discovery, he tampered with evidence

subject to a subpoena, and risked exposing the Company to an obstruction of justice claim."

### b.   Kozlowski=s Fraudulent New York Home Purchase

234.   According to the Company=s September Report, a Tyco subsidiary purchased a

cooperative apartment in New York City in November 1998 for $5,547,248 "[u]pon Mr. Kozlowski=s

instructions," and made subsequent improvements to it.  The September Report admits that "Mr.

Kozlowski purchased this property from the Tyco subsidiary in May 2000 at the depreciated book value of $7,011,669, rather than its then current market value.@

   **c.**  **Concealed, Fraudulent Overpayment to Kozlowski for NH Property**

235. The September Report also admits that defendant Kozlowski and others caused a Tyco subsidiary to purchase property in Rye, New Hampshire from Kozlowski on July 6, 2000 for approximately $4,500,000.  After an appraisal in March 2002 valued the property at $1,500,000, the September Report states that ATyco wrote down the carrying value of the property to the appraised value and charged Mr. Kozlowski=s $3,049,576 overpayment to expense.@

   **d.**  **Kozlowski Non-Legitimate Business Expenses**

236. The Company=s September Report also admits that defendant Kozlowski Aused millions of dollars of Company funds to pay for his other personal interests and activities@ prior to and during the Class Period, Aincluding a $700,000 investment in the film >Endurance=; more than $1 million for an extravagant birthday party celebration for his wife in Sardinia; over $1 million in undocumented business expenses, including a private venture (West Indies Management B $134,113); jewelry ($72,042); clothing ($155,067); flowers ($96,943); club membership dues ($60,427); wine ($52,334); and an undocumented $110,000 charge for the purported corporate use of Mr. Kozlowski=s personal yacht, >Endeavour.=@

   **e.**  **Kozlowski Charitable Contributions For Personal Benefit**

237. Also prior to and throughout the Class Period, as set forth in the Company=s September Report, defendant Kozlowski:

caused Tyco to make donations or pledges to charitable organizations totaling over $106 million. Of this total, at least $43 million in donations were represented in transmittal letters or otherwise as Mr. Kozlowski=s personal donations, or were made using the Company=s funds for Mr. Kozlowski=s personal benefit. Mr. Kozlowski=s letters accompanying these donations or pledges often indicated that they were made Aon behalf of L. Dennis Kozlowski,@ such as a 1997 pledge to Seton Hall University that enclosed a $1 million Tyco check with a letter signed by Mr. Kozlowski that referred to Amy pledge to Seton Hall University.@ Mr. Kozlowski made two other million-dollar pledges to schools under his own name but using Tyco funds, and made several other pledges that were publicly announced as being from Mr. Kozlowski, or in which a facility was named after him or his family, even though he had used Tyco=s money to make the pledge.

238.    In addition, defendant Kozlowski donated $4 million to Cambridge University to study corporate governance, falsely claiming that half the contribution was being made from his personal funds, whereas in fact all the money had been appropriated from Tyco. According to the November 6, 2002 edition of THE DAILY TELEGRAPH (LONDON):

> Even the producers of The Office [a British television sitcom] would be hard-pressed to invent a script quite as whacky as a chair of Corporate Governance donated to Cambridge University by Tyco International.
>
> Mr. Kozlowski claimed the glory for endowing the chair with $4m, but it seems that half of it came from the Tyco shareholders. In practice, it all came from their pockets, since he seemed to have some difficulty in distinguishing between what was his, and what belonged to the company . . . .

239.    According to the September Report:

> [m]ost egregiously, in 2001 Mr. Kozlowski donated to the Nantucket Conservation Foundation, Inc. a total of $1,300,000 in Company money. The donation was used partially to purchase 60 acres of property called ASquam Swamp@ adjacent to Mr. Kozlowski=s own Nantucket estate on Squam Road. The effect of this gift was to preclude future development of the land and thereby increase the value of Mr. Kozlowski=s home.

**f.    Walsh Payment**

240.    In early 2001, according to the Company≈s September Report, Frank E. Walsh, Jr.,

Tyco≈s Lead Director and the former Chairman of its Compensation Committee, recommended to the

Board that Tyco acquire a financial services company, and later proposed that he introduce Kozlowski

to the Chairman and CEO of The CIT Group, a large financial services company.  The report states:

> Subsequent negotiations led to an agreement for Tyco to acquire CIT, which closed in
> June 2001.  After the terms of the CIT transaction had been agreed to, Mr. Kozlowski
> caused Tyco to pay to and for the benefit of Mr. Walsh a $20 million fee for his role in
> the transaction.

> Mr. Kozlowski told Mr. Walsh, and Mr. Walsh agreed, that they should conceal this
> payment from the Board.

241.    On June 17, 2002, Tyco filed suit against Walsh for breaching his fiduciary obligations

by arranging an unauthorized $20 million Afinder≈s fee@ from Tyco for himself in connection with the

Company≈s 2001 acquisition of CIT, hiding it from his fellow directors and, when confronted by the

Board, refusing to return it.

242.    According to the Walsh Complaint, the day after the fee was disclosed in the

Company≈s proxy statement, Tyco≈s stock dropped sharply, resulting in an almost $17 billion decline in

the Company≈s market capitalization in a single day.  As stated by Tyco in the Walsh Complaint:

> On January 28, 2002, Tyco filed its proxy statement for its upcoming annual general
> meeting with the Securities and Exchange Commission, and the contents of that proxy,
> including the disclosure of the payments to Walsh, became public.  ***Following this
> disclosure, which was immediately picked up and publicized in the national
> financial press, the share price of Tyco≈s stock fell from $42 to $33.65, reducing
> the Company≈s market capitalization by $16.7 billion, in one day***.  [Emphasis
> added].

243.    Tyco said in a June 17, 2002 press release:

We are taking this action because Frank Walsh violated his fiduciary duties as a Tyco director and put his personal gain ahead of the interests of the company and its shareholders.  Mr. Walsh engaged in a pattern of self-dealing and unethical conduct. He had a clear and unambiguous disclosure obligation to the Board that he chose not to honor. We will pursue this matter aggressively so that Mr. Walsh is held accountable for the damage done to Tyco and its shareholders. The company is also continuing its investigation of Dennis Kozlowski's conduct and will pursue whatever remedies are appropriate based on the results of that investigation.

### g.      Swartz Breach of Nominee Agreement

244.    According to the September Report, defendant Swartz lived in a Tyco-owned apartment at 30 E. 85th Street, New York since April 2000.  On May 6, 2002, he caused the Company to enter a notation in its books and records purporting to transfer title to that apartment, including fixtures and furniture, to himself at its depreciated book value of $9,646,975, which Swartz paid in cash.  No appraisal was performed in connection with this transfer.  On July 18, 2002, defendant Swartz agreed to reverse that transaction.  The Company stated in its report that Swartz's KEL account has been credited $9,646,975 to reflect this reversal.

### h.      Swartz Personal Expense Reimbursement

245.    The Company admitted in its September Report that defendant Swartz caused Tyco to pay him a reimbursement of $1.2 million on March 1, 2002 to cover lost deposits on personal real estate transactions involving apartments in Trump Tower on Fifth Avenue in New York.

### i.      Compensation Committee Deceptions

246.    On June 22, 2001, Tyco acquired 15 million shares of Flag, a telecom company for $11,421,810 cash and 5,580,647 TyCom shares.  The Company reported a $79,364,700 gain associated with the swap of TyCom shares for the Flag equity.  As a result of the gain, purportedly as another bonus, accelerated vestings of restricted shares were made to various key individuals.[19]  Each of the executives involved in the grant of restricted shares sold the shares back to the Company=s Newington subsidiary on June 20, 2001 and received wire transfers to their personal accounts in the amounts indicated in the note below, justified on the basis that the transaction resulted in a $79 million gain to TyCom.  The Compensation Committee approved and certified the vesting of 290,000 shares for defendants Kozlowski and Swartz only on October 1, 2001 Ain conjunction with the gain@ on the Flag transaction.  The total cost to the Company related to the award of these shares was $15,378,700.  However, by the end of the quarter (September 30, 2001) and prior to the October 1, 2001 certification by the Compensation Committee, the value of the Flag stock decreased substantially, to the point that it was impaired, thus undermining the basis on which the special bonus vesting was approved.  The Company admitted in its September Report that neither defendants Kozlowski nor Swartz, who were both members of the Board of Directors during this time period, ever disclosed this impairment or the full circumstances of the Flag transaction to the Compensation Committee.  Their entitlement to these bonuses was predicated upon a failure to disclose relevant facts for their own personal benefit.  Other examples of self-dealing and serious breaches of fiduciary duties owed to Tyco by defendant Kozlowski, in particular his deceptions to the Compensation Committee resulting in the accelerated

---

[19] For example, defendant Kozlowski received 155,000 shares with a vesting value of $8,219,650 and defendant Swartz received 77,500 shares with a vesting value of $4,109,825.

vesting of his own and other executives= shares of restricted stock and his entitlement to executive

benefits, are the subject of litigation in Tyco=s civil suit against Kozlowski and are further detailed in that

complaint.

### j.     Other Undisclosed Transactions Between Tyco and Its Directors

247.     Following the Tyco/ADT merger in 1997, Lord Ashcroft KCMG, a Tyco director and

the former Chief Executive Officer of ADT, offered for sale his residential property in Boca Raton,

Florida.  According to news reports, on October 27, 1997, Ashcroft sold his Royal Palm Yacht and

Country Club home to his wife for $100.  On the same day, she sold it to Byron Kalogeru, who was

then Tyco=s vice-president and general counsel, for $2.5 million.  According to a June 10, 2002 article

in THE WALL STREET JOURNAL, the house was purchased with Tyco funds, without input from the Tyco

Board, and placed in Kalogerou=s name.  According to the article, Kalogerou did not use the home B

Kozlowski did.

### 9.     Kozlowski and Swartz Engage in Short Swing Trading

248.     According to a complaint filed by Tyco against both Kozlowski and Swartz in

December 2002, between August 1, 2000 and January 30, 2002, while Kozlowski served as a director

and Chief Executive Officer of Tyco, he bought and sold a number of Tyco equity securities within a

six-month period in violation of 15 U.S.C. ' 78p(b).  Tyco=s complaint also alleges that between

August 1, 2000 and April 26, 2002, while Swartz served as an executive vice president and Chief

Financial Officer of Tyco, he bought and sold a number of Tyco equity securities within a six-month

period in violation of 15 U.S.C. ' 78p(b).  Tyco estimates Kozlowski and Swartz=s profits from these

short swing trades exceed $40 million.

**THE TYCO DEFENDANTS= MATERIALLY FALSE AND
MISLEADING STATEMENTS DURING THE CLASS PERIOD**

**Materially False and Misleading Statements Throughout the
Class Period That Acquisitions Will Be Immediately APositive@ or Accretive@**

249.    Throughout the Class Period, in a series of press releases, the Tyco Defendants

repeatedly touted the Apositive@ or Aaccretive@ impact of its disclosed acquisitions on the Company=s

free cash flow and earnings.  As the Tyco Defendants either knew or were reckless in not knowing,

each of these statements when made was materially false and misleading and omitted material

information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.[20]  These statements

included the following:

250.    On May 7, 2000, Tyco announced its acquisition of the Thomas & Betts Electronic

OEM Business.  The press release headline stated that the acquisition would be immediately accretive

to earnings.  According to the press release:

> AThis acquisition offers significant cost saving opportunities through manufacturing
> synergies, rationalization of R&D and efficiencies through combined product marketing,
> distribution and purchasing,@ Mr. Kozlowski stated.  **Mr. Kozlowski also noted that
> the addition of this business would provide an immediate positive contribution
> to Tyco=s earnings.**
>
> AOur previous acquisitions in Tyco Electronics have achieved strong top line growth and
> exceeded cost reduction targets. We expect that the acquisition of the Electronic OEM
> Business of Thomas & Betts will also provide **positive benefits to Tyco
> shareholders,@ Mr. Kozlowski concluded.**  [Emphasis added.]

251.    On June 28, 2000, Tyco announced the acquisition of Mallinckrodt.  The Company=s

press release stated:

---

[20] All sections cited herein are under the heading ADefendants' Wrongful Course of Conduct@
above.

104

**Acquisition Will Have Immediate Positive Impact on Earnings; Strengthens Tyco Healthcare=s Leading Positions in Medical Devices**

* * *

**AThe Mallinckrodt acquisition will be immediately accretive to Tyco=s earnings,@ Mr. Kozlowski stated.  A**It offers consolidation opportunities as well as significant manufacturing, purchasing and distribution synergies. Our past acquisitions in Tyco Healthcare have achieved strong top line growth and operating efficiencies. We expect that the acquisition of Mallinckrodt also will provide ongoing positive benefits to Tyco shareholders.  [Emphasis added.]

252.    On October 17, 2000, Tyco announced the completion of the Mallinckrodt purchase.

According to the Company=s press release:

**AThe Mallinckrodt acquisition will be immediately accretive to Tyco=s earnings,@ according to L. Dennis Kozlowski, Tyco=s Chairman and Chief Executive Officer.  A**It offers consolidation opportunities as well as significant manufacturing, purchasing and distribution synergies.  Our past acquisitions in Tyco Healthcare have achieved strong top line growth and operating efficiencies. The acquisition of Mallinckrodt also will provide ongoing positive benefits to Tyco shareholders.  [Emphasis added.]

253.    On November 13, 2000, Tyco announced that it had agreed to acquire Lucent=s Power

Systems Business.  As set forth in the Company=s press release:

**Acquisition Provides Excellent Strategic Fit for Tyco Electronics and TyCom, Will be Immediately Accretive to earnings**. . . . Tyco International Ltd. (NYSE: TYC; LSE: TYI; BSX: TYC) a diversified manufacturing and service company, today announced that it has agreed to acquire Lucent Technologies= Power Systems business unit (ALPS@) from Lucent Technologies Inc. (NYSE: LU) for $2.5 billion in cash. The acquisition is subject to customary regulatory approvals.

**According to L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco International Ltd., AWe expect that the acquisition of LPS, like previous acquisitions, will be immediately accretive to Tyco=s earnings. Previous acquisitions in Tyco Electronics continue to achieve strong top line growth and exceed cost reduction targets.@** [Emphasis added.]

105

254.    On December 4, 2000, Tyco announced that it would acquire Simplex Time Recorder

Co.  According to the Company=s press release:

> **According to L. Dennis Kozlowski, Tyco=s Chairman and Chief Executive**
> **Officer, AThis transaction meets all of Tyco=s acquisition criteria. The**
> **transaction will be immediately accretive to Tyco=s earnings per share and**
> **generate positive operating cash flows.** In addition, Simplex is a leader in the
> markets it serves, provides a strong recurring revenue stream and is an excellent
> complement to Tyco=s existing Fire and Security Services product offering, capabilities
> and geographic reach. **The combination of Simplex with Tyco Fire and Security**
> **Services will provide excellent manufacturing and service synergies, allowing**
> **for immediate positive benefits for Tyco shareholders.@** [Emphasis added.]

255.    On December 29, 2000, Tyco announced that it had completed its acquisition of

Lucent=s Power Systems Business.  According to the press release:

> **According to L. Dennis Kozlowski, Chairman and Chief Executive Officer of**
> **Tyco International Ltd., AThis** business is an excellent fit for Tyco Electronics. We
> expect that **the acquisition of LPS will be immediately accretive to Tyco=s**
> **earnings. Previous acquisitions in Tyco Electronics continue to achieve strong**
> **top line growth and exceed expected earnings targets.@** [Emphasis added.]

256.    On February 5, 2001, Tyco announced that it would acquire Scott Technologies.  The

press release stated:

> **Acquisition Will Have Immediate Positive Impact on Tyco=s Earnings** . . .

> \* \* \*

> **According to L. Dennis Kozlowski, Tyco=s Chairman and Chief Executive**
> **Officer, AThis transaction will be immediately accretive to Tyco=s earnings per**
> **share and will generate positive operating cash flows. Scott Technologies, which**
> **is a leader in its markets, will add significant recurring revenue to Tyco Fire &**
> **Security Services. Scott=s equipment is sold to many customers of the Tyco Fire**
> **& Security Services group, providing complementary products through a**
> **common distribution channel.@** [Emphasis added.]

257.    On March 28, 2001, Tyco issued a press release announcing that it had been named

the Anumber one performing company of 2000 by BusinessWeek magazine.@ According to the press

release:

> Tyco is the top performer based on its revenue growth, earnings growth, return to
> shareholders, profit margins and return on equity, tallied for both one year and three
> years. . . . L. Dennis Kozlowski, Chairman and CEO of Tyco, commented, ATyco is
> delighted to receive this recognition from BusinessWeek. **Tyco=s >growth on growth=
> strategy has been designed to deliver ongoing solid, sustainable organic growth
> coupled with growth through acquisitions**. Our strategy has positioned Tyco as the
> leader in our markets and as the high-quality, low-cost producer in the industries in
> which we operate.@ . . **In addition, Tyco has made and integrated more than 118
> acquisitions, __all of them__ accretive to shareholders.** [Emphasis added.]

258.    On May 3, 2001, Tyco announced the completion of the acquisition of Scott

Technologies.  As set forth in the press release:

> **According to L. Dennis Kozlowski, Tyco=s Chairman and Chief Executive
> Officer, AThis acquisition will be immediately accretive to Tyco=s earnings per
> share and will generate positive operating cash flows. Scott Technologies, which
> is a leader in its markets, will add significant recurring revenue to Tyco Fire &
> Security Services.** [Emphasis added.]

259.    On May 17, 2001, Tyco announced the acquisition of SecurityLink.  As stated in

the Company press release:

> Tyco International Ltd. to Acquire SecurityLink and Other Businesses Of Cambridge
> Protection Industries L.L.C.; **Acquisition Will Have Immediate Positive Impact on
> Tyco=s Earnings** . . .

*   *   *

> **Also, as with our existing ADT operations, we expect this business to generate
> healthy organic growth with attractive incremental margins**.  Looking at the near-
> term, **we expect the transaction will be immediately accretive to Tyco=s earnings
> per share and free cash flow per share**. The integration of the Cambridge businesses

with ADT will provide product, service and operational synergies, which will result in ongoing positive benefits to Tyco shareholders.@ [Emphasis added.]

260.    On May 30, 2001, Tyco announced the acquisition of C. R. Bard.  As stated in the

Company press release:

> Tyco International to Acquire C. R. Bard; Provides New Product Platforms for International Growth Of Tyco Healthcare=s Medical Devices Business; **Acquisition Will Be Immediately Accretive to Tyco Earnings and Cash Flow.**

> *    *    *

> **Mr. Kozlowski added: ABard also offers substantial cost synergies through leveraging administrative costs as well as gaining efficiencies in manufacturing, distribution and purchasing.  The transaction will be immediately accretive to Tyco=s earnings and free cash flow per share. The acquisition will provide ongoing benefit to our customers and shareholders.@** [Emphasis added.]

261.    On July 5, 2001, Tyco announced the completion of the SecurityLink acquisition.

According to the Company=s press release:

> Tyco International Ltd. Completes Purchase Of SecurityLink and Other Businesses of Cambridge Protection Industries LLC; **Acquisition Expected To Be Immediately Accretive to Tyco=s Earnings**

> *    *    *

> **According to Tyco=s Chairman and Chief Executive Officer L. Dennis Kozlowski: AWe expect this transaction will be immediately accretive to Tyco=s earnings per share and free cash flow.@** [Emphasis added.]

262.    On August 3, 2001, Tyco announced another acquisition:

> Tyco International to Acquire Sensormatic; Provides Comprehensive Range of New Products and Services Within Tyco Fire & Security; **Acquisition will be Immediately Accretive to Tyco Cash Flow and Earnings**

> *    *    *

108

**According to Mr. Kozlowski: @This transaction will provide excellent, ongoing value to our customers and shareholders.  It will be immediately accretive to Tyco=s earnings and free cash flow per share. We see significant cost savings and synergistic opportunities in the areas of sales, administration, manufacturing and distribution.@** [Emphasis added.]

263.    On December 3, 2001, Tyco announced the acquisition of Paragon Trade Brands.  In the Company press release headline Tyco stated, **@Acquisition Will Be Immediately Accretive to Tyco Earnings and Cash Flow@** (emphasis added).

264.    On December 20, 2001, Tyco announced the acquisition of McGrath RentCorp.  According to the Company=s press release:

> Tyco International to Acquire McGrath RentCorp; Acquisition Expands Tyco Capital=s Product Portfolio and Recurring Revenue Base; **Immediately Accretive to Tyco Earnings and Cash Flow**

> \* \* \*

**According to L. Dennis Kozlowski . . . @As is the case with all Tyco acquisitions, the transaction will be immediately accretive to both Tyco=s earnings and cash flow.@** [Emphasis added.]

### 1999 Materially False and Misleading Statements And Omissions

265.    Even before the Class Period began on December 13, 1999, when the Tyco Defendants filed the Company=s Form 10-K for the fiscal year ended September 30, 1999, the SEC had begun a nonpublic, informal inquiry relating to charges and reserves taken in connection with the Company=s acquisitions.  In a press release dated December 9, 1999, only four days before the start of the Class Period, the Tyco Defendants denied any impropriety, quoting defendant Kozlowski:  @>we welcome the opportunity to respond to [the SEC=s] request.  **We remain confident of our accounting methodology, our public disclosures and the continuing strength of our business=@**

109

(emphasis added).[21]  This statement was materially false and misleading for the reasons specified above in Section(s) A, A.1.a, A.1.d and A.3.  It remained uncorrected through the ensuing Class Period, and was reinforced throughout the Class Period by other similar statements by the Tyco Defendants falsely denying the scheme of accounting manipulation in which they were continuously engaged throughout the Class Period.

266.    The price of Tyco stock closed at $28.25 on December 9, 1999, the first day of the Class Period.

**The 1999 10-K filed on December 13, 1999**

267.    On December 13, 1999, the first day of the Class Period, the Tyco Defendants filed Tyco=s 10-K for the fiscal year ended September 30, 1999 (the A1999 10-K@), signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, James S. Pasman, Jr., and W. Peter Slusser).  In it, the Tyco Defendants set out numerous statements that were materially false and misleading and that omitted material information, as evidenced by (among other things) the Tyco Defendants= restatement of its operating results in a June 26, 2000 10-K/A for fiscal year ended September 30, 1999 (discussed below).  These false and misleading statements addressed a variety of topics, including the following:

**Tyco=s AStrategy@**

---

[21] The press release was filed with the SEC on December 9, 1999 in a Form 8-K, signed by defendant Swartz.

268.    The 1999 10-K purports to set forth Tyco=s Astrategy,@ which the Tyco Defendants later

repeated verbatim in filings with the SEC throughout the Class Period.  According to the 1999 10-K:

> Tyco=s strategy is to be the low-cost, high quality producer and provider in each of its
> markets.  It promotes its leadership position by investing in existing businesses,
> developing new markets and acquiring complementary businesses and products.
> Combining the strengths of its existing operations and its business acquisitions, Tyco
> seeks to enhance shareholder value through increased earnings per share and strong cash
> flows.

As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when

made was materially false and misleading and omitted material information for the reasons set forth above

in Section(s) A, A.1.a and A.2.d.

### Tyco=s Manipulation of Purchase Accounting Reserves

269.    The 1999 10-K sets forth statements that were materially false and misleading

concerning Tyco=s manipulation of purchase accounting reserves:

> In Fiscal 1999, the Company made acquisitions that were accounted for under the
> purchase accounting method at an aggregate cost of $6,923.3 million.  Of this amount,
> $4,546.8 million was paid in cash (net of cash acquired), $1,449.6 million was paid in
> the form of Tyco common shares, and the Company assumed $926.9 million in debt. In
> connection with these acquisitions, the Company established purchase accounting
> reserves of $525.4 million for transaction and integration costs. **At the beginning of
> Fiscal 1999, purchase accounting reserves were $505.6 million as a result of
> purchase accounting transactions made in prior years. During Fiscal 1999, the
> Company paid out $354.4 million in cash and incurred $16.3 million in non-cash
> charges against the reserves established during and prior to Fiscal 1999. Also in
> Fiscal 1999, the Company determined that $90.0 million of purchase accounting
> reserves related to acquisitions  prior to Fiscal 1999 were not needed and
> reversed that amount against goodwill. At September 30, 1999, there remained
> $570.3 million in purchase accounting reserves on the Company=s Consolidated
> Balance sheet, of which $408.0 is included in current liabilities and $162.3 million
> is included in long-term liabilities. The Company expects to pay out
> approximately $350.0 million in cash in Fiscal 2000 that will be charged against
> these purchase accounting reserves.** [Emphasis added.]

111

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

270.    The 1999 10-K also provides information about specific acquisitions, including Tyco=s merger with AMP Inc. (AAMP@) and U.S. Surgical Corp. (AUS Surgical@) in Apooling of interests@ transactions, but fails to acknowledge either the Tyco Defendants= practice of aggressive accounting (through the manipulation of accounting reserves, *inter alia*) or their practice of incentivizing executives at acquiree companies to manipulate the acquiree=s financial reporting before the acquisition to create the false appearance of superior earnings for Tyco after the acquisition.  According to the 1999 10-K:

> In Fiscal 1999, the Company consummated two mergers that were accounted for under the pooling of interests method of accounting. The merger with United States Surgical Corporation closed on October 1, 1998, and the merger with AMP Incorporated closed on April 2, 1999. As required by generally accepted accounting principles, the Company restated its financial statements as if USSC and AMP had always been a part of the Company. The Company recorded as expenses during Fiscal 1999 costs directly associated with the USSC and AMP mergers and the costs of terminating employees and closing or consolidating facilities as a result of the mergers. The Company also expensed in Fiscal 1999 the costs of staff reductions and facility closings that AMP undertook as part of a plan to improve its profitability unrelated to the Company=s merger with AMP. In Fiscal 1998, the Company expensed charges for staff reductions and facility closings under the AMP profit improvement plan and charges that USSC incurred to exit certain of its businesses. These are discussed in more detail under ALiquidity and Capital Resources@ below.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

271.    As the December Report states in the case of AMP:  Athe recorded quarterly results for AMP show a decline in profits prior to the acquisition by Tyco and an increase in profits following the acquisition.@  Similarly, the December Report says of US Surgical:  ASurgical=s reported results also declined during the quarter immediately prior to the merger, as compared with quarters prior to and after the consummation of the merger.@

**Tyco=s Operating Results**

272.    The 1999 10-K also gives favorable, purportedly accurate information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

|  |  |  | (UNAUDITED) TWELVE MONTHS ENDED |
|  | FISCAL 1999 | FISCAL 1998 | SEPTEMBER 30, 1997 |
|  | ----------- | ---------- | ----------------- |
|  | (IN MILLIONS) | | |
| Pre-tax income before extraordinary items and cumulative effect of accounting changes............... | 1,651.2 | 1,702.8 | 79.0 |
| Income taxes................................ | (620.2) | (534.2) | (379.5) |
|  | --------- | --------- | --------- |
| Income (loss) before extraordinary items and cumulative effect of accounting changes.. ............. | 1,031.0 | 1,168.6 | (300.5) |
| Extraordinary items, net of taxes.......... | (45.7) | (2.4) | (60.9) |
| Cumulative effect of accounting changes, net of taxes | -- | -- | 15.5 |
|  | -------- | --------- | --------- |
| Net income (loss)............................ | $  985.3 | $ 1,166.2 | $ (345.9) |
|  | ========= | ========= | ========= |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d

273.    In addition, these operating statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco=s favorable results to Aorganic growth@ and Asynergies@ resulting from Tyco=s acquisitions.  According to the 1999 10-K:

113

Operating profits improved in all segments in each of Fiscal 1999 and Fiscal 1998, with the exception of the Healthcare and Specialty Products segment in Fiscal 1998 for reasons that are discussed below. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.

Similarly, regarding the AMP and US Surgical mergers, the 1999 10-K states: A[b]y integrating merged companies with the Company=s existing businesses, the Company expects to realize operating synergies and long-term cost savings.@ And concerning profits in Tyco=s electrical business, defendant states:

The 40.5% increase in operating profits in Fiscal 1999 compared with Fiscal 1998 was due to improved margins at AMP, the acquisition of Raychem, and higher sales volume at TSSL and the Tyco Printed Circuit Group. The improved operating margins in Fiscal 1999 compared with Fiscal 1998 were primarily due to the implementation of AMP=s profit improvement plan, which was initiated in the fourth quarter of Fiscal 1998, cost reduction programs associated with the AMP merger, a pension curtailment/settlement gain and the acquisition of Raychem. For information on the implementation of the AMP profit improvement plan and the cost reduction programs related to the AMP merger, see Note 16 (1999 Charges and 1998 Charges) to the Consolidated Financial Statements. These improvements were partially offset by $253.4 million of certain costs in Fiscal 1999 at AMP prior to the merger with Tyco, including costs to defend the AlliedSignal Inc. tender offer, the write-off of inventory and other balance sheet write-offs and adjustments.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Management Remuneration**

274.    The 1999 10-K addresses management remuneration only by reference, stating:

AInformation concerning management remuneration is hereby incorporated by reference to the Registrant=s definitive proxy statement which will be filed with the Commission within 120 days after the

close of the fiscal year." Because the 1999 10-K incorporates Tyco=s Proxy Statement, filed on March 1, 2000, by reference, the 1999 10-K contains the same materially false and misleading statements set forth therein, as described below.

275.    The 1999 10-K also gives limited information concerning loans taken by senior management under Tyco=s KEL, which was instituted to encourage ownership of the Company=s common stock by executives and other key employees.  According to the 10-K:  ADuring Fiscal 1999, the maximum amount outstanding under the program was $91.6 million."  As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.b, B and B.4.

276.    On December 14, 1999, J.P. Morgan, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled, ALong Awaited 10K Provides Full Disclosure and Reinforces Accounting Confidence."  The report stated:

> Tyco=s recently filed 10-K provides unprecedented disclosure and reinforces our confidence that the Company has not misrepresented its financial picture.

**The 1999 10-K/A filed on 1/28/00**

277.    On January 28, 2000, the Tyco Defendants filed Tyco=s 10-K/A for the fiscal year ended September 30, 1999 (the A1/28/00 10-K/A@), signed by defendant Swartz.  The 1/28/00 10-K/A provides additional information about the remuneration of top management at Tyco.  For example, the Tyco Defendants submitted the following information concerning the compensation of defendants Kozlowski and Swartz:

| | | | | | ANNUAL COMPENSATION (2) | | | LONG-TERM COMPENSATION | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| NAME & PRINCIPAL POSITION | YEAR | SALARY | CASH BONUS(3) | STOCK BONUS (4) | RESTRICTED STOCK AWARD(S)(5) | SHARES UNDERLYING STOCK OPTIONS | LONG-TERM INCENTIVE PAYOUTS | ALL OTHER COMPENSATION |

```
(6)
----------------       ----  ---------  ------------  ---------  ------------  ---------  ---------  --------------
-

L. DENNIS KOZLOWSKI.......  1999  $1,350,000  $3,200,000             $25,707,178  6,621,834             $387,001
  CHAIRMAN & CHIEF          1998   1,250,000   2,500,000              20,140,000  3,832,800              901,002
  EXECUTIVE OFFICER,        1997   1,250,000   2,544,260                          6,600,000  $6,508,125  108,125
  TYCO INTERNATIONAL
  LTD.

                                                                * * *

MARK H. SWARTZ............  1999    750,000   1,600,000              12,029,641  2,976,480             150,014
  EXECUTIVE VICE PRESIDENT  1998    559,500   1,250,000              10,070,000  2,764,666             256,878
  AND CHIEF FINANCIAL       1997    559,500   1,272,130                          2,200,000  2,169,375   31,994
  OFFICER, TYCO International Ltd.
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.1.a-b, B.4.a-b, B.5, B.7 and B.8. [22]

278.    And the 1/28/00 10-K/A contains the following materially false and misleading statement concerning Tyco=s KEL program:

> At September 30, 1999, the amount of loans outstanding under the loan program totaled $18,569,137, of which $0 was loaned to Mr. Kozlowski . . . and $0 to Mr. Swartz. The largest amount of indebtedness since October 1, 1998 incurred by each of the Named Officers was: $52,688,249 for Mr. Kozlowski . . . .

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.1.a-b, B.5, B.7 and B.8.

**The 1999 10-K/A filed on 6/26/00**

279.    On June 26, 2000, the Tyco Defendants filed another 10-K/A for the fiscal year ended September 30, 1999 (the A6/26/00 10-K/A@), signed by defendant Swartz.  At the same time, Tyco

---

[22] On February 1, 2000, the Tyco Defendants filed a 10-K/A for the fiscal year ended September 30, 1999 (the A2/1/00 10-K/A@), signed by defendant Swartz.  The 2/1/00 10-K/A simply corrects a formatting error in the chart above.  The corrected information from the 2/1/00 10-K/A, rather than the version in the 1999 10-K, is used in the chart as quoted.

restated its operating results for the first two quarters of fiscal 2000 (as discussed below).  The Tyco

Defendants announced the restatement in a release issued over the PR NEWSWIRE on June 26, 2000,

which said that the restatement was in response to a Alimited review@ of a single Tyco registration

statement for a debt exchange offer filed in December 1999, and that the review included Athose portions

of Tyco=s financial statements principally relating to charges and reserves reported in connection with

Tyco=s acquisition activity.@

     280.    In the 6/26/00 10-K/A, the Tyco Defendants gave the following explanation for the need

to restate Tyco=s operating results:

> The amendment to the financial statements is being filed to reclassify certain charges and
> to adjust merger, restructuring and other non-recurring charges between periods due to
> the timing of the underlying events as follows:
>
> > - To reclassify $172.5 million of charges, incurred by AMP prior to its
> > merger with Tyco, related to the write-off of goodwill and fixed assets of
> > exited businesses in the Consolidated Statement of Operations out of the
> > Amerger, restructuring and other non-recurring charges@ line and into the
> > Acharge for the impairment of long-lived assets@ line;
> >
> > - To reclassify $27.5 million of inventory related restructuring costs in the
> > Consolidated Statement of Operations out of the Amerger, restructuring
> > and other non-recurring charges@ line and into the Acost of sales@ line;
> >
> > - To eliminate $26.0 million of merger, restructuring and other
> > non-recurring charges which were originally recorded in fiscal 1999
> > related primarily to severance and facility closings and the subsequent
> > reversal of such charge recorded as a credit to merger, restructuring and
> > other non-recurring (credits) charges taken in the first quarter of fiscal
> > 2000;
> >
> > - To record a credit in fiscal 1999 for the reversal of $16.9 million of
> > merger, restructuring and other non-recurring charges which were
> > originally recorded in fiscal 1997 related primarily to facility closings and
> > lease termination costs (this credit was previously recorded in the first

quarter of fiscal 2000);

- To report certain non-recurring costs related to the integration of the
USSC suture business originally recorded in the first quarter of fiscal
1999 as costs in later periods when such activity was completed
(deferring $11.1 million of merger, restructuring and other non-recurring
charges originally recorded in fiscal 1999 until fiscal 2000); and

- To update various disclosures primarily related to purchase accounting

liabilities and merger, restructuring and other non-recurring charges.

281.    Although Tyco=s filing of an amended 10-K was in effect an admission that it had

materially misstated its operating results during the Class Period, the Tyco Defendants attempted to

downplay that admission by restating its results only minimally, by denying that there were any materially

false statements in its previously filed 10-K, and by denying any involvement in a scheme, later admitted

in the December Report, to manipulate its acquisition accounting.  This scheme, described in detail above

in Section(s) A, A.1.a and A.1.d, included the Tyco Defendants= practice of aggressive accounting

(through the manipulation of accounting reserves, *inter alia*), and their practice of incentivizing executives

at acquired companies to manipulate the acquired company=s financial reporting before the acquisition to

create the false appearance of superior earnings for Tyco after the acquisition.

282.    The 6/26/00 10-K/A itself contains numerous materially false and misleading statements

on a variety of topics, including the following:

**Tyco=s Operating Results**

283.    The 6/26/00 10-K/A also gives favorable, purportedly accurate information concerning

Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

|  | FISCAL 1999 | FISCAL 1998 | (UNAUDITED) TWELVE MONTHS ENDED SEPTEMBER 30, 1997 |
| --- | --- | --- | --- |
|  |  | (IN MILLIONS) |  |
| Pre-tax income before extraordinary items and cumulative effect of accounting changes................. | 1,705.2 | 1,702.8 | 79.0 |
| Income taxes.................................. | (637.5) | (534.2) | (379.5) |
| Income (loss) before extraordinary items and cumulative effect of accounting changes................. | 1,067.7 | 1,168.6 | (300.5) |
| Extraordinary items, net of taxes.............. | (45.7) | (2.4) | (60.9) |
| Cumulative effect of accounting changes, net of taxes.. | -- | -- | 15.5 |
| Net income (loss)............................... | $ 1,022.0 | $ 1,166.2 | $ (345.9) |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

284.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco≈s favorable results to organic growth and synergies resulting from Tyco≈s acquisitions:

> Operating income improved in all segments in each of Fiscal 1999 and Fiscal 1998, with the exception of the Healthcare and Specialty Products segment in Fiscal 1998 for reasons that are discussed below. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**12/21/99 S-8**

285.    On December 21, 1999, the Tyco Defendants filed a Form S-8 for the registration of 10,000,000 shares of Tyco common stock (the "12/21/99 S-8"), signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, James S. Pasman, Jr., and W. Peter Slusser).  Because the 12/21/99 S-8 incorporates Tyco=s 1999 10-K by reference, it contains the same materially false and misleading statements set forth in the 1999 10-K, as described above.

286.    The 12/21/99 S-8 also sets forth the Consent of PricewaterhouseCoopers, dated December 17, 1999, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above.

**12/21/99 S-4 (and related S-4/A and Prospectus)**

287.    On December 21, 1999, the Tyco Defendants filed with the SEC a Form S-4 relating to Tyco=s proposed offer to exchange up to $1,000,000,000 aggregate principal amount of new 6 7/8% notes due 2002 for any and all of its outstanding 6 7/8% notes due 2002 (the "12/21/99 S-4").  The 12/21/99 S-4 was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, James S. Pasman, Jr., and W. Peter Slusser).  Because the 12/21/99 S-4 incorporates Tyco=s 1999 10-K by reference, the S-4 contains the same materially false and misleading statements set forth in the 1999 10-K, as described above.

288.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 12/21/99 S-4 recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy

when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

289.    In addition, the 12/21/99 S-4 sets forth the Consent of PricewaterhouseCoopers, dated December 17, 1999, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above.

290.    On June 26, 2000, the Tyco Defendants filed with the SEC a Form S-4/A (the A6/26/00 S-4/A@), amending the 12/21/99 S-4.  The 6/26/00 S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, James S. Pasman, Jr., and W. Peter Slusser).  Because the 6/26/00 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999 and January 20, 2000.

291.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 6/26/00 S-4/A recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

292.    In addition, the 6/26/00 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated

June 26, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

293.    On June 30, 2000, the Tyco Defendants filed with the SEC a Prospectus relating to Tyco=s proposed offer to exchange up to $1,000,000,000 aggregate principal amount of new 6 7/8% notes due 2002 for any and all of its outstanding 6 7/8% notes due 2002 (the A6/30/00 Prospectus@). Because the 6/30/00 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999 and January 20, 2000.

294.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 6/30/00 Prospectus recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.a and A.1.d.

**1999 Annual Report to Shareholders**

295.    On or about March 14, 2000, Tyco released its 1999 Annual Report to Shareholders (the A1999 Annual Report@).  The 1999 Annual Report falsely and misleadingly states on its first page that Awe have grown our earnings at a 35% compounded rate for the past five years.@  As the Tyco

Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d above.

      296.    The 1999 Annual Report also included a letter to Tyco shareholders from defendant Kozlowski, which states:

> Fiscal 1999 was an excellent year for Tyco International. We exceeded our corporate goals and continued to build on our recurring revenue base and forge strong partnerships with our customers. We also acquired many fine companies that will provide an immediate boost to our already strong profit and cash flow and become an additional source of sustainable growth well into the future.

> For the sixth consecutive year, we increased revenues and earnings substantially. Revenues rose 18 percent to $22.5 billion and earnings grew $1.15 billion to $2.56 billion, an 82 percent increase over the prior year.

> Fiscal 2000, which began for Tyco on October 1, 1999, is off to a good start. We expect sales to exceed $26 billion and free cash flow C an important measure of our underlying business performance C to nearly double, from $1.7 billion to over $3.0 billion. This free cash flow figure is after the reinvestment of $1.6 billion in capital expenditures to strengthen our position in each of our four business areas.

> Today, Tyco is healthier than ever.

>          \*   \*   \*

> We aim for sustained earnings growth in excess of 20 percent, powered by increased revenues and margin expansion. We achieve this by: the elimination of overhead and burdensome bureaucracy; economies of scale; a relentless focus on costs, productivity improvements and quality; and an increase in growth in the higher-margin service components of our business. Where growth, margin improvement and cost reduction are concerned, Tyco has no finish line. This model has produced consistently strong results for well over a decade.

>          \*   \*   \*

> Although we have successfully integrated our major acquisitions, we never

assume such success will automatically be ours. Indeed, we know the corporate landscape is littered with failed marriages, that the hope of wondrous synergies is often a mirage. Therefore, we spend hundreds of hours assessing the benefits and risks of each transaction we consider. We always ask: What=s the worst-case scenario?

We perform thorough due diligence every time, and we walk away from nine out of every ten transactions we evaluate. Even when we decide that the rewards significantly outweigh the risks, we spend a great deal of time planning the integration process to minimize the difficulties inherent in each acquisition.

My Perspective: Confidence in the Future

We believe that shareholder value is created through higher earnings per share and strong cash flow. And this has been reflected in the performance of our share price: In the past five years, Tyco shares have appreciated four times faster than the S&P 500. We're proud of that record, although, as we enter a new millennium, we tend to regard it as ancient history.

The questions we ask are: What have we done for you lately? What are we going to do for you in the next five years? What we have done is to establish an outstanding group of global businesses, which can do well in any economic environment. And we have given our employees incentives to achieve the first-class business and financial performance you have come to expect from Tyco.

[W]e will keep executing the same strategy that has brought us this far. We will continue to use our strong balance sheet and powerful cash flow to invest in our operations and to make strategic acquisitions to improve our product line as well as our bottom line. I promise that we will stay focused on the business goals that matter most: seizing opportunities, generating new revenue sources, growing earnings and cash flow, and increasing shareholder value.

The future looks bright. We think we can double our earnings over the next three years.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

297.    The 1999 Annual Report also provided investors with a false overview of the

Company=s operations:

> Overview
>
> Sales increased 18.0% during Fiscal 1999 to $22,496.5 million from $19,061.7 million in Fiscal 1998. Sales in Fiscal 1998 increased 14.4% compared to the twelve months ended September 30, 1997. Income (loss) before extraordinary items and cumulative effect of accounting changes was $1,031.0 million in Fiscal 1999, as compared to $1,168.6 million in Fiscal 1998 and ($300.5) million in the twelve months ended September 30, 1997. Income before extraordinary items for Fiscal 1999 included an after-tax charge of $1,341.5 million ($1,596.7 million pre-tax) related to the mergers with USSC and AMP and costs associated with AMP=s profit improvement plan. Income before extraordinary items for Fiscal 1998 included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP=s profit improvement plan and costs incurred by USSC to exit certain businesses. Loss before extraordinary items and cumulative effect of accounting changes for the twelve months ended September 30, 1997 included an after-tax charge of $1,485.5 million ($1,670.4 million pretax) for merger and transaction costs, write-offs and integration costs primarily associated with the mergers of ADT, Former Tyco, Keystone and Inbrand.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

298.    The 1999 Annual Report also gives limited information concerning loans taken by senior management under Tyco=s KEL, which was instituted to encourage ownership of the Company=s common stock by executives and other key employees.  According to the 1999 Annual Report:

> Loans are made to employees of the Company under the Former Tyco 1983 Key Employee Loan Program for the payment of taxes upon the vesting of shares granted under Former Tyco=s Restricted Stock Ownership Plans. The loans are unsecured and bear interest, payable annually, at a rate which approximates the Company=s incremental short-term borrowing rate. Loans are generally repayable in ten years, except that earlier payments are required under certain circumstances. During Fiscal 1999, the maximum amount outstanding under this program was $91.6 million. Loans receivable under this program were $18.6 million and $22.2 million at September 30, 1999 and 1998, respectively.

As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and B.4.

### 2000 Materially False and Misleading Statements and Omissions

### 1/18/00 Conference Call

299.    On January 18, 2000, Tyco held a conference call to discuss, among other things, its earnings during the first quarter of fiscal 2000.  Defendants Kozlowski and Swartz also addressed the informal inquiry begun by the SEC the month before into potential accounting improprieties at Tyco. During the call both Kozlowski and Swartz falsely reassured investors and analysts that there had been no improprieties at Tyco, and that Tyco was looking forward to a very profitable future:

> SWARTZ:        Since we disclosed last month, when the SEC informed us about the informal inquiry being performed, we ended up making the submissions as expected, beginning in January and will continue to provide the information that=s being requested by the SEC.  **What=s extremely important to realize though is that we have gone through this information, reviewed the materials going back three years; we at the company remain very comfortable and confident that our accounting was appropriate for reserves as our auditors also remain confident with the accounting that we performed for those acquisitions**.  We will continue to make the submissions as requested by the SEC and move as quickly as possible in providing it to them so that we can get this behind us; however, **we continue, as I said, to remain very comfortable with our accounting**.  [Emphasis added.]

> *  *  *

> KOZLOWSKI:   So with that, these are the reasons why I say prospects have never been better here, the core businesses are great, the undersea fiber optic cable network appears to be great for us, our cash flow is terrific, **we believe we have no issues with the SEC from everything we=ve seen** but,

you know, we=re still going through this informal inquiry and we will fully cooperate with the SEC and we=re looking forward to having a very, very good and exciting year here, and there are some acquisitions on the horizon for us.  [Emphasis added.]

\* \* \*

. . . we=re looking at a company that, you know, **will have strong organic growth for us, and we=re looking at a company that should be enjoying organic growth in double figures going forward**. [Emphasis added.]

\* \* \*

Just to quickly reiterate, we=re very pleased with where we are at Tyco, we had strong revenue growth of some 27% of which about 16% of it was organic growth . . . . **you can see our results have never been better and our prospects have never seemed stronger to us** . . . . [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.3.

300.    On January 19, 2000, Bear Stearns, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled AAwesome Quarter.@ The report stated that Tyco=s approximately $1 billion more in free cash that quarter Avalidates the strength of the business model.@ As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d

**1/20/00 8-K**

127

301.    On January 20, 2000, the Tyco Defendants filed a Form 8-K announcing that diluted earnings per share for the first quarter of fiscal 2000 (ending December 31, 1999), before non-recurring charges and credits and extraordinary items, were 46 cents per share, a 48 percent increase over the previous year=s 31 cents per share.  In the attached press release defendant Kozlowski is quoted as saying:  AOrganic growth across each of our four business segments and all geographies drove Tyco=s performance in the first quarter. . . .  Free cash flow was improved as well. The strength of our core businesses combined with strong cash flows are indicative of another strong year for Tyco.@  As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**1/28/00 S-8**

302.    On January 28, 2000, Tyco filed a Form S-8 for the registration of 10,000,000 shares of Tyco common stock (the A1/28/00 S-8"), signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, James S. Pasman, Jr., and W. Peter Slusser).  Because the 1/28/00 S-8 incorporates Tyco=s 1999 10-K by reference, the S-8 contains the same materially false and misleading statements set forth in the 1999 10-K, as described above.

303.    In addition, the 1/28/00 S-8 sets forth the Consent of PricewaterhouseCoopers, dated January 27, 2000, permitting the incorporation by reference of its materially false and misleading report dated October 21, 1999, quoted in the 1999 10-K and discussed above.

**2/11/00 10-Q for quarter ended 12/31/99**

304.     On February 11, 2000, the Tyco Defendants filed Tyco=s Form 10-Q for the quarter

ended December 31, 1999 (the A2/11/00 10-Q@), signed by defendant Swartz.  In it, the Tyco

Defendants set out numerous materially false and misleading statements, as evidenced by (among other

things) the Tyco Defendants= restatement of its operating results in a June 26, 2000 10-Q/A for the same

period (discussed below).  These false and misleading statements addressed a variety of topics, including

the following:

### Tyco=s Operating Results

305.     The 2/11/00 10-Q also gives favorable, purportedly accurate information concerning

Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

|  | (UNAUDITED) FOR THE QUARTERS ENDED DECEMBER 31, | |
| --- | --- | --- |
|  | 1999 | 1998 |
|  | (IN MILLIONS) | |
| Pre-tax income (loss) before extraordinary items............ | 1,069.9 | (74.4) |
| Income taxes................................................ | (278.5) | (33.3) |
| Income (loss) before extraordinary items.................... | 791.4 | (107.7) |
| Extraordinary items, net of taxes........................... | (0.2) | (2.4) |
| Net income (loss).......................................... | $ 791.2 | $ (110.1) |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

306.     In addition, these statements are materially false and misleading because they fail to

disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in

the December Report), but instead attribute Tyco=s favorable results to organic growth and synergies

resulting from Tyco=s acquisitions:

Operating income improved in all segments in the quarter ended December 31, 1999 as

compared to the quarter ended December 31, 1998. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Tyco=s Charges and Reserves**

307.    The 2/11/00 10-Q also gives materially false and misleading information regarding Tyco=s reserves.  For example:

In the quarter ended December 31, 1999, the Company established restructuring and other non-recurring reserves of $14.4 million primarily related to the exiting of USSC=s interventional cardiology business and the restructuring of AMP=s Brazilian operations. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $453.3 million. During the quarter ended December 31, 1999, the Company paid out $58.3 million in cash and incurred $19.9 million in non-cash charges that were charged against these reserves. Also in the quarter ended December 31, 1999, the Company determined that $137.6 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit to the merger, restructuring and other non-recurring charges line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP=s products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, whose costs were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company=s 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At December 31, 1999, there remained $251.9 million of merger, restructuring and other non-recurring reserves on the Company=s Consolidated Balance Sheet, of which $207.7 million is included in current liabilities and $44.2 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

308.    During this same period, THE NEW YORK TIMES reported in an article entitled ACashing in Gets Tougher at Tyco@ (2/13/00) an announcement by defendant Kozlowski that, Aafter questions about his company=s accounting practices and a big stock drop, . . . Tyco would have to hit impressive financial targets for executives to exercise future stock options.@ As defendant Kozlowski either knew or was reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.b, A.3 and B.

309.    Nonetheless, the Tyco Defendants continued to tout Tyco=s Astrategy@ of aggressive acquisition.  According to an article in  THE WALL STREET JOURNAL entitled  ALion=s Share: For Plastic Hangers, You Almost Need to Go to Tyco International@ (2/15/00), executives of Tyco Ahave said the acquisitions frequently allow them to bring leadership to fragmented, inefficient industries. Purchased firms are melded with Tyco units and the overlap eliminated. Profit margins of acquisitions often double in just a year, the company says.@ As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**3/1/00 Proxy Statement for 2000 annual meeting**

310.    On March 1, 2000, the Tyco Defendants filed with the SEC Tyco=s Proxy Statement for the 2000 annual meeting (the A2000 Proxy Statement@).  The 2000 Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the Key

131

Employee Loan Program, and allegations of accounting impropriety by the Company.

**Management Remuneration**

311.    Concerning Tyco=s executive compensation program generally, the 2000 Proxy

Statement states:

> Tyco=s executive compensation program [offers] significant financial rewards when the
> Company and the individual achieve superior results (as exemplified in the above chart),
> but significantly lower compensation is paid if performance goals are not met.
> Specifically, if the compensation targets are not achieved, the Company=s executives are
> ineligible for either cash bonuses or equity-based compensation. In order for Mr.
> Kozlowski and Mr. Swartz to earn a cash bonus in fiscal 1999, cash income and
> operating cash flow growth of a minimum of 15% over fiscal 1998 performance was
> required, and before they could earn shares in fiscal 1999, an increase in earnings per
> share of at least 17.5% growth over fiscal 1998 was required. . . .

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B.

312.    The 2000 Proxy Statement also contains materially false and misleading information

regarding the administration of compensation to executive officers and key managers.

> The Compensation Committee of the Board of Directors approves all of the policies
> under which compensation is paid or awarded to the Company=s executive officers and
> key managers and oversees the administration of executive compensation programs. The
> Compensation Committee is composed solely of independent directors, none of whom
> has any interlocking relationships with the Company that are subject to disclosure under
> rules of the SEC relating to proxy statements.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B.

313.    The 2000 Proxy Statement contains the following specific information concerning the compensation of defendants Kozlowski and Swartz:

| NAME & PRINCIPAL POSITION (6) | YEAR | ANNUAL COMPENSATION (2) | | | LONG-TERM COMPENSATION | | | |
|---|---|---|---|---|---|---|---|---|
| | | SALARY | CASH BONUS(3) | STOCK BONUS (4) | RESTRICTED STOCK AWARD(S)(5) | SHARES UNDERLYING STOCK OPTIONS | LONG-TERM INCENTIVE PAYOUTS | ALL OTHER COMPENSATION |
| L. DENNIS KOZLOWSKI....... CHAIRMAN & CHIEF EXECUTIVE OFFICER, TYCO INTERNATIONAL LTD. | 1999 1998 1997 | $1,350,000 1,250,000 1,250,000 | $3,200,000 2,500,000 2,544,260 | | $25,707,178 20,140,000 | 6,621,834 3,832,800 6,600,000 | $6,508,125 | $387,001 901,002 108,125 |
| | | | | * * * | | | | |
| MARK H. SWARTZ............ EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER, TYCO International Ltd. | 1999 1998 1997 | 750,000 559,500 559,500 | 1,600,000 1,250,000 1,272,130 | | 12,029,641 10,070,000 | 2,976,480 2,764,666 2,200,000 | 2,169,375 | 150,014 256,878 31,994 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.1, B.4, B.5, B.6, B.7 and B.8.

314.    The 2000 Proxy Statement also failed to disclose and misrepresented the actual compensation of defendant Kozlowski:

For fiscal 1999, Mr. Kozlowski received a base salary of $1.35 million and a cash bonus in the amount of $3.2 million, as shown in the SUMMARY COMPENSATION TABLE on page 12. Mr. Kozlowski was also granted 624,000 shares of restricted stock on October 18, 1999. Mr. Kozlowski≋s eligibility for the cash bonus was conditioned on the Company≋s experiencing minimum growth in pre-tax income and operating cash flow of 15% over fiscal 1998 and his eligibility for the stock award was conditioned upon an increase in earnings per share of at least 17.5% over fiscal 1998. The Company≋s performance substantially exceeded these benchmarks. These shares were granted based on achievement of fiscal 1999 performance criteria and vested on January 5, 2000. While Mr. Kozlowski did not receive any new stock option awards during fiscal 1999, he did receive restoration options. The restoration provision enables executive officers to use their earned equity award to repay indebtedness owed to the Company or to use option proceeds for tax planning purposes while maintaining their equity position in the Company.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B, B.1.a, B.4.a, B.5, B.7 and B.8.

315.   In an effort to justify this astronomical compensation, the 2000 Proxy Statement

describes fiscal 1999 as Tyco=s Amost successful year ever,@

> with increases over fiscal 1998 in earnings per share before non-recurring items of 51%, net income before non-recurring items of 117%, and net sales of 83%, prior to the restatement of 1998 results for the pooling of interests with United States Surgical Corporation and AMP Incorporated. Executive compensation was directly tied to, and is reflective of, this performance.

It attributes that success to Kozlowski:

> Mr. Kozlowski also led the Company in making strategic acquisitions that, along with the organic growth of the Company, laid the groundwork for continued growth and performance.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

**<u>Key Employee Loan Program</u>**

316.     The 2000 Proxy Statement provides materially false and misleading statements

concerning Tyco=s KEL Program.  It states, for example:

> The Compensation Committee administers the loan program. **The Compensation Committee authorizes loans, which may not exceed the amount allowable under any regulation of the United States Treasury or other applicable statute or regulation**. Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured. **Loans generally bear interest at Tyco=s incremental short-term borrowing rate (5.5% for 1999)**. **Loans are generally repayable in ten years or when the participant reaches age 69, whichever occurs first**, except that earlier payments must be made in the event that the participant=s employment with the Company or its subsidiaries terminates. The participant is also required to make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted.  [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B.4 and B.5.

317.     The 2000 Proxy Statement also falsely and misleadingly states:

> At September 30, 1999, the amount of loans outstanding under the [Key Employee Corporate Loan Program] totaled $18,569,137, of which $0 was loaned to Mr. Kozlowski . . . and $0 to Mr. Swartz. The largest amount of indebtedness since October 1, 1998 incurred by each of the Named Officers was: $52,688,249 for Mr. Kozlowski . . . .

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B, B.1.a-b, B.4.a-b, B.5, B.7 and B.8

**Allegations of Misconduct Against Tyco**

318.    Finally, the 2000 Proxy Statement addresses the informal SEC investigation, and

characterizes allegations that the Tyco Defendants engaged in improper acquisition accounting as mere

Arumors@:

> As shareholders are aware, certain recent rumors and allegations, which we believe to be
> unfounded, have adversely affected Tyco=s stock price. Shareholders are also aware that
> the SEC is conducting an inquiry and that shareholder lawsuits have been filed against the
> Company in various courts across the country. . . .  We continue to have complete
> confidence in the senior management team and feel the fundamentals driving the company
> have not changed. As indicated earlier, our philosophy is to reward stellar performances,
> which is what we did for fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A.1 and A.3.

319.    On March 10, 2000, J.P. Morgan, reporting materially false and misleading information

received from the Tyco Defendants, issued an analyst report entitled, ATYC: Potential Semiconductor

and Components IPO Add Catalyst.@  The report stated:

> The news that Tyco management will consider an IPO of its semiconductor and
> fiberoptic component businesses within AMP adds to an already strong collection of
> catalysts in the coming year.

*   *   *

> We continue to rate Tyco our top pick in the sector owing to a solid internal growth
> outlook, continued free cash generation and a variety of catalysts for the stock in coming
> months.  We believe that a number of catalysts, including the IPO of the
> telecommunication assets and the resolution of the SEC inquiry, as well as the additional
> acquisitions and upside to current F[ree] C[ash] F[low] estimates, could drive the stock
> in the near term.

136

* * *

[A]nother quarter of solid performance and a clean bill of health from the SEC should extinguish any doubt concerning unreasonable accounting practices. . . .

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A.1 and A.3.

320.    Tyco=s stock price closed at $48.50 on March 10, 2000.

**4/18/00 Conference Call**

321.    On April 18, 2000, Tyco held a conference call to discuss, among other things, its

earnings during the second quarter of fiscal 2000.  Defendants Kozlowski and Swartz also addressed the

SEC=s informal investigation of the Tyco Defendants= acquisition accounting.  During the call, defendant

Swartz falsely stated:

> SWARTZ:       . . . we continue to be confident with the financial results we=ve reported previously and the personnel working on that, we continue to provide the information to the SEC that was requested and we=re really not in a position to give any update in far as timing in that we don=t control that.  What we do control though is getting the information to them and seeing what=s going in and **we continue to remain very confident with the financial results we=ve reported**.

> * * *

> Q:       But when. . . when you=re saying you=re happy with the way things are going, what . . . what is it that you=re looking at that makes you happy?

> SWARTZ:       That we=re . . . that we=re in a situation that we=re able to produce the information to them quickly on what had been requested and based on the additional review that we=ve gone through as well as outside advisors that we=ve brought in, to be. . . **continue to be very comfortable with the financials results.**   [Emphasis added.]

137

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1 and A.3.

322.    During the call, defendant Kozlowski also emphasized the financial health of the Company:

> KOZLOWSKI:    . . .we=re very pleased with our quarter, with the strong outlook we have going forward but the fact that our organic growth for the company has been some 19% that our earnings are up some 47% and then the prospects and outlook for a very strong cash flow.

As THE WALL STREET JOURNAL quoted Kozlowski the following day in an article entitled ATyco=s Profit Surged in Fiscal 2nd Quarter, Helped by Sales Gain@ (4/19/00):  A>Each of our four businesses had strong organic growth and generated positive free cash flow in the second quarter . . .  Our core businesses are well-positioned to continue that trend for the remainder of the year.=@  As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

323.    On May 12, 2000, J.P. Morgan, reporting materially false and misleading information received from the Tyco Defendants, issued an upbeat analyst report, entitled ABusiness Review Delivers Message of Powerful Fundamentals and On Track.@  The report stated:

> CFO Mark Swartz made an interesting observation about things we haven=t seen with

Tyco that are almost always associated with companies that have real accounting concerns:  (1) [t]here have been no management departures, (2) [t]he auditors have not backed away from the opinion in the least (and the external forensic accountants remain very comfortable the accounting is clean), and (3) [i]n the 7 months since the negative allegations have been made, business results have not deteriorated B to the contrary they have accelerated.  These are simply not characteristics of a company that has been cooking its books.

*   *   *

A healthy acquisition pipeline and plenty of available cash should lead to stepped up deal flow.

As defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1 and A.3.

### 5/15/00 10-Q for quarter ended 3/31/00

324.    On May 15, 2000, the Tyco Defendants filed Tyco=s Form 10-Q for the quarter ended March 31, 1999 (the A5/15/00 10-Q@), signed by defendant Swartz.  In it, the Tyco Defendants set out numerous materially false and misleading statements, as evidenced by (among other things) the Tyco Defendants= restatement of its operating results in a June 26, 2000 10-Q/A for the same period (discussed below).  These false and misleading statements addressed a variety of topics, including the following:

### Tyco=s Operating Results

325.    The 5/15/00 10-Q also gives favorable, purportedly accurate information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

|  | (UNAUDITED) | | | |
| | FOR THE QUARTERS ENDED MARCH 31, | | FOR THE SIX MONTHS ENDED MARCH 31, | |
| | 2000 | 1999 | 2000 | 1999 |
| | | | (IN MILLIONS) | |
| Pre-tax income before extraordinary items...... | 1,140.4 | 308.2 | 2,210.4 | 233.8 |
| Income taxes................................... | (284.5) | (146.2) | (563.1) | (179.5) |
| Income before extraordinary items.............. | 855.9 | 162.0 | 1,647.3 | 54.3 |
| Extraordinary items, net of taxes............. | -- | (42.5) | (0.2) | (44.9) |
| Net income.................................... | $ 855.9 | $ 119.5 | $ 1,647.1 | $ 9.4 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

326.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco=s favorable results to organic growth and synergies resulting from Tyco=s acquisitions:

Operating income improved in all segments in the six months ended March 31, 2000 as compared to the six months ended March 31, 1999. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Tyco=s Charges and Reserves**

327.    The 5/15/00 10-Q also gives materially false and misleading information regarding Tyco=s reserves.  For example:

In the six months ended March 31, 2000, the Company established restructuring and other non-recurring reserves of $24.8 million, of which $7.3 million is included in cost of sales, primarily related to the exiting of USSC≠s interventional cardiology business and the restructuring activities in AMP≠s Brazilian operations and wireless communications business. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $453.3 million. During the six months ended March 31, 2000, the Company paid out $92.4 million in cash and incurred $45.5 million in non-cash charges that were charged against these reserves. Also in the six months ended March 31, 2000, the Company determined that $150.3 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit of $144.0 million to the merger, restructuring and other non-recurring charges line item and a credit of $6.3 million to the cost of sales line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP≠s products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company≠s 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At March 31, 2000, there remained $189.9 million of merger, restructuring and other non-recurring reserves on the Company≠s Consolidated Balance Sheet, of which $147.6 million is included in current liabilities and $42.3 million is included in long-term liabilities.

Similarly:

The Company has taken recent merger, restructuring and other non-recurring charges and charges for the impairment of long-lived assets with respect to AMP and USSC.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A and A.1.d.

328.    Tyco≠s share price closed at $50.75 on May 15, 2000.

**6/26/00 10-Q/A filed for quarter ended 12/31/99**

329.    On June 26, 2000, the Tyco Defendants filed another 10-Q/A for the quarter ended

December 31, 1999 (the A6/26/00 10-Q/A(1)@), signed by defendant Swartz.  According to the 6/26/00

10-Q/A(1), the restatement was in response to a Alimited review@ by the SEC.

330.    In the 6/26/00 10-Q/A(1), the Tyco Defendants gave the following explanation for the

need to restate Tyco=s operating results:

> The amendment to the financial statements herein is being filed to reclassify certain
> charges and to adjust merger, restructuring and other non-recurring charges between
> periods due to the timing of the underlying events as follows:
>
> > - To reclassify $65.6 million of charges, incurred by AMP during the
> > quarter ended December 31, 1998 prior to its merger with Tyco, related
> > to the write-off of goodwill and fixed assets of exited businesses in the
> > Consolidated Statements of Operations out of the Amerger, restructuring
> > and other non-recurring (credits) charges, net@ line and into the Acharge
> > for the impairment of long-lived assets@ line;
> >
> > - To eliminate $26.0 million of merger, restructuring and other
> > non-recurring credits recorded to merger, restructuring and other
> > non-recurring (credits) charges in the first quarter of fiscal 2000 related
> > to charges which were originally recorded in fiscal 1999 related primarily
> > to severance and facility closings;
> >
> > - To reverse a $16.9 million credit previously recorded in the quarter
> > ended December 31, 1999, related to merger, restructuring and other
> > non-recurring charges which were originally recorded in fiscal 1997
> > related primarily to facility closings and lease termination costs, and to
> > record $3.0 million of that credit in the quarter ended December 31,
> > 1998;
> >
> > - To reclassify $15.0 million of inventory related restructuring costs,
> > incurred during the quarter ended December 31, 1998, in the
> > Consolidated Statements of Operations out of the Amerger, restructuring
> > and other non-recurring (credits) charges, net@ line and into the Acost of
> > sales@ line;

- To report certain non-recurring costs related to the integration of the USSC suture business originally recorded in the first quarter of fiscal 1999 as costs in later periods when such activity was completed (reversing a $22.3 million charge in the quarter ended December 31, 1998 and recording $7.7 million of that charge in the quarter ended December 31, 1999); and

- To update various disclosures primarily related to the above adjustments.

331.    Although Tyco=s filing of an amended 10-Q was in effect an admission that it had materially misstated its operating results during the Class Period, the Tyco Defendants attempted to downplay that admission by restating its results only minimally, by denying that there were any materially false statements in its previously filed 10-Q, and by denying any involvement in a scheme, later admitted in the December Report, to manipulate its acquisition accounting.  This scheme, described in detail above, included the Tyco Defendants= practice of aggressive accounting (through the manipulation of accounting reserves, *inter alia*), and their practice of incentivizing executives at acquired companies to manipulate the acquired company=s financial reporting before the acquisition to create the false appearance of superior earnings for Tyco after the acquisition.

332.    The 6/26/00 10-Q/A(1) itself contains numerous materially false and misleading statements on a variety of topics, including the following:

**Tyco=s Operating Results**

333.    The 6/26/00 10-Q/A(1) also gives favorable, purportedly accurate information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

|                                                    | (UNAUDITED) FOR THE QUARTERS ENDED DECEMBER 31, | |
| -------------------------------------------------- | --------- | --------- |
|                                                    | 1999      | 1998      |
|                                                    | (IN MILLIONS) | |
| Pre-tax income (loss) before extraordinary items.... | 1,019.3   | (49.1)    |
| Income taxes.......................................... | (262.1)   | (40.5)    |
| Income (loss) before extraordinary items............. | 757.2     | (89.6)    |
| Extraordinary items, net of taxes.................... | (0.2)     | (2.4)     |
| Net income (loss).................................... | $ 757.0   | $ (92.0)  |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

334.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco=s favorable results to organic growth and synergies resulting from Tyco=s acquisitions:

> Operating income improved in all segments in the quarter ended December 31, 1999 as compared to the quarter ended December 31, 1998. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Tyco=s Charges and Reserves**

335.    The 6/26/00 10-Q/A(1) also gives materially false and misleading information regarding Tyco=s reserves:

In the quarter ended December 31, 1999, the Company established restructuring and other non-recurring reserves of $22.1 million primarily related to the exiting of USSC=s interventional cardiology business, charges associated with USSC=s suture business and the restructuring of AMP=s Brazilian operations. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $399.3 million. During the quarter ended December 31, 1999, the Company paid out $58.3 million in cash and incurred $19.9 million in non-cash charges that were charged against these reserves. Also in the quarter ended December 31, 1999, the Company determined that $94.7 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit to the merger, restructuring and other non-recurring charges line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP=s products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, whose costs were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company=s 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At December 31, 1999, there remained $248.5 million of merger, restructuring and other non-recurring reserves on the Company=s Consolidated Balance Sheet, of which $204.3 million is included in current liabilities and $44.2 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A and A.1.d.

**6/26/00 10-Q/A filed for quarter ended 3/31/00**

336.   On June 26, 2000, the Tyco Defendants filed another 10-Q/A for the quarter ended March 31, 1999 (the A6/26/00 10-Q/A(2)@), signed by defendant Swartz.  According to the 6/26/00 10-Q/A(2), the restatement was in response to a Alimited review@ by the SEC.

337.   In the 6/26/00 10-Q/A(2), the Tyco Defendants gave the following explanation for the need to restate Tyco=s operating results:

145

The amendment to the financial statements herein is being filed to reclassify certain charges and to adjust merger, restructuring and other non-recurring charges between periods due to the timing of the underlying events as follows:

> - To reclassify $103.5 million of charges, incurred by AMP during the quarter ended March 31, 1999 prior to its merger with Tyco, related to the write-off of goodwill and fixed assets of exited businesses in the Consolidated Statement of Operations out of the "merger, restructuring and other non-recurring charges (credits), net" line and into the "charge for the impairment of long-lived assets" line;

> - To record a credit in the quarter ended March 31, 1999 for the reversal of $5.3 million of merger, restructuring and other non-recurring charges which were originally recorded in fiscal 1997 related primarily to facility closings and lease termination costs (this credit was previously recorded in the first quarter of fiscal 2000);

> - To reclassify $1.9 million of inventory related restructuring costs, incurred during the quarter ended March 3,1 1999, in the Consolidated Statement of Operations out of the "merger, restructuring and other non-recurring charges (credits), net" line and into the "cost of sales" line;

> - To report certain non-recurring costs related to the integration of the USSC suture business originally recorded in the first quarter of fiscal 1999 as costs in later periods when such activity was completed (recording $2.0 million of that charge in the quarter ended March 31, 1999 and $0.5 million in the quarter ended March 31, 2000); and

> - To update various disclosures primarily related to the above

> adjustments.

338.    Although Tyco's filing of an amended 10-Q was in effect an admission that it had materially misstated its operating results during the Class Period, the Tyco Defendants attempted to downplay that admission by restating its results only minimally, by denying that there were any materially false statements in its previously filed 10-Q, and by denying any involvement in a scheme, later admitted in the December Report, to manipulate its acquisition accounting.  This scheme, described in detail

146

above, included the Tyco Defendants= practice of aggressive accounting (through the manipulation of

accounting reserves, *inter alia*), and their practice of incentivizing executives at acquired companies to

manipulate the acquired company=s financial reporting before the acquisition to create the false

appearance of superior earnings for Tyco after the acquisition.

339.    The 6/26/00 10-Q/A(2) itself contains numerous materially false and misleading

statements on a variety of topics, including the following:

**Tyco=s Operating Results**

340.    The 6/26/00 10-Q/A(2) also gives favorable, purportedly accurate information

concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary

information:

|  | (UNAUDITED) | | | |
|---|---|---|---|---|
|  | FOR THE QUARTERS ENDED MARCH 31, | | FOR THE SIX MONTHS ENDED MARCH 31, | |
|  | 2000 | 1999 | 2000 | 1999 |
|  | (IN MILLIONS) | | | |
| Pre-tax income before extraordinary items........ | 1,139.9 | 311.5 | 2,159.3 | 262.4 |
| Income taxes.................................... | (284.4) | (147.2) | (546.6) | (187.7) |
| Income before extraordinary items................ | 855.5 | 164.3 | 1,612.7 | 74.7 |
| Extraordinary items, net of taxes.............. | -- | (42.5) | (0.2) | (44.9) |
| Net income...................................... | $ 855.5 | $ 121.8 | $ 1,612.5 | $ 29.8 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

341.    In addition, these statements are materially false and misleading because they fail to

disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in

the December Report), but instead attribute Tyco≡s favorable results to organic growth and synergies

resulting from Tyco≡s acquisitions:

> Operating income improved in all segments in the six months ended March 31, 2000 as compared to the six months ended March 31, 1999. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions. The Company enhances its margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities. The Company regards charges that it incurs to reduce costs in the ordinary course of business as recurring charges, which are reflected in cost of sales and in selling, general and administrative expenses in the Consolidated Statements of Operations.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

### Tyco≡s Charges and Reserves

342. The 6/26/00 10-Q/A(2) also gives materially false and misleading information regarding

Tyco≡s reserves:

> In the six months ended March 31, 2000, the Company established restructuring and other non-recurring reserves of $33.0 million, of which $7.3 million is included in cost of sales, primarily related to the exiting of USSC≡s interventional cardiology business, charges associated with USSC≡s suture business and the restructuring activities in AMP≡s Brazilian operations and wireless communications business. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $399.3 million. During the six months ended March 31, 2000, the Company paid out $92.4 million in cash and incurred $45.5 million in non-cash charges that were charged against these reserves. Also in the six months ended March 31, 2000, the Company determined that $107.4 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit of $101.1 million to the merger, restructuring and other non-recurring charges line item and a credit of $6.3 million to the cost of sales line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP≡s products which was not anticipated at the time of the

merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company=s 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At March 31, 2000, there remained $187.0 million of merger, restructuring and other non-recurring reserves on the Company=s Consolidated Balance Sheet, of which $144.7 million is included in current liabilities and $42.3 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A and A.1.d.

343.    On June 26, 2000, UBS Warburg, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled, ATYC: SEC Review = Positive Outcome . . . Overhang Lifted.@ The report stated:

Magnitude of SEC Accounting Requests Is Insignificant, in our view.

*   *   *

Management also expressed comfort with consensus estimates for the second quarter, $0.57, and 2000, $2.16 . . . We remain extremely bullish on TYC. . .

*   *   *

[W]e are looking for $3.3 billion in free cash flow generation this fiscal year, which along with the company=s unlevered balance sheet, afford ample powder for acquisitions - implying our earnings estimates are conservative.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1 and A.3.

149

344.    Tyco=s share price closed at $48.69 on June 26, 2000.

345.    On June 27, 2000, the day after the Tyco Defendants filed the 6/26/0010-K/A, the 6/26/00 10-Q/A (1), and the 6/26/00 10-Q/A (2), THE WALL STREET JOURNAL reported that, with the filing of the restatements, the SEC=s informal inquiry was effectively put to rest (ATyco=s Shares Rise 13% After Concern Restates Results Following SEC Review@).  Analyst response was favorable.  According to the article:  AMichael Holton, analyst at T. Rowe Price Associates in Baltimore, . . . said the results of the inquiry >put to rest any lurking fears about the company=s accounting and the credibility of its management.=  He called the announcement >positive across the board.=@

346.    That same day, defendant Kozlowski was cited by the FINANCIAL TIMES as saying that Athe changes [reflected in the restatements] only affected the timing of non-recurring charges at Tyco.@  According to the June 27 article (ATyco Lifted by Conclusion of SEC Review@), Kozlowski said that A[t]he company has >the financial resources and flexibility to continue to pursue acquisitions that will have an immediate positive impact on our earnings per share.=@  As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1 and A.3.

**6/28/00 Conference Call**

347.    On June 28, 2000, Tyco held a conference call to discuss, among other things, its acquisition of Mallinckrodt and its projections for the quarter.  During the call, defendant Kozlowski continued to falsely predict a favorable quarter:

> KOZLOWSKI:    To begin with, first of all we are confident of our quarter and our year at Tyco.  Business continues to be good.  Our organic growth continues to go well.  We expect we will have a strong quarter. . . . We are still

projecting our $3.3 billion of free cash this year.

348.    About the Mallinckrodt acquisition and other acquisitions he stated:

KOZLOWSKI:          Mallinckrodt fits all the criteria that we often talk about for a Tyco acquisition.  **It will be immediately accretive to the company.**  It has strong growth.  As a matter of fact, the growth of the Mallinckrodt businesses markets are even better than the strong growth that we=re experiencing in current Tyco Healthcare markets.

                                        *   *   *

                    But as we said back in May, you=re seeing good strong organic growth from us.  We do anticipate real good organic growth out for the next 12-24 months in all of our businesses, from everything we see and we=re well positioned.  And we will be adding to that with these selective acquisitions that make a whole lot of sense.  That are immediately **accretive**, give us good strong cash flows and fit right within to what we=re doing.  [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

**7/12/00 S-4 (and related S-4/A and Prospectus)**

349.    On July 12, 2000, Tyco filed with the SEC a Form S-4 relating to a proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco (the "7/12/00 S-4").  The 7/12/00 S-4 was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco's directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 7/12/00 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999 and January 20, 2000.

350.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Class Period, the 7/12/00 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 268.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Mallinckrodt:

> At a meeting held on June 22, 2000, Tyco's Board of Directors determined that the acquisition of Mallinckrodt was in keeping with its corporate strategy of complementing its internal growth with acquisitions that are likely to benefit from cost reductions and synergies when combined with Tyco's existing operations and that are expected to be accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

351.    In addition, the 7/12/00 S-4 sets forth the Consent of PricewaterhouseCoopers, dated July 10, 2000, permitting the incorporation by reference of its materially false and misleading report,

152

dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

352.    On August 9, 2000, the Tyco Defendants filed with the SEC a Form S-4/A (the "8/9/00 S-4/A"), amending the 7/12/00 S-4.  The 8/9/00 S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco's directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/9/00 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

353.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Class Period, the 8/9/00 S-4/A recites Tyco's purported strategy, quoted and discussed above in paragraph 268.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Mallinckrodt, using precisely the same language quoted from the 7/12/00 S-4, above.  As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

354.    In addition, the 8/9/00 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated August 8, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and

misleading materials discussed herein.

355.    On August 11, 2000, the Tyco Defendants filed with the SEC a Prospectus relating to the proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco (the A8/11/00 Prospectus@). Because the 8/11/00 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

356.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 8/11/00 Prospectus recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  It also reiterates its so-called strategy in its discussion of Tyco=s acquisition of Mallinckrodt, using precisely the same language quoted from the 7/12/00 S-4, above.  As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

357.    On July 13, 2000, Tyco issued a press release, filed with the SEC in a Form 8-K the following day, announcing that the SEC had terminated its informal inquiry into Tyco=s accounting practices without recommending an enforcement action.  According to the press release:  AAs Tyco has previously stated, the Company has at all times been confident with respect to the propriety of its accounting and its previously issued financial statements.@  As the Tyco Defendants either knew or were

reckless in not knowing, this statement when made was materially false and misleading and omitted

material information for the reasons set forth above in Section(s) A.1 and A.3.

**7/19/00 Conference Call**

358.     On July 19, 2000, Tyco held a conference call to discuss, among other things, its

earnings during the third quarter of fiscal 2000.  Defendant Kozlowski falsely stated:

> KOZLOWSKI:          Revenue was up 27% versus last year to 7.4 billion with strong organic
> growth.  We had organic growth of over 17% this quarter. . . . We here
> at Tyco continue to see strong performance across all business segments,
> we anticipate a good fourth quarter and our fiscal year 2001 which
> begins on October 1st looks very good to us at this time. . . .We are very
> comfortable with the estimates for next quarter. . . .

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

359.     Kozlowski also addressed the termination of the SEC=s inquiry into Tyco=s accounting

practices.  Reiterating the message of Tyco=s recent press release, defendant Kozlowski stated:  Athe

company has at all times been confident with respect to the propriety of its accounting and its previously

issued financial statements.  I hope with that we will not deal with accounting questions or accounting

inquiries here at Tyco.@  When asked whether he was Aaware of any new negative news articles or

anything that happens to be coming out,@ Kozlowski responded:  ANot at all.@  As defendant Kozlowski

either knew or was reckless in not knowing, this statement when made was materially false and

misleading and omitted material information for the reasons set forth above in Section(s) A.1 and A.3.

**7/24/00 S-4 (and related S-4/A, Prospectuses, and Post-Effective Amendment)**

360.    On July 24, 2000, Tyco filed with the SEC a Form S-4 relating to Tyco=s proposal to exchange up to Euro 600,000,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6-1/8% Notes due 2007 (the A7/24/00 S-4").  The 7/24/00 S-4 was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 7/24/00 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999 and January 20, 2000.

361.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 7/24/00 S-4 recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

362.    In addition, the 7/24/00 S-4 sets forth the Consent of PricewaterhouseCoopers, dated July 21, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

363.    On August 3, 2000, Tyco filed with the SEC a Form S-4/A (the "8/3/00 S-4/A"),

amending its 7/24/00 S-4.  The 8/3/00 S-4/A was signed by defendant Swartz for himself and for

defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua M. Berman,

Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S.

Pasman, Jr., and W. Peter Slusser).  Because the 8/3/00 S-4/A incorporates the following documents by

reference, it contains the same materially false and misleading statements set forth in those documents, as

described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended

September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended

December 31, 1999 and March 31, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on

December 9, 1999, January 20, 2000, and July 14, 2000.

364.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class

Period, the 8/3/00 S-4/A recites Tyco=s purported strategy, quoted and discussed above in paragraph

268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy

when made was materially false and misleading and omitted material information for the reasons set forth

above in Section(s) A, A.1.a and A.1.d.

365.    Under the heading "Recent Developments," the 8/3/00 S-4/A states as follows:

On July 19, 2000, Tyco announced its results for the third quarter of fiscal 2000,
the three and nine months ended June 30, 2000. Tyco reported that diluted earnings per
share before non-recurring charges and credits and extraordinary item, for its third
quarter ended June 30, 2000 were 58 cents per share, a 38 percent increase over 42
cents per share for the same quarter last year. Net income rose to $992.1 million, an
increase of 42 percent compared to $699.4 million last year. Sales for the quarter rose
27 percent to $7.42 billion compared with last year=s $5.82 billion. The results for last
year are before restructuring and non-recurring charges and extraordinary item.  After
giving effect to restructuring and other non-recurring charges and credits, diluted earnings

157

per share before extraordinary item were 58 cents, or $997.3 million, in fiscal 2000
compared to 13 cents, or $212.2 million, in fiscal 1999.

Income before non-recurring charges and credits and extraordinary items for the
nine months of fiscal 2000 rose to $2.63 billion, or $1.54 per diluted share, a 44 percent
increase over last year's diluted per share earnings of $1.07. After giving effect to
acquisition related and other non-recurring charges and credits, diluted earnings per
share before extraordinary item were $1.52, or $2.61 billion for the first nine months of
fiscal 2000 compared to 17 cents, or $286.9 million, in fiscal 1999. Revenues for the
nine months increased to $21.13 billion, 30 percent higher than last year's $16.27 billion.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

366.    In addition, the 8/3/00 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated

August 2, 2000, permitting the incorporation by reference of its materially false and misleading report,

dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and

misleading materials discussed herein.

367.    On August 11, 2000, Tyco filed with the SEC a Prospectus relating to Tyco's proposed

offer to exchange up to Euro 600,000,000 aggregate principal amount of new 6 1/8% notes due 2007

for any and all of its outstanding 6-1/8% Notes due 2007 (the "8/11/00 Prospectus"). Because the

8/11/00 Prospectus incorporates by reference the same documents that were incorporated by reference

in the 8/3/00 S-4/A, it contains the same materially false and misleading statements set forth in those

documents, as described herein.

368.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Class

Period, the 8/11/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in

paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

369.     Under the heading ARecent Developments,@ the 8/11/00 Prospectus uses precisely the same language quoted from the 8/3/00 S-4/A above.  As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

370.     On November 29, 2000, Tyco filed with the SEC a Post-Effective Amendment to the 7/24/00 S-4 and the 8/3/00 S-4/A discussed above (the A11/20/00 Post-Effective Amendment@).  The 11/20/00 Post-Effective Amendment was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 11/20/00 Post-Effective Amendment  incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, July 14, 2000, November 1, 2000, and November 15, 2000.

371.     Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 11/20/00 Post-Effective Amendment recites Tyco=s purported strategy, quoted and

discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

372.    In addition, the 11/20/00 Post-Effective Amendment contains materially false and misleading statements about Tyco under the heading ACurrent Developments.@  For example:

> On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30, 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999. Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax gain from the initial public offering of TyCom Ltd. Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

373.    Further:

> For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50 billion in fiscal 1999. Income before restructuring and other non- recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a 42% increase over $1.53 per diluted share in fiscal 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

374.    The 11/20/00 Post-Effective Amendment also gives favorable, purportedly accurate

information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the

following summary information:

```
                      Nine
                     Months     Year Ended
                      Ended    September 30,
                    June 30,
                      2000       1999
                    -------- -------

Earnings:
Income (loss) before
 extraordinary items and
 cumulative effect of
 accounting changes..... $2,610.0 $1,067.7
Income taxes............    878.9    637.5
                        -------- --------
                         3,488.9  1,705.2
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

375.    The 11/20/00 Post-Effective Amendment also includes information on charges included

in earnings:

> Earnings for the nine months ended June 30, 2000, the years ended September 30, 1999
> and 1998, the nine months ended September 30, 1997 and the years ended December
> 31, 1996 and 1995 include net merger, restructuring and other non-recurring (credits)
> charges of $(81.3) million (of which net charges of $1.0 million are included in cost of
> sales), $1,035.2 million (of which $106.4 million is included in cost of sales), $256.9
> million, $947.9 million, $344.1 million and $97.1 million, respectively. Earnings also
> include charges for the impairment of long-lived assets of $99.0 million, $507.5 million,
> $148.4 million, $744.7 million and $8.2 million in the nine months ended June 30, 2000,
> the year ended September 30, 1999, the nine months ended September 30, 1997 and
> the years ended December 31, 1996 and 1995, respectively.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

376.    In addition, the 11/20/00 Post-Effective Amendment sets forth the Consent of PricewaterhouseCoopers, dated November 27, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

377.    On December 15, 2000, Tyco filed with the SEC a Prospectus relating to the proposed offer by Tyco International Group S.A. to exchange up to (Euro)26,885,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6 1/8% notes due 2007 not heretofore exchanged (the A12/15/00 Prospectus@).  Because the 12/15/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 11/20/00 Post-Effective Amendment, it contains the same materially false and misleading statements set forth in those documents, as described herein.

378.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 12/15/00 Prospectus recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

379.    In addition, the 12/15/00 Prospectus contains materially false and misleading statements about Tyco under the heading ACurrent Developments.@  These statements are identical to those quoted above from the 11/29/00 Post-Effective Amendment under the same heading, and are materially false

and misleading for the same reasons.

380.    The 12/15/00 Prospectus also contains information on charges included in earnings that is identical to that quoted above from the 11/29/00 Post-Effective Amendment.  That information, too, is materially false and misleading for the same reasons given above.

**8/14/00 10-Q for quarter ended 6/30/00**

381.    On August 14, 2000, the Tyco Defendants filed Tyco=s Form 10-Q for the quarter ended June 30, 2000 (the A8/14/00 10-Q@), signed by defendant Swartz.  In it, the Tyco Defendants set out numerous materially false and misleading statements addressing a variety of topics, including the following:

**Tyco=s Operating Results**

382.    The 8/14/00 10-Q also gives favorable, purportedly accurate information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

|  | FOR THE QUARTERS ENDED JUNE 30, | | FOR THE NINE MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
|  | 2000 | 1999 | 2000 | 1999 |
|  | (UNAUDITED) (IN MILLIONS) | | | |
| Pre-tax income before extraordinary items........... | 1,329.7 | 399.2 | 3,488.9 | 661.5 |
| Income taxes...................................... | (332.4) | (187.0) | (878.9) | (374.6) |
| Income before extraordinary items................. | 997.3 | 212.2 | 2,610.0 | 286.9 |
| Extraordinary items, net of taxes................. | -- | (0.5) | (0.2) | (45.4) |
| Net income........................................ | $ 997.3 | $ 211.7 | $ 2,609.8 | $ 241.5 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

383.    In addition, these statements are materially false and misleading because they fail to

disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in

the December Report), but instead attribute Tyco=s favorable results to organic growth and synergies

resulting from Tyco=s acquisitions:

> Operating income, before certain credits (charges), improved in all segments in the
> quarter and nine months ended June 30, 2000 as compared to the quarter and nine
> months ended June 30, 1999. The operating improvements are the result of increased
> revenues and enhanced margins in certain segments. Increased revenues resulted from
> organic growth and from acquisitions.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

### Tyco=s Charges and Reserves

384.    The 8/14/00 10-Q also gives materially false and misleading information regarding

Tyco=s reserves.  For example:

> In the nine months ended June 30, 2000, the Company established restructuring and
> other non-recurring reserves of $35.9 million, of which $7.3 million is included in cost of
> sales, primarily related to the restructuring activities in AMP=s Brazilian operations and
> wireless communications business, charges associated with USSC=s suture business and
> the exiting of USSC=s interventional cardiology business. At September 30, 1999, there
> existed merger, restructuring and other non-recurring reserves of $399.3 million. During
> the nine months ended June 30, 2000, the Company paid out $116.4 million in cash and
> incurred $50.5 million in non-cash charges that were charged against these reserves.
> Also in the nine months ended June 30, 2000, the Company determined that $117.2
> million of merger, restructuring and other non-recurring reserves established in prior
> years was not needed and recorded a credit of $110.9 million to the merger,
> restructuring and other non-recurring charges line item and a credit of $6.3 million to the
> cost of sales line item in the Consolidated Statement of Operations. The changes in
> estimates of the restructuring plan at AMP were attributable primarily to increased
> demand for certain of AMP=s products which was not anticipated at the time of the

merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company=s 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At June 30, 2000, there remained $151.1 million of merger, restructuring and other non-recurring reserves on the Company=s Consolidated Balance Sheet, of which $117.6 million is included in accrued expenses and other current liabilities and $33.5 million is included in other long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**8/18/00 S-3 (and related Prospectus)**

385.    On August 18, 1999, Tyco filed a Form S-3 relating to the public offering and sale of 4,703,999 shares of Tyco common stock issuable upon exercise of stock options held by Kozlowski and the KMS Family Partnership L.P. (the A8/18/00 S-3(1)@).  The 8/18/00 S-3(1) was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/18/00 S-3(1) incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

386.     Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 8/18/00 S-3(1) recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

387.     In addition, the 8/18/00 S-3(1) sets forth the Consent of PricewaterhouseCoopers, dated August 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

388.     On September 12, 2000, Tyco filed with the SEC a Prospectus relating to the public offering and sale of 4,703,999 shares of Tyco common stock issuable upon exercise of stock options held by Kozlowski and the KMS Family Partnership L.P. (the A9/12/00 Prospectus@).  Because the 9/12/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 8/18/00 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

389.     Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 9/12/00 Prospectus recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.   As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**8/18/00 S-3**

166

390.    On August 18, 2000, Tyco filed a Form S-3 (the "8/18/00 S-3(2)") for the registration of up to $2,500,000,000 of any of the following securities either separately or in units:  debt securities, preference shares, depositary shares and common shares.  The 8/18/00 S-3(2) was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco's directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/18/00 S-3(2) incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

391.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Class Period, the 8/18/00 S-3(2) recites Tyco's purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

392.    The 8/18/00 S-3(2) also sets out the following operating information about the Company:

```
                            NINE
                           MONTHS
                            ENDED     YEAR ENDED
                          JUNE 30,   SEPTEMBER 30,
                          ---------  --------
                            2000       1999
                          ---------  --------

Earnings:
Income (loss) before
  extraordinary items and
  cumulative effect of
  accounting changes..........  $2,610.0   $1,067.7
Income taxes.................    878.9      637.5
                          --------  --------
                           3,488.9   1,705.2
                          --------  --------
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

393.    In addition, the 8/18/00 S-3(2) sets forth the Consent of PricewaterhouseCoopers, dated August 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

**8/18/00 S-3 (and related Prospectus and Prospectus Supplement**)

394.    On August 18, 2000, Tyco filed a Form S-3 for the registration of $3,500,000,000 in debt securities of Tyco International Group S.A (the "8/18/00 S-3(3)").  The 8/18/00 S-3(3) was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/18/00 S-3(3) incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

395.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 8/18/00 S-3(3) recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

396.    The 8/18/00 S-3(3) also sets out the following operating information about the Company:

```
                    NINE
                   MONTHS
                   ENDED      YEAR ENDED
                  JUNE 30,   SEPTEMBER 30,
                 ---------   -------------
                   2000          1999
                 ---------   -------------

Earnings:
Income (loss) before
  extraordinary items and
  cumulative effect of
```

169

```
accounting changes..........  $2,610.0   $1,067.7
Income taxes.................     878.9      637.5
                               --------   --------
                                3,488.9    1,705.2
                               --------   --------
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

397.    In addition, the 8/18/00 S-3(3) sets forth the Consent of PricewaterhouseCoopers, dated August 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

398.    On September 18, 2000, Tyco filed with the SEC a Prospectus relating to the registration of $3,500,000,000 in debt securities of Tyco International Group S.A. (the "9/18/00 Prospectus"). Because the 9/18/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 8/11/00 S-3(3), it contains the same materially false and misleading statements set forth in those documents, as described herein.

399.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Class Period, the 9/18/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 268. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

400.    On February 20, 2001, the Tyco Defendants filed with the SEC a Prospectus Supplement (the "2/20/01 Prospectus Supplement") to the 9/18/00 Prospectus. Because the 2/20/01

Prospectus Supplement incorporates by reference the same documents that were incorporated by reference in the 8/11/00 S-3(3), it contains the same materially false and misleading statements set forth in those documents, as described herein.

401.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 2/20/01 Prospectus Supplement recites Tyco=s purported strategy, quoted and discussed below in paragraph 460.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

402.    On June 5, 2001, the Tyco Defendants filed with the SEC a Prospectus Supplement to the 9/18/00 Prospectus (the A6/5/01 Prospectus Supplement@).  Because the 6/5/01 Prospectus Supplement incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on Form 10-K and 10-K/A for the fiscal year ended September 30, 2000; (ii) Tyco=s Quarterly Reports on Form 10-Q for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

403.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 6/5/01 Prospectus Supplement recites Tyco=s purported strategy, quoted and discussed below in paragraph 460.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

404.    On July 26, 2001, Tyco filed with the SEC a Prospectus Supplement (the "7/26/01 Prospectus Supplement") to the 9/18/00 Prospectus.  Because the 7/26/01 Prospectus Supplement incorporates by reference the same documents that were incorporated by reference in the 8/11/00 S-3(3), it contains the same materially false and misleading statements set forth in those documents, as described herein.

405.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Class Period, the 7/26/01 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 461.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

406.    The 7/26/01 Prospectus Supplement also states as follows:

On July 18, 2001, Tyco announced its results for the third quarter of fiscal 2001, the three months ended June 30, 2001.  Revenues for the quarter rose 25% to $9.29 billion compared with last year's $7.42 billion.  Diluted earnings per share before extraordinary items for the third quarter of fiscal 2001 were $0.67, or $1.22 billion, compared to $0.58 or $997.3 million, in  the third quarter of fiscal 2000.  Net income before non-recurring and extraordinary items rose to $1.31 billion, an increase of 32% compared to $992.1 million last year.  Diluted earnings per share before non-recurring and extraordinary items for the third fiscal quarter ended June 30, 2001 were $0.72, a 24% increase over earnings of $0.58 per diluted share in the third quarter of fiscal 2000.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d

407.    In a press release dated October 18, 2000 (filed with a Form S-8 on November 1, 2000), Tyco announced that it had completed the acquisition of Mallinckrodt.  The press release stated:

AThe Mallinckrodt acquisition will be immediately accretive to Tyco=s earnings,@ according to L. Dennis Kozlowski, Tyco=s Chairman and Chief Executive Officer. AIt offers consolidation opportunities as well as significant manufacturing, purchasing and distribution synergies. Our past acquisitions in Tyco Healthcare have achieved strong top line growth and operating efficiencies. The acquisition of Mallinckrodt also will provide ongoing positive benefits to Tyco shareholders.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d

**10/18/00 S-4 (and related S-4/A=s)**

408.    On October 18, 2000, Tyco filed with the SEC a Form S-4 relating to a proposed merger between InnerDyne and a subsidiary of Tyco (the A10/18/00 S-4@).  The 10/18/00 S-4 was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 10/18/00 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

409.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 10/18/00 S-4 recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  It also reiterates its so-called strategy in its discussion of Tyco=s acquisition of InnerDyne:

173

At a meeting of Tyco=s board of directors held on October 3, 2000, Tyco=s board determined that the acquisition of InnerDyne was in keeping with its corporate strategy of complementing its internal growth with acquisitions that are likely to benefit from cost reductions and synergies when combined with Tyco=s existing operations and that are expected to be accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d

410.    In addition, the 10/18/00 S-4 sets forth the Consent of PricewaterhouseCoopers, dated October 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

411.    On October 20, 2000, Tyco filed with the SEC a Form S-4/A (the A10/20/00 S-4/A@), amending the 10/18/00 S-4.  The 10/20/00 S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 10/20/00 S-4/A incorporates by reference the same documents that were incorporated by reference in the 10/18/00 S-4, it contains the same materially false and misleading statements set forth in those documents, as described herein.

412.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 10/20/00 S-4/A recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  It also reiterates its so-called strategy in its discussion of Tyco=s acquisition of InnerDyne, using precisely the same language quoted from the 10/18/00 S-4, above.  As the Tyco Defendants either knew

or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d

413.    In addition, the 10/20/00 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated October 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

414.    On November 14, 2000, Tyco filed with the SEC a Form S-4/A (the A11/14/00 S-4/A@), amending its S-4 filed on October 18, 2000 and S-4/A filed on October 20, 2000.  The 11/14/00 S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser). Because the S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, July 14, 2000, and November 1, 2000.

415.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 11/14/00 S-4/A recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  It also reiterates its so-called strategy in its discussion of Tyco=s acquisition of InnerDyne, using

175

precisely the same language quoted from the 10/18/00 S-4, above.  As the Tyco Defendants either knew

or were reckless in not knowing, these statements of strategy when made were materially false and

misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and

A.1.d

416.    In addition, the 11/14/00 S-4/A contains materially false and misleading statements about

Tyco under the heading ARecent Developments.@ For example:

> On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000,
> the three months ended September 30, 2000.  For the fiscal 2000 fourth quarter, income
> before restructuring and other non-recurring credits, charges, gain and extraordinary
> items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or
> $0.46 per diluted share, for the quarter ended September 30, 1999.  After giving effect
> to restructuring and other non-recurring credits, charges, gain and extraordinary items,
> net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted
> share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of
> fiscal 1999.  Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax
> gain from the initial public offering of TyCom Ltd. Fourth quarter sales rose 25% to
> $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) A, A.1.a and A.1.d

417.    Further:

> For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50
> billion in fiscal 1999.  Income before restructuring and other non-recurring credits,
> charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a
> 42% increase over $1.53 per diluted share in fiscal 1999.  After giving effect to
> restructuring and other non-recurring credits, charges, gain and extraordinary items, net
> income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02
> billion, or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d

418.    In addition, the 11/14/00 S-4/A S-3 sets forth the Consent of PwC, dated November 14, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

419.    On March 15, 2001, the Tyco Defendants filed with the SEC a Prospectus Supplement relating to Tyco=s proposed offer of 31,085 common shares relating to a proposed merger between InnerDyne and a Tyco subsidiary (the A3/15/01 Prospectus Supplement@).  Because the 3/15/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco=s Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, and March 15, 2001.

420.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 3/15/01 Prospectus Supplement recites Tyco=s purported strategy, quoted and discussed below in paragraph 460.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**10/23/00 S-8**

421.    On October 23, 2000, Tyco filed a Form S-8 for the registration of 1,000,000 shares of

Tyco common stock relating to the Investment Plan for Employees of Mallinckrodt Inc. (the A10/23/00 S-8"), signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 10/23/00 S-8 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

422.    In addition, the 10/23/00 S-8 sets forth the Consent of PricewaterhouseCoopers, dated August 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 23, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

423.    On October 25, 2000, J.P. Morgan, reporting materially false and misleading information received from the Tyco Defendants, issued another bullish report on Tyco entitled, AStrong 4Q Results Deliver Revenue.@  The report stated:

> Tyco delivered another upside quarter in a tough environment, reinforcing our view the stock should enjoy a flight to quality given a slew of earnings disappointments this quarter.

*   *   *

> Tyco exceeded its already aggressive target of $3.3 billion related in free cash for the

178

year posting free cash for the quarter of over $1.4 billion and a full year total of over $3.3 billion.

\* \* \*

Management reinforced its view on acquisitions and once again outlined its disciplined approach of comprehensive due diligence, strategic business fit, and long term growth sustainability, going a long way to quell investor concerns over the potential for a large, unfavorable deal.  The company does not intend to be the buyer of last resort for every large industrial company that is for sale and its track record supports this view.  The stock has been hurt by this perception recently and we think the absence of Tyco activity on some high profile acquisitions should reinforce this point and lower the perceived risk.

\* \* \*

Investors are looking at technology names with exposure to many end markets that Tyco Electronics serves and concluding that Tyco will hit a bump in the road.  We do not dispute that growth in handsets, computers or other tech markets has slowed, but it has certainly not stopped altogether.  Tyco has good visibility into the next several quarters and expects growth to hold near current levels over that period of time.

\* \* \*

Management reaffirmed its comfort level with our $2.70 earnings estimate for FY2001, and looks for recent strong trends to persist across its businesses through the year.

424.    The price of Tyco stock closed at $54.75 on October 25, 2000.

**10/24/00 Conference Call**

425.    On October 24, 2000, Tyco held a conference call to discuss, among other things, its earnings during the fourth quarter of fiscal 2000.  Defendant Kozlowski touted Tyco=s performance for the quarter:  AThe organic growth for the entire fiscal year was in excess of 16%. . . . [W]e detect no signs of weakness in any areas of any of our businesses.@  He said also:  AI hope you got the sense from our conference call here today that business is very good at Tyco, the outlook is quite strong.  You will be seeing robust organic growth from us.@  As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

426.    In addition, defendant Kozlowski described Tyco=s strategy for acquiring other companies, emphasizing that each and every acquisition has to be Astrongly accretive@ to Tyco:

KOZLOWSKI:       . . . [I]rregardless of the size [all our acquisitions] have to meet the same criteria of being strongly accretive to us, and we get that accretion through cost reductions, we do not count revenue enhancements into any of that but we=ve push hard for revenue enhancement and we wouldn=t buy a company whose revenues we didn=t think we could enhance, we simply wouldn=t pay for it at the time it comes to a part of the company, it has to fit within the segments that we are in, it has to have management sponsorship here, and it has to be something that just makes a whole lot of sense.

As defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

427.    The following day, in an article entitled ATyco=s Net Income More Than Doubles; Profit Before One-Time Items Rises 40%,@ THE WALL STREET JOURNAL quoted an Aupbeat@ Kozlowski as saying: Awe detect no signs of weakness in any of our businesses,@ and called the company=s outlook Aquite strong.@  As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A and B.

**11/9/00 S-3 (and related S-3/A and Prospectus)**

428.    On November 9, 2000, Tyco filed a Form S-3 for the registration of 2,180,010 shares of Tyco common stock relating to Tyco=s October 26, 2000 acquisition of CIGI Investment Group, Inc. (the A11/9/00 S-3@).  The 11/9/00 S-3 was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 11/9/00 S-3 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, July 14, 2000, and November 1, 2000.

181

429.    Like the 1999 10-K and many of Tyco≡s other filings with the SEC throughout the Class Period, the 11/9/00 S-3 recites Tyco≡s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

430.    In addition, the 11/9/00 S-3 contains materially false and misleading statements about Tyco under the heading ACurrent Developments.@  For example:

> On October 24, 2000, Tyco announced its preliminary unaudited results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000.  For the fiscal 2000 fourth quarter, income before restructuring and other non- recurring credits, charges, gain and extraordinary item was $1.10 billion, or $0.64 per share on a fully diluted basis, as compared to $782.7 million, or $0.46 per share on a fully diluted basis, for the quarter ended September 30, 1999.  After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary item, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999.   Results in the fourth quarter included a $1.76 billion pretax gain from the initial public offering of TyCom Ltd. Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

431.    Further:

> For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50 billion in fiscal 1999.  Income before restructuring and other non- recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a 42% increase over $1.53 in fiscal 1999.  After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary item, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion, or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

432.    In addition, the 11/9/00 S-3 sets forth the Consent of PricewaterhouseCoopers, dated November 8, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

433.    On November 14, 2000, Deutsche Banc Alex. Brown, issued an analyst report entitled, ATYC Sees $0.05 FY01 LPS Accretion LPS B Buying Opportunity B Consensus EPS Should Rise.@ The report stated, A[o]nce again, Tyco has made an acquisition that makes both economic and strategic sense.  We=ve come to expect nothing less from Tyco.@

434.    On November 30, 2000, Tyco filed a Form S-3/A (the A11/30/00 S-3/A@), amending the 11/9/00 S-3.  The 11/30/00 S-3/A was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the S-3/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on

December 9, 1999, January 20, 2000, July 14, 2000, November 1, 2000, and November 15, 2000.

435.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class

Period, the 11/30/00 S-3/A recites Tyco=s purported strategy, quoted and discussed above in paragraph

268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy

when made was materially false and misleading and omitted material information for the reasons set forth

above in Section(s) A, A.1.a and A.1.d.

436.    In addition, the 11/30/00 S-3/A contains materially false and misleading statements about

Tyco under the heading ACurrent Developments.@  For example:

> On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000,
> the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income
> before restructuring and other non-recurring credits, charges, gain and extraordinary
> items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or
> $0.46 per diluted share, for the quarter ended September 30, 1999. After giving effect
> to restructuring and other non-recurring credits, charges, gain and extraordinary items,
> net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted
> share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of
> fiscal 1999. Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax
> gain from the initial public offering of TyCom Ltd. Fourth quarter sales rose 25% to
> $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

437.    Further:

> For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50
> billion in fiscal 1999. Income before restructuring and other non-recurring credits,
> charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a
> 42% increase over $1.53 per diluted share in fiscal 1999. After giving effect to
> restructuring and other non-recurring credits, charges, gain and extraordinary items, net

income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

438.    In addition, the 11/30/00 S-3/A sets forth the Consent of PricewaterhouseCoopers, dated November 29, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

439.    On December 8, 2000, Tyco filed with the SEC a Prospectus in connection with the registration of 2,180,010 shares of Tyco common stock relating to Tyco=s October 26, 2000 acquisition of CIGI Investment Group, Inc. (the A12/8/00 Prospectus@).  Because the 12/8/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 11/30/00 S-3/A, it contains the same materially false and misleading statements set forth in those documents, as described herein.

440.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 12/8/00 Prospectus recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

441.    In addition, the 12/8/00 Prospectus contains materially false and misleading statements

about Tyco under the heading ACurrent Developments.@ These statements are identical to those quoted

above from the 11/30/00 S-3/A under the same heading, and are materially false and misleading for the

same reasons.

**11/14/00 Conference Call**

442.    On November 14, 2000, Tyco held a conference call to announce a deal to purchase a

unit of Lucent.  According to defendant Kozlowski:

> KOZLOWSKI:          **The deal is very attractive financially in terms of earnings per
> share accretion and return.**  This is possible through some $385
> million in synergies. . . . About 60% of the synergies will be realized in
> the first full year we have the company and about 99% of the synergies
> will be realized in year 2.  So therefore, as we pointed out, year one
> accretion will be about 6¢, year two and year three will be about 12¢ and
> 15¢ respectively. . . . We believe we will have no problems meeting the
> goals, the financial goals that we have set out before your within this
> business.  And overall we are pleased to also report that Tyco continues
> to function well.  All of our businesses are operating at a high level.
> **We=re very comfortable with the earnings estimates that we have
> out for the quarter and for the year and this deal will be accretive
> as we pointed out to those earnings estimates for the year.**
> [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

443.    About three weeks later, Tyco agreed to buy Simplex Time Recorder.  According to a

December 5, 2000 THE WALL STREET JOURNAL article (ATyco Agrees to Buy Simplex Time

Recorder@), defendant Kozlowski said of the deal:  A>The combination of Simplex with Tyco Fire and

Security Services will provide excellent manufacturing and service synergies, allowing for immediate

benefits for Tyco shareholders.@  As defendant Kozlowski either knew or was reckless in not knowing, this statement when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**12/8/00 S-3 (and related S-3/A and Prospectus)**

444.    On December 8, 2000, Tyco filed a Form S-3 for the registration of $4,657,500,000 in Liquid Yield Option Notes due 2020 (the A12/8/00 S-3@).  The 12/8/00 S-3 was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 12/8/00 S-3 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco=s Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, July 14, 2000, November 1, 2000, and November 15, 2000.

445.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 12/8/00 S-3 recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

446.    In addition, the 12/8/00 S-3 contains materially false and misleading statements about Tyco under the heading ACurrent Developments.@  For example:

On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30, 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999. Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax gain from the initial public offering of TyCom Ltd. Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

447.    Further:

For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50 billion in fiscal 1999. Income before restructuring and other non- recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a 42% increase over $1.53 per diluted share in fiscal 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

448.    The 12/8/00 S-3 also gives favorable, purportedly accurate information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

|  | NINE MONTHS ENDED JUNE 30, | YEAR ENDED SEPTEMBER 30, |
|---|---|---|
|  | 2000 | 1999 |
| Earnings: | | |
| Income (loss) before extraordinary items and cumulative effect of accounting changes.......... | $2,610.0 | $1,067.7 |
| Income taxes................. | 878.9 | 637.5 |
|  | 3,488.9 | 1,705.2 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

449.    The 12/8/00 S-3 also includes information on charges included in earnings:

Earnings for the nine months ended June 30, 2000, the years ended September 30, 1999 and 1998, the nine months ended September 30, 1997 and the years ended December 31, 1996 and 1995 include net merger, restructuring and other non-recurring (credits) charges of $(81.3) million (of which net charges of $1.0 million are included in cost of sales), $1,035.2 million (of which $106.4 million is included in cost of sales), $256.9 million, $947.9 million, $344.1 million and $97.1 million, respectively. Earnings also include charges for the impairment of long-lived assets of $99.0 million, $507.5 million, $148.4 million, $744.7 million and $8.2 million in the nine months ended June 30, 2000, the year ended September 30, 1999, the nine months ended September 30, 1997 and the years ended December 31, 1996 and 1995, respectively.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

450.    In addition, the 12/8/00 S-3 sets forth the Consent of PricewaterhouseCoopers, dated December 8, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and

189

misleading materials discussed herein.

451.    On December 15, 2000, Tyco filed a Form S-3/A (the "12/15/00 S-3/A"), amending the 12/8/00 S-3. The 12/15/00 S-3/A was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco's directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser). Because the 12/15/00 S-3/A incorporates by reference the same documents that were incorporated by reference in the 12/8/00 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

452.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Class Period, the 12/15/00 S-3/A recites Tyco's purported strategy, quoted and discussed above in paragraph 268.

453.    In addition, the 12/15/00 S-3/A contains materially false and misleading statements about Tyco under the heading "Current Developments." These statements are identical to those quoted above from the 12/8/00 S-3 under the same heading, and are materially false and misleading for the same reasons.

454.    The 12/15/00 S-3/A also includes information on charges included in earnings that is identical to that quoted above from the 12/8/00 S-3. That information, too, is materially false and misleading for the same reasons given above.

455.    The 12/15/00 S-3/A also sets forth the Consent of PricewaterhouseCoopers, dated December 15, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially

190

false and misleading materials discussed herein.

456.    On December 19, 2000, the Tyco Defendants filed with the SEC a Prospectus relating to the registration of $4,657,500,000 in Liquid Yield Option Notes due 2020 (the A12/19/00 Prospectus@).  Because the 12/19/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 12/8/00 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

457.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 12/19/00 Prospectus recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

458.    In addition, the 12/19/00 Prospectus contains materially false and misleading statements about Tyco under the heading ACurrent Developments.@  These statements are identical to those quoted above from the 12/8/00 S-3 under the same heading, and are materially false and misleading for the same reasons.

**The 2000 10-K filed on 12/21/00**

459.    On December 21, 2000, Tyco filed its 10-K for the fiscal year ended September 30, 2000 (the A2000 10-K@), signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  In it, the Tyco Defendants set out numerous materially false and misleading statements on a variety of topics, including the following:

**Tyco=s AStrategy@**

460.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class

Period, the 2000 10-K recites Tyco=s purported strategy:

> Tyco=s strategy is to be the low-cost, high quality producer and provider in each of our markets. We promote our leadership position by investing in existing businesses, developing new markets and acquiring complementary businesses and products. Combining the strengths of our existing operations and our business acquisitions, we seek to enhance shareholder value through increased earnings per share and strong cash flows.

As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when

made was materially false and misleading and omitted material information for the reasons set forth above

in Section(s) A, A.1.a and A.1.d.

**Tyco=s Manipulation of Purchase Accounting Reserves**

461.    The 2000 10-K sets forth statements that were materially false and misleading

concerning Tyco=s manipulation of purchase accounting reserves:

> In Fiscal 2000, we made acquisitions that were accounted for under the purchase accounting method at an aggregate cost of $5,162.0 million. Of this amount, $4,246.5 million was paid in cash (net of cash acquired), $671.4 million was paid in the form of Tyco common shares, and we assumed $244.1 million in debt. In connection with these acquisitions, we established purchase accounting reserves of $426.2 million for transaction and integration costs. **At the beginning of Fiscal 2000, purchase accounting reserves were $570.3 million as a result of purchase accounting transactions made in prior years. During Fiscal 2000, we paid out $544.2 million in cash and incurred $52.1 million in non-cash charges against the reserves established during and prior to Fiscal 2000. Also in Fiscal 2000, we determined that $117.8 million of purchase accounting reserves related to acquisitions made prior to Fiscal 2000 were not needed and reversed that amount against goodwill. At September 30, 2000, there remained $372.6 million in purchase accounting reserves on our Consolidated Balance Sheet, of which $349.2 million is included in current liabilities and $23.4 million is included in long-term liabilities.** [Emphasis added.]

192

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Tyco=s Operating Results**

462.    The 2000 10-K also gives favorable, purportedly accurate information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

```
                                         FISCAL 2000        FISCAL 1999        FISCAL 1998
                                         -----------        -----------        -----------

Income before income taxes, minority
  interest and extraordinary items.........   6,464.8           1,705.2            1,702.8
Income taxes..............................   (1,926.0)           (637.5)            (534.2)
Minority interest..........................     (18.7)               --                 --
                                           ---------         ---------          ---------
Income before extraordinary items..........   4,520.1           1,067.7            1,168.6
Extraordinary items, net of taxes..........      (0.2)            (45.7)              (2.4)
                                           ---------         ---------          ---------
Net income.................................  $ 4,519.9         $ 1,022.0          $ 1,166.2
                                           =========         =========          =========
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d

463.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco=s favorable results to Aorganic growth@ and Asynergies@ resulting from Tyco=s acquisitions.  According to the 2000 10-K:

> Operating income improved in all segments in each of Fiscal 2000 and Fiscal 1999. The operating improvements are the result of both increased revenues in all segments and enhanced margins in all but one segment in Fiscal 2000. Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.

The Tyco Defendants also state: AB y integrating merged companies with our existing businesses, we expect to realize operating synergies and long-term cost savings.@ And concerning profits in Tyco=s electrical business, the Tyco Defendants state:

> The 49.6% increase in operating income, before certain credits (charges), in Fiscal 1999 compared with Fiscal 1998 was due to improved margins at AMP, the acquisition of Raychem, and higher sales volume at the Tyco Printed Circuit Group. The improved operating margins, before certain credits (charges), in Fiscal 1999 compared with Fiscal 1998 were primarily due to the implementation of AMP=s profit improvement plan, which was initiated in the fourth quarter of Fiscal 1998, cost reduction programs associated with the AMP merger, a pension curtailment/settlement gain and the acquisition of Raychem.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Management Remuneration and Related Transactions**

464.    The 2000 10-K addresses management remuneration only by reference, stating: AInformation concerning management remuneration is hereby incorporated by reference to the Registrant=s definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year.@ Because the 2000 10-K incorporates Tyco=s Proxy Statement, filed on January 29, 2001, by reference, the 2000 10-K contains the same materially false and misleading statements set forth therein, as described below at paragraphs 479-485.

465.    Similarly, the 2000 10-K addresses related transactions by reference, stating:

AInformation concerning certain relationships and related transactions is hereby incorporated by reference to the Registrant=s definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year.@ Because the 2000 10-K incorporates Tyco=s Proxy Statement, filed on January 29, 2001, by reference, the 2000 10-K contains the same materially false and misleading statements set forth therein, as described below at paragraphs 479-485.

466.    On January 2, 2001, THE WALL STREET JOURNAL reported that Tyco completed its purchase of a Lucent unit for $2.5 billion.  The article included a comment from Tyco concerning the benefits of the acquisition:

> Tyco said the acquisition, which gives it a strong foothold in the fast-growing business of providing power supplies to telecommunications concerns, will be Aimmediately accretive.@

As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**2000 Annual Report to Shareholders**

467.    On or about January 30, 2001, Tyco released its 2000 Annual Report to Shareholders (the A2000 Annual Report@).  On its very first page, the 2000 Annual Report falsely and misleadingly states that its Aexceptional financial results@ are the product of its Agrowth-on-growth@ strategy:

> Tyco has demonstrated the ability to grow each of its businesses organically, as well as by the acquisition of complementary businesses or product lines.  This Agrowth-on-growth@ strategy has yielded exceptional financial results for several years, and puts us in a position to achieve excellent growth in the future.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

468.    The 2000 Annual Report touts Tyco=s ability to achieve AOrganic Growth,@ even in the

absence of any additional acquisitions:

> Based on its performance to date, Tyco would continue growing revenues and achieving
> double-digit earnings gains annually for the foreseeable future even without additional
> acquisitions. This is because we have leadership positions in many of the world=s best
> growth industries. Thus, we have the ability to increase sales each year through a
> combination of geographic expansion, the introduction of innovative new products and
> market share gains fueled by our status as the low-cost producer in most of our markets.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

469.    The 2000 Annual Report included a full page description of the Company=s Afree cash

flow@:

> At Tyco, cash is king. We judge ourselves by the amount of free cash flow that we
> generate each year after we have paid all necessary expenses, including capital
> expenditures, which exceeded $1.8 billion last year. In fiscal 2000, Tyco generated over
> $3.3 billion in free cash flow. Cash generation is crucial because it is the very best
> indicator of how a company is really performing and it provides the resources for us to
> continue to grow our businesses by acquisition or other types of investment, such as
> through Tyco Ventures, our new venture capital arm.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

470.    The 2000 Annual Report also provided investors with a false and misleading explanation

196

of Tyco=s acquisition strategy, including its purported ability to acquire companies that Aimmediately@ add

to earnings:

> Acquisitions are a definite growth driver at Tyco. The second part of the growth-on-
> growth strategy involves acquisitions that add new products and businesses to
> complement our core groups. We seek to acquire companies with superior products that
> have long-term growth potential but are performing below peak level, or companies that
> fill a gap in our existing product lines. All acquisitions must immediately add to earnings,
> but they must also make strategic sense by helping us become a stronger competitor in
> one of our existing business segments. Buying at a good price is important; finding a
> company whose people and products fit well in our organization is essential.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

471.    The 2000 Annual Report also included a letter to Tyco shareholders from defendant

Kozlowski, which states:

> Fiscal 2000 was another very strong year for Tyco. I am pleased to report that all our
> operating units beat their performance targets, and they are in a position to achieve
> excellent growth in 2001 and beyond.

> Tyco=s internal revenue growth in fiscal 2000 was 14 percent, a remarkable feat for a
> company of our size. Put another way, our business units delivered $3.7 *billion* in
> incremental sales last year alone B not counting acquisitions. That is what I call a growth
> company.

> For the seventh consecutive year, we increased revenues and earnings substantially.
> Revenues rose 29 percent to $28.9 billion and earnings grew $1.2 billion to $3.7 billion,
> a 46 percent increase over the prior year. Our diluted earnings per share increased 42
> percent to $2.18. These are outstanding numbers, the result of our focus on lean, efficient
> management, continuous production improvement and aggressive expansion into new
> markets. . . .

> I have never been more confident about Tyco=s core businesses and our growth
> opportunities. We generated more than $3.3 billion in free cash flow in 2000, an amount

197

that we hope to increase to over $4 billion **B** before capital spending on the TyCom Global Network **B** in 2001. . . .

**Growth on Growth**

At Tyco, we have a two-pronged growth strategy. First, we seek to achieve double-digit organic growth every year. This is growth without ever doing another acquisition. . . . Strategic acquisitions also play a key role in our growth. A good acquisition should not only be profitable on its own terms, it should also help existing businesses and product lines. . . .

Tyco=s future looks outstanding and I am confident that our Agrowth-on-growth@ strategy will continue to deliver enviable results. We are poised for growth because we have the best brand names in our industries, names that represent Areliability@ and Ainnovation@ to purchasers.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

472.    In addition, the 2000 Annual Report provided investors with a false overview of the Company=s operations:

Sales increased 28.6% during Fiscal 2000 to $28,931.9 million from $22,496.5 million in Fiscal 1999. Sales in Fiscal 1999 increased 18.0% compared to Fiscal 1998. Income before extraordinary items was $4,520.1 million in Fiscal 2000, as compared to $1,067.7 million in Fiscal 1999 and $1,168.6 million in Fiscal 1998. Income before extraordinary items for Fiscal 2000 included an after-tax net credit of $793.7 million ($1,484.7 million pre-tax) consisting of restructuring, non-recurring and impairment charges of $327.3 million ($424.2 million pre-tax) primarily for non-recurring claims related to a merged company and the exiting of USSC=s interventional cardiology business, offset by a credit of $113.6 million ($148.9 million pre-tax) representing a revision of estimates of merger, restructuring and other non-recurring accruals and a gain of $1,007.4 million ($1,760.0 million pre-tax) on the issuance of common shares in connection with TyCom=s initial public offering. Income before extraordinary items for Fiscal 1999 included an aftertax net charge of $1,304.8 million ($1,542.7 million pre-tax) primarily related to the mergers with USSC and AMP and costs associated with AMP=s profit improvement plan. Income before extraordinary items for Fiscal 1998

included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP=s profit improvement plan and costs incurred by USSC to exit certain businesses.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

473.    The 2000 Annual Report also provides limited information concerning loans taken by senior management under Tyco=s KEL program, which was instituted to encourage ownership of the Company=s common stock by executives and other key employees.  According to the 2000 Annual Report:  ADuring Fiscal 2000, the maximum amount outstanding under is program was $26.0 million. Loans receivable under this program were $11.4 million and $18.6 million at September 30, 2000 and 1999, respectively.@  As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.b, B.4 and B.5.

474.    Finally, the 2000 Annual Report includes PwC=s audit opinion, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), on Tyco=s 2000 and 1999 financial statements.  As set forth above, PwC=s opinion falsely stated that such Tyco financial statements were presented in conformity with GAAP, and that PwC=s audit was performed in accordance with GAAS.

### 2001 Materially False and Misleading Statements and Omissions

475.    On January 12, 2001, J.P Morgan, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled, AStrong 1Q Results Could Be A Catalyst.@  The report stated:

We expect very solid earnings and revenue results from Tyco when they report earnings next week, and believe the news would be enough to push the stock beyond its recent $52-58 trading range.  We think nervousness about the economy has weighed on the stock lately, and just making expectations should be worth something.  Of course, the 2001 outlook is the key ingredient to investor interest this time around given the questions on the economy, but even here we expect the company to remain bullish.  We continue to believe the company is in very good shape to deliver on its full year expectations in almost any conceivable scenario this year, and is actually one of the few on our list where we view meaningful EPS upside as a possibility.  Weathering a sharp economic slowdown, or even a recession, with greater than 20% earnings growth should finally deliver the respect (and the multiple) we think the stock deserves.  We look for TYC to be a strong performer both heading into a slowdown given our earnings confidence, and coming out because of the enhanced credibility.

*   *   *

Tyco is our highest conviction Buy rated stock and we have a $95 per share target.

476.    The price of Tyco stock closed at $59.63 on January 13, 2001.

## 1/17/01 Conference Call

477.    On January 17, 2001, Tyco held a conference call with analysts.  During the call, the

Tyco Defendants continued to report "organic growth":

> KOZLOWSKI:          Tyco International today reported a 24% increase in first quarter earnings per share.  Our earnings per share increased to 57 cents a share from 46 cents last year.  Our revenue was up 21% to $8 billion for the quarter and we are pleased to report that organic growth for Tyco which excluding TyCom which has a different business model now where they building out their own system.  Organic growth was up from 16%.

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

## 2001 Proxy Statement

200

478.    On January 29, 2001, the Tyco Defendants filed with the SEC Tyco=s Proxy Statement

for the 2001 annual meeting (the A2001 Proxy Statement@).  The 2001 Proxy Statement contains

materially false and misleading statements on a variety of topics, including management remuneration, the

Key Employee Loan Program, and allegations of accounting impropriety by the Company.

**Management Remuneration**

479.    Concerning Tyco=s executive compensation program generally, the 2001 Proxy

Statement states:

> Tyco=s executive compensation program [offers] significant financial rewards when Tyco
> and the individual achieve excellent results; however, significantly lower compensation is
> tied to lower levels of performance. Specifically, if the compensation targets are not
> achieved, Tyco executives are ineligible for either cash bonuses or equity-based
> compensation. In order for Mr. Kozlowski and Mr. Swartz to earn a cash bonus in fiscal
> 2000, a minimum of 22.5% growth in pre-tax income and operating cash flow growth
> over fiscal 1999 performance was required. In addition, in order to meet the
> performance criteria to vest the minimum number of restricted shares, growth in earnings
> per share of at least 22.5% over fiscal 1999 was required.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B.

480.    The 2001 Proxy Statement also contains materially false and misleading information

regarding the administration of compensation to executive officers and key managers:

> The Compensation Committee of the Board of Directors is composed solely of
> independent directors, none of whom has any interlocking relationships with Tyco that
> are subject to disclosure under rules of the SEC relating to proxy statements. The
> Compensation Committee approves all of the policies under which compensation is paid
> or awarded to Tyco=s Chief Executive Officer, reviews and, as required, approves such
> policies for executive officers and key managers, and oversees the administration of
> executive compensation programs.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.

481.    The 2001 Proxy Statement contains the following specific information concerning the compensation of defendants Kozlowski and Swartz:

|  |  |  |  |  |  | LONG TERM COMPENSATION | | |
|---|---|---|---|---|---|---|---|---|
|  |  | ANNUAL COMPENSATION(1) | | |  | TYCO SHARES | TYCOM SHARES |  |
| NAME & PRINCIPAL POSITION | YEAR | SALARY | CASH BONUS(3) | STOCK BONUS(4) | RESTRICTED STOCK AWARD(S)(5) | UNDERLYING STOCK OPTIONS | UNDERLYING STOCK OPTIONS | ALL OTHER COMPENSATION(6) |
| L. DENNIS KOZLOWSKI...... | 2000 | $1,350,000 | $2,800,000 |  | $21,207,540 | 5,107,158 | 800,000 | $527,152 |
| CHAIRMAN & CEO, TYCO | 1999 | 1,350,000 | 3,200,000 |  | 25,707,178 | 6,621,834 |  | 387,001 |
| INTERNATIONAL LTD. | 1998 | 1,250,000 | 2,500,000 |  | 20,140,000 | 3,832,800 |  | 901,002 |
| MARK H. SWARTZ.......... | 2000 | 768,750 | 1,400,000 |  | 10,603,770 | 2,535,999 | 500,000 | 292,487 |
| EVP & CFO, TYCO | 1999 | 750,000 | 1,600,000 |  | 12,029,641 | 2,976,480 |  | 150,014 |
| INTERNATIONAL LTD. | 1998 | 559,500 | 1,250,000 |  | 10,070,000 | 2,764,666 |  | 256,878 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.1, B.2, B.3, B.4, B.5, B.6, B.7 and B.8.

482.    The 2001 Proxy Statement failed to disclose and misrepresented the actual compensation of defendant Kozlowski:

> For fiscal 2000, Mr. Kozlowski received a base salary of $1.35 million and a cash bonus in the amount of $2.8 million, as shown in the SUMMARY COMPENSATION TABLE on page 14. Mr. Kozlowski was granted 600,000 shares of restricted stock on January 5, 2000. These shares will vest over a period of up to three years if the specified performance criteria referred to above are met.

> Mr. Kozlowski also received an aggressive performance-based option award, which includes significant growth in earnings per share and stock price appreciation measures

(described in footnote 3 on page 16). Mr. Kozlowski also received restoration options in accordance with the restoration option provision. The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco. At the time of the TyCom initial public offering, Mr. Kozlowski received an award of options to purchase 800,000 TyCom common shares at the initial public offering price of $32.00 with pro-rata vesting over four years. The Committee believes Tyco is best served by the continued leadership of Mr. Kozlowski. The Committee conferred with a nationally recognized consulting firm that analyzed Tyco=s performance, as well as the marketplace for executive talent. The firm reviewed the performance option award, designed to focus on Mr. Kozlowski=s retention as well as growth in shareholder value, and made its recommendations. Another consulting firm reviewed and concurred with the recommendations.

The Committee considers Mr. Kozlowski=s level of compensation appropriate in view of his performance and continued leadership of Tyco during fiscal 2000. As noted above, Tyco experienced outstanding growth in earnings per share of 42.5%, operating cash flow of 48.6%, and net sales of 29%.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.1.a, B.2, B.3, B.4.a, B.5, B.7 and B.8.

**Key Employee Loan Program**

483.    The 2001 Proxy Statement provides materially false and misleading statements concerning Tyco=s KEL Program.  It states, for example:

The Compensation Committee administers the loan program. **The Compensation Committee authorizes loans, which may not exceed the amount allowable as provided by any regulation of the United States Treasury or other state or federal statute**. Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured. Loans under the loan program generally bear interest at Tyco=s incremental short-term borrowing rate (6.67% for 2000) and are generally repayable in ten years or when the participant reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the participant=s employment with Tyco or its subsidiaries terminates. The participant is also required to

> make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted. [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.4 and B.5.

484.    The 2001 Proxy Statement also falsely and misleadingly states:

> At September 30, 2000, the amount of loans outstanding under the [Key Employee Loan] program totaled $11,421,655, of which nothing was outstanding for any of the Named Officers. The largest amount of indebtedness since October 1, 1999 for each of these individuals was $12,711,768 for Mr. Kozlowski, $304,363 for Mr. Garvey, and $1,000,000 for Mr. Swartz. Neither Dr. Gromer nor Mr. Meelia had loans under the program during fiscal 2000.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.4 and B.5.

**1/31/01 S-8**

485.    On January 31, 2001, the Tyco Defendants filed a Form S-8 for the registration of 200,000 shares of Tyco common stock (the A1/31/01 S-8@), signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, III, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 1/31/01 S-8  incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on Form 10-K for the fiscal year ended September 30, 2000; and (ii) Tyco=s

Current Reports on Form 8-K filed on November 1, 2000, and November 15, 2000.

486.    In addition, the 1/31/01 S-8 sets forth the Consent of PricewaterhouseCoopers, dated January 29, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

**2/13/01 10-Q for quarter ended 12/31/00**

487.    On February 13, 2001, the Tyco Defendants filed Tyco=s Form 10-Q for the quarter ended December 31, 2000 (the A2/13/01 10-Q@), signed by defendant Swartz.  In it, the Tyco Defendants set out numerous materially false and misleading statements.  These false and misleading statements addressed a variety of topics, including the following:

**Tyco=s Operating Results**

488.    The 2/13/01 10-Q also gives favorable, purportedly accurate information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

|  | (UNAUDITED) FOR THE QUARTERS ENDED DECEMBER 31, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Income before income taxes, minority interest, extraordinary item and cumulative effect of accounting change........... | 1,551.2 | 1,024.3 |
| Income taxes........................................... | (529.5) | (263.9) |
| Minority interest...................................... | (12.5) | (3.2) |
| Income before extraordinary item and cumulative effect of accounting change..................................... | 1,009.2 | 757.2 |
| Extraordinary item, net of tax......................... | -- | (0.2) |
| Cumulative effect of accounting change, net of tax......... | (29.7) | -- |
| Net income............................................. | $  979.5 | $  757.0 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

**Tyco=s Reserves**

489.    The 2/13/01 10-Q also gives materially false and misleading information concerning

Tyco=s reserves.  For example:

> During the quarter ended December 31, 2000, we recorded restructuring and other
> non‑recurring charges of $18.1 million primarily related to an environmental remediation
> project and the closure of a manufacturing plant. Additionally, we incurred a
> non‑recurring charge of $25.0 million related to the write-up of inventory under purchase
> accounting. The $25.0 million charge has been included in cost of sales. At September
> 30, 2000, there existed merger, restructuring and other non‑recurring reserves of $365.9
> million. During the quarter ended December 31, 2000, we paid out $11.3 million in cash
> and incurred $1.7 million in non‑cash charges that were charged against these reserves.
> At December 31, 2000, there remained $371.0 million of merger, restructuring and other
> non‑recurring reserves in our Consolidated Balance Sheet, of which $341.3 million is
> included in current liabilities and $29.7 million is included in long-term liabilities.  p25

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

**2/23/01 S-4 (and related S-4/A and Prospectus)**

490.    On February 23, 2001, Tyco filed with the SEC a Form S-4 relating to Tyco=s

proposed offer to issue 9,415,481 shares of Tyco stock upon consummation of the merger with Scott

Technologies, Inc.(the A2/23/01 S-4@).  The 2/23/01 S-4 was signed by defendants Kozlowski, Swartz,

Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F.

Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter

Slusser).  Because the 2/23/01 S-4 incorporates the following documents by reference, it contains the

same materially false and misleading statements set forth in those documents, as described herein:  (i)

206

Tyco=s Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco=s

Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco=s Current

Reports on Form 8-K filed on November 1, 2000, November 15, 2000, and February 9, 2001.

491.    Like many of Tyco=s other filings with the SEC throughout the Class Period, the 2/23/01

S-4 recites Tyco=s purported strategy, quoted and discussed above in paragraph 268.  It also reiterates

its so-called strategy in its discussion of Tyco=s acquisition of Scott:

> At a meeting held on January 10, 2001, Tyco=s Board of Directors determined that the
> acquisition of Scott was in keeping with its corporate strategy of complementing its
> internal growth with acquisitions that are likely to benefit from cost reductions and
> synergies when combined with Tyco=s existing operations and that are expected to be
> accretive to Tyco=s earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when

made were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) A, A.1.a and A.1.d.

492.    In addition, the 2/23/01 S-4 sets forth the Consent of PricewaterhouseCoopers, dated

February 20, 2001, permitting the incorporation by reference of its materially false and misleading report,

dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000

10-K and discussed above, and other materially false and misleading materials discussed herein.

493.    On March 30, 2001, Tyco filed with the SEC a Form S-4/A (the A3/30/01 S-4/A@) and

a Prospectus (the A3/30/01 Prospectus@) relating to the proposed merger between Scott Technologies,

Inc. and Tyco.  Because the 3/30/01 S-4/A and the 3/30/01 Prospectus each incorporate the following

documents by reference, they each contain the same materially false and misleading statements set forth

in those documents, as described herein:  (i) Tyco=s Annual Report on Form 10-K for the fiscal year

ended September 30, 2000; (ii) Tyco=s Quarterly Report on Form 10-Q for the quarter ended

December 31, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on November 1, 2000,

November 15, 2000, February 9, 2001, and March 29, 2001.

494.    Like many of Tyco=s other filings with the SEC throughout the Class Period, the 3/30/01

S-4/A and the 3/30/01 Prospectus each recite Tyco=s purported strategy, quoted and discussed above

in paragraph 460.  They also reiterate its so-called strategy in their discussion of Tyco=s acquisition of

Scott, using precisely the same language quoted from the 2/23/01 S-4, above.  As the Tyco Defendants

either knew or were reckless in not knowing, these statements of strategy when made were materially

false and misleading and omitted material information for the reasons set forth above in Section(s) A,

A.1.a and A.1.d.

495.    The 3/30/01 S-4/A and the 3/30/01 Prospectus also give favorable, purportedly

accurate information concerning Tyco=s operating results, including the identical historical financial data of

Tyco represented in the 2/23/01 S-4, quoted above.  As the Tyco Defendants either knew or were

reckless in not knowing, these statements when made were materially false and misleading and omitted

material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

496.    In addition, the 3/30/01 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated

March 14, 2001, permitting the incorporation by reference of its materially false and misleading report,

dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000

10-K and discussed above, and other materially false and misleading materials discussed herein.

497.    On March 5, 2001, UBS Warburg, reporting materially false and misleading information

received from the Tyco Defendants, issued an analyst report entitled, AWarning Signs Abound, But

News From Tyco Remains Positive.@  The report stated:

> Signs continue to mount that demand may weaken at Tyco Electronics, but news from the company remains positive.

> \* \* \*

> Companies serving related industries to both Tyco Electronics and TyCom continue to reduce forecasts.

> \* \* \*

> We maintain a Buy rating on Tyco reflecting our belief that management will continue to generate market-beating returns for its shareholders by leveraging its current positions in high-growth industries, focusing future investments in sectors that are growing rapidly, wringing excess costs out of acquired organizations, leveraging its strengths throughout acquired organizations. . .

> \* \* \*

> Our rating remains Aonly@ a buy due to our belief that the market has appropriately priced many of Tyco=s prior successes into the current stock price and the risk to earnings if semiconductor demand continues to decelerate rapidly.

498.    Tyco stock closed at $54.90 on March 6, 2001.

**3/13/01 Conference Call**

499.    On March 13, 2001, Tyco held a conference call to discuss, among other things, its

proposed acquisition of CIT.  Defendant Kozlowski stated:

> KOZLOWSKI:        On the plus side, this transaction is accretive to Tyco shareholders delivering .10 cents the first full year.  If one were to take out the amortization on this we=d be delivering some .72 cents the first full year.  The new accounting rules allow us to deliver .10 cents and if we were to pool, to be on an apples to apples basis, we would be delivering that .10 cents.  This .10 cents now is based upon putting the two companies together at current rent rates and a little bit of some cost reductions at CIT . . . . **This acquisition meets all of our criteria.  CIT is a market leader.  The transaction is immediately accretive to**

**earnings before any revenue enhancements**.  [Emphasis added.]

\* \* \*

We=re very, very enthused by this acquisition.  It=s certainly going to add to earnings.  We feel good about our earnings right now.  The transaction most likely will close in about July.  It should add a couple of cents this year, that we=re in, and next year for the full year for the full fiscal year now we=re probably talking about some .10 to .12 cents before we get into the revenue enhancements for the business.

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1, A.1.d and A.1.e.

**3/16/01 S-3 (and related Prospectus)**

500.    On March 16, 2001, Tyco filed with the SEC a Form S-3 related to the February 12, 2001 issuance of $3,035,000,000 of Zero Coupon Convertible Debentures due February 12, 2021 (the A3/16/01 S-3@).  The 3/16/01 S-3 was signed by defendants Kozlowski, Swartz, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 3/16/01 S-3 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco=s Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco=s Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, and March 15, 2001.

501.    The 3/16/01 S-3 also sets out the following favorable, purportedly accurate information concerning Tyco=s operating results:

|  | Quarter Ended December 31, 2000 | Year Ended September 30, | | | Nine Months Ended September 30, 1997 | Year Ended December 31, 1996 |
|---|---|---|---|---|---|---|
|  |  | 2000 | 1999 | 1998 |  |  |
|  | (in millions, except ratio) | | | | | |
| Earnings: | | | | | | |
| Income (loss) before extraordinary items and cumulative effect of accounting changes.............. | $1,009.2 | $4,520.1 | $1,067.7 | $1,168.6 | $(348.5) | $ 49.4 |
| Income taxes.......... | 529.5 | 1,926.0 | 637.5 | 534.2 | 348.1 | 469.4 |
| Minority interest..... | 12.5 | 18.7 | -- | -- | -- | -- |
|  | 1,551.2 | 6,464.8 | 1,705.2 | 1,702.8 | (0.4) | 518.8 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

502.    In addition, the 3/16/01 S-3 sets forth the Consent of PricewaterhouseCoopers, dated March 14, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

503.    On April 3, 2001, Tyco filed with the SEC a Prospectus related to the February 12, 2001 issuance of the Zero Coupon Convertible Debentures (the "4/3/01 Prospectus").  Because the 4/3/01 Prospectus incorporates by reference the same documents that were incorporated by reference in the 3/16/01 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

**3/29/01 S-4 (and related S-8)**

504.    On March 29, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), a direct wholly-owned subsidiary

of Tyco (the "3/29/01 S-4").  The 3/29/01 S-4 was signed by defendants Kozlowski, Swartz, Ashcroft,

and Walsh, and by other of Tyco's directors (Joshua M. Berman, Richard S. Bodman, John F. Fort,

Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).

Because the 3/29/01 S-4 incorporates the following documents by reference, it contains the same

materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's

Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly

Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on

Form 8-K filed on November 1, 2000, November 15, 2000, and February 9, 2001.

505.    Like many of Tyco's other filings with the SEC throughout the Class Period, the 3/29/01

S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 460.  It also reiterates

its so-called strategy in its discussion of Tyco's acquisition of CIT:

> The acquisition of CIT would also be consistent with Tyco's corporate strategy of
> complementing internal growth with synergistic acquisitions that are expected to be
> immediately accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a, A.1.d and A.1.e.

506.    The 3/29/01 S-4 also gives favorable, purportedly accurate information concerning

Tyco's operating results, including the following:

212

|  | QUARTERS ENDED DECEMBER 31, | | YEAR ENDED SEPTEMBER 30, | |
| --- | --- | --- | --- | --- |
|  | 2000(2) | 1999(2) | 2000(3) | 1999(4) |
|  | (UNAUDITED) | | | |

(IN MILLIONS, EXCEPT PER SHARE DATA)

CONSOLIDATED STATEMENTS
  OF OPERATIONS DATA:

| | | | | |
| --- | --- | --- | --- | --- |
| Operating income....... | 1,308.9 | 1,189.0 | 5,474.4 | 2,190.8 |
| Income (loss) from continuing operations........... | 1,009.2 | 757.2 | 4,520.1 | 1,067.7 |
| Income (loss) from continuing operations per common share(10): | | | | |
| Basic................ | 0.58 | 0.45 | 2.68 | 0.65 |
| Diluted.............. | 0.57 | 0.44 | 2.64 | 0.64 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

507.    In addition, the 3/29/01 S-4 sets forth the Consent of PricewaterhouseCoopers, dated March 26, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

508.    On April 13, 2001, the Tyco Defendants filed with the SEC a Form S-4/A (the "4/13/01 S-4/A"), amending the 3/29/01 S-4.  Because the 4/13/01 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, and April 3, 2001.

509.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class

Period, the 4/13/01 S-4/A recites Tyco=s purported strategy, quoted and discussed above in paragraph

460.  It also reiterates its so-called strategy in its discussion of Tyco=s acquisition of CIT, using precisely

the same language quoted from the 3/29/01 S-4, above.  As the Tyco Defendants either knew or were

reckless in not knowing, these statements of strategy when made were materially false and misleading

and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

510.    In addition, the 4/13/01 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated

April 13, 2001, permitting the incorporation by reference of its materially false and misleading report,

dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000

10-K and discussed above, and other materially false and misleading materials discussed herein.

511.    On April 24, 2001, Tyco filed with the SEC a prospectus relating to the proposed

merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV) (the A4/24/01

Prospectus@).  Because the 4/24/01 Prospectus incorporates the following documents by reference, it

contains the same materially false and misleading statements set forth in those documents, as described

herein:  (i) Tyco=s Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii)

Tyco=s Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco=s

Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001,

March 15, 2001, March 29, 2001, and April 3, 2001.

512.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class

Period, the 4/24/01 Prospectus recites Tyco=s purported strategy, quoted and discussed above in

paragraph 460.  It also reiterates its so-called strategy in its discussion of Tyco=s acquisition of CIT,

using precisely the same language quoted from the 3/29/01 S-4, above.  As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

513.    The 4/24/01 Prospectus also gives favorable, purportedly accurate information concerning Tyco=s operating results, including the following:

```
                                QUARTERS ENDED
                                 DECEMBER 31,       YEAR ENDED SEPTEMBER 30,
                                --------------------  ----------------------------
                                 2000(2)   1999(2)    2000(3)     1999(4)
                                ---------  --------   ---------   ---------
                                   (UNAUDITED)
(IN MILLIONS, EXCEPT PER SHARE DATA)

CONSOLIDATED STATEMENTS
  OF OPERATIONS DATA:

  Operating income.......    1,308.9    1,189.0    5,474.4    2,190.8
  Income (loss) from
    continuing
    operations...........    1,009.2      757.2    4,520.1    1,067.7
  Income (loss) from
    continuing operations
    per common share(10):
    Basic................       0.58       0.45       2.68       0.65
    Diluted..............       0.57       0.44       2.64       0.64
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

514.    On May 24, 2001, the Tyco Defendants filed with the SEC a Post-Effective Amendment No. 1 to Form S-4 relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV) (the A5/24/01 Post-Effective Amendment@).  The 5/24/01 Post-Effective Amendment was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss,

Wendy E. Lane, James S. Pasman, Jr., W. Peter Slusser and Joseph F. Welch). Because the 5/24/01 Post-Effective Amendment incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco=s Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco=s Quarterly Report on Form 10-Q for the quarter ended December 31, 2000 and March 31, 2001; and (iii) Tyco=s Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001 and May 24, 2001.

515.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 5/24/01 Post-Effective Amendment recites Tyco=s purported strategy, quoted and discussed above in paragraph 460. As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

516.    In addition, the 5/24/01 Post-Effective Amendment sets forth the Consent of PricewaterhouseCoopers, dated May 23, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

517.    On June 5, 2001, the Tyco Defendants filed with the SEC a prospectus relating to Tyco=s proposed offer to exchange up to 7,141,083 common shares of Tyco stock for exchangeable shares of Tyco=s direct subsidiary, CIT Exchangeco, Inc. (the A6/5/01 Prospectus@). Because the 6/5/01 Prospectus incorporates the following documents by reference, it contains the same materially false and

misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on

Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco=s Quarterly Reports on Form 10-Q

for the quarters ended December 31, 2000 and March 31, 2001; and (iii) Tyco=s Current Reports on

Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001,

March 29, 2001, April 3, 2001, and May 24, 2001.

518.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class

Period, the 6/5/01 Prospectus recites Tyco=s purported strategy, quoted and discussed above in

paragraph 460.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of

strategy when made was materially false and misleading and omitted material information for the reasons

set forth above in Section(s) A, A.1.a and A.1.d.

519.    On June 7, 2001, Tyco filed with the SEC a Form S-8 in connection with the issuance of

securities to The CIT Group, Inc. Savings Incentive Plan, relating to the proposed merger between The

CIT Group, Inc. and Tyco (the A6/7/01 S-8@).  The 6/7/01 S-8 was signed by defendants Kozlowski,

Swartz, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman,

John F. Fort, Stephen W. Foss, Joseph F. Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter

Slusser).  Because the 6/7/01 S-8 incorporates the following documents by reference, it contains the

same materially false and misleading statements set forth in those documents, as described herein:  (i)

Tyco=s Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco=s

Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000 and March 31, 2001; and

(iii) Tyco=s Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February

9, 2001, March 15, 2001, March 29, 2001, April 3, 2001 and May 24, 2001.

520.    In addition, the 6/7/01 S-8 sets forth the Consent of PricewaterhouseCoopers, dated June 7, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

## 4/18/01 Conference Call

521.    On April 18, 2001, the Tyco Defendants held a conference call with analysts to discuss the Company=s purported earnings growth.  During the call, defendant Kozlowski stated, among other things, that Tyco=s earnings continued to increase despite the economic downturn:

> KOZLOWSKI:    Okay, so to recap here, we=re very pleased with our earnings increase of 30% from last year, our revenue growth of some 25%, overall Tyco organic growth of some 13% and our free cash flow of $1.1 billion.  We had what we feel was a strong quarter.  We anticipate a strong ending to the second half of our year and our outlook for next year at this time continues to be, continues to be good in spite of the various economic conditions that are going on around the world.

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

## 5/11/01 10-Q for quarter ended 3/31/01

522.    On May 11, 2001, the Tyco Defendants filed Tyco=s Form 10-Q for the quarter ended March 31, 2001 (the A5/11/01 10-Q@), signed by defendant Swartz.  In it, the Tyco Defendants set out numerous materially false and misleading statements.  These false and misleading statements addressed a variety of topics, including the following:

### Tyco=s Operating Results

523.    The 5/11/01 10-Q also gives favorable, purportedly accurate information concerning

Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

```
                                             FOR THE QUARTERS      FOR THE SIX MONTHS
                                             ENDED MARCH 31,        ENDED MARCH 31,
                                            -------------------   ---------------------
                                             2001       2000       2001        2000
                                            --------   --------   ---------   ---------

                                                           (UNAUDITED)

Income before income taxes, minority interest,
  extraordinary items and cumulative effect of
  accounting change...............................  1,544.9    1,141.6    3,096.1     2,166.0
Income taxes.......................................  (385.9)    (285.0)    (915.4)     (549.0)
Minority interest..................................   (11.7)      (1.1)     (24.2)       (4.3)
                                            --------   --------   ---------   ---------
Income before extraordinary items and cumulative
  effect of accounting change......................  1,147.3     855.5     2,156.5     1,612.7
Extraordinary items, net of tax....................   (10.3)       --       (10.3)       (0.2)
Cumulative effect of accounting change, net of
  tax..............................................      --         --       (29.7)        --
                                            --------   --------   ---------   ---------
Net income.........................................  $1,137.0   $  855.5   $ 2,116.5   $ 1,612.5
                                            ========   ========   =========   =========
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

524.    In addition, these statements are materially false and misleading because they fail to

disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in

the December Report), but instead attribute Tyco=s favorable results to organic growth and synergies

resulting from Tyco=s acquisitions:

> Operating income, before certain credits (charges), improved in all segments in both the
> three months and six months ended March 31, 2001 as compared to the three months
> and six months ended March 31, 2000, with the exception of the Telecommunications
> segment for reasons that are discussed below. The operating income improvements are
> the result of both increased revenues and, with the exception of Tyco Healthcare,
> enhanced margins. Increased revenues result from organic growth and from acquisitions
> that are accounted for under the purchase method of accounting. We enhance our
> margins through improved productivity and cost reductions in the ordinary course of
> business, unrelated to acquisition or divestiture activities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1 d.

**Tyco=s Reserves**

525.    The 5/11/01 10-Q also gives materially false and misleading information regarding the Company=s reserves.  For example:

> During the six months ended March 31, 2001, we recorded restructuring and other non-recurring charges of $164.5 million, of which $32.4 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project. In addition, we incurred a non-recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales. We also determined that $166.8 million of non-recurring charges established in the prior year were not needed due to the settlement of litigation. At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million. During the six months ended March 31, 2001, we paid out $55.6 million in cash and incurred $35.7 million in non-cash charges that were charged against these reserves. At March 31, 2001, there remained $272.3 million of merger, restructuring and other non-recurring reserves in our Consolidated Balance Sheet, of which $231.6 million is included in current liabilities and $40.7 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**5/30/01 Conference Call**

526.    On May 30, 2001, Tyco held a conference call with analysts to discuss the Company=s continued strategy of growing through acquisitions (including the CIT merger).  The Tyco Defendants stated:

KOZLOWSKI:    This morning we announced the acquisition of C.R. Bard for roughly $3.2 billion.  We are of course excited about this deal and let me tell you why.  It strengthens and broadens our healthcare franchise and is immediately accretive by about 5¢ per share for the first 12 months of ownership.  . . . our operations continue to perform well and we are on target to achieve our earnings and cash flow targets for the quarter and for the rest of our fiscal year.

*   *   *

We are on schedule to close CIT this coming Friday. . . . CIT will be immediately accretive to us probably adding about a penny to our fiscal third quarter earnings for the one month that we own the company and another couple of cents for our fiscal fourth quarter results.  The accretion is incremental to the earnings comments we have made in the past.  In other words, we are comfortable with earning expectations of around 69¢ per share in the third quarter, consensus is now around 68¢, and around 277-278 for the year versus a consensus of about 275 for the year. I also want to take this opportunity to briefly outline the acquisition of Cambridge Security. . . . This deal is a classic Tyco bolt-on transaction.  We=ll fold Cambridge into our existing ADT infrastructure, thereby standing about $220 million of cost efficiencies.  We look for the deal to add about 3¢ to earnings during the first year that we have it, with an initial cash on cash return in excess of 20% for the year.  So from our organic growth plan for next year and the acquisitions of Cambridge, CIT, and Bard, we=re starting to view the year fiscal year 2002 as a good year - a very good year for us.

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.1.e.

527.    On July 6, 2001, in an article entitled, ATyco Closes $1 Billion Purchase,@ THE WALL STREET JOURNAL reported that:

Tyco International Ltd. said it closed its $1 billion acquisition of the electronic-security business of Cambridge Protection Industries LLC. . . .
Tyco Chairman Dennis Kozlowski said the acquisition would be Aimmediately

221

accretive@ to earnings and would generate Astrong organic growth with attractive incremental margins.@ The acquisition was announced May 17.  [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

528.    On July 18, 2001, Tyco announced its results for the third quarter of fiscal 2001 (the three months ended June 30, 2001):[23]

> Revenues for the quarter rose 25% to $9.29 billion compared with last year=s $7.42 billion. Diluted earnings per share before extraordinary items for the third quarter of fiscal 2001 were $0.67, or $1.22 billion, compared to $0.58, or $997.3 million, in the third quarter of fiscal 2000. Net income before non-recurring and extraordinary items rose to $1.31 billion, an increase of 32% compared to $992.1 million last year. Diluted earnings per share before non-recurring and extraordinary items for the third fiscal quarter ended June 30, 2001 were $0.72, a 24% increase over earnings of $0.58 per diluted share in the third quarter of fiscal 2000.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**7/18/01 Conference Call**

529.    On July 18, 2001, Tyco held a conference call to discuss, among other things, its earnings during the third quarter of fiscal 2001.  According to defendant Kozlowski:

---

[23] On July 25, 2001, the Tyco Defendants filed this announcement with the SEC on Form 8-K, which was signed by defendant Swartz.

KOZLOWSKI:          Organic growth excluding TyCom, was 6% for the combined company, with a 17% increase at Fire & Security, an 8% increase in Healthcare more than offsetting a 5% decline at Electronics. . . .

*   *   *

The outlook for continued growth at Tyco is excellent. Based on the business trends we see today, we remain comfortable with our previous guidance of 277-278 for fiscal year 2001. That=s primarily because of the recurring revenue, healthcare and service businesses that I emphasized earlier on. Looking out to 2002, while it may be too early to be precise, we believe that a 345 estimate is quite reasonable. In regards to Free Cash Flow, our previous guidance of $4 billion for 2001 now appears to be too conservative and I would point toward a higher $4.3 or 4.4 billion number. We are confident we can grow our Free Cash Flow by 20% to exceed $5 billion and some of that is coming from some reduction in working capital, specifically on the Electronics side of the business.

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

## 7/24/01 S-3

530.    On July 24, 2001, Tyco filed with the SEC a Form S-3 relating to the registration of $300,000,000 of debt securities of a Tyco subsidiary (the A7/24/01 S-3@). The 7/24/01 S-3 was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., Joseph F. Welch and W. Peter Slusser). Because the 7/24/01 S-3 incorporates the 8/18/00 S-3(2) by reference, it contains the same materially false and misleading statements set forth in that document, as described herein.

531.    In addition, the 7/24/01 S-3 sets forth the Consent of PricewaterhouseCoopers, dated

July 23, 2001, permitting the incorporation by reference of its materially false and misleading report,

dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000

10-K and discussed above, and other materially false and misleading materials discussed herein.

**8/3/01 Conference Call**

532.    On August 4, 2000, Tyco held a conference call to discuss, among other things, its

acquisition of Sensormatic.  According to defendant Kozlowski: AThis will be an excellent deal for us . . .

. and it=s immediately accretive by at least .3 cents per share during the first year of our ownership.@

533.    About Tyco=s earnings guidance, Kozlowski added:

KOZLOWSKI:           . . . all in all, we remain very comfortable with our guidance of $2.77-
                     2.78 per share for our fiscal >01 which closes on September 30th this
                     year which would represent about a 27% increase vs. last year.  For
                     fiscal year 2002, we continue to believe that $3.45 per share is a
                     reasonable estimate, but as we said on the conference call, we will allow
                     for a range between $3.20 and $3.60 . . .

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

534.    On August 6, 2001, Deutsche Bank Alex Brown, reporting materially false and

misleading information received from the Tyco Defendants, issued an analyst report entitled, ATYC

Electronics=July Okay . . . SRM=s Strategic Impact Could Surpass EPS.@ The report stated,

AKozlowski said the acquisition pipeline was strong and was made up solely of tuck-in and bolt-on

acquisitions for core companies, and contained >absolutely no surprises.=@

**8/13/01 10-Q for quarter ended 6/30/01**

535.    On August 13, 2001, the Tyco Defendants filed Tyco=s Form 10-Q for the quarter

ended June 30, 2001 (the A8/13/01 10-Q@), signed by defendant Swartz.  In it, the Tyco Defendants set

out numerous materially false and misleading statements.  These false and misleading statements

addressed a variety of topics, including the following:

**Tyco=s Operating Results**

536.    The 8/13/01 10-Q also gives favorable, purportedly accurate information concerning

Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

```
                                            TYCO INTERNATIONAL LTD.
                                        AND CONSOLIDATED SUBSIDIARIES
                                        -----------------------------
                                            FOR THE QUARTERS
                                             ENDED JUNE 30,
                                        -----------------------------
                                          2001            2000
                                        -----------    --------------

INCOME BEFORE INCOME TAXES, MINORITY
   INTEREST, AND EXTRAORDINARY ITEMS.......    1,614.8         1,333.7
Income taxes...............................     (378.8)         (333.7)
Minority interest..........................      (15.8)           (2.7)
                                             ----------      ----------
Income before extraordinary items..........    1,220.2           997.3
Extraordinary items, net of tax............       (3.4)             --
                                             ----------      ----------
NET INCOME.................................   $ 1,216.8       $   997.3
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

537.    In addition, these statements are materially false and misleading because they fail to

disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in

the December Report), but instead attribute Tyco=s favorable results to organic growth and synergies

resulting from Tyco=s acquisitions:

Operating income, before certain (charges) credits, improved in all segments in both the
quarter and nine months ended June 30, 2001 as compared to the quarter and nine

months ended June 30, 2000, with the exception of the Telecommunications segment discussed below. The operating income improvements are the result of increased revenues resulting from organic growth and from acquisitions that are accounted for under the purchase method of accounting. We enhance our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

### Tyco=s Reserves

538.   The 8/13/01 10-Q also gives materially false and misleading information regarding the Company=s reserves.  For example:

During the nine months ended June 30, 2001, we recorded restructuring and other non‑recurring charges of $214.7 million, of which $39.8 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project. In addition, we incurred a non‑recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales. We also determined that $166.8 million of non‑recurring charges established in the prior year were not needed due to the settlement of litigation. At September 30, 2000, there existed merger, restructuring and other non‑recurring reserves of $365.9 million. During the nine months ended June 30, 2001, we paid out $113.5 million in cash and incurred $86.2 million in non‑cash charges that were charged against these reserves. At June 30, 2001, there remained $214.1 million of merger, restructuring and other non‑recurring reserves in Tyco Industrial=s Consolidated Balance Sheet, of which $183.8 million is included in current liabilities and $30.3 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

### 8/24/01 S-4 (and related S-4/A and Prospectus)

539.    On August 24, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed merger

between Sensormatic Electronics Corporation (ASensormatic@) and a subsidiary of Tyco (the A8/24/01

S-4@).  The 8/24/01 S-4 was signed by defendants Swartz, Kozlowski, Walsh and Ashcroft, and by

other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss,

Joseph F. Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/24/01

S-4 incorporates the following documents by reference, it contains the same materially false and

misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on

Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco=s Quarterly Reports on Forms

10-Q for the quarters ended December 31, 2000, March 31, 2001 and June 30, 2001; and (iii) Tyco=s

Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001,

March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2001, July 25, 2001, August

3, 2001, and August 16, 2001.

540.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class

Period, the 8/24/01 S-4 recites Tyco=s purported strategy, quoted and discussed above in paragraph

460.  It also reiterates its so-called strategy in its discussion of Tyco=s acquisition of Sensormatic:

> At a meeting of the executive committee of Tyco=s board of directors held on August 1,
> 2001, the executive committee determined that the acquisition of Sensormatic was in
> keeping with its corporate strategy of complementing its internal growth with acquisitions
> that are likely to benefit from cost reductions and synergies when combined with Tyco=s
> existing operations and that are expected to be accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when

made were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) A, A.1.a and A.1.d.

541.    In addition, the 8/24/01 S-4 sets forth the Consent of PricewaterhouseCoopers, dated

August 23, 2001, permitting the incorporation by reference of its materially false and misleading report,

dated October 24, 2000, quoted in the 2000 10-K and discussed above, and other materially false and

misleading materials discussed herein.

542.    On September 13, 2001, the Tyco Defendants filed with the SEC a Form S-4/A (the

A9/13/01 S-4/A@), amending the 8/24/01 S-4.  The 9/13/01 S-4/A was signed by defendant Swartz for

himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua

M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joeseph F. Welch, Wendy E. Lane,

James S. Pasman, Jr., and W. Peter Slusser).  Because the 9/13/01 S-4/A incorporates by reference the

same documents that were incorporated by reference in the 8/21/01 S-4, it contains the same materially

false and misleading statements set forth in those documents, as described herein.

543.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class

Period, the 9/13/01 S-4/A recites Tyco=s purported strategy, quoted and discussed above in paragraph

460.  It also reiterates its so-called strategy in its discussion of Tyco=s acquisition of Sensormatic, using

precisely the same language quoted from the 8/24/01 S-4, above.  As the Tyco Defendants either knew

or were reckless in not knowing, these statements of strategy when made were materially false and

misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and

A.1.d.

544.    In addition, the 9/13/01 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated

September 10, 2001, permitting the incorporation by reference of its materially false and misleading

report, dated October 24, 2000, quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

545. On September 25, 2001, the Tyco Defendants filed a prospectus with the SEC relating to the proposed merger between Sensormatic and a subsidiary of Tyco (the "9/25/01 Prospectus"). Because the 9/25/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000, March 31, 2001, and June 30, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2002, July 25, 2001, August 3, 2001, and August 16, 2001.

546. Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Class Period, the 9/25/01 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 460. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**8/28/01 S-3 (and related Prospectus and Supplemental Prospectus)**

547. On August 28, 2001, Tyco filed a Form S-3 for the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities (the "8/28/01 S-3"). The 8/28/01 S-3 was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco's directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joseph E. Welch, Wendy E. Lane,

James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/28/01 S-3 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco=s Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco=s Quarterly Reports on Forms 10-Q for the quarters ended December 31, 2000, March 31, 2001, and June 30, 2001; and (iii) Tyco=s Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2001, July 25, 2001, August 3, 2001, and August 16, 2001.

548.    Like the 2000 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 8/28/01 S-3 recites Tyco=s purported strategy, quoted and discussed above in paragraph 460.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

549.    In addition, the 8/28/01 S-3 sets forth the Consent of PricewaterhouseCoopers, dated August 23, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

550.    On August 31, 2001, Tyco filed with the SEC a Prospectus in connection with the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities (the A8/31/01 Prospectus@).  Because the 8/31/01 Prospectus incorporates by reference the same documents that were incorporated by reference in the 8/28/01 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

551.    Like the 1999 10-K and many of Tyco=s other filings with the SEC throughout the Class Period, the 12/8/00 Prospectus recites Tyco=s purported strategy, quoted and discussed above in paragraph 460.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

552.    On October 25, 2001, Tyco filed a Prospectus Supplement to the 8/31/01 Prospectus (the A10/25/01 Prospectus Supplement@).  Because the 10/25/01 Prospectus Supplement incorporates by reference the same documents that were incorporated by reference in the 8/28/01 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

553.    The 10/25/01 Prospectus Supplement contains false and misleading statements about Tyco=s operating results under the heading ARecent Developments of Tyco.@  For example:

> Revenues before non-recurring items . . . for the quarter rose 29% to $10.08 billion compared with last year=s $7.80 billion.  Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000.  After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.

> * * *

> Revenues before non-recurring items and the adoption of SAB 101 for the year ended September 30, 2001 increased to $36.29 billion, 25% higher than last year=s $28.93 billion.  Diluted earnings per share before non-recurring charges and credits and extraordinary items, and the adoption of SAB 101, for the year rose to $2.81 per diluted share, or $5.15 billion, a 29% increase over last year=s diluted per share earnings of $2.18, or $3.73 billion.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**9/11/01 Conference Call**

554.    On September 11, 2001, Tyco held a conference call/investor meeting with analysts. During the call, the Tyco Defendants provided investors with significant assurance that the Company was performing well and that it would remain profitable.  For example, the Tyco Defendants stated as follows:

> KOZLOWSKI:          . . . **we remain very much on track to achieve our earnings and cash flow targets for the year.**  Specifically, we=re confident that Tyco will earn $2.77-2.78 a share in fiscal year '01 which would represent a 27% increase vs. last year.  Our free cash flow will exceed $4 billion, compared to $3.4 billion last year.  For fiscal year '02, we are looking for around $3.45 per share, with a range of 320 to 365, depending upon the end-markets for the electronics industry.  This is the same thing we have been saying for months.  The $3.45 would represent around a 25% increase above this year=s record total and even the low end of our range would show better than a 15% growth.  We expect free cash flows to exceed $5 billion next year.  Our ability to deliver this growth in a pretty tough economic environment is a function of our very large exposure to recurring and service businesses such as security and businesses with no economic volatility like health care.
>
> *   *   *
>
> So we thought about titling my section of this agenda because there=s been a lot of negative sentiment, a lot of questions, **so we thought I=d call this part ADon=t worry, be happy.@  Everything at Tyco is going to be okay.**  [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

555.    On October 3, 2001, Deutsche Bank Alex Brown, reporting materially false and

misleading information received from the Tyco Defendants, issued an analyst report entitled, ATYC:

F4Q01 EPS Preview.@  The report stated:

> We rate TYC management strongest among our coverage universe.  This is key, since
> we think the risk to watch for is companies with structures that can=t respond quickly
> enough to the new, more downbeat, reality. . .

*   *   *

> We believe that Tyco offers the >complete package= for multi-industry company
> investors: strong internal top line growth, excellent margins, an earnings stream with low
> cyclicality, strong cash flow and excellent acquisition skills.

## 10/18/01 Conference Call

556.    On October 18, 2001, the Tyco Defendants conducted another conference call with

analysts to convey their positive earnings estimates.

> KOZLOWSKI:        Putting this together, we are reiterating our previous guidance of $3.70
> per share for the current fiscal year we are in that began on October 1st
> which represents around 23% growth.
>
> *   *   *
>
> We remain very comfortable with our projection .3 cents per share of
> earnings accretion from the [Sensormatic] deal.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

557.    The next day, on October 19, 2001, THE WALL STREET JOURNAL reported defendant

Kozlowski=s false assurance that Tyco was well-positioned to grow during the economic downturn.

> L. Dennis Kozlowski, Tyco=s chairman and chief executive officer, also gave a bullish forecast for fiscal 2002, slightly raising the range of the company=s earnings targets and saying Tyco Ahas never been better positioned to grow during an economic downturn.@

As defendant Kozlowski either knew or was reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

### 10/23/01 S-4 (and related S-4/A and Prospectus)

558.    On October 23, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed amalgamation agreement between TyCom and a subsidiary of Tyco wherein TyCom would become a wholly-owned subsidiary of Tyco (the A10/23/01 S-4@).  The 10/23/01 S-4 was signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joseph F. Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 10/23/01 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco=s Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 2000; (ii) Tyco=s Quarterly Reports on Form 10-Q for the quarterly periods ended December 31, 2000, March 31, 2001 and June 30, 2001; and (iii) Tyco=s Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2001, July 25, 2001, August 3, 2001, and August 16, 2001.

559.    Under the heading ARecent Developments of Tyco and TyCom,@ the Tyco Defendants stated the following with regard to its fourth quarter of fiscal 2001 financial results:

> Revenues before non-recurring items. . . for the quarter rose 29% to $10.08 billion

234

compared with last year=s $7.80 billion.  Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000.  After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

560.    In addition, the 10/23/01 S-4 sets forth the Consent of PricewaterhouseCoopers, dated October 18, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

561.    On November 9, 2001, the Tyco Defendants filed with the SEC a Form S-4/A (the A11/9/01 S-4/A@), amending the 10/23/01 S-4.  The 11/9/01 S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joseph F. Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 11/9/01 S-4/A incorporates by reference the same documents that were incorporated by reference in the 10/23/01 S-4, it contains the same materially false and misleading statements set forth in those documents, as described herein.

562.    Like the 10/23/01 S-4, the 11/9/01 S-4/A contains false and misleading statements about Tyco=s financial results under the heading ARecent Developments of Tyco and TyCom.@

Revenues before non-recurring items . . . for the quarter rose 29% to $10.08 billion

compared with last year=s $7.80 billion.  Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000.  After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.

\*   \*   \*

Revenues before non-recurring items and the adoption of SAB 101 for the year ended September 30, 2001 increased to $36.29 billion, 25% higher than last year=s $28.93 billion.  Diluted earnings per share before non-recurring charges and credits and extraordinary items, and the adoption of SAB 101, for the year rose to $2.81 per diluted share, or $5.15 billion, a 29% increase over last year=s diluted per share earnings of $2.18, or $3.73 billion.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

563.    On November 13, 2001, the Tyco Defendants filed with the SEC a Prospectus relating to the amalgamation agreement between TyCom and a subsidiary of Tyco (the A11/13/01 Prospectus@).  Because the11/13/01 Prospectus incorporates by reference the same documents that were incorporated by reference in the 10/23/01 S-4, it contains the same materially false and misleading statements set forth in those documents, as described herein.

564.    Like the 10/23/01 S-4 and 11/9/01 S-4/A, the 11/13/01 Prospectus contains false and misleading statements about Tyco=s financial results under the heading ARecent Developments of Tyco and TyCom.@  These statements are identical to those quoted above from the 11/9/01 S-4/A under the same heading, and are materially false and misleading for the same reasons.

236

**11/15/01 Conference Call**

565.    The Tyco Defendants hosted another conference call with investors on November 15,

2001.  During the call, defendant Kozlowski continued to provide investors with false assurances

concerning the Company=s projected earnings growth:

> KOZLOWSKI:        Let me start here this morning with our guidance for fiscal year 2002.
> We expect earnings per share to grow over 21% this year to $2.70 a
> share.
>
>                                          \*   \*   \*
>
> Looking to the business cycle, we believe Tyco will grow revenues at a
> 10% rate and we expect our long track record of margin improvements
> to continue. . .

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

566.    On December 7, 2001, J.P. Morgan, reporting materially false and misleading

information received from the Tyco Defendants, issued an analyst report entitled, ATyco Int=l: Investor

Meetings Reinforce Increasing ROIC Message.@  The report stated:

> The story at Tyco remains on track, characterized by accelerating ROIC and strong to
> improving fundamentals across the portfolio.  We recently had the opportunity to spend a
> few days with Dennis Kozlowski, during which the Tyco CEO reinforced some of the
> themes discussed at the investor day. . . .  The story seems very much on track as
> management presentations touched on most of the major current issues, including
> expectations for increasing ROIC, strong operating trends in key businesses and the
> acquisition strategy going forward. . . . We continue to rate Tyco our top pick and look
> for further multiple expansion. . . .

567.    The price of Tyco stock closed at $58.84 on December 7, 2001.

**12/28/01 10-K for fiscal year ended 9/30/01**

568.    On December 28, 2001, Tyco filed its Form 10-K for the fiscal year ended September

30, 2001 (the A2001 10-K@), signed by defendants Swartz, Kozlowski, Ashcroft, and Walsh, and by

other of Tyco=s directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss,

Wendy E. Lane, James S. Pasman, Jr., W. Peter Slusser, and Joseph F. Welch).

569.    In the 2001 10-K, the Tyco Defendants set out numerous materially false and misleading

statements, as evidenced by (among other things) the Tyco Defendants= restatement of the Company=s

operating results in a December 31, 2002 Form 10-K/A for the 2001 fiscal year.  These materially false

and misleading statements addressed a variety of topics, including the following:

**Tyco=s AStrategy@**

570.    The 2001 10-K purports to set forth Tyco=s Astrategy,@ which the Tyco Defendants

repeated verbatim in other SEC filings during the Class Period.  According to the 2001 10-K:

> Tyco=s strategy is to be the low-cost, high-quality producer and provider in each of our
> industrial markets and, through Tyco Capital, to provide innovative financing and leasing
> solutions to independent customers and in support of our industrial segments.  We
> promote our leadership position by investing in existing businesses, developing new
> markets and acquiring complementary businesses and products.  Combining the strengths
> of our existing operations and our business acquisitions, we seek to enhance shareholder
> value through increased earnings per share and strong cash flows.

As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when

made was materially false and misleading and omitted material information for the reasons set forth above

in Section(s) A, A.1.a and A.1.d.

**Tyco=s Operating Results**

238

571.     The 2001 10-K also gives favorable, purportedly accurate information concerning

Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information

($ in millions):

|  | FISCAL 2001 | FISCAL 2000 | FISCAL 1999 |
|---|---|---|---|
| Income before income taxes, minority interest, extraordinary items and cumulative effect of accounting changes......... | 6,003.5 | 6,464.8 | 1,705.2 |
| Income taxes.............................................. | (1,284.9) | (1,926.0) | (637.5) |
| Minority interest......................................... | (47.5) | (18.7) | -- |
| INCOME BEFORE EXTRAORDINARY ITEMS AND CUMULATIVE EFFECT OF ACCOUNTING CHANGES........................................ | 4,671.1 | 4,520.1 | 1,067.7 |
| Extraordinary items, net of tax........................... | (17.1) | (0.2) | (45.7) |
| Cumulative effect of accounting changes, net of tax........ | (683.4) | -- | -- |
| TYCO INDUSTRIAL NET INCOME................................. | $ 3,970.6 | $ 4,519.9 | $ 1,022.0 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

572.     In addition, these statements are materially false and misleading because they fail to

disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in

the December Report), but instead attribute Tyco=s favorable results to organic growth and synergies

resulting from Tyco=s acquisitions.  According to the 2001 10-K:

> Operating income, before certain (charges) credits and accounting change, improved in
> all segments in each of Fiscal 2001 and Fiscal 2000, with the exception of the
> Telecommunications segment as discussed below. The operating improvements are the
> result of both increased revenues in all but our Telecommunications segment and
> enhanced margins in all but our Healthcare and Specialty Products segment. Increased
> revenues resulted from acquisitions that are accounted for under the purchase method of
> accounting and from organic growth. We enhanced our margins through improved
> productivity and cost reductions in the ordinary course of business, unrelated to
> acquisition or divestiture activities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

239

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

573.    And concerning profits in Tyco=s electrical business, the Tyco Defendants stated:

The 14.3% increase in revenue, before accounting change, in Fiscal 2001 over Fiscal 2000 resulted primarily from acquisitions. These acquisitions included:  Siemens Electromechanical Components GmbH & Co. KG (ASiemens@) and AFC Cable Systems, Inc. (AAFC Cable@) in November 1999; Praegitzer Industries, Inc. (APraegitzer@) in December 1999; Critchley Group PLC (ACritchley@) in March 2000; the electronic OEM business of Thomas & Betts in July 2000; CIGI Investment Group, Inc. (ACIGI@) in October 2000; and Lucent Technologies= Power Systems business unit in December 2000. Excluding the impact of these acquisitions, revenue increased an estimated 0.3%, which reflects an economic slowdown in the computer and consumer electronics and communications industries and, to a lesser extent, the effect of foreign exchange rates.

The 62.1% increase in revenue in Fiscal 2000 over Fiscal 1999 was predominantly due to acquisitions and, to a lesser extent, organic growth. These acquisitions included: Glynwed International, plc in March 1999; Raychem Corporation (ARaychem@) in August 1999; Siemens and AFC Cable in November 1999; Praegitzer in December 1999; Critchley in March 2000; and the electronic OEM business of Thomas & Betts in July 2000. Excluding the impact of these acquisitions, revenue increased an estimated 13.1%.

The 20.0% increase in operating income and the increase in margins, before certain (charges) credits and accounting change, in Fiscal 2001 compared with Fiscal 2000 was primarily due to acquisitions and improved margins at both Tyco Printed Circuit Group and AMP. These increases were somewhat offset by decreased operating income and margins at Allied Tube and Conduit resulting from higher raw material prices.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

## Management Remuneration

574.    The 2001 10-K addresses management remuneration only by reference, stating:

> Information concerning executive compensation is hereby incorporated by reference to
> the Registrant≡s definitive proxy statement which will be filed with the Commission within
> 120 days after the close of the fiscal year.

Because the 2001 10-K incorporates Tyco≡s Proxy Statement, filed on January 8, 2002, the 2001 10-K

contains the same materially false and misleading statements set forth therein, as described below.

575.    The 2001 10-K also gives limited information concerning loans taken by senior

management under Tyco≡s Key Employee Loan Program (the AKEL program≡), which was instituted to

encourage ownership of the Company≡s common stock by executives and other key employees.

According to the 10-K: ADuring Fiscal 2001, the maximum amount outstanding under [the KEL]

program was $29.5 million.  Loans receivable under this program were $11.2 million and $11.4 million

at September 30, 2001 and 2000, respectively.≡ As the Tyco Defendants either knew or were reckless

in not knowing, these statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) B, B.4 and B.5.

**2001 Annual Report to Shareholders**

576.    On or about January 11, 2002, Tyco released its 2001 Annual Report to Shareholders

(the A2001 Annual Report≡).  The 2001 Annual Report again reminded investors of Tyco≡s strategy to

achieve growth by acquisitions:

> **DISCIPLINED ACQUIRER**  Good acquirers don≡t build empires.  They make
> money.  **Tyco approaches acquisitions with a strict set of rules.  We begin with
> the strategic logic:  the transaction must improve our potential for long-term
> internal growth.  It must be immediately accretive to earnings and cash flow per
> share and produce high returns on invested capital.**  To consistently achieve these
> targets, we require that each acquisition be championed by a business unit that will
> oversee the integration into one of our existing segments.  [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

577.    The 2001 Annual Report also set forth information concerning Tyco=s Key Employee

Loan program:

> During Fiscal 2001, the maximum amount outstanding under [the Key Employee Loan]
> program was $29.5 million.  Loans receivable under this program were $11.2 million and
> $11.4 million at September 30, 2001 and 2000, respectively.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B, B.4 and B.5.

578.    The 2001 Annual Report also included a letter to Tyco shareholders from defendant

Kozlowski, which states:

> Fiscal 2001 was a year of outstanding performance for Tyco International.  And,
> although I have made similar statements before, the consistency of our ability to deliver
> strong results is important, especially in a year marked by global economic turbulence.
> Many outstanding companies found it impossible to meet their financial targets last year;
> and some couldn=t make any money at all.
>
> Yet in the worst economic environment we have seen in a decade, Tyco managed to
> exceed its profit goals.  All of us at Tyco are very proud of that achievement.
>
> How were we able to perform so well?  The answers go to the heart of what makes
> Tyco tick.  And they explain why, despite the current economic slowdown, we remain
> optimistic about fiscal 2002.
>
> We grew diluted earnings per share 29 percent in fiscal 2001 in large part because of the
> strategy we formed during the 1990-1991 recession to reinvent Tyco as a company that
> could thrive in any economy.  Since then, we have built business with low cyclicality and
> the ability to generate strong recurring revenues.

As defendants either knew or were reckless in not knowing, these statements when made were materially

242

false and misleading and omitted material information for the reasons set forth above in Section(s) A,

A.1.a and A.1.d.

579.    Defendant Kozlowski=s letter goes on to say:

This strength was reflected in our earnings.  For the ninth consecutive year, we increased revenues and earnings substantially.  Revenues rose 25 percent to $36.3 billion and earnings grew $1.4 billion to $5.1 billion, a 38 percent increase over the prior year.  Our diluted earnings per share increased 29 percent to $2.81.  Free cash flow exceeded $4.7 billion in fiscal 2001 and should surpass $5 billion next year.

Much of the increase came from organic growth.  If Tyco never made another acquisition, we should be able to increase our earnings at a solid double-digit rate.  We are fortunate to be in the types of businesses that grow even during economic slowdowns.  For fiscal 2002, we are looking forward to earnings growth of 20 percent or better

I remain optimistic about Tyco=s future.  It=s a cliche today for a CEO to proclaim that his company is Awell-positioned@ but, in truth, we are.

As defendants either knew or were reckless in not knowing, these statements when made were materially

false and misleading and omitted material information for the reasons set forth above in Section(s) A,

A.1.a and A.1.d.

580.    The letter continues:

Fiscal 2001 was a year of many achievements.  Among the highlights:

*   *   *

*  *We acquired The CIT Group, Inc., a leading commercial consumer finance company with over $50 billion in assets.  In the four months we have owned CIT (now known as Tyco Capital Corporation), it has performed exceptionally well.* Tyco Capital is a broadly diversified lender B both geographically and by industry B with powerful franchises and the ability to grow its earnings in all types of environments.  It has a large base of recurring revenue.  [Italics in original.]

As defendants either knew or were reckless in not knowing, these statements when made were materially

false and misleading and omitted material information for the reasons set forth above in Section(s) A,

A.1.a, A.1.d and A.1.e.

581.    The letter also states:

In 2001, Tyco demonstrated that, despite difficult business conditions, it could indeed
grow its business in virtually any environment.  We believe we can continue to do so, and
that we can deliver consistent growth for investors in the future.

We are in excellent businesses, and everywhere we look we see opportunities to expand
by creating new products, by moving into new markets and sometimes by acquisitions.
We are poised to deliver many years of exciting returns.

As defendants either knew or were reckless in not knowing, these statements when made were materially

false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.a

and A.1.d.

582.    The 2001 Annual Report also sets forth all the identical operating results quoted above

from the 2001 10-K.  Those results are materially false and misleading, and omit material information, for

the same reasons given above.

## 2002 Materially False and Misleading Statements and Omissions

## 1/8/02 S-4 (and related S-4/A)

583.     On January 8, 2002, Tyco filed with the SEC a Form S-4 relating to a proposed merger between McGrath RentCorp and Tyco (the "1/8/02 S-4").  The 1/8/02 S-4 was signed by defendants Kozlowski, Swartz, Ashcroft, and Walsh, and by other of Tyco's directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Wendy E. Lane, James S. Pasman, Jr., W. Peter Slusser, and Joseph F. Welch).  Because the 1/8/02 S-4 incorporates Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2001 by reference, it contains the same materially false and misleading statements set forth in that document, as described herein.

584.     Like many of Tyco's other filings with the SEC throughout the Class Period, the 1/8/02 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 570.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of McGrath RentCorp:

> At a meeting held on December 12, 2001, the executive committee of Tyco's board of directors determined that the acquisition of McGrath was in keeping with its corporate strategy of complementing its internal growth with acquisitions that are likely to benefit from cost reductions and synergies when combined with Tyco's existing operations and that are expected to be immediately accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

585.     The 1/8/02 S-4 also gives favorable, purportedly accurate information concerning Tyco's operating results, including the following:

|  | YEAR ENDED SEPTEMBER 30, | | |
| --- | --- | --- | --- |
|  | 2001(2) | 2000(3) | 1999(4) |
| (IN MILLIONS, EXCEPT PER SHARE DATA) | | | |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | |
| Total revenues(1)..................... | $ 36,388.5 | $30,691.9 | $22,496.5 |
| Income (loss) from continuing operations........................... | 4,671.1 | 4,520.1 | 1,067.7 |
| Income (loss) from continuing operations per common share(8): | | | |
| Basic............................... | 2.59 | 2.68 | 0.65 |
| Diluted............................. | 2.55 | 2.64 | 0.64 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

586.    In addition, the 1/8/02 S-4 sets forth the Consent of PricewaterhouseCoopers, dated January 7, 2002, permitting the incorporation by reference of its materially false and misleading report, dated October 18, 2001 (except as to Note 31, which is as of December 18, 2001), quoted in the 2001 10-K and discussed above.

587.    On May 22, 2002, Tyco filed with the SEC a Form S-4/A relating to a proposed merger between McGrath RentCorp and Tyco (the "5/22/02 S-4/A").  The 5/22/02 S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Ashcroft, and Walsh, and for other of Tyco's directors (Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Wendy E. Lane, James S. Pasman, Jr., W. Peter Slusser, and Joseph F. Welch).  Because the 5/22/02 S-4/A incorporates Tyco's Annual Report on Form 10-K for the year ended September 30, 2001, and its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2002, it contains the same materially false and misleading statements set forth in those documents, as described herein.

588.     Like many of Tyco=s other filings with the SEC throughout the Class Period, the 5/22/02 S-4/A recites Tyco=s purported strategy, quoted and discussed above in paragraph 570.  It also reiterates its so-called strategy in its discussion of Tyco=s acquisition of McGrath RentCorp, using precisely the same language quoted from the 1/8/02 S-4, above.  As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

589.     In addition, the 5/22/02 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated May 21, 2002, permitting the incorporation by reference of its materially false and misleading report, dated October 18, 2001 (except as to Note 31, which is as of December 18, 2001), quoted in the 2001 10-K and discussed above.

**1/15/02 Conference Call**

590.     On January 15, 2002, Tyco held a conference call to discuss, among other things, its earnings during the first quarter of fiscal 2002.  Although the Tyco Defendants were to announce the breakup of Tyco into four separate parts the following week, they continued to give false reassurance of favorable results:

> KOZLOWSKI:     Putting all this together, we remain committed to our full year earnings guidance of $3.70 per share, up 21% from last year.  We have not previously offered any guidance at all on the second quarter.  Given the likelihood of another tough quarter in electronics, we think second quarter earnings will be in the range of 80-82¢ per share up roughly 17% for the quarter.

591.     Kozlowski also falsely reassured investors and analysts about Arumors@ that were

resurfacing about Tyco=s accounting, and about the openness of its disclosures:

> KOZLOWSKI:  **We=re a very open company**, we=re very willing to talk about anything that our investors, shareholders, interested parties have to talk to us about, we have Jack Blackstock, Maryanne Kane, Mark Swartz, myself, available, we present our accounting in the best disclosures that we can possibly put together here.  Are we complex?  Yes, but because we are complex **we have absolutely no qualms whatsoever in presenting a good disclosure, there=s nothing hidden behind the scenes**, our cash flows are going to be strong, we will back up our earnings with our cash flows and from time to time there are, of course, some motivated parties who can thrive or make money on rumors and that=s an unfortunate part of this business, but **here at Tyco we=re very willing to discuss anything at all that anybody might have** . . . . [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.3.

592.   A January 16, 2002 article in THE WALL STREET JOURNAL entitled, ATyco International Says Soft Demand Will Depress Fiscal Second-Quarter Results,@ reported:

> Mr. Kozlowski said the company remains **Afrustrated by continuing negative rumors@** regarding the company=s accounting. **AThere is nothing negative going on at any place at Tyco,@** he said, inviting anyone with questions about the company=s accounting practices to Agive us a call.@ He also said the company stands by its earnings estimate of $3.70 a share for the fiscal year. Tyco is based in Bermuda but managed from Exeter, N.H.  [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

593.   Similarly, a January 16, 2002 article in THE NEW YORK TIMES entitled, ATyco Shares

Fall as Investors Show Concern on Accounting,@ reported:

> Dennis Kozlowski, Tyco=s chairman, expressed frustration in a conference call with analysts yesterday morning that Tyco=s accounting continues to be questioned. **AOur accounting has been reviewed and found to be sound**,@ Mr. Kozlowski said. **AOur disclosure is exceptionally detailed.@**

\* \* \*

> **Mr. Swartz, Tyco=s chief financial officer, said Tyco follows standard accounting in its acquisitions and does not manipulate balance sheets.** [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a, A.1.d. and A.3.

594.    Shortly thereafter, on January 22, 2002, Tyco issued a press release concerning its plan

to separate into Afour independent, publicly traded companies.@[24]  The press release stated:

> PEMBROKE, BERMUDA, JANUARY 22, 2002--Tyco International Ltd. (NYSE-TYC, BSX-TYC, LSE-TYI) today announced a plan to unlock tens of billions of dollars of shareholder value by separating Tyco into four independent, publicly traded companies: Security and Electronics; Healthcare; Fire Protection and Flow Control; and Financial Services. Tyco believes these actions will lead to substantially greater total shareholder value by creating independent companies that will be more appropriately valued by the market. Each new public company created from these transactions will be a proven industry leader, and each will go forward with a global market position; a strong and experienced management team; an entrepreneurial culture; an independent Board of Directors and significant financial strength.

\* \* \*

> AThis is a bold, shareholder-value driven plan that we believe will create extraordinary near- and long-term benefits for Tyco=s shareholders and bondholders, as well as for our

---

[24] The January 22, 2002 press release was filed with the SEC on Form 8-K on January 24, 2002, which was signed by defendant Swartz.

249

employees and customers,@ said L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco. AOver the past decade, Tyco=s share price has increased ten-fold as we have used Tyco=s size, access to capital and operating philosophy to build world-class healthcare, electronics, telecommunications, security, fire protection, flow control, and financial services businesses. These businesses have now developed to a size and stage where they can thrive on their own and perhaps be even more agile than Tyco. The plan we are announcing today is the logical extension of the same value creation strategy we have successfully pursued for nearly a decade.@

AFurthermore, as independent, public companies, each of these businesses will offer investors a >pure-play= opportunity with excellent growth prospects and greatly increased simplicity, clarity and transparency. As such, we believe each will be valued substantially higher than the implied valuations it has received in recent years as part of Tyco.@

Mr. Kozlowski continued, AI am extremely proud of Tyco=s performance. **We have built a great portfolio of businesses and over the five years ended September 30, 2001, we have delivered earnings per share growth at a compounded annual rate of over 40% and industry-leading operating profit margins in each of our businesses. During this same period, we have increased annual free cash flow from $240 million in 1996 to $4.8 billion in fiscal 2001. Nonetheless, even with this performance, Tyco is trading at a 2002 P/E multiple of 12.0x, a discount of almost 50% to the S&P 500.@**

AThe plan announced today is designed to close that gap--the gap between Tyco=s market value in recent years and the value of our businesses. Our objective has always been to deliver value to our shareholders. That is why we are taking this action today, and why we are all very excited about the future.@ [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**1/22/02 Conference Call**

595.     The Tyco Defendants held a conference call with analysts on January 22, 2002 to discuss their plan to break the Company into four separate parts.  Defendants Kozlowski and Swartz stated as follows:

KOZLOWSKI:        . . . the plan [to break up the company] will release value . . . . the separation will enhance our ability to continue to create shareholder value in the future. . . . We are strictly playing offense here.  I want to stress that this is not a defensive response to the **baseless ridiculous rumors** last week nor the recent weakness in the stock price.

*   *   *

SWARTZ:        **Related to the accounting rumors and accusations that Dennis talked about earlier, the split offs are going to create more transparency and financial disclosure on the pure play individual businesses that you will be seeing.**

*   *   *

SWARTZ:        During the balance of this year, and as we look forward to fiscal 2003, the earnings of Tyco will continue strong.  Guidance for the second quarter is a strong 14% to 17% growth over the prior year.  The full year earnings of $3.70 are in excess of 20% growth over the prior year, and every one of these businesses will enter fiscal 2003 with extremely strong organic fundamentals to continue to have these strong earnings.

*   *   *

SWARTZ:        **I do take issue with better disclosure and we have many times asked people to show us better disclosure on acquisitions and we'll do it and have yet to see any that would be improved from what we currently have.**  Secondly, as far as cash pay for acquisitions, they are included in those footnotes 100 percent and back to footnote 2 you can look and see exactly what the cash was this year and last year and go back every year you want to so every acquisitions we have made is disclosed and it is included. . . .

*   *   *

SWARTZ:        . . . So the amount of disclosure that will end up being seen will be the same good state of art disclosure that we have had better than anyone else we can find out there but it will be done on a more reduced level and **even with all these accounting insinuations, allegations, rumors, etc. we have had over the past few weeks, this has not changed our plan ANY nor any level of comfort as far as being**

251

**able to go forward, have these individual financial statements and send each of these businesses off with extremely strong earnings and cash flows.** [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.3.

596.    Defendant Kozlowski also went out of his way to assure investors that there were no accounting improprieties or cash flow issues at Tyco.  For example, defendant Kozlowski stated:

KOZLOWSKI:            . . . **we have no liquidity crisis** . . .

*   *   *

. . . **there=s absolutely no new accounting questions** . . .

*   *   *

I want to stress that this is not a defensive response to the **baseless ridiculous rumors** last week

*   *   *

**The quality of our earnings has been excellent.**  This is shown in the ratio of pre-cash flow to earnings or the cash conversion ratio.  Our free cash flow has represented over 90% of earnings during the last couple of years.  [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

597.    Investors saw Tyco=s plan to break itself up as a further sign that there were no accounting improprieties at the Company.  For example, a January 23, 2002 article in USA TODAY

252

entitled, ATyco to split into four independent companies,@ reported:

> AYou don=t create four new public entities if you have something to hide,@ says John Inch, analyst at Bear Stearns.

598.    On January 23, 2002, Wachovia Securities, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled, ATYC: Raising Target Price to $80.@  The report stated:

> Management - we like the individual business teams and have seen their businesses first hand over the past few years - we think they will do just fine.  But - while this was an excellent company before Dennis Kozlowski became CEO (soon followed by Mark Schwartz) [sic] he clearly took things to a different level, and that will be difficult to replicate in terms of vision and sheer drive.  There are only one of each.

599.    Defendant Kozlowski was then quoted in THE NEW YORK TIMES on January 24, 2002 as saying that investors should not react negatively to the Company=s new breakup strategy:

> ACrooks are going to be crooks at any company,@ Mr. Kozlowski said. **ABut we have executives of very high integrity.@** [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**1/28/02 Proxy Statement**

600.    On January 28, 2002, the Tyco Defendants filed with the SEC Tyco=s Proxy Statement for the 2002 annual meeting.  The Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the Key Employee Loan Program, and allegations of accounting impropriety by the Company.

> **Management Remuneration**

601.    Concerning Tyco=s executive compensation program generally, the 2002 Proxy

Statement states:

> [Tyco=s executive compensation program] offers the executive significant financial
> rewards when Tyco and the executive achieve excellent results. At lower levels of
> performance, where expected compensation targets are not achieved, executive
> compensation is sharply reduced. Executives are ineligible for cash bonuses and do not
> benefit from equity-based compensation. Thus, in order for Mr. Kozlowski and Mr.
> Swartz to have earned a cash bonus in fiscal 2001, the Company had to achieve a
> minimum of 15% growth in net income and at least a 10% growth in operating cash flow
> over fiscal 2000. The performance criterion required to vest the minimum number of
> restricted shares granted to these executives was a growth rate in earnings per share
> before non-recurring items of at least 15% over fiscal 2000. The Committee reports that
> the Company achieved each of these benchmarks, reflecting superior performance
> notwithstanding a very difficult business and economic environment.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B.

602.    The 2002 Proxy Statement also contains materially false and misleading information

regarding the administration of compensation to executive officers and key managers:

> The Compensation Committee of the Board of Directors is composed solely of
> independent directors, none of whom has any interlocking relationships with Tyco that
> are subject to disclosure under rules of the SEC relating to proxy statements.  The
> Compensation Committee approves all of the policies under which compensation is paid
> or awarded to Tyco=s Chief Executive Officer, reviews and, as required, approves such
> policies for executive officers and key managers, and has oversight of the administration
> of executive compensation programs.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B.

254

603.     The 2002 Proxy Statement contains the following specific information concerning the

compensation of defendants Kozlowski and Swartz:

```
                              ANNUAL COMPENSATION(1)              LONG TERM COMPENSATION
                         ---------------------------------------  ----------------------------
                                                         OTHER     RESTRICTED     SHARES
NAME & PRINCIPAL                        CASH     STOCK    ANNUAL       STOCK     UNDERLYING    ALL
OTHER
POSITION                 YEAR  SALARY   BONUS(3) BONUS(4) COMPENSATION(5) AWARD(S)(6) STOCK OPTIONS
COMPENSATION(7)
----------------         ----  -------- -------- -------- --------------- ----------- ------------- --------
------

L. Dennis Kozlowski...... 2001 $1,650,000 $4,000,000          $219,543  $30,398,880   1,439,135
$4,313,553
   CHAIRMAN & CEO,        2000  1,350,000  2,800,000            143,652   21,207,540   5,357,798(8)
383,500
   TYCO INTERNATIONAL LTD. 1999 1,350,000  3,200,000             81,960   25,707,178   6,621,834
305,041

Mark H. Swartz........... 2001   968,750  2,000,000  500,014   277,856   15,199,440     788,425
2,112,968
   EVP & CFO, TYCO        2000   768,750  1,400,000            171,039   10,603,770   2,692,649(8)
121,448
     INTERNATIONAL LTD.   1999   750,000  1,600,000             63,066   12,029,641   2,976,480
86,948
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B, B.1.a-b, B.2, B.3, B.4.a-b, B.5, B.6, B.7 and B.8.

604.     The 2002 Proxy Statement failed to disclose and misrepresented the actual

compensation of defendant Kozlowski:

> For fiscal 2001, Mr. Kozlowski received a base salary of $1.65 million and, based on a
> 38.9% increase in Net Income before non-recurring items and a 31.3% increase in
> Operating Cash Flow, a cash bonus in the amount of $4 million, as shown in the
> SUMMARY COMPENSATION TABLE on page 14. Mr. Kozlowski was granted
> 600,000 shares of performance-based restricted stock on October 1, 2001. If the
> pre-determined specified performance criteria are met, these shares will vest over a
> period of up to three years. After three years, any remaining unearned shares will be
> forfeited and returned to the Company.

> Mr. Kozlowski also received restoration options in accordance with the restoration
> option provision of the Company=s option program. The restoration provision enables
> executive officers to use certain earned equity awards and certain proceeds from the sale
> of shares acquired upon the exercise of options to pay option exercise costs, repay
> indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while
> maintaining their equity position in Tyco.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.1.a, B.2, B.3, B.4.a, B.5, B.7 and B.8.

### Key Employee Loan Program

605.    The 2002 Proxy Statement provides materially false and misleading statements concerning Tyco=s KEL Program.  It states, for example:

> The Compensation Committee administers the loan program. **The Committee authorizes loans, which may not exceed the amount allowable under any regulation of the United States Treasury or other state or federal statute**. Loans may be required to be secured by Tyco common shares owned by the borrower or may be unsecured. Loans under the loan program generally bear interest at Tyco=s incremental short-term borrowing rate (which was 3.7% for 2001). The loans are generally repayable in ten years or when the borrower reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the borrower=s employment with Tyco or its subsidiaries terminates. The borrower is also required to make loan payments upon the sale or other disposition of Tyco common shares with respect to which loans have been granted, other than gifts to certain family members. [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.4 and B.5.

606.    The 2002 Proxy Statement also falsely and misleadingly states:

> At September 30, 2001, the amount of loans outstanding under the [Key Employee Loan] program totaled $11,230,192, of which $0 was outstanding for Mr. Kozlowski, $231,718 was outstanding for Mr. Boggess, $20,702 was outstanding for Mr. Meelia and $0 was outstanding for Mr. Swartz. The largest amount of indebtedness under the program during fiscal 2001 for each of the named officers was $23,009,703 for Mr. Kozlowski, $6,500,000 for Mr. Swartz, $20,702 for Mr. Meelia and $231,718 for Mr. Boggess. . . .

256

> Mr. Walsh, a director, was instrumental in bringing about the acquisition by a subsidiary of the Company of The CIT Group, Inc. (now Tyco Capital Corporation) of Livingston, New Jersey. For his services, Tyco paid Mr. Walsh a fee of $10 million. In addition, at Mr. Walsh=s request, Tyco contributed $10 million to a charitable fund established under The Community Foundation of New Jersey. Mr. Walsh, as trustee of this fund, recommends the public charities to which contributions are made. At the time of the acquisition, Mr. Walsh owned 50,000 shares of common stock of The CIT Group, Inc., which were converted to 34,535 Tyco common shares at the exchange ratio applicable to all stockholders of CIT.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.4, B.5 and B.8.f.

607.   In the January 29, 2002 edition of THE WALL STREET JOURNAL, Tyco disclosed that it paid defendant Walsh $20 million for his role in the CIT merger deal:

> **Tyco spokeswoman Maryanne Kane said Tyco=s board decided, without any outside help, that the $20 million payment was A appropriate based on the amount of work@ Mr. Walsh did, which she said included providing guidance, advice and facilitating meetings.**  [Emphasis added.]

A Tyco press release of that same date quoted defendant Kozlowski as saying:  A>The Board felt that fee was appropriate in light of Mr. Walsh=s efforts.=@  As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.8.f

608.   Tyco=s stock fell 20% in reaction to Tyco=s disclosure.  On January 30, 2002, THE WALL STREET JOURNAL reported that:

> L. Dennis Kozlowski, Tyco=s chief executive, said in a statement that the payment was **A appropriate in light of Mr. Walsh=s efforts**.@ But Mr. Kozlowski added that A clearly we are in an environment where people are intensely skeptical of corporate America, and for that matter, of Tyco.@ Mr. Kozlowski has repeatedly defended the company=s

accounting as proper. He said he believes the sharp fall in Tyco=s stock price was Aunjustified,@ adding that the company is moving forward in Ahigh gear@ with its plan to break itself into four pieces to create more shareholder value. [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a, A.1.d and B.8.f.

609.    On January 30, 2002, THE NEW YORK TIMES reported that defendants Kozlowski and

Swartz had sold stock by returning it to the Company:

> Two senior executives of Tyco International Ltd. quietly disposed of more than $100 million in Tyco stock during the company=s last fiscal year, despite public comments that they rarely if ever sold Tyco shares.

> L. Dennis Kozlowski, Tyco=s chairman, and Mark Swartz, its chief financial officer, returned the stock to the company in late 2000 and 2001, according to forms filed with the Securities and Exchange Commission in November.

> *   *   *

> Mr. Kozlowski has repeatedly told analysts and the media that his large holdings in Tyco stock demonstrate his commitment to the company. AI=m paid in Tyco stock,@ Mr. Kozlowski said in an interview last month. AWe, the board, everybody, feel the best way to keep management=s interest aligned with shareholders is to keep 100 percent of our net worth in Tyco=s stock.@

> Mr. Kozlowski returned about 1.25 million shares of stock to the company last year, according to the filings. Mr. Kozlowski owns about three million shares of Tyco stock, according to a report Tyco filed Monday with the S.E.C., and has an additional 11 million Tyco options.

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) B, B.9.

610.    On January 31, 2002, J.P. Morgan, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled, ATyco Int=l: Our Rebuttal to the Short Case and Liquidity Risk.@  The report stated:

> The notion that Tyco Aspring loads@ its results in the quarters following an acquisition is not supported by an analysis of the segment results.   In spite of the continual grind of bad press, rumors and a falling stock price, we believe there remains no smoking gun on Tyco accounting or business practices, and we see no liquidity risks.

611.    On February 4, 2002, defendant Swartz admitted to THE WALL STREET JOURNAL that Tyco that, in fiscal years 1999, 2000 and 2001, the Company paid almost $8 billion in cash for over 700 undisclosed acquisitions, the existence or terms of which were never revealed to the investing public or disclosed in the Company=s public filings.  The article stated:

> Tyco International Ltd. said it spent about $8 billion in its past three fiscal years on more than 700 acquisitions that were never announced to the public.
>
> *   *   *
>
> Although Tyco says its disclosures have been adequate, the company late last week sent a special alert to its investors giving new details about its unannounced acquisitions after questioned about them for this article. The alert, which gave fresh information about last year but not the full three-year period, revealed that Tyco paid $4.19 billion in cash for unannounced deals in the fiscal year ended Sept. 30, 2001, or about 37% of the $11.3 billion in cash it spent on all deals. The company said separately that it made 350 unannounced acquisitions in that fiscal year
>
> *   *   *
>
> Mark Swartz, Tyco=s chief financial officer, said the company clearly states in its financial filings the Anet@ amount of cash it paid for all acquisitions, a number that includes the hundreds of unannounced deals. He said the company doesn=t disclose details on its numerous smaller deals because they aren=t Amaterial@ given Tyco=s huge size.
>
> When asked about prior years, Mr. Swartz said Tyco paid about $2.3 billion for 225 unannounced deals in fiscal 2000, and roughly $1.5 billion for between 150 and 175

259

companies in fiscal 1999.

Mr. Swartz agreed that it would be impossible for an investor to discern the amounts it spent on unannounced deals, because Tyco doesn=t provide a crucial piece of information in its regulatory filings: The amount of cash on the balance sheets in companies it acquires. Tyco subtracts that amount from its total acquisition spending to get the Anet@ figure, but calculating the unannounced deals requires it to be added back. AYou could fault me for that,@ Mr. Swartz said, adding that the company may include that extra detail in future financial filings.

As defendant Swartz either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

612.    On February 4, 2002, the Tyco Defendants admitted in a press release that, contrary to

their repeated assurances, Tyco did not have a healthy cash flow, had to exit the commercial paper

market, and had to draw down the full $5.9 billion from its emergency backup credit lines to pay for

$4.5 billion in outstanding commercial paper debt.[25]  The press release stated:

PEMBROKE, BERMUDA, FEBRUARY 4, 2002--Tyco International Ltd. (NYSE: TYC, LSE: TYI, BSX: TYC) today announced that it will repurchase all of the company=s $4.5 billion commercial paper at its scheduled maturities. To fund these purchases, Tyco will borrow under its $5.9 billion of existing bank facilities with a term maturity of February 2003 as to $3.9 billion and February 2006 as to the other $2.0 billion.

L. Dennis Kozlowski, Tyco=s Chairman and Chief Executive Officer, said, AWhile the increased interest costs will reduce earnings by up to $0.02 per share in fiscal 2002, by taking these actions we are enhancing Tyco=s flexibility, liquidity, and eliminating uncertainty about our ability to finance our recently announced plan to unlock

---

[25] The February 4, 2002 press release was filed with the SEC on Form 8-K on February 6, 2002, which was signed by defendant Swartz.

shareholder value. Additionally, **the company has projected remaining fiscal year 2002 free cash flow to be in excess of $4 billion**, of which a majority will be used to reduce existing indebtedness.@

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

613.    On February 4, 2002, the Tyco Defendants admitted in a press release that, contrary to their repeated assurances, Tyco did not have a healthy cash flow, had to exit the commercial paper market, and had to draw down the full $5.9 billion from its emergency backup credit lines to pay for $4.5 billion in outstanding commercial paper debt.

614.    In addition to admitting that Tyco=s use of emergency debt would reduce the Company=s earnings and free cash flow, defendant Swartz also admitted that Tyco=s draw-down of its emergency backup credit facilities substantially impaired the Company=s credit rating.  At the beginning of Tyco=s conference call on February 6, 2002, defendant Swartz told investors that they Adid see the effect of our draw down on two of the agencies this week. . . .  S&P took a dramatic step downward to BBB in our rating.@  Standard & Poor=s also placed the Company on ACreditWatch,@ citing concern over the Auncertainty@ regarding Tyco=s access to the capital markets, and the smaller cushion available to the Company after the exhaustion of its emergency backup credit facilities.  Similarly, Fitch Ratings placed Tyco=s commercial paper ratings on ARating Watch Negative,@ downgraded Tyco=s Senior Unsecured Debt (along with the Unconditionally Guaranteed Debt of Tyco=s subsidiary, Tyco International Group S.A.) from A to A-, and downgraded Tyco=s commercial paper from F1 to F2.

615.    Fear that the Company=s debt structure will explode has only worsened.  Tyco has been

foreclosed from the traditional commercial paper market and has been forced into more costly forms of debt. For example, Tyco announced on January 8, 2003 that it sold $2.5 billion of 15-year convertible bonds and $1.25 billion of 20-year convertible bonds. The 15-year bonds carry a 2.75 percent coupon and are convertible into Tyco shares at $22.78, a 32 percent premium over January 7, 2003's closing price, $17.26. The 20-year bonds carry a 3.125 percent coupon and a $21.75 conversion price, a 26 percent premium.

616.   In addition to admitting that Tyco=s use of emergency debt would reduce the Company=s earnings and free cash flow, defendant Swartz later admitted that Tyco=s draw-down of its emergency backup credit facilities substantially impaired the Company=s credit rating. During the opening of Tyco=s conference call on February 6, 2002, defendant Swartz stated that Ayou did see the effect of our draw down on two of the agencies this week. S&P took a dramatic step downward to BBB in our rating.@ Standard & Poor=s also placed the Company on ACreditWatch,@ citing concern over the Auncertainty@ regarding Tyco=s access to the capital markets, and the smaller cushion available to the Company after the exhaustion of its emergency backup credit facilities. Similarly, Fitch Ratings placed Tyco=s commercial paper ratings on ARating Watch Negative,@ downgraded Tyco=s Senior Unsecured Debt (along with the Unconditionally Guaranteed Debt of Tyco=s subsidiary, Tyco International Group S.A.) from A to A-, and downgraded Tyco=s commercial paper from F1 to F2.

**2/6/02 Conference Call**

617.   In a conference call on February 6, 2002, the Tyco Defendants announced that it was drawing down its bank lines, and attempted to squelch rumors about manipulative acquisition accounting. According to defendant Kozlowski:

KOZLOWSKI:    Tyco has been over the last few weeks subjected to various **rumors and we believe misleading press coverage**.  We have several examples of this in recent days, ranging from outlandish headlines in a particular newspaper that is not even close to supported in the related article, to charges in things like TheStreet.com that we failed to disclose acquisitions that was later retracted by TheStreet.com.  Reports and rumors such as this do harm to our company and our shareholders.  They spook investors during these times, and they require lots of our management time to refute and they distract our employees.

*   *   *

Now that you heard about **there=s no liquidity problems** and we=re going to be filing even more disclosures on our Qs and Ks at the end of the quarter and we=re rolling out ....even more disclosure to you and we have nothing at all that concerns us and we=ll walk anybody through any aspects of the accounting that is necessary.  Now let=s look back at the business.  **I want to assure that TYCO remains on solid ground in its businesses.**

*   *   *

Another benefit of the bank debt is that it makes us less susceptible to various market rumors, including those that we could have a liquidity issue, which we don=t, but if it is left to grow, it could become some kind of a self-fulfilling prophecy.

*   *   *

The bank lines that we have put in place are more expensive than commercial paper and that=s why we did commercial paper in the past as opposed to bank lines.

*   *   *

SWARTZ:    **On one other issue, the accounting questions that have been asked.  Unfortunately, buried in a New York Times article today, they do come out and say that no evidence of accounting irregularities have been found at Tyco.  That is true, that is exactly what happened two years ago when these same allegations were given, same exact arguments, and we we re able**

263

**to demonstrate two years ago that our accounting was sound, the results we were showing were appropriate, and that was confirmed by independent reviews both from the government and also from independent auditors. We are in the same position today as far as our approach to accounting. It=s on a conservative basis, it is full disclosure, second to none, and we do know that as a result of the questions being thrown out into the marketplace, in a current jittery market, that there are questions that end up coming from just the allegations themselves. We understand that, we recognize that, and we are currently working on the best way to once again demonstrate that the accounting is sound and appropriate and we will put that on a public filing in an 8-K with SEC to be able to once again demonstrate to you that the accounting continues to be as sound as it was two years ago, a year ago and as included in our 10-K and our 10-Q that will be coming, one of full disclosure. So we do believe that the discussion we are having today, this morning, on our liquidity and accounting, will be able to prove that our business fundamentals and our approach to day-to-day business continues unchanged.**

\* \* \*

KOZLOWSKI:        We still believe that we will earn about $4 billion in free cash for the year, even with some of the other fluctuations in earnings that we talked about here and the possibilities of some downturns in electronics.

\* \* \*

**So to state the obvious, there is a crisis of confidence at Tyco, but there=s no crisis of reality.** Although I would argue this is not a crisis of our creation, but we will be out talking to you, doing whatever is necessary over communicating to do our best to eliminate this crisis, as well as providing you pertinent financial information that will answer all of your questions.

\* \* \*

SWARTZ:        . . . since you brought up the issue on other acquisitions, the articles that came out Friday and Monday related to the headlines of an inflammatory nature that these had never been included in financial statements or our cash flows. If anyone had been interested in seeing what the total

amounts of cash acquisitions were for the 3-year period, they could go to the statement of cash flows on a line that says, Acash paid for acquisitions@, and be able to see that total.  Additionally, footnote 2, which I talked about earlier, which is extremely comprehensive, and includes all the detailed information, is related to 100% of those acquisitions that are included on the cash flow statement.  And if there had been a story that could have come out, it would have been that there were acquisitions that we did not put out individual press releases on; however, as far as the financial statements are concerned, 100% of the acquisitions are included in there; we did have to pay the cash; it came out of our accounts.  And additionally, the organic growth that we talk about on a quarterly basis, continues to exclude all acquisitions, effective foreign currency, and raw materials.

\* \* \*

KOZLOWSKI:         **There is no liquidity issue.**  [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

618.     That same day, Tyco took an unusual step and issued a press release to reassert some points that were made during the February 6, 2002 conference call, including that ATyco=s business fundamentals are strong.@[26]  As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

619.     On February 11, 2002, THE WALL STREET JOURNAL reported that Tyco was trying to gain credibility with investors and convince them that the Company was healthy:

---

[26] The February 6, 2002 press release was filed with the SEC on Form 8-K on February 8, 2002, which was signed by defendant Swartz.

Tyco International Ltd., seeking to raise its credibility with investors, released detailed quarterly financial projections showing strong cash flow from its operations, enough money to pay its debts and a $2.15 billion cash balance at the end of 2002.

J. Brad McGee, a Tyco executive vice president, said the big industrial and financial-services concern took the unusual step to make a strong case it wasn=t in financial distress. **A**We wanted to make sure questions about liquidity were off the table,**@** he said.  [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

620.    As part of their ongoing effort to keep investors continually in the dark, the Tyco

Defendants also held a conference with analysts on February 13, 2002.  The Tyco Defendants stated:

KOZLOWSKI:      I do want to remind you that we will be filing our fiscal first quarter Q on tomorrow.  You=ll see even more disclosure than you are used to at Tyco.  **We already provide substantially more disclosure than our peers.**  We believe this is a good thing.  **The more you know about our accounting, I believe the more comfortable you will be.**

*   *   *

SWARTZ:         . . . **We believed that as with all of our accounting that the best approach for us is to follow the most conservative that we can as far as showing the financial strength of the company.**

*   *   *

KOZLOWSKI:      We=re confident once we sit with these people and walk with them through what=s going on they see there is a stable company that=s a going concern, that=ll continue to be a going concern and **does not have a liquidity crisis.**  [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a, A.1.d and B.3.

621.    On February 13, 2002, THE NEW YORK TIMES reported that in 30 months, defendants Kozlowski and Swartz made hundreds of millions of dollars selling their shares of Tyco stock:

> Since July 1999, Tyco International=s two top executives have made more than $500 million in profits by selling Tyco shares, while saying publicly that they rarely, if ever, reduce their holdings.

## 2/13/02 Conference Call

During a conference call that same day, defendant Kozlowski continued to falsely reassure analysts and investors concerning Tyco=s liquidity:  AWe're confident once we sit with these people and walk with them through what=s going on they see there is a stable company that=s a going concern, that'll continue to be a going concern **and does not have a liquidity crisis**.@ [Emphasis added].  As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.1.f.

## 2/14/02 10-Q

622.    On February 14, 2002, the Tyco Defendants filed Tyco=s Form 10-Q for the quarter ended December 31, 2001 (the A2/14/02 10-Q@), signed by defendant Swartz.  In it, the Tyco Defendants set out numerous materially false and misleading statements.  These false and misleading statements addressed a variety of topics, including the following:

### Tyco=s Operating Results

623.    The 2/14/02 10-Q also gives favorable, purportedly accurate information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

267

| | TYCO INTERNATIONAL LTD. AND CONSOLIDATED SUBSIDIARIES | |
| | FOR THE QUARTERS ENDED DECEMBER 31, | |
| | 2001 | 2000 |
| --- | --- | --- |
| INCOME BEFORE INCOME TAXES, MINORITY INTEREST, EXTRAORDINARY ITEMS AND CUMULATIVE EFFECT OF ACCOUNTING CHANGES............................... | 1,845.1 | 1,538.3 |
| Income taxes........................................... | (390.5) | (525.0) |
| Minority interest..................................... | (0.8) | (12.5) |
| Income before extraordinary items and cumulative effect of accounting changes...................... | 1,453.8 | 1,000.8 |
| Extraordinary items, net of tax...................... | (2.8) | -- |
| Cumulative effect of accounting changes, net of tax............................................... | -- | (683.4) |
| NET INCOME........................................... | $ 1,451.0 | $ 317.4 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

624.    In addition, these statements are false and misleading and omit material information because Tyco has admitted that *during the quarter ended December 31, 2001, its pre-tax income was overstated by more than 21%*.  As both the December Report and Tyco=s 10-Q/A for the quarter ended December 31, 2001 (filed on December 31, 2002) reflect, Tyco has now recorded charges of $290.6 million for the first quarter of fiscal 2002, $185.9 million of which is attributable to ADT dealer reimbursements.

**Tyco=s Reserves**

625.    The 2/14/02 10-Q also gives materially false and misleading information concerning Tyco=s reserves.  For example:

> At the beginning of fiscal 2002, purchase accounting reserves were $732.1 million as a result of purchase accounting transactions in prior years. In connection with first quarter fiscal 2002 acquisitions, we established purchase accounting reserves of $80.7 million for transaction and integration costs. In addition, purchase accounting liabilities of $216.2 million and a corresponding increase to goodwill and deferred tax assets were recorded during the quarter ended December 31, 2001 relating to fiscal 2001 acquisitions. These reserves related primarily to revisions associated with finalizing the exit plans of LPS,

Tyco Capital and SecurityLink, all acquired during fiscal 2001. During the quarter ended December 31, 2001, we paid out $176.9 million in cash for purchase accounting liabilities, plus $41.8 million relating to earn-out liabilities, and incurred $2.6 million in non-cash charges (including $2.3 million relating to earn-out liabilities) against the reserves established during and prior to this quarter. Certain acquisitions have provisions which require Tyco to make additional Aearn-out@ payments to the sellers, if the acquired company achieves certain milestones subsequent to its acquisition by Tyco. Also, in the quarter ended December 31, 2001, we determined that $15.8 million of purchase accounting reserves related primarily to acquisitions prior to fiscal 2002 were not needed and reversed that amount against goodwill. At December 31, 2001, there remained $836.0 million in purchase accounting reserves on Tyco Industrials Consolidated Balance Sheet, of which $650.8 million is included in accrued expenses and other current liabilities and $185.2 million is included in other long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

626.    During this time, defendant Kozlowski continued to assure investors that there were no accounting improprieties at Tyco.  For example, an article in the February 22, 2002 edition of the Boston Globe, entitled ACEO DEFENDS TYCO PLAN, ACCOUNTING TYCO CHIEF DEFENDS BREAKUP PLAN, ACCOUNTING,@ stated:

HAMILTON, Bermuda - Tyco International Ltd. chief executive Dennis Kozlowski yesterday defended the conglomerates accounting methods and breakup plan, declaring, A**We have nothing to hide**,@ even as a large investor questioned the impartiality of Tycos auditors.

Kozlowski sought to reassure investors at Tycos annual shareholder meeting here that, despite a wave of uncertainty that has battered the companys stock in recent weeks, A**Our accounting is conservative and it is proper.**@ He said Tyco had been unfairly sucked into the cyclone of concern around the collapse of Enron Corp.

A**Let me assure you, Tyco is a very healthy and viable company**,@ Kozlowski said.

[Emphasis added.]

269

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a,  A.1.d and B.3.

627.    On February 26, 2002, Tyco filed a Form 8-K with the SEC, signed by defendant Swartz, which attaches a February 18, 2002 letter from defendant PwC to Audit Committee Chairman John Fort stating in part:

> As you know, we meet with you and the other members of the Audit Committee periodically to discuss our worldwide audit approach and areas of audit focus for the purpose of our overall annual audit of Tyco International Ltd. (ATyco@ or the ACompany@). Our audits of the consolidated financial statements of Tyco as of September 30, 2001 and 2000, and for the three years ended September 30, 2001 comprised audit test and procedures deemed necessary for the purpose of expressing an opinion on such financial statements taken as a whole. **We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America**, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. For none of the periods referred to above, or for any other period, did we perform audit tests for the purpose of expressing an opinion on individual balances of accounts or summaries of selected transactions, and accordingly, we express no opinion thereon. As a reminder, the financial statements of the Company are the responsibility of the Company=s management; our responsibility is to express an opinion on these financial statements based on our audits.
>
> One of the areas of our audit focus on Tyco relates to business combinations. The nature of the procedures that we perform related to any specific business combination is dependent on the nature and materiality of the transaction. Each significant business combination may have unique characteristics, and accordingly we exercise independent judgment as to what audit procedures related to any specific business combination are necessary to support our audit opinion on the financial statements of Tyco taken as a whole.
>
> A business combination work plan to achieve the audit objectives in conjunction with our overall audit would likely include some combination of the following procedures, depending on individual facts and circumstances . . . .  [Emphasis added].

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.5.

628.   On February 28, 2002, THE NEW YORK TIMES reported that, prior to acquisition, Tyco encouraged Raychem to prepay some expenses before the acquisition was completed.

> Tyco International said yesterday that it had encouraged Raychem, an electronic components maker that it bought in 1999, to prepay some expenses before the acquisition was completed.
>
> Tyco executives have denied that Tyco changes the payment practices of companies it buys before the takeovers are final. Brad McGee, a spokesman for Tyco, said yesterday that the prepayments at Raychem were standard business practices and did not contradict the company=s earlier statements.
>
>            \*   \*   \*
>
> The disclosure about Raychem came in response to questions about a letter sent by a former Raychem employee to the Securities and Exchange Commission. The letter outlined payments that Raychem made at Tyco=s behest before the acquisition closed. Tyco paid $3 billion for Raychem in August 1999.
> Mr. McGee said last night that he had not seen the letter but that Asome former employees did approach the S.E.C. with allegations.@ He added that the S.E.C. had carefully reviewed Tyco=s actions and had found no problems.
>
> **AThe enforcement division of the S.E.C. specifically inquired into these allegations,@ he said. AThe results of their inquiry are now a matter of public record, a no-action letter.@**
>
> **The accusations, Mr. McGee said, Aare well-covered territory, lacking any substance, that we consider to be a dead issue.@ He said the prepayments had no effect on Tyco=s reported income, although they did improve its reported cash flow.**
>
>            \*   \*   \*

> Last month, with its stock sliding, Tyco said it would split into four companies, reversing its decade-long strategy of growth by acquisition. Tyco=s shares have also been buffeted by the disclosure that L. Dennis Kozlowski, its chairman, and Mark H. Swartz, its chief financial officer, have sold more than $500 million in Tyco stock over the last three years. Mr. Kozlowski said in December that A100 percent of my net worth@ is in Tyco stock. [Emphasis added].

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

629.    On March 10, 2002, in an article entitled, ATYCO=S WALKING A FINE LINE; CEO INSISTS BREAKUP WILL ADD VALUE,@ the SUN-SENTINEL (Ft. Lauderdale) reported:

> **ATyco has always been an open company and we have nothing to hide**,@ Kozlowski told the shareholders, according to a Reuters report. **AOur accounting is conservative and proper, living up to the letter and the spirit of the law.@** [Emphasis added.]

As defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

630.    On March 19, 2002, an article in THE WALL STREET JOURNAL entitled ATyco Inflated Cash Flow Of Acquisition@ reported that the Company engaged in certain accounting manipulations as part of its Raychem acquisition:

> **A Tyco executive vice president, J. Brad McGee, denied there was any attempt to boost Tyco=s results, and defended its accounting as proper.** Mr. McGee said the specific payments discussed in the e-mails were investigated by the Securities and Exchange Commission in 1999 and 2000 as part of a broader informal probe of Tyco=s accounting. The SEC ended its probe in mid-2000, taking no action.

*   *   *

272

> **Mr. McGee said Tyco has never Amanipulated the cash flow or earnings of companies we acquire for the purpose of spring-loading, or getting better results after the acquisition.@**   [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a, A.1.d. and B.3.

631.    On March 20, 2002, Deutsche Bank Alex Brown, reporting materially false and

misleading information received from the Tyco Defendants, issued an analyst report entitled, ATYC: S&P

Comments.@  The report stated:

> Tyco=s CFO Mark Swartz addressed recent articles in The Wall Street Journal, Fortune.com and the New York Times regarding Tyco=s acquisition accounting practices.  **Tyco believes that these articles are based on information that has been inaccurately Ahashed and rehashed@ during the past two months.  . . . Tyco still believes that its accounting policies are appropriate . . . . and that allegations in the press are the results of reporting without knowledge of Tyco=s accounting practices.**  [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a, A.1.d and B.3.

**2/26/02 Conference Call**

632.    During a weekly conference call on February 26, 2002, defendant Swartz sought to

falsely reassure analysts and investors about the propriety of Tyco=s acquisition accounting practices.

According to defendant Swartz:

> SWARTZ:    This is the same corporate management team we have in place today that was in place 2 years ago which is the last time we had accounting allegations against the

273

company.  Allegations that are exactly the same today as they were 2 years ago, however the names of the acquisition and the dollar amount have changed.  **Two years ago when we had these false allegations, as the management group, we told you that our accounting was appropriate and conservative, that the auditor opinions continued unchanged, the SEC ended up their enforcement action with no action being taken, and that the shareholder suits were baseless.**  With the court coming out yesterday and affirming the last point, **the integrity of what we communicated to you 2 years ago was completely true**, and 2 years ago we saw the same stock market volatility and credit market uncertainty that is in place today.  **So now roll forward 2 years where we do have the same accounting allegations once again and as a management group we tell you once again that the accounting is appropriate and conservative, PwC, our outside auditors continue with their opinions unchanged and the new round of shareholder suits that copy the ones 2 years ago are also baseless.  And our integrity is extremely important to us, that is why we believe in being completely open, disclosing to a level far beyond others and we will continue to do that until we are able to in the future provide you the same closure that we have been able to provide to the accusations that we had 2 years ago.**

\* \* \*

. . . **to conclude, our accounting continues to be done appropriately and conservatively.**  [Emphasis added.]

633.     Swartz also sought to give false reassurance regarding Tyco≡s liquidity:

SWARTZ:     . . . **we are in a very liquid position right now for the next 12 months** and that divestitures that we≡re looking at and have talked about publicly to this point, which is both plastics and CIT, will be incremental to that liquidity and should give people even more comfort relative to our outlook and **our ability to continue to go ahead and increase shareholder value and get the credit side of the house comfortable that all these other assertions that are being made are not true.**  [Emphasis added.]

As defendant Swartz either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a, A.1.d and B.3.

274

**3/5/02 Conference Call**

634.     During a weekly conference call on March 5, 2002, defendant Swartz continued to

attempt, falsely, to allay concerns about Tyco=s acquisition Astrategy,@ and its accounting practices:

> SWARTZ:     . . . anyone who has been following Tyco over the past few years knows, we are
> extremely disciplined when it comes to acquisition.  **Every acquisition needs to
> be immediately additive to earnings and cash flow during the first quarter
> of ownership, needs to add to the competitive strength of our businesses,
> has to provide minimum returns in the mid teens during the first year of
> ownership.  That is our acquisition strategy**, it is true for every acquisition
> and we continue to expect as we make acquisitions going forward, that we will
> continue to have income statement benefits and cash flow benefits as it reflects
> the strength of these acquisitions and the benefit it ends up bringing to our
> business.
>
> *   *   *
>
> Well again, thank you for listening to us today and learning more about **the
> accounting here at Tyco which, as you hear, continues to be in
> conformance with GAAP, prepared on a conservative basis with proper
> disclosure for our investors to see the performance of our business.**
> [Emphasis added.]

As defendant Swartz either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a and A.1.d.

**3/12/02 Conference Call**

635.     Swartz=s campaign to falsely reassure investors and analysts about Tyco=s acquisition

accounting and liquidity continued during the next weekly conference call, on March 12, 2002:

> SWARTZ:     . . . **as we have said, our accounting, as far as acquisition accounting, in
> addition to the other areas that we have talked about, is in accordance
> with GAAP in an appropriate and consistent basis.**

* * *

**There is not a cash crisis looming at Tyco**, nor has there been one in the past.

* * *

**We have ample amounts of cash and liquidity available** and given the ongoing uncertainty in that CP market, we don=t think it makes sense for us to jump in until that all balances itself out on issues unrelated to Tyco.  [Emphasis added.]

As defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**3/19/02 Conference Call**

636.     During the weekly investor call on March 19, 2002, Swartz again tried to characterize the allegations of improper acquisition accounting at Tyco as a Arehash@:

SWARTZ:     They [recent stories in The Wall Street Journal, New York Times and Fortune.com] continue to be a **rehash of a rehash of items that we have thoroughly gone through and found to be totally appropriate not only by ourselves, but also our auditors and others.  We are at a total loss to explain how recycled and disproved allegations like these warrant placement as the second most important news story in the global business in finance areas today.**  [Emphasis added.]

As defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.5.

276

**4/2/02 Conference Call**

637.     On April 2, 2002, the Company held yet another conference call in its ongoing efforts to

provide false assurances concerning Tyco=s accounting practices.  Defendant Swartz stated as follows:

> SWARTZ:            [Referring to] **Arecycled allegations of so-called spring loading@**
>
>                              *   *   *
>
>                    As I have said over the past few weeks based on January and
>                    February=s numbers, we see no need to revise earnings or cash flow
>                    guidance for the quarter.
>
>                              *   *   *
>
> SWARTZ:            We know of no insider sales that have taken place during this period.
>
>                              *   *   *
>
>                    **We also are real pleased and proud of our accounting policies and
>                    the standard we have set for open and forthright disclosure.**
>
>                              *   *   *
>
>                    **We are unaware of any other management team of any company,
>                    of any size or complexity that has been willing to subject itself to
>                    as open a discussion of its accounting and disclosure practices as
>                    Tyco has.  We think that says something about our confidence in
>                    Tyco and more importantly the integrity of our numbers.**
>                    [Emphasis added.]

As defendant Swartz either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a, A.1.d and B.3.

638.    On April 3, 2002, J.P. Morgan, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled, ATyco Int=l: The Weekly Conference Call and Fine Tuning Estimates.@  The report stated:

> Tyco=s disclosure and openness in the past several months has been unprecedented, and we are still left without a Asmoking gun@.  We think Tyco remains a collection of valuable and strong franchises that are positioned for growth.
>
> *   *   *
>
> We find Tyco a compelling investment given its strong collection of businesses and attractive valuation.

639.    A few weeks later, on April 25, 2002, the Tyco Defendants announced the termination of the breakup plan and poor financial results.  The press release stated:[27]

> Pembroke, Bermuda, April 25, 2002--Tyco International Ltd. (NYSE: TYC, BSX: TYC, LSE: TYI) today announced that it has terminated its plan to separate the company into four separate businesses and is taking steps to further strengthen the long-term prospects of the company. It also reported earnings for the second quarter in an accompanying release.

640.    The press release also attached a letter from defendant Kozlowski to all shareholders in which he announced abandonment of the plan to break up Tyco, and then took Afull responsibility@:

> Having said that, it=s been upsetting to see inaccurate reporting and unsubstantiated rumors about Tyco given such a public platform. As stewards of a public company we know we are subject to scrutiny every day and the current climate is one in which all companies are under a microscope. **We have always tried to be as transparent in our accounting as possible. Indeed, I consider our disclosure to be second to none among our peer companies. That some in the media would compare us to**

---

[27] The April 25, 2002 press release was filed with the SEC on Form 8-K on May 1, 2002, which was signed by defendant Swartz.

**companies that may have intentionally misled investors through the use of financial chicanery is insulting and inaccurate. To be thrown into stories about Aaccounting scandals@damages our reputation and casts aspersions on our employees.**

\* \* \*

By fully monetizing CIT, we can eliminate any lingering perceptions about the company=s short-term financial position and create a strong foundation for the future.

\* \* \*

**We will continue to drive organic growth through product innovation, superior service, and geographic expansion.**

\* \* \*

In addition, the senior corporate management team will not receive bonuses this year. [Emphasis added].

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A, A.1.a, A.1.d and B.3.

**4/25/02 Conference Call**

641.    The Tyco Defendants elaborated on their announcement during a conference call with

analysts on April 25, 2002:

> KOZLOWSKI:        Finally, **Tyco was the subject of a wave of some incorrect rumors and some misleading press reports**.  These shook investors= confidence and also scared our employees, suppliers and customers.  In a melee we lost some customers and we confused employees.  In doing so the rumors became partially self-fulfilling.  To prevent any risk of a liquidity squeeze we drew our backup bank lines and then triggered a debt rating downgrade from Standard & Poors and had higher costs of funds.  We were comfortable being placed under a microscope but I have to admit to being very frustrated with some of the **outlandish**

**stories and headlines**.  They damaged our reputation, hurt and confused our employees, and certainly cost our shareholders money. We responded to these series of rumors with a series of weekly conference calls to answer questions from any and all.  **We are proud of our company and we believe that our openness will allow rationality ultimately to return.**

\*   \*   \*

On an all end basis Tyco lost 96 cents per share, this includes one dollar and 61 cents per share of impairment and other unusual charges.  I will highlight these items to you to help you analyze the underlying performance of the business, but I do want to stress that I see them as real costs and that it will be included in our compensation calculations. As a result, senior corporate management will not receive bonuses this year although operating managers may depending upon the results of their specific units.

\*   \*   \*

SWARTZ:                    **I=d like to stress that there are no liquidity issues**, next February is a reasonable roll forward with the reasonable amounts of debt that we would be in a position to go ahead and refinance, the only significance put that we have after that time period is not until our first fiscal quarter of 2004.

\*   \*   \*

KOZLOWSKI:            . . . I think on a going forward basis the press reports really had no accounting issues and they were getting more into the rumors and things on our sale of assets or our overall strategic direction which is probably a fair criticism because there was a lot of uncertainty as to where Tyco was going and by providing this clarity in our comprehensive letter to shareholders, our press release and this conference call today, hopefully we will clear that up but if conference calls are needed, then we will certainly re-institute them at a moments notice.  [Emphasis added.]

280

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

642.    That same day, April 25, 2002, Tyco publicly announced its plans for a 100% public offering of CIT in the amount of approximately $7.2 billion.  By selling-off CIT, either through an outright sale or via an IPO, Tyco, as it informed investors, would improve its liquidity and reduce its debt by at least $10 billion.  CIT filed an S-1 registration statement with the SEC that day.  As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.e.

643.    On April 26, 2002, Deutsche Bank Alex Brown, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled, TYC AIt Was A Mistake@ B Upside Remains B Lower Target On Conservative Guidance.@  The report stated:

> EPS met: TYC reported $0.65 in line with DB, $0.02 better than consensus.   Credibility lower: TYC terminated its break-up plan. While the reversal is a less-bad plan than breaking up in our view, investors justifiably punished TYC for changing its strategy (again).  To its credit, TYC admitted Ait was a mistake= and has conservative EPS.

**4/30/02 Conference Call**

644.    During a conference call on April 30, 2002, defendant Swartz once again specifically addressed the question of Tyco=s liquidity and earnings power, falsely attempting to reassure investors and analysts:

> SWARTZ:        . . . **we continue to feel extremely comfortable as to the earnings power**, the cash flow generation from every one of our businesses in which we participate.

* * *

Two other points related to liquidity, just some misconceptions in the marketplace, we did not head the monetization route because we weren't in a position to spin CIT.  From a debt perspective, we very well could have gone ahead and spun it. . . . **we feel good about the liquidity**, we have a plan in place to do it with minimal execution risk, there are plenty of assets with strong cash flows that we have that we can rely on,

* * *

**We are continuing to run these businesses without a liquidity issue** in that we do not believe there is one right now and its not that our heads are in the sand but on the contrary it's an issue next February, we've got a plan in place to go ahead and raise the cash proceeds that are necessary to overcome that . . .

* * *

**I do want to make clear though, you know, I am not changing any guidance as far as the balance of the year, we do think where we are currently, that that is the right level that people should factor in.**

* * *

SWARTZ:        . . . **there is no liquidity issue**, for those of you looking at next February.  [Emphasis added.]

As defendant Swartz either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A.1.

**5/15/02 10-Q for the quarter ended 3/31/02**

645.    On May 15, 2002, the Tyco Defendants filed Tyco's Form 10-Q for the quarter ended

March 31, 2002 (the "5/15/02 10-Q"), signed by defendant Swartz.  In it, the Tyco Defendants set out

numerous materially false and misleading statements, as evidenced by (among other things) the Tyco

Defendants= restatement of its operating results in a June 12, 2002 10-Q/A for the same period.  These false and misleading statements addressed a variety of topics, including the following:

### Tyco=s Operating Results

646.    The 5/15/02 10-Q also gives favorable, purportedly accurate information concerning Tyco=s operating results.  For example, the Tyco Defendants provide the following summary information:

```
                                         TYCO INTERNATIONAL LTD.
                                            AND CONSOLIDATED
                                               SUBSIDIARIES
                                         -----------------------
                                         FOR THE QUARTERS ENDED
                                                MARCH 31,
                                         -----------------------
                                            2002        2001
                                         -----------  -----------

(LOSS) INCOME BEFORE INCOME TAXES, MINORITY
   INTEREST AND EXTRAORDINARY ITEMS...............   (1,803.0)    1,488.1
Income taxes.......................................     (97.4)     (366.0)
Minority interest..................................      (4.3)      (11.7)
                                                    ---------    --------
(Loss) income before extraordinary items..........  (1,904.7)    1,110.4
Extraordinary items, net of tax...................      (0.7)      (10.3)
                                                    ---------    --------
NET (LOSS) INCOME.................................. $(1,905.4)   $1,100.1
```

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.

647.    In addition, these statements are false and misleading and omit material information because Tyco has admitted that during the quarter ended March 31, 2002, it understated its reported loss by more than **71%**.  As both the December Report and Tyco=s 10-Q/A for the quarter ended March 31, 2002 (filed on December 31, 2002) reflect, during the second quarter of fiscal 2002 Tyco failed to timely record a loss due to an impairment in the value of its CIT subsidiary, **despite its contemporaneous analysis that an impairment charge was necessary.**[28]  When Tyco ultimately

---

[28]Tyco=s 10-K for the year ended September 30, 2002 states that Athe Company performed a SFAS 142 first step impairment analysis as of March 31, 2002 and concluded that an impairment charge was warranted at that time.@ Nonetheless, the Company failed to record the charge.

restated its March 31, 2002 financial statements, it reported a **$4.5  billion impairment** in the value of

CIT=s goodwill.  The effect of this charge eliminated almost **40%** of the earnings Tyco accumulated over

its corporate life.

648.    Thus, the following additional statements in the 5/15/02 Tyco=s 10-Q were materially

false and misleading and omitted material information (as the Company has effectively admitted):

> The Company periodically reviews and evaluates its goodwill and other intangible assets
> for potential impairment. Effective October 1, 2001, the beginning of Tyco=s fiscal year
> 2002, the Company adopted SFAS No. 142, AGoodwill and Other Intangible Assets,@
> under which goodwill is no longer amortized but instead is assessed for impairment at
> least annually.  Under the transition provisions of SFAS No. 142, there was no goodwill
> impairment at October 1, 2001.  ***Updated valuations were completed as of March
> 31, 2002 for our Tyco Telecommunications (formerly TyCom) reporting unit and
> Tyco Capital, which resulted in no impairment of goodwill at that date.***
>
> \*   \*   \*
>
> However, during the quarter ended March 31, 2002, circumstances developed that
> could potentially impair the value of goodwill with respect to our Tyco
> Telecommunications reporting unit and Tyco Capital.  Updated valuations were
> completed as of March 31, 2002, ***which resulted in no impairment of goodwill at
> that date.***  [Emphasis added.]

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A.1.

**Tyco=s Reserves**

649.    The 5/15/02 10-Q also gives materially false and misleading information regarding

Tyco=s reserves.  For example:

> at the beginning of fiscal 2002, purchase accounting reserves were $732.1 million as a
> result of purchase accounting transactions in prior years. In connection with fiscal 2002
> acquisitions, we established purchase accounting reserves of $182.2 million for
> transaction and integration costs. In addition, purchase accounting liabilities of $355.7
> million and a corresponding increase to goodwill and deferred tax assets were recorded
> during the six months ended March 31, 2002 relating to fiscal 2001 acquisitions. These
> reserves related primarily to revisions associated with finalizing the exit plans of LPS,
> Tyco Capital and SecurityLink, all acquired during fiscal 2001. During the six months
> ended March 31, 2002, we paid out $318.4 million in cash for purchase accounting
> liabilities, plus $58.0 million relating to earn-out liabilities, and incurred $26.3 million in
> non-cash charges and reclassifications (including $2.3 million relating to earn-out
> liabilities) against the reserves established during and prior to this six-month period. In
> addition, during the six months ended March 31, 2002, we assumed pre-existing put
> option rights of $105.9 million, of which $22.2 million has been paid in cash. Certain
> acquisitions have provisions which require Tyco to make additional Aearn-out@ payments
> to the sellers if the acquired company achieves certain milestones subsequent to its
> acquisition by Tyco. Also, in the six months ended March 31, 2002, we determined that
> $47.3 million of purchase accounting reserves related to acquisitions prior to fiscal 2002
> were not needed and reversed that amount against goodwill. At March 31, 2002, there
> remained $880.3 million in purchase accounting reserves on Tyco Industrial=s
> Consolidated Balance Sheet, of which $600.3 million is included in accrued expenses
> and other current liabilities and $280.0 million is included in other long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A.1.

650.    A May 15, 2002 Associated Press Newswire story profiled defendant Kozlowski.  The

story quoted Kozlowski from an interview given to Dow Jones after the April 25, 2002 announcement

regarding the potential CIT IPO as follows: **AI=m very well qualified to lead the Company out of its**

**present state**,@ and have @absolutely no intention at all@ of resigning (emphasis added). As defendant

Kozlowski either knew or was reckless in not knowing, the bolded statement when made was materially

false and misleading and omitted material information for the reasons set forth above in Section(s) A and

B.

**5/16/02 Conference Call**

651.    During a conference call on May 16, 2002, defendant Swartz continued to reassure

investors and analysts that Tyco was @comfortable with the guidance that we gave for the quarter and for

the year,@ and that @there is no real liquidity issue going on here at Tyco.@ As defendant Swartz either

knew or was reckless in not knowing, these statements when made were materially false and misleading

and omitted material information for the reasons set forth above in Section(s)  A.1.  Tyco=s 10-Q/A (filed

on December 31, 2002) later revealed that ***during the quarter ended June 30, 2002, Tyco=s***

***reported pre-tax*** income ***of $150.6 million was restated to a*** loss ***of $236.1 million*** because of an

improper failure to timely record an impairment in the value of goodwill at Tyco Telecommunications and

Tyco Infrastructure Services.  As a result, ***Tyco=s reported pre-tax earnings during that quarter***

***were overstated by approximately $387 million.***

652.    On May 16, 2002, AP, Dow Jones, and Reuters reported that Swartz reiterated that the

Company planned to pay off about $10 billion of its $27 billion in debt after spinning-off CIT, and that

the Company was on course to do so by the end of June.  According to Swartz, the Company was @not

worried@ about a potential debt downgrade to junk status given the Company=s cash and cash-flow

levels as well as the benefit from the expected sale or initial public offering of CIT.  Swartz further stated

that the Company=s @financial position as we sit right now is stronger than it was a year ago today.@  As a

result of the positive statements, the Company=s stock rose $1.14, or 5.87 percent, to close at $20.56.

As defendant Swartz either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A.1.

653.    On May 17, 2002, numerous media outlets reported on the Company=s positive

statements from May 16, particularly focusing on the expected sale or IPO of CIT by the end of June

2002.  For example, THE WALL STREET JOURNAL reported:

> [Tyco=s] chief financial officer said the company is confident it can complete a sale or
> initial public offering of its CIT Group finance unit by the end of June.
>
> **Mark Swartz also told an investor conference call that the company plans to pay
> off at least $10 billion of the $27 billion in debt being shouldered by its industrial
> arm, using the proceeds from the CIT deal, along with cash on hand from
> operations.**  [Emphasis added].
>
> An IPO or sale of CIT is considered critical to investor confidence in Tyco, which has
> lost credibility this year amid abrupt changes in strategic direction and questions about its
> liquidity and heavy debt load.  To raise cash, the company has been trying to unload
> CIT, which it bought last June for $9.5 billion, but which is probably worth much less
> now.  Mr. Swartz said the company continues to pursue both an IPO of the unit and an
> outright sale.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in

Section(s) A.1.

654.    On May 31, 2002, UBS Warburg, reporting materially false and misleading information

received from the Tyco Defendants, issued an analyst report entitled, ATyco Int=l: SIA Reports

Semiconductor Shipments Down 8% in April.@  The report stated:

287

Over the last few months, earnings estimates for Tyco have dropped from just under $3.70 per share (the center of management=s range) to $2.58 per share.

* * *

We maintain our fiscal 2002 earnings estimate of $2.60 per share and our fiscal 2003 earnings estimate of $2.95 per share.

* * *

We believe Tyco=s accounting policies are consistent with industry standards: Our analytical conclusion remains that Tyco=s accounting and disclosures are in accordance with GAAP and in accordance with industry practice.  Our investment conclusion remains that Tyco=s stock should appreciate over time as investors regain comfort with its accounting policies.

655.    The Tyco Defendants announced on June 1, 2002 that defendant Kozlowski was the target of a criminal investigation being undertaken by the District Attorney of the County of New York into possible violations of state sales tax laws.

656.    According to the Company=s December Report, the Board was then informed on June 1 and June 2, 2002:  (1) that defendants Kozlowski and Belnick had been aware of the investigation since on or about May 3, 2002; (2) that the Company itself had received a subpoena in connection with the investigation; (3) that defendant Belnick had retained counsel to represent the Company in the investigation; (4) that the Company=s counsel had met with prosecutors and had furnished prosecutors with data and documents; and (5) that it was now expected that defendant Kozlowski would be indicted.

657.    According to the December Report, on June 2, 2002, Tyco requested that the Boies firm represent it in connection with negotiating the terms of defendant Kozlowski=s resignation.  Those negotiations led to defendant Kozlowski resigning from the Tyco Board and from his position as the Company=s Chief Executive Officer on June 3, 2002.

288

658.    In light of this the market also immediately began to question all aspects of the

Company=s performance.  For example:

    a.      *Reuters Business Report* (June 3, 2002):

AThis is one more piece of uncertainty and the share price is telling you
what shareholders think,@ said John Maack, director of equities at money
manager Crabbe Huson Group. AWhat we needed here were signs of
stability and that things were going to be OK, not this@;

    b.      *TheStreet.com* (June 3, 2002):

AThe market is taking this as an indication that if [Kozlowski] were
somewhat devious as a person, then they're extending that to the
company,@ said Brett Gallagher, head of U.S. equities at Julius Baer
Investment Management;

    c.      *Wall Street Journal Online News Roundup* (June 4, 2002):

Mr. Kozlowski resigned Monday amid an investigation into possible
sales-tax evasion involving millions of dollars in artwork. Although the
investigation appeared to focus on how he managed his vast personal
fortune, much of it from sales of company stock, analysts said it raised
serious concerns about his oversight of Tyco and its finances.

Investors already worried about the company's future sold Tyco stock
with a vengeance, sending its shares down nearly 27% Monday in
extremely heavy trading. Tyco stock has fallen 73% since Jan. 1; and

    d.      *Forbes.com* (June 4, 2002):

Tyco=s diminishing credibility took another big hit on the news as did its
stockBwhich fell 27% to $16.05 on Monday.  Why?  Similarities
between Kozlowski=s personal dealings and Tyco=s corporate strategy
keep coming to light.

659.    On June 4, 2002, Kozlowski was indicted by the District Attorney of the County of

New York for conspiring with executives and employees of art galleries and art consultants in New York

and London to avoid paying more than $1 million in New York State and City sales taxes on millions of

dollars in artwork purchased by Kozlowski and his wife (Kozlowski Indictment).  The Kozlowski

Indictment alleges that from August 11, 2001 through June 3, 2002, Kozlowski and his co-conspirators

avoided having either the customer pay or the vendor collect the sales taxes due on the sale of at least six

expensive paintings valued at $13,175,000.  According to an article in the NEW YORK POST, dated July

12, 2002, the paintings were paid for with Tyco funds and then repaid without interest.  Kozlowski and

his co-conspirators generated false documents, such as invoices and shipping documents, to make it

appear that the art work was to be shipped out of New York and therefore not covered by New York

State sales tax provisions.

660.    An article in the June 4, 2002 edition of THE NEW YORK TIMES, entitled ATyco Chief

Out As Tax Inquiry Picks Up Speed,@ reported:

> Two weeks ago, with the investigation of his art purchases accelerating, Mr. Kozlowski
> offered a more modest speech to the graduates of St. Anselms College in Manchester,
> N.H.
>
> AAs you go forward in life, you will become leaders of families, communities, and even
> companies,@ Mr. Kozlowski said in the text of his May 18 commencement address.
> AYou will be confronted with questions every day that test your morals. The questions
> will get tougher and the consequences will become more severe. Think carefully, and for
> your sake, do the right thing, not the easy thing.@

661.    Upon the news of Kozlowskis indictment and forced resignation, the price of Tyco

shares dropped $5.90, or 27%, to $16.05 from the previous closing price of $21.95 on May 31, 2002.

662.    As reported by Reuters Business Report on June 6, 2002:

> AThe Company has a duty to disclose to its shareholders these types of loan
> arrangements, and if there was some misrepresentation regarding the nature of the loan,

that could rise to a criminal violation of the securities laws,@ said Robert Mintz, a former federal prosecutor who is a partner with McCarter & English.

663.    On June 7, 2002, Tyco announced that it may delay the public offering of CIT and that two major agencies, Moody=s Investors Services (AMoody=s@) and Standard & Poor=s (AS&P@), had cut their ratings on Tyco=s debt to one notch above junk status.  Thus, Moody=s cut Tyco=s long-term credit rating to Baa3 from Baa2 and lowered its short-term rating to Prime 3 from Prime 2.  Moody=s warned that AAbsent significant near-term debt reduction with proceeds from a successful sale of CIT, Tyco=s ratings would likely fall into speculative grade.@  Moody=s further warned that it may cut the Company=s debt to junk status if a sale is not completed A in the very near future, as early as the end of June.@  Moody=s also stated that it Abelieves that potential proceeds from the (IPO) will fall short of expectations and Tyco will face a significant debt burden with sizable maturities over the next 18 months.@

664.    On the same day, S&P cut Tyco=s long-term rating to BBB- and left its short term rating unchanged at A2.  S&P said Tyco faced an erosion in management credibility and investor confidence, and was Aconcerned about the Company=s ability to access capital markets or bank financing.@  S&P changed its CreditWatch implication to Anegative.@  S&P stated that its ratings could be lowered further in the coming days or weeks if there were further developments in the criminal investigation or if the CIT IPO was not launched within the next two weeks; did not close within a month of the launch; or if proceeds from the offering were insufficient to improve Tyco=s liquidity.

665.    Tyco also confirmed on June 7, 2002 that it was launching its own Acomprehensive

internal investigation,@ with the assistance of the Boies firm, into Kozlowski=s and other executives= use of

company funds.

666.    That same day, there were also numerous reports that the Manhattan District Attorney=s

Office and the SEC had broadened their investigations beyond Kozlowski to determine if executives

used the Company=s cash to buy any art and homes.

667.    Tyco=s shares plunged $4.50 per share on June 7, to close at $10.10 (a six-year low) on

volume of 199.8 million shares.  According to Reuters Business Report, on that date, A[t]he downgrades.

. . , which are likely to make borrowing more expensive, could reduce [Tyco=s] cash flow by $635

million in its third and fourth quarter, [Tyco] Chief Financial Officer Mark Swartz said.  Reuters further

reported:

> AIf the CEO would take those kinds of risks in his personal life, then you could make the
> assumption that he was acting that way at the company,@ Plaza said.

> AKozlowski was so hands-on and so aggressive throughout all parts of the company that
> it has to touch other management.  You could assume that type of behavior was either
> allowed or encouraged.@

668.    On June 7, 2002, J.P. Morgan Securities cut its rating on Tyco to Amarket perform@

from Abuy,@ citing corporate governance issues and the Company=s potential legal problems.

669.    During a conference call held that same day, the last day of the Class Period, defendant

Swartz tried to downplay the crisis at Tyco as Aa credibility and a perception issue.@  Similarly, John

Fort, who was chosen by the Board to assume control of the Company, tried to reassure analysts and

investors, falsely, that all was fundamentally well at Tyco.  According to Fort:

FORT:   **We are . . . we expect nothing related to Dennis to be material to our financials, and I think that=s worth repeating.  They=re just not material.  They=re not going to affect either our historic or expected financials.**

\* \* \*

**. . . we do not have a liquidity issue at this point even in spite of recent developments.**

\* \* \*

**Now just look at this company and just take a look at it.  I mean our accounting is sound**, even though we have tough economic times, **our earnings and cash flows are strong and real.**  We=re built on real hard assets factories and products and customers.  **We=re committed to solid organic growth going forward.**  We have competent excellent employees and **we have our liquidity issues under control** and with all that, **I think it=s very difficult to forecast that we=re not going to be successful going forward.**  [Emphasis added.]

## POST-CLASS PERIOD EVENTS

670.    On June 10, 2002, Tyco announced that it had fired defendant Belnick because it had lost confidence in Belnick=s willingness and ability to conduct a fair investigation of company executives, including Belnick himself.

671.    Additionally, on June 10, 2002, Fitch Investors Services cut Tyco=s corporate credit rating to junk status, BB, from BBB and its commercial paper rating to B from F2, and downgraded its ratings on CIT=s senior debt to BBB from A, citing concerns about the chaos surrounding Tyco.  Among other reasons cited by Fitch was Ashort comings in corporate governance.@  Fitch warned that it may cut the long-term rating again.  AIt may be more difficult@ to unload CIT amid an Aerosion in investor confidence@ S&P analyst Werneth said in a conference call.  AThe longer [CIT] is out there, the worse it is for [Tyco]@ said S&P managing director Kelly.

672.   On June 12, 2002, Tyco announced that it had restated previously issued financial statements for the second quarter of fiscal 2002 to report a $4.5 billion estimated goodwill impairment related to CIT Group Inc., then a wholly-owned subsidiary of Tyco.  The Company filed amendments to both its and CIT=s Forms 10-Q for the quarter ended March 31, 2002.  An amendment to the Registration Statement on Form S-1 relating to the proposed IPO of CIT Group Inc. was also filed to reflect this change.  Tyco later re-sold CIT in a public offering that generated billions of dollars less than Tyco had paid for CIT only eighteen months earlier.

673.   Similarly, on June 12, 2002, the NEW YORK DAILY NEWS reported that the SEC was again looking into Tyco=s accounting for acquisitions:

> . . . The original inquiry got its start in 1999 after a Dallas investment manager began warning clients that cash flow from Tyco acquisitions appeared inflated.  One theory was that Tyco was aggressively undervaluing the assets of acquisition targets before the new companies joined Tyco=s balance sheet.  The practice, detractors said, allowed Tyco to build a pool of assets from which it could then unlock value at a later point.
>
> Though the SEC gave Tyco a clean bill of health two years ago, **at least one New York businessman with close ties to Simplex Time Recorder, a December 2000 Tyco acquisition, told the Daily News he witnessed such dealings first-hand.**
>
> **AI think it=s fair and accurate to say they made [Simplex] writedowns on the value of their receivables to a level that, if it didn=t break the law, certainly bordered on breaking the law,@ the businessman said.**

[Emphasis added].

674.   On June 14, 2002, Dow Jones Business News discussed the impact of the recent Tyco debt downgrades:

> The rating downgrades trigger the termination of a program under which Tyco securitizes its accounts receivables. Tyco will have to come up with $530 million to buy back those

receivables. But on the call, Mr. Swartz said the banks holding the securitizations are still buying receivables from the company, based on the fundamentals of the business.

The official said management doesn=t know yet if it has to repay $225 million under a yen-denominated facility due to the credit rating downgrades.

Mr. Swartz also said Tyco isn=t in danger of going above the 52.5% debt-to- capital ratio governing its bank debt covenant. AWe=re not facing any issues related to debt covenants,@ he said.

On the call, Mr. Swartz outlined Tyco=s debt obligations and suggested management should encounter little problem meeting its obligations.

Tyco should have $10 billion in the next six months to pay down debt, said the CFO. He cited, among other things, the expected proceeds from CIT monetization and cash flow generation. The $10 billion paydown would cut Tyco=s debt to $17 billion from $27 billion, according to the official.

Tyco is counting on the $5 billion to $5.8 billion from the CIT IPO proceeds to pay down a good chunk of its debt, though some company observers think that projection is aggressive.

Mr. Swartz added that management is Acomfortable@ with the performance of CIT, which should get an upgrade from credit rating agencies once it=s separated from Tyco.

Mr. Fort said getting SEC approval of CIT IPO prospectus has had a Asubstantial@ impact on the company. ACIT is a very important step,@ he said.@  The roadshow is under way.@

675.    On June 17, 2002, Tyco filed a complaint in the United States District Court, Southern District of New York, alleging that defendant Kozlowski approved a $20 million Afee@ to Walsh, who served as a member of Tyco=s Board of Directors from 1997 though February 2002.  This fee was to compensate Walsh in connection with Tyco=s acquisition of CIT.

676.    On June 17, 2002, Tyco filed a lawsuit against Belnick in federal court in New York.  In the Complaint, Tyco charged that Belnick had improperly used Tyco funds to buy a $2.75 million

apartment in New York City and a $10 million resort property in Utah; concealed an additional $35

million of his compensation and unpaid loans from September 1998 to March 2002 which were not

approved by the Company=s board of directors and which were never disclosed to shareholders in

violation of SEC Regulation S-K, Item 402; failed to disclose the criminal investigation of Kozlowski;

failed to cooperate with the Company=s own internal investigation; and attempted to destroy documents.

 Tyco=s allegations were primarily based on an internal investigation it had conducted.

677.    In its Complaint, Tyco admitted that numerous payments and benefits paid to Belnick

were never disclosed to the public.  These included: the $15 million in interest free loans to buy homes in

New York and Utah; the grant of 100,000 shares of restricted stock with a market value of over $5

million in April 2000; an additional $2 million cash bonus in July 2000; and a subsequent grant of

200,000 shares of restricted stock with a total market value of over $10 million.  In addition, in a

retention agreement Belnick signed when he joined Tyco, he and Kozlowski agreed that Tyco would pay

Belnick $20 million by October 1, 2002 if he were to stay with the Company.  This agreement was not

disclosed to the public or the Board.

678.    On June 17, 2002, Tyco filed a lawsuit against Walsh in federal court in New York,

seeking restitution and damages resulting from Walsh=s breach of fiduciary duty and violation of the

Company=s By Laws relating to Walsh=s taking of the $20 million fee without the requisite Board

approval and without making a full disclosure of his interest in a transaction being contemplated by the

Company.

679.    In addition to being sued by the Company, Walsh was criminally charged by the New

York County District Attorney for intentionally concealing information from Tyco=s directors and

296

shareholders about the $20 million finder=s fee Awhile engaged in inducing and promoting the issuance, distribution, exchange, sale, negotiation and purchase@ of Tyco securities.

680.    On July 1, 2002, Tyco priced the CIT shares at $23, well below the $25-$29 share estimated range announced on June 12, 2002. Thus, the CIT IPO grossed proceeds of $4.6 billion, well below the reduced $5.0-$5.8 billion estimated range that was announced on June 12, 2002. Given the announcement of the diminished proceeds Tyco would receive from the CIT IPO, Tyco=s shares declined by 6.2% on July 1, 2002.

681.    During a conference call on July 2, 2002, Tyco stated that it was satisfied with the CIT IPO, and that it expected to beat Wall Street forecasts for the fiscal third-Quarter and year end September 30, 2002. Tyco did not announce any extraordinary events or charges. Yet the very next day, after having deluded investors into thinking that Tyco was on the road to recovery, THE WALL STREET JOURNAL reported that Tyco planned to take a $2.4 billion charge for the third quarter to Areflect the diminished value of its former CIT Group finance unit.@

682.    On July 2, 2002, The Committee on Energy and Commerce of the United States Congress sent a letter to the SEC concerning accounting at five companies, including Tyco. The Committee made a specific request for Aall records@ in the SEC=s 1999-2000 investigation of Tyco=s accounting, which was, at that time, found not to be improper by the SEC.

683.    On September 10, 2002, Belnick was indicted by a New York County Supreme Court Grand Jury for failing to disclose two relocation loans that Belnick obtained from Tyco in six Director and Officer Questionnaires he completed between November 1998 and January 2002. According to an Omnibus Pretrial Motion (the APretrial Motion@) filed by Belnick in the case, Belnick Aregularly

completed disclosure forms for PricewaterhouseCoopers confirming the balance of his outstanding New York (and subsequently Utah) relocation loans (and on two occasions advised the auditors that he actually owed more on the relocation loans than they calculated).@ Belnick specifically alleged that on October 17, 2001, he Aconfirmed the Utah (and reconfirmed the New York) relocation loans@ to PwC. Still, those loans were not publicly disclosed and Belnick knew they were not publicly disclosed.

684.    On September 12, 2002, the New York County District Attorney charged Kozlowski and Swartz with AEnterprise Corruption,@ grand larceny, conspiracy and falsifying business records relating to the theft of more than $170 million from Tyco and fraudulent sales of more than $430 million of Tyco securities.  The indictment alleges that from January 1, 1995 through September 9, 2002, Kozlowski and Swartz created and operated a criminal enterprise for the purpose of stealing money from Tyco and defrauding investors by falsifying records, concealing material information and providing false information to Tyco shareholders.

685.    The Enterprise Corruption Indictment noted that Kozlowski and Swartz did not act alone and described their roles in the criminal enterprise:

> Defendant Kozlowski was the boss of the criminal enterprise, and set its policies.  He decided what bonuses would be paid, to whom, and when, without regard for the restrictions that the Board had put on executive officers= compensation.  He entered into private deals with executive officers and directors of Tyco, which he sought to keep secret even when they were required to be disclosed.  He caused Internal Audit to report to the Board through himself, and ensured that they would not audit TME [Management, Inc., a Tyco subsidiary].  Working with personnel from Investor Relations, defendant Kozlowski met with and defrauded investors, analysts and journalists to manipulate Tyco=s stock price.  He used the personnel in Executive Treasury to pay his bills from the Tyco Aconcentration account.@  He established a system of internal controls in which his assistant=s authorization was sufficient to warrant expenditures of many millions of dollars.

Defendant Swartz was chief of operations of [the criminal enterprise]; he was the second-in-command to defendant Kozlowski. Defendant Swartz exercised control over the transfer of funds, the booking of accounting entries, and the operations of those portions of Tyco=s Human Resources department dealing with certain compensation, bonuses, and loans. Defendant Swartz established a system by which the Finance Department, and not the Tyco Legal Department, controlled the data going into Tyco=s filings with the [SEC] and caused Tyco=s filings to be false and deceptive. Defendant Swartz deceived investors and the Board by misallocating substantial personnel costs resulting in falsely enhanced operating performance.

686. According to the Enterprise Corruption Indictment, Kozlowski and Swartz exercised control over Tyco=s flow of information and funds by: (1) granting themselves excess compensation in the form of improper bonuses; (2) forgiving the payment of personal expenses and unapproved loans; and (3) concealing these payments from the Company=s shareholders. Then, the indictment alleges that A[a]s part of a scheme constituting a systematic on-going course of conduct the defendants and others . . . falsely represented and materially omitted to represent accurately and in a timely fashion:

(1)     The compensation paid to executive officers.
(2)     The loans extended to executive officers.
(3)     The extent of stock sales by corporate insiders.
(4)     The earnings per share of Tyco stock before non-recurring charges.
(5)     The level of spending by the executive officers in managing the money and property of Tyco=s owners and investors.
(6)     Related party transactions.@

687. The Enterprise Corruption Indictment charges that Kozlowski and Swartz concealed from Tyco=s shareholders that: (1) tens of millions of dollars worth of payments and forgiven loans were made to Tyco executives; (2) tens of millions of dollars worth of credit lines and loans were given to Tyco executives; (3) Kozlowski and Swartz sold substantial amounts of Tyco stock to Tyco; (4) Tyco=s reported earnings were artificially inflated; (5) Tyco executives used corporate resources to fund

personal ventures and property acquisitions; (6) Tyco purchased properties from members of Tyco=s Board; and (7) Tyco gifted residences, money and other property to employees.

688.    Also according to the Enterprise Corruption Indictment, while Kozlowski was giving speeches to Tyco=s investors about his confidence in the Company, he misrepresented the number of Tyco stock sales he made, which had exceeded 5.5 million shares.  During the time period covered by the indictment, Kozlowski received proceeds of more than $280 million in insider sales and Swartz received proceeds of more than $125 million in insider sales.

689.    The same day Kozlowski was indicted for the second time, Tyco filed a lawsuit against Kozlowski in federal court in New York seeking the return of his income and benefits since 1997 and the forfeiture of all his severance pay.

690.    Among the perks enjoyed by Kozlowski at Tyco=s expense was the rent of a Fifth Avenue apartment from 1997 to 2001 at an annual rate of $264,000; the purchase of a $7 million Park Avenue apartment, purchased below market value in 2000 with interest free loans; the sale of his New Hampshire home to Tyco at higher than market value; the purchase of an apartment on Fifth Avenue in 2001 for $16.8 million and another $3 million in improvements and $11 million in furnishings; and the gross-up of benefits to insulate Kozlowski from tax liability.

691.    Kozlowski also abused Tyco=s KELP, borrowing more than $274.2 million to pay for artwork, real estate maintenance fees, construction and remodeling costs for his homes, a yacht, investment property, antiques and furniture.  Tyco=s Complaint against Kozlowski also disclosed several charitable contributions made by Tyco at Kozlowski=s direction.

692.     On September 12, 2002, the SEC filed an action against Kozlowski, Swartz and Belnick for fraud, making false and misleading proxy statements, fraudulent stock sales, reporting violations, and record-keeping violations.

693.     On December 6, 2002, Tyco filed an action pursuant to 15 U.S.C. ' 78p(b) against Kozlowski and Swartz to recover over $40 million in short-swing trading profits they made on the sale of Tyco stock between August 1, 2000 and April 26, 2002.

694.     On December 17, 2002, the SEC filed a settled civil action in federal court for the Southern District of New York, alleging that Walsh violated the federal securities laws by signing a Tyco registration statement that failed to disclose his $20 million finder=s fee.

695.     Walsh=s case was the first of the four criminal cases brought by the New York County District Attorney over the last few months involving Tyco executives to be resolved.  On December 17, 2002, Walsh entered a guilty plea, agreed to pay $20 million in restitution to Tyco (which was paid on that date) and a $2.5 million fine, and resigned from the three for-profit Boards on which he sat. Separately, Walsh entered into a consent agreement with the SEC which bars him from serving on a public for-profit Board.

## ADDITIONAL SCIENTER ALLEGATIONS

**Insider Selling During the Class Period**

696.     While the Tyco Defendants were issuing materially false favorable statements about the Company=s financial condition and business prospects, and concealing or obscuring negative information, the Individual Defendants, who had access to confidential information and were aware of the truth about the Company and its financial condition, were benefitting from the illegal course of business or course of

conduct described in this complaint by selling large blocks of the Company=s stock at artificially inflated prices without disclosing the material adverse facts about the Company to which they were privy.  Such sales were unusual in their amount and in their timing.  The numerous and repeated insider sales of Tyco common stock by the Individual Defendants imposed upon them an additional duty of full disclosure of all of the material facts alleged in this complaint.

697.   The following table shows the heavy insider selling (*totaling more than $836 million*) by the Individual Defendants during the Class Period:

| INDIVIDUAL DEFENDANTS' CLASS PERIOD INSIDER SALES | | | | | |
|---|---|---|---|---|---|
| Name | Position | Date | Shares | Price | $ Value |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 01/05/00 | 744,000.00 | 35.35 | 26,300,400.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 934,417.00 | 58.28 | 54,457,822.76 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 934,417.00 | 58.28 | 54,457,822.76 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 451,191.00 | 58.28 | 26,295,411.48 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 451,191.00 | 58.28 | 26,295,411.48 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 30,626.00 | 58.28 | 1,784,883.28 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 30,626.00 | 58.28 | 1,784,883.28 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 1,007,401.00 | 56.83 | 57,250,598.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 1,007,401.00 | 56.83 | 57,250,598.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 240,501.00 | 56.83 | 13,667,671.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 240,501.00 | 56.83 | 13,667,671.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 7,700.00 | 56.83 | 437,591.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 7,700.00 | 56.83 | 437,591.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 219,107.00 | 55.25 | 12,105,661.75 |

| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 219,107.00 | 55.25 | 12,105,661.75 |
|---|---|---|---|---|---|
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 52,308.00 | 55.25 | 2,890,017.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 52,308.00 | 55.25 | 2,890,017.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 1,674.00 | 55.25 | 92,488.50 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 1,674.00 | 55.25 | 92,488.50 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/14/00 | 86,233.00 | 58.3 | 5,027,383.90 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/14/00 | 86,233.00 | 58.3 | 5,027,383.90 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 10/24/00 | 600,000.00 | 54.31 | 32,587,500.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 10/31/00 | 148,000.00 | 56.69 | 8,389,750.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 01/30/01 | 350,000.00 | 62.8 | 21,980,000.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 06/20/01 | 107,935.00 | 52.96 | 5,716,237.60 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 07/03/01 | 155,000.00 | 54.98 | 8,521,900.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 08/01/01 | 117,696.00 | 53.15 | 6,255,542.40 |
| **TOTAL** | | | **8,284,947.00** | | **$ 457,770,390.66** |
| | | | | | |
| MARK H. SWARTZ | CFO,O,EVP | 01/05/00 | 372,000.00 | 35.35 | 13,150,200.00 |
| MARK H. SWARTZ | CFO,O,EVP | 09/07/00 | 368,197.00 | 58.28 | 21,458,521.16 |
| MARK H. SWARTZ | CFO,O,EVP | 09/07/00 | 368,197.00 | 58.28 | 21,458,521.16 |
| MARK H. SWARTZ | CFO,O,EVP | 09/11/00 | 944,398.00 | 56.83 | 53,670,138.34 |
| MARK H. SWARTZ | CFO,O,EVP | 09/11/00 | 944,398.00 | 56.83 | 53,670,138.34 |
| MARK H. SWARTZ | CFO,O,EVP | 09/12/00 | 205,404.00 | 55.25 | 11,348,571.00 |
| MARK H. SWARTZ | CFO,O,EVP | 09/12/00 | 205,404.00 | 55.25 | 11,348,571.00 |
| MARK H. SWARTZ | CFO,OD,EVP | 10/24/00 | 300,000.00 | 54.31 | 16,293,750.00 |
| MARK H. SWARTZ | CFO,OD,EVP | 10/31/00 | 74,000.00 | 56.69 | 4,194,875.00 |

303

| | | | | | |
|---|---|---|---|---|---|
| MARK H. SWARTZ | CFO,OD,EVP | 01/30/01 | 175,000.00 | 62.8 | 10,990,000.00 |
| MARK H. SWARTZ | CFO,O,EVP | 02/01/01 | 107,958.00 | 60.96 | 6,581,119.68 |
| MARK H. SWARTZ | CFO,OD,EVP | 06/20/01 | 53,967.00 | 53.03 | 2,861,870.01 |
| MARK H. SWARTZ | CFO,OD,EVP | 07/03/01 | 77,500.00 | 54.98 | 4,260,950.00 |
| **TOTAL** | | | **4,196,423.00** | | **$ 231,287,225.69** |
| | | | | | |
| MARK A. BELNICK | O,EVP | 10/25/00 | 116,717.00 | 54.35 | 6,343,568.95 |
| MARK A. BELNICK | O,EVP | 07/19/01 | 200,000.00 | 53.85 | 10,770,000.00 |
| MARK A. BELNICK | GC,O,EVP | 12/04/01 | 116,666.00 | 58 | 6,766,628.00 |
| MARK A. BELNICK | GC,O,EVP | 12/04/01 | 116,666.00 | 58.13 | 6,781,794.58 |
| **TOTAL** | | | **550,049.00** | | **$   30,661,991.53** |
| | | | | | |
| FRANK E. WALSH | D | 11/30/00 | 15,147.00 | 52.89 | 801,124.83 |
| FRANK E. WALSH | D | 11/30/00 | 15,147.00 | 52.96 | 802,185.12 |
| FRANK E. WALSH | D | 12/18/01 | 9,032.00 | 56.09 | 506,604.88 |
| FRANK E. WALSH | D | 12/18/01 | 6,691.00 | 56.09 | 375,298.19 |
| FRANK E. WALSH | D | 12/18/01 | 4,073.00 | 56.09 | 228,454.57 |
| **TOTAL** | | | **50,090.00** | | **$     2,713,667.59** |
| | | | | | |
| MICHAEL A. ASHCROFT | D | 08/01/00 | 175,000.00 | 54.38 | 9,516,500.00 |
| MICHAEL A. ASHCROFT | D | 08/02/00 | 75,000.00 | 54.38 | 4,078,500.00 |
| MICHAEL A. ASHCROFT | D | 08/03/00 | 50,000.00 | 53.38 | 2,669,000.00 |
| MICHAEL A. ASHCROFT | D | 08/04/00 | 25,000.00 | 53.45 | 1,336,250.00 |
| MICHAEL A. ASHCROFT | D | 08/07/00 | 275,000.00 | 53.96 | 14,839,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| MICHAEL A. ASHCROFT | D | 08/08/00 | 25,000.00 | 54.5 | 1,362,500.00 |
| MICHAEL A. ASHCROFT | D | 08/09/00 | 78,500.00 | 53.89 | 4,230,365.00 |
| MICHAEL A. ASHCROFT | D | 08/10/00 | 100,000.00 | 53.81 | 5,381,000.00 |
| MICHAEL A. ASHCROFT | D | 08/11/00 | 196,500.00 | 54.43 | 10,695,495.00 |
| MICHAEL A. ASHCROFT | D | 02/06/01 | 228,300.00 | 61.3 | 13,994,790.00 |
| MICHAEL A. ASHCROFT | D | 02/09/01 | 271,700.00 | 60 | 16,302,000.00 |
| MICHAEL A. ASHCROFT | D | 12/05/01 | 247,400.00 | 59.98 | 14,839,052.00 |
| MICHAEL A. ASHCROFT | D | 12/07/01 | 252,600.00 | 58.15 | 14,688,690.00 |
| **TOTAL** | | | **2,000,000.00** | | **$ 113,933,142.00** |
| **Total Insider Selling by Individual Defendants** | | | **15,081,509.00** | | **$ 836,366,417.47** |

698.    Other insiders in the Company similarly sold their Tyco stock at artificially inflated prices, without disclosing the truth to other investors.

| CLASS PERIOD SELLING BY OTHER TYCO INSIDERS | | | | | |
|---|---|---|---|---|---|
| **Name** | **Position** | **Date** | **Shares** | **Price** | **$ Value** |
| JERRY R. BOGGESS | P,O | 7/24/00 | 100,000.00 | 56.31 | 5,631,250.00 |
| JERRY R. BOGGESS | O,OX | 10/24/00 | 6,218.50 | 54.31 | 337,742.28 |
| JERRY R. BOGGESS | O,OX | 10/26/01 | 41,796.00 | 50.5 | 2,110,698.00 |
| **TOTAL** | | | **148,014.50** | | **$    2,110,698.00** |
| | | | | | |
| JOHN F. FORT | D | 7/25/00 | 10,000.00 | 55 | 550,000.00 |
| JOHN F. FORT | D | 7/26/00 | 7,500.00 | 55.25 | 414,375.00 |

| JOHN F. FORT | D | 7/26/00 | 2,500.00 | 55 | 137,500.00 |
|---|---|---|---|---|---|
| JOHN F. FORT | D | 7/27/00 | 10,000.00 | 54.56 | 545,600.00 |
| JOHN F. FORT | D | 7/27/00 | 5,000.00 | 54.81 | 274,050.00 |
| JOHN F. FORT | D | 7/28/00 | 5,000.00 | 52.56 | 262,800.00 |
| JOHN F. FORT | D | 7/28/00 | 5,000.00 | 53.31 | 266,550.00 |
| JOHN F. FORT | D | 7/28/00 | 5,000.00 | 53.43 | 267,150.00 |
| JOHN F. FORT | D | 7/28/00 | 5,000.00 | 53.5 | 267,500.00 |
| JOHN F. FORT | D | 7/28/00 | 500 | 52.68 | 26,340.00 |
| JOHN F. FORT | D | 7/31/00 | 10,000.00 | 53.62 | 536,200.00 |
| JOHN F. FORT | D | 8/1/00 | 10,000.00 | 54.5 | 545,000.00 |
| JOHN F. FORT | D | 8/1/00 | 5,000.00 | 54 | 270,000.00 |
| JOHN F. FORT | D | 8/2/00 | 5,000.00 | 54 | 270,000.00 |
| JOHN F. FORT | D | 8/2/00 | 5,000.00 | 54.06 | 270,300.00 |
| JOHN F. FORT | D | 8/3/00 | 5,000.00 | 53.25 | 266,250.00 |
| JOHN F. FORT | D | 10/25/00 | 10,000.00 | 54.06 | 540,600.00 |
| JOHN F. FORT | D | 10/25/00 | 10,000.00 | 54.13 | 541,300.00 |
| **TOTAL** | | | **115,500.00** | | **$    6,251,515.00** |
| | | | | | |
| STEPHEN W. FOSS | D | 12/22/00 | 5,000.00 | 51 | 255,000.00 |
| STEPHEN W. FOSS | D | 9/21/01 | 4,088.00 | 40.78 | 166,708.64 |
| STEPHEN W. FOSS | D | 9/21/01 | 3,288.00 | 40.78 | 134,084.64 |

| STEPHEN W. FOSS | D | 9/21/01 | 2,201.00 | 40.78 | 89,756.78 |
| STEPHEN W. FOSS | D | 9/21/01 | 894 | 40.78 | 36,457.32 |
| **TOTAL** | | | **15,471.00** | | **$     682,007.38** |
| | | | | | |
| ALBERT R. GAMPER | CEO,P,O | 6/4/01 | 44,794.00 | 53.42 | 2,392,895.48 |
| ALBERT R. GAMPER | CEO,P,O | 6/7/01 | 310,815.00 | 55.82 | 17,349,693.30 |
| ALBERT R. GAMPER | CEO,P,O | 6/14/01 | 207,210.00 | 55.33 | 11,464,929.30 |
| ALBERT R. GAMPER | O,OS | 10/26/01 | 8,994.00 | 50.5 | 454,197.00 |
| **TOTAL** | | | **571,813.00** | | **$     31,661,715.08** |
| | | | | | |
| NEIL R. GARVEY | O,OS | 10/24/00 | 26,528.00 | 54.31 | 1,440,802.00 |
| NEIL R. GARVEY | O,OS | 6/18/01 | 75,000.00 | 55.8 | 4,185,000.00 |
| **TOTAL** | | | **101,528.00** | | **$     5,625,802.00** |
| | | | | | |
| PHILIP M. HAMPTON | D | 2/2/00 | 3,276.00 | 40.9 | 133,988.40 |
| PHILIP M. HAMPTON | D | 2/2/00 | 2,193.00 | 40.92 | 89,737.56 |
| PHILIP M. HAMPTON | D | 2/2/00 | 892 | 40.92 | 36,500.64 |
| **TOTAL** | | | **6,361.00** | | **$     260,226.60** |
| | | | | | |
| STEPHEN P. MCDONOUGH | O,OX | 1/29/01 | 8,000.00 | 62.21 | 497,680.00 |
| STEPHEN P. MCDONOUGH | O,OX | 1/30/01 | 10,000.00 | 62.21 | 622,100.00 |
| **TOTAL** | | | **18,000.00** | | **$     1,119,780.00** |

| | | | | | |
|---|---|---|---|---|---|
| RICHARD J. MEELIA | O,OS | 8/7/00 | 125,000.00 | 54.38 | 6,797,500.00 |
| RICHARD J. MEELIA | O,OX | 10/24/00 | 14,607.00 | 54.31 | 793,342.69 |
| RICHARD J. MEELIA | O,OS | 10/26/01 | 96,970.00 | 50.59 | 4,905,712.30 |
| RICHARD J. MEELIA | O,OX | 10/26/01 | 96,970.00 | 50.59 | 4,905,712.30 |
| **TOTAL** | | | **333,547.00** | | **$   17,402,267.29** |
| | | | | | |
| WILLIAM PETER SLUSSER | D | 12/13/01 | 2,467.00 | 54.35 | 134,081.45 |
| WILLIAM PETER SLUSSER | D | 12/13/01 | 2,467.00 | 54.35 | 134,081.45 |
| WILLIAM PETER SLUSSER | D | 12/14/01 | 4,533.00 | 55 | 249,315.00 |
| **TOTAL** | | | **9,467.00** | | **$   517,477.90** |
| | | | | | |
| JOSEPH F. WELCH | D | 2/4/02 | 1,800.00 | 32 | 57,600.00 |
| **TOTAL** | | | **1,800.00** | | **$   57,600.00** |
| | | | | | |
| **Total Insider Selling by Other Tyco Insiders** | | | **1,321,501.50** | | **$   65,689,089.25** |
| | | | | | |
| **GRAND TOTAL** | | | **16,403,010.50** | | **$  902,055,506.72** |

699.    In addition to his open market sales, Kozlowski sold numerous Tyco shares to the

Company.  Due to a loophole that does not require immediate disclosure of sales of stock by company

executives B regardless of their magnitude B when the sale is made to the issuing company, these sales were not reported until the filing of a Form F-5, up to thirteen months after the sales.  Although the proceeds from these sales are not disclosed in the Form F-5, plaintiffs  estimate that the proceeds exceed $65 million.

700.    In addition to his open market sales, Swartz sold numerous Tyco shares directly to the Company.   Due to a loophole that does not require immediate disclosure of sales of stock by company executives B regardless of their magnitude B when the sale is made to the issuing company, these sales were not reported until the filing of a Form F-5, up to thirteen months after the sales.  Although the proceeds from these sales are not disclosed in the Form F-5, plaintiffs estimate that the proceeds exceed $38 million.

701.    According to a February 13, 2002 article in THE NEW YORK TIMES, although defendants Kozlowski and Swartz publicly stated that they rarely if ever sold their Tyco shares, late in fiscal 2000 and during fiscal 2001, and unknown to the investing public, defendants Kozlowski and Swartz secretly sold approximately **$105 million** of Tyco stock directly to the Company.  These sales were not disclosed to investors until November 13, 2001 **B thirteen months after the first of those sales were made**  (the AUndisclosed Insider Sales@).  The Undisclosed Insider Sales are especially suspect because, by making them directly to the Company, Kozlowski and Swartz did not have to disclose them in SEC Form 4 within 10 days after the month of the sales, as would be required with open-market sales.  By selling their shares back to the Company, Kozlowski and Swartz were able to hide such sales from investors for thirteen months.

702.    A February 11, 2002 article in THE NEW YORK TIMES discussed the Undisclosed

Insider Sales:

> Two top executives at Tyco International sold more than $100 million in Tyco shares in
> late 2000 and 2001, but the sales did not become public for as long as a year.  Today,
> Tyco shares are worth about half what they were at the time of the transactions. . . .
>
> [T]hese sellers . . . have taken advantage of an 11-year old loophole in federal securities
> laws that allows executives to wait as long as 13 months to disclose their sales when the
> buyer of the their shares is the company itself.  The loophole is the same one that
> enabled Kenneth L. Lay, the former chief executive of Enron, to sell millions of dollars
> of Enron shares in the months that the stock was plummeting, without filing the usual
> federal disclosure forms for insider sales.
>
> In the wake of Enron=s collapse and new questions about Tyco=s accounting methods,
> corporate governance experts say the rule should be changed so that investors can have
> a clear, prompt picture of executive stock sales.

Defendants Kozlowski and Swartz hid their private sales to the Company from public scrutiny for over

thirteen months while they continued making false and materially misleading statements during the Class

Period, and while secretly pocketing $105 million from the Undisclosed Insider Sales alone.  Indeed,

defendants Kozlowski and Swartz even received new stock options from the Company to replace the

Tyco shares they sold through the Undisclosed Insider Sales.

703.    Furthermore, the Company=s incentive plan (the APlan@) for additional payments to

defendants Kozlowski and Swartz was directly tied to the Company=s reported earnings growth and

free cash flow.  Under the Plan and during the Class Period, in fiscal 2000-2001 alone, Kozlowski and

Swartz received 10,278,007 shares of restricted stock, worth $51,606,420 and $25,803,210,

respectively, and were also each paid a cash bonus of $6.8 million and $3.4 million, respectively, based

upon certain performance criteria.  According to the Company=s Schedule 14A, filed on January 29,

2001 (the A2001 Proxy Statement@), the incentive compensation to defendants Kozlowski and Swartz was based upon, <u>inter alia</u>, (i) an increase in earnings for the Company, and (ii) an improvement in operating cash flow for the Company.  Tyco=s 2001 Proxy Statement also explicitly admitted that defendants Kozlowski=s and Swartz=s incentive compensation Ais in direct correlation to Tyco=s performance and . . . ultimately determined by the future performance of Tyco as reflected by its share price.@  Further, the Company=s Schedule 14A filed on January 28, 2002 stated:

> **[I]n order for Mr. Kozlowski and Mr. Swartz to have earned a cash bonus in fiscal 2001, the Company had to achieve a minimum of 15% growth in net income and at least a 10% growth in operating cash flow over fiscal 2000.**  The performance criterion required to vest the minimum number of restricted shares granted to these executives was a growth rate in earnings per share before non-recurring items of at least 15% over fiscal 2000.

(Emphasis added.)  As such, compensation to Kozlowski and Swartz under Tyco=s incentive plan was inextricably linked to the Tyco Defendants= materially false and misleading statements during the Class Period.  This linkage is highly probative of the Tyco Defendants= motive and opportunity to commit securities fraud.

**Tyco=s $40 Billion In Public Stock Offerings During The Class Period**

704.    The Tyco Defendants= scienter is also established by virtue of their efforts during the Class Period to issue hundreds of millions of shares of common stock to pay, in whole or part, for the Company=s **more than $40 billion** in acquisitions during the fiscal years 1999 through 2002.  These transactions using Tyco=s artificially inflated common stock as currency constitute insider trading on a massive scale.

**CLASS ACTION ALLEGATIONS**

705.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the

Federal Rules of Civil Procedure, on behalf of themselves and all other purchasers or acquirors of Tyco

securities during the Class Period.  Excluded from the Class are Tyco, its subsidiaries and affiliates, the

Individual Defendants, members of the immediate families of each Individual Defendant, PwC, its

subsidiaries and affiliates, any entities in which any of the defendants had a controlling interest, and the

legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any of the

Defendants.

706.     The members of the Class are so numerous that joinder of all Class Members is

impracticable.  On information and belief, there were thousands, if not millions, of purchasers or

acquirors of Tyco securities during the Class Period.  These purchasers were geographically dispersed

in many different states and regions of the United States.  As an illustration, as of the filing of this lawsuit,

there were approximately two billion shares of Tyco common stock outstanding. Throughout the Class

Period, Tyco shares were actively traded on the New York Stock Exchange.  The average daily

volume of trading in Tyco common stock during the Class Period was several million shares.  Therefore,

many millions of shares of Tyco common stock were traded during the Class Period.  Record owners

and other members of the Class may be identified from records maintained by Tyco and/or its transfer

agent(s) and may be notified of the pendency of this action by mail and publication using forms of notice

similar to those customarily used in securities class actions.

707.     Plaintiffs= claims are typical of the claims of the other members of the Class, and

plaintiffs and all members of the Class sustained damages as a result of defendants= wrongful conduct

complained of herein.

708.     Questions of law and fact common to members of the Class predominate over any questions affecting any individual members of the Class.  These common questions of law and fact include whether, *inter alia*:

     a.     Defendants violated the federal securities laws by making material misrepresentation or by omitting to state material facts necessary to render statements contained therein not misleading;

     b.     Defendants acted with knowledge or with reckless disregard for the truth in omitting to state such material facts with regard to plaintiffs= Exchange Act claims;

     c.     The market price of the Company=s securities during the Class Period was artificially inflated due to the non-disclosure and/or misrepresentations complained of herein; and

     d.     The members of the Class have sustained damages and, if so, what is the proper measure thereof.

709.     Plaintiffs will fairly and adequately protect the interests of the other members of the Class.  Plaintiffs have retained counsel competent and experienced in class action securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, the Class they seek to represent.

710.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable.  Furthermore, because the damages suffered by the individual class members may be relatively small in relation to the potential costs of litigation of this complexity, the expense and burden of individual litigation make it impractical for the Class Members individually to redress the wrongs done to them.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

711.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The

statements complained of concerned Tyco=s financial statements and historical and/or current condition

affecting the Company.  Many of the statements pleaded herein were not specifically identified as

Aforward-looking statements@ when made.  To the extent of any forward-looking statements, there were

no meaningful cautionary statements identifying the important then-present factors that could and did

cause actual results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements

pleaded herein, defendants are liable for those false forward-looking statements because at the time

each of those statements was made, the particular speaker knew or recklessly disregarded that the

statement was false or misleading, knew of or recklessly disregarded and failed to disclose adverse

information relating to the statement, and/or the statement was authorized and/or approved by an

executive officer of Tyco who knew or recklessly disregarded that the statement was materially false

and misleading when made.

712.    Any warnings contained in the press releases and the financial statements quoted herein

were generic statements of the kind of risks that affect any company and misleadingly contained no

specific factual disclosure of any of Tyco=s accounting irregularities or the Undisclosed Acquisitions.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

713.    At all relevant times, the market for Tyco=s securities was efficient in that it promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the price.

714.    As an illustration, the common stock of Tyco met the requirements for listing, and was listed and traded on the New York Stock Exchange, a highly developed and efficient market, under the ticker symbol ATYC.@ During the Class Period, Tyco stock was heavily traded, with volume averaging at least several million shares daily.  Tyco filed periodic public reports with the SEC, and was followed by analysts from major brokerages, including Goldman Sachs, Salomon Smith Barney, and T. Rowe Price.  The reports of these analysts were redistributed to their customers and the public at large, and Tyco regularly issued press releases, which were carried by national newswires.  Thus, the analyst reports and Tyco=s press releases entered the public marketplace.  As a result, the market for Tyco securities promptly digested current information with respect to Tyco from all publicly available sources, and reflected such information in Tyco=s stock price.  Plaintiffs and other members of the Class relied on the integrity of the market price of Tyco=s securities.

715.    Based upon the foregoing, plaintiffs and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market for the purpose of class certification as well as for ultimate proof of their claims on the merits.  Plaintiffs will also rely, in part, upon the presumption of reliance established by material omissions and upon the actual reliance of the Class members.

315

## LOSS CAUSATION

716.   Plaintiffs and the Class were damaged as a result of defendants= fraudulent conduct set forth herein.  The price of Tyco=s common stock was at $31.00 on the first day of the Class Period (December 13, 1999).  Thereafter, while defendants repeatedly failed to disclose material information, the price steadily rose and stayed in the $50s for much of the Class Period -- reaching a Class Period high of $59.76 on December 5, 2001.  On January 29, 2002, the day after the Walsh payment was disclosed in the Company=s 2002 Proxy Statement, Tyco=s shares fell from $42 to $33.65, reducing the company=s market capitalization **B** according to Tyco **B** by almost $17 billion in one day.  Subsequently, as the Tyco Defendants fought off attacks on the credibility of the Company's financial statements and the integrity of its management, the price of Tyco common stock slid down to $20 per share. Subsequently, on June 3, 2002 Tyco shares fell $5.90 to close at $16.05 on news that defendant Kozlowski (i) was the target of a criminal investigation being undertaken by the New York District Attorney into possible violations of state sales tax laws, and (ii) was resigning as the CEO of Tyco. Finally, on June 7, 2002, Tyco stock fell to a six-year low, down $4.50 to $10.10 per share, on news that:  (1) the Manhattan DA's office and the SEC broadened their investigations beyond Kozlowski to determine if Tyco executives used the company's cash to buy and art and homes; (2) S&P and Moody's reduced Tyco's debt to lowest investment-grade rating (just above junk bond status), forcing Tyco to repay at least $530 million in debt; (3) the sale of CIT was delayed by the SEC while its fraud investigation continues; and (4) Tyco confirmed that it was launching its own "comprehensive internal investigation" into Kozlowski's and other executives' use of company funds.  The stock continued to trade at low levels during the 90 days after the end of the Class Period.

**COUNT I**

**VIOLATION OF SECTION 10(b) OF THE 1934 ACT
AND RULE 10b-5 PROMULGATED THEREUNDER
BY ALL OF THE DEFENDANTS**

717.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

718.     This Count is brought by plaintiffs on behalf of themselves and all class members,

against all Defendants, for violations of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated

thereunder.

719.     During the Class Period, defendants carried out a scheme, plan and course of conduct

that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including

plaintiffs and the Class; (ii) artificially inflate and maintain the market price of Tyco securities; and (iii)

cause plaintiffs and the Class to purchase or otherwise acquire Tyco securities at inflated prices.  In

furtherance of this unlawful scheme, plan, and course of conduct, defendants took the actions set forth

herein.

720.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements made

not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud

and deceit upon the purchasers and/or acquirers of the Company=s stock in an effort to maintain

artificially high market prices for Tyco securities in violation of Section 10(b) of the 1934 Act, 15

U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5.  Defendants are sued

either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons

as alleged below.

721.    In addition to the duties of full disclosure imposed on defendants as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, in compliance with GAAP and the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. ' 210.01 et seq.) and S-K (17 C.F.R. ' 229.10 et seq.) and other SEC regulations, including truthful, complete and accurate information with respect to the Company=s operations and performance so that the market prices of the Company=s publicly traded securities would be based on truthful, complete and accurate information.

722.    Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company=s financial results, businesses, operations, and prospects as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse, non-public information, and engaged in acts, practices, and a course of conduct as alleged herein, in an effort to assure investors of Tyco=s earnings, assets, revenues expenses and the accuracy of the Company=s financial reporting of performance, which included the making of, or the participation in the making of, untrue statements of material facts and omissions to state the material facts necessary in order to make the statements made about the Company=s financial and business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein.

723.    The Individual Defendants= primary liability arise from the following facts: (i) they were high-level executives and directors of the Company during the Class Period and were members of the

Company=s management team; (ii) by virtue of their responsibilities and activities as senior officers of the

Company, they were privy to and participated in the drafting, reviewing, and/or approving the

misleading statements, omissions, releases, reports, and other public representations of and about Tyco,

and/or signed the Company=s public filings with the SEC, which public filings contained the allegedly

materially misleading statements and omissions; (iii) they knew or had access to the material adverse

non-public information about the financial results of Tyco which were not disclosed; and (iv) they were

aware of the Company=s dissemination of information to the investing public which they knew or

recklessly disregarded was materially false and misleading.

724.    Each of the defendants had actual knowledge of the misrepresentations and omissions

of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them.  Defendants=

material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose

and effect of concealing Tyco=s accounting irregularities and the Undisclosed Acquisitions from the

investing public and supporting the artificially inflated price of its securities.  As demonstrated by

defendants= statements throughout the Class Period, if they did not have actual knowledge of the

misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements were

false or misleading.

725.    As a result of the dissemination of the materially false and misleading information and/or

defendants= failure to disclose material facts, as set forth herein, the market price of Tyco securities was

artificially inflated at all times during the Class Period.  In ignorance of the fact that the market price of

Tyco=s publicly-traded securities was artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and the truth of any representations made to appropriate agencies as to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by such defendants during the Class Period, plaintiffs and the Class purchased or otherwise acquired for value Tyco securities during the Class Period at artificially high prices and were damaged thereby.

726.    At the time of such misstatements and omissions, plaintiffs and the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs, the Class and the marketplace known of the true financial condition of the Company, which was not disclosed by defendants, plaintiffs and the Class would not have purchased or otherwise acquired Tyco securities during the Class Period, or, if they had purchased or otherwise acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

727.    By virtue of the foregoing, defendants have violated Section 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

728.    As a direct and proximate result of defendants= wrongful conduct, plaintiffs and the Class suffered damages.

## COUNT II

### VIOLATIONS OF SECTION 14(a) OF THE 1934 ACT AND
### RULE 14a-9 PROMULGATED THEREUNDER
### THE TYCO DEFENDANTS

729.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

730.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

731.    This Count is brought by plaintiffs on behalf of themselves and all class members against the Tyco Defendants with respect to the Proxy Statements issued by Tyco on March 1, 2000, January 29, 2001 and January 28, 2002 (the "Proxy Statements") for violations of Sections 14(a) and Rule 14a-9 promulgated thereunder.

732.    Section 14(a) of the 1934 Act provides that it is unlawful to use the mails or any means or instrumentality of interstate commerce to solicit proxies in contravention of any rule promulgated by the SEC.  15 U.S.C. ' 78n(a).

733.    Rule 14a-9 provides in pertinent part: "No solicitation subject to this regulation shall be made by means of any . . . communication, written or oral, containing any statement which, at the time, and in light of the circumstances under which it is made, is false and misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading. . . ." 17 C.F.R. ' 240.14a-9.

734.    The Tyco Defendants caused to be issued or permitted and acquiesced in or controlled the issuance of the Proxy Statements.

735.    In the Proxy Statements, the Tyco Defendants requested, among other things, that plaintiffs and other Tyco stockholders, among others, vote in person, or by proxy, for reelection of

directors, for an amendment to the Company=s by-laws to allow director remuneration to be set by the Tyco board without shareholder approval, and to reappoint PwC as the Company=s auditors.

736.    The Proxy Statements were materially false and misleading because, as set forth above, they omitted and/or failed to disclose (a) information concerning the falsification of Tyco's financial reporting, reported acquisition costs, and the purported success of its acquisition strategy; and (b) information concerning looting of the Company by its senior executives who were conducting Tyco as a criminal enterprise.

737.    As a result of the foregoing, the Tyco Defendants have violated Section 14(a) of the 1934 Act, 15 U.S.C. ' 78n(a), and Rule 14a-9 promulgated thereunder by the SEC.

738.    As a direct and proximate result of the Tyco Defendants= wrongful conduct, plaintiffs and the Class suffered damages.

## COUNT III

## VIOLATION OF SECTION 20(a) OF THE 1934 ACT
## BY THE INDIVIDUAL DEFENDANTS

739.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

740.    This Count is brought by plaintiffs on behalf of themselves and all class members against the Individual Defendants for violation of Section 20(a) of the 1934 Act.

741.    The Individual Defendants and each of them acted as a controlling person of Tyco within the meaning of Section 20(a) of the 1934 Act, as alleged herein.  By virtue of their executive positions, and/or position on the Company=s Board of Directors, each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company,

including the content and dissemination of the various statements that plaintiffs contend are materially false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company=s internal reports, press releases, public filings, and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

742.    In particular, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, especially by virtue of their senior positions, and exercised the same.

743.    As set forth above, Tyco and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons of Tyco, each of the Individual Defendants is liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of the Individual Defendants= wrongful conduct, plaintiffs and the Class suffered damages.

**COUNT IV**

**VIOLATION OF SECTION 20A OF THE 1934 ACT
BY THE INDIVIDUAL DEFENDANTS**

744.    This Claim is brought against the Individual Defendants by plaintiffs Louisiana Retirement Systems, Plumbers and Pipefitters National Pension Fund, United Association General Officers Pension Plan, United Association Office Employees Pension Plan, United Association Local Union Officers & Employees Pension Fund and Voyageur Asset Management Henry C. Gill, Donald

Kurl; Hans von Bernthal, Neil L. Harvey, Robert and Blanche Mansfield, Robert J. Colozzo, Patricia

M. Snyder on Behalf of Graham Foundation For Advanced Studies In The Fine Arts, Robert W. Allen,

Rose M. Allen, Anne D. Gill, David W. Smith, Leon H. Denison, Lucy Roth, Sedelle Witzel, Robert P.

Beem, Robert Setterland, Virginia Becker, Wilson G. Varcoe & Patricia T. Varcoe.  As set forth in the

chart attached as Exhibit F, each of these plaintiffs purchased Tyco common stock contemporaneously

with sales of Tyco stock by the Individual Defendants.  This Count is also brought on behalf of all class

members who purchased Tyco common stock contemporaneously with sales of Tyco common stock

by an Individual Defendant.

745.    By virtue of their positions as senior insiders of Tyco, the Individual Defendants were in

possession of material, non-public information about the Company at the time of their collective sales of

more than *$836 million* of their own Tyco stock to plaintiffs and members of the Class at artificially

inflated prices.

746.    By virtue of their participation in the scheme to defraud investors described herein, and

their sales of stock while in possession of material, non-public information about the adverse information

detailed herein, Individual Defendants violated the Exchange Act and applicable rules and regulations

thereunder.

747.    Plaintiffs and all other members of the Class who purchased shares of Tyco stock

contemporaneously with the sales of Tyco stock by the Individual Defendants: (1) have suffered

substantial damages in that they paid artificially inflated prices for Tyco stock as a result of the securities

law violations described herein; and (2) would not have purchased Tyco stock at the prices they paid,

or at all, if they had been aware that the market prices had been artificially inflated by defendants= false and misleading statements.

748. The Individual Defendants are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## COUNT V

## VIOLATION OF SECTION 11 OF THE 1933 ACT
## BY ALL OF THE DEFENDANTS

749. This Count is brought on behalf of plaintiffs Plumbers and Pipefitters National Pension Fund, Voyaqeur Asset Management, Inc., Diane Rubenstein and Steve Smith and all class members pursuant to Section 11 of the 1933 Act, 15 U.S.C. ' 77k, against all defendants.

750. This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

751. The following registration statements and prospectuses (the ARegistration Statements/Prospectuses@) were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above:

Form S-8 for the registration of 10,000,000 shares of Tyco common stock, dated December 21, 1999

Form S-4 relating to Tyco=s proposed offer to exchange up to $1,000,000,000 aggregate principal amount of new 6 7/8% notes due 2002 for any and all of its outstanding 6 7/8% notes due 2002 , dated December 21, 1999

Form S-4/A, dated June 26, 2000

325

Prospectus relating to Tyco=s proposed offer to exchange up to $1,000,000,000 aggregate principal amount of new 6 7/8% notes due 2002 for any and all of its outstanding 6 7/8% notes due 2002, dated June 30, 2000

Form S-8 for the registration of 10,000,000 shares of Tyco common stock, dated January 28, 2000

Form S-4 relating to a proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco, dated July 12, 2000

Form S-4/A, dated August 9, 2000

Prospectus relating to the proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco, dated August 11, 2000

Form S-4 relating to Tyco=s proposal to exchange up to Euro 600,000,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6-1/8% Notes due 2007, dated July 24, 2000

Form S-4/A, dated August 3, 2000

Prospectus relating to Tyco=s proposed offer to exchange up to Euro 600,000,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6-1/8% Notes due 2007, dated August 11, 2000

Post-Effective Amendment to the 7/24/00 S-4 and the 8/3/00 S-4/A, dated November 29, 2000

Prospectus relating to the proposed offer by Tyco International Group S.A. to exchange up to (Euro)26,885,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6 1/8% notes due 2007 not heretofore exchanged, dated December 15, 2000

Form S-3 relating to the public offering and sale of 4,703,999 shares of Tyco common stock issuable upon exercise of stock options held by Kozlowski and the KMS Family Partnership L.P., dated August 18, 1999

Prospectus relating to the public offering and sale of 4,703,999 shares of Tyco common stock issuable upon exercise of stock options held by Kozlowski and the KMS Family Partnership L.P., dated September 12, 2000

326

Form S-3 for the registration of up to $2,500,000,000 of any of the following securities either separately or in units: debt securities, preference shares, depositary shares and common shares, dated August 18, 2000

Form S-3 for the registration of $3,500,000,000 in debt securities of Tyco International Group S.A, dated August 18, 2000

Prospectus relating to the registration of $3,500,000,000 in debt securities of Tyco International Group S.A., dated September 18, 2000

Prospectus Supplement to the 9/18/00 Prospectus, dated February 20, 2001

Prospectus Supplement to the 9/18/00 Prospectus, dated June 5, 2001

Prospectus Supplement to the 9/18/00 Prospectus, dated July 26, 2001

Form S-4 relating to a proposed merger between InnerDyne and a subsidiary of Tyco, dated October 18, 2000

Form S-4/A, amending the 10/18/00 S-4, dated October 20, 2000

Form S-4/A, amending its S-4 filed on October 18, 2000 and S-4/A filed on October 20, 2000, dated November 14, 2000

Prospectus Supplement relating to Tyco=s proposed offer of 31,085 common shares relating to a proposed merger between InnerDyne and a Tyco subsidiary, dated March 15, 2001

Form S-8 for the registration of 1,000,000 shares of Tyco common stock relating to the Investment Plan for Employees of Mallinckrodt Inc., dated October 23, 2000

Form S-3 for the registration of 2,180,010 shares of Tyco common stock relating to Tyco=s October 26, 2000 acquisition of CIGI Investment Group, Inc., dated November 9, 2000

Form S-3/A, amending the 11/9/00 S-3, dated November 30, 2000

Prospectus in connection with the registration of 2,180,010 shares of Tyco common stock relating to Tyco=s October 26, 2000 acquisition of CIGI Investment Group, Inc., dated December 8, 2000

Form S-3 for the registration of $4,657,500,000 in Liquid Yield Option Notes due 2020, dated December 8, 2000

Form S-3/A, amending the 12/8/00 S-3, dated December 15, 2000

Prospectus relating to the registration of $4,657,500,000 in Liquid Yield Option Notes due 2020, dated December 19, 2000

Form S-8 for the registration of 200,000 shares of Tyco common stock, dated January 31, 2001

Form S-4 relating to Tyco=s proposed offer to issue 9,415,481 shares of Tyco stock upon consummation of the merger with Scott Technologies, Inc., dated February 23, 2001

Form S-4/A and a Prospectus relating to the proposed merger between Scott Technologies, Inc. and Tyco, dated March 30, 2001

Form S-3 related to the February 12, 2001 issuance of $3,035,000,000 of Zero Coupon Convertible Debentures due February 12, 2021, dated March 16, 2001

Prospectus related to the February 12, 2001 issuance of the Zero Coupon Convertible Debentures, dated April 3, 2001

Form S-4 relating to a proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), a direct wholly-owned subsidiary of Tyco, dated March 29, 2001

Amendment No. 1 to Form S-4, dated April 13, 2001

Prospectus relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), dated April 24, 2001

Post-Effective Amendment No. 1 to Form S-4 relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), dated May 24, 2001

Prospectus relating to Tyco=s proposed offer to exchange up to 7,141,083 common shares of Tyco stock for exchangeable shares of Tyco=s direct subsidiary, CIT Exchangeco, Inc., dated June 5, 2001

Form S-8 in connection with the issuance of securities to The CIT Group, Inc. Savings Incentive Plan, relating to the proposed merger between The CIT Group, Inc. and Tyco, dated June 7, 2001

Form S-4/A, amending the 6/15/01 S-4, dated July 2, 2001

Form S-3 relating to the registration of $300,000,000 of debt securities of a Tyco subsidiary, dated July 24, 2001

Form S-4 relating to a proposed merger between Sensormatic Electronics Corporation and a subsidiary of Tyco, dated August 24, 2001

Form S-4/A, amending the 8/24/01 S-4, dated September 13, 2001

Prospectus with the SEC relating to the offer of Tyco Acquisition Corp. XXIV (NV), a wholly-owned subsidiary of Tyco, to exchange common shares of Tyco for each outstanding share of common stock of Sensormatic Electronics Corporation, dated September 25, 2001

Form S-3 for the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities, dated August 28, 2001

Prospectus in connection with the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities, dated August 31, 2001

Prospectus Supplement to the 8/31/01 Prospectus, dated October 25, 2001

Form S-4 relating to a proposed amalgamation agreement between TyCom and a subsidiary of Tyco wherein TyCom would become a wholly-owned subsidiary of Tyco, dated October 23, 2001

Form S-4/A, amending the 10/23/01 S-4, dated November 9, 2001

Prospectus relating to the amalgamation agreement between TyCom and a subsidiary of Tyco, dated November 13, 2001

Form S-4 relating to a proposed merger between McGrath RentCorp. and Tyco, dated January 8, 2002

Form S-4/A relating to a proposed merger between McGrath RentCorp and Tyco, dated May 22, 2002

752.    The Company is the registrant for these offerings.  Defendants named herein signed and/or were otherwise responsible for the contents and dissemination of the Registration Statements/Prospectuses.

329

753.    PwC consented to the inclusion of its audit reports in the Registration Statements/Prospectuses, and to being named therein as an expert.

754.    As issuer of the shares, Tyco is strictly liable to plaintiffs and the Class for the misstatements and omissions.

755.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements/Prospectuses were true and without omissions of any material facts and were not misleading.

756.    Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the plaintiffs that were contained in the Registration Statements/Prospectuses, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the 1933 Act.

757.    Plaintiffs Plumbers and Pipefitters National Pension Fund, Voyageur Asset Management, Inc., Diane Rubenstein and Steve Smith and the Class acquired Tyco shares issued pursuant to, or traceable to, and in reliance on, the Registration Statements/Prospectuses.

758.    Plaintiffs and the Class have sustained damages.  The value of Tyco shares has declined substantially subsequent to and due to defendants= violations.

759.    At the time they acquired Tyco shares, plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered such facts or wrongful conduct.  Less than one year elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiffs filed their

Complaint.  Less than three years elapsed from the time that the securities upon which this Count is

brought were *bona fide* offered to the public to the time plaintiffs filed their Complaint.

## COUNT VI

## VIOLATION OF SECTION 12(a)(2) OF THE 1933 ACT
## BY THE TYCO DEFENDANTS

760.    This Count is brought on behalf of plaintiffs Plumbers and Pipefitters National Pension

Fund, Voyageur Asset Management, Inc., Diane Rubenstein and Steve Smith and all class members

pursuant to Section 12(a)(2) of the 1933 Act against the Tyco Defendants.

761.    This Count does not sound in fraud.  All of the preceding allegations of fraud or

fraudulent conduct and/or motive are specifically excluded from this Count.

762.    The Tyco Defendants were sellers, offerors, and/or solicitors of sales of the shares

offered pursuant to the Registration Statements/Prospectuses.

763.    The Registration Statements/Prospectuses contained untrue statements of material facts,

omitted to state other facts necessary to make the statements made not misleading, and concealed and

failed to disclose material facts.  The Tyco Defendants= actions of solicitation included participating in

the preparation of the materially false and misleading Registration Statements/Prospectuses.

764.    The Tyco Defendants owed to plaintiffs the duty to make a reasonable and diligent

investigation of the statements contained in the Registration Statements/Prospectuses to insure that such

statements were true and that there was no omission to state a material fact required to be stated in

order to make the statements contained therein not misleading.  The Tyco Defendants knew of, or in the

exercise of reasonable care should have known of, the misstatements and omissions contained in the Registration Statements/Prospectuses as set forth above.

765.     Plaintiffs Plumbers and Pipefitters National Pension Fund, Voyageur Asset Management, Inc., Diane Rubenstein and Steve Smith and the class purchased or otherwise acquired Tyco shares pursuant to or traceable to the defective Registration Statements/Prospectuses.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statements/Prospectuses.

766.     Plaintiffs and the class offer to tender to the Tyco Defendants those Tyco securities that plaintiffs continue to own in return for the consideration paid for those securities together with interest thereon.

767.     By reason of the conduct alleged herein, the Tyco Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the 1933 Act.  Accordingly, plaintiffs who hold Tyco shares purchased or acquired pursuant or traceable to Registration Statements/Prospectuses have the right to rescind and recover the consideration paid for their Tyco shares and, hereby elect to rescind and tender their Tyco shares to the Tyco Defendants sued herein.  Plaintiffs and Class members who have sold their Tyco shares are entitled to rescissory damages.

768.     Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action.  Less than one year elapsed from the time when plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

**COUNT VII**

332

## VIOLATION OF SECTION 15 OF THE 1933 ACT
## BY THE INDIVIDUAL DEFENDANTS

769.     This Count is brought by plaintiffs Plumbers and Pipefitters National Pension Fund,

Voyageur Asset Management, Inc., Diane Rubenstein and Steve Smith pursuant to Section 15 of the

1933 Act against the Individual Defendants.

770.     This Count does not sound in fraud.  All of the preceding allegations of fraud or

fraudulent conduct and/or motive are specifically excluded from this Count.

771.     Each of the Individual Defendants was a control person of Tyco by virtue of their

positions as directors and/or as senior officers of Tyco.  The Individual Defendants each had a series of

direct and/or indirect business and/or personal relationships with other directors and/or major

shareholders of Tyco.

772.     Each of the Individual Defendants was a culpable participant in the violations of

Sections 11 and 12(a)(2) of the 1933 Act alleged in Counts V and VI above, based on their having

signed or participated in the preparation and/or dissemination of the Registration

Statements/Prospectuses or having otherwise participated in the process that allowed the offerings to be

successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment:

A.     determining that the instant action is a proper class action maintainable under Rule 23 of

the Federal Rules of Civil Procedure;

B.      awarding compensatory damages and/or recission as appropriate against defendants and each of them, in favor of plaintiffs and all Class Members for damages sustained as a result of defendants= wrongdoing;

C.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including but not limited to disgorgement);

D.      awarding plaintiffs and all Class Members their costs and disbursements of this suit, including reasonable attorneys= fees, accountants= fees and experts= fees; and

E.      awarding such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: January 28, 2003                       Respectfully submitted,

                                              ORR & RENO, P.A.

                                              _____
                                              William L. Chapman
                                              N.H. Bar No. 397
                                              One Eagle Square, P.O. Box 3550
                                              Concord, NH 03302-3550
                                              Telephone:  (603) 224-2381
                                              Fax: (603) 224-2318

                                              *Local Counsel for the Securities Action*
                                              *Plaintiffs*

OF COUNSEL:

Jay W. Eisenhofer
Megan D. McIntyre
Sidney S. Liebesman
GRANT & EISENHOFER, P.A.
1201 North Market Street, Suite 2100
Wilmington, DE  19801-1165

334

Telephone:  (302) 622-7000

Paul D. Young
Mark T. Millkey
Brian C. Kerr
MILBERG WEISS BERSHAD HYNES & LERACH LLP
One Pennsylvania Plaza
New York, NY  10119
Telephone:  (212) 594-5300

Richard S. Schiffrin
Katharine M. Ryan
Michael K. Yarnoff
SCHIFFRIN & BARROWAY, LLP
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA  19004
Telephone:  (610) 667-7706

*Co-Lead Counsel for the Securities Action Plaintiffs*